**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| DONALD J. TRUMP, the Forty-Fifth President of the United States, LINDA CUADROS AND AMERICAN CONSERVATIVE UNION, INDIVIDUALLY AND ON BEHALF OF THE CLASS, <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC., and JACK DORSEY, <br><br> Defendants. | **CLASS ACTION COMPLAINT FOR:** <br><br> **FIRST AMENDMENT VIOLATION** <br><br> **JURY TRIAL REQUESTED** |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.      Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States, individually, and on behalf of those similarly situated Putative Class Members, by and through the undersigned counsel, brings this action against Twitter, Inc., ("Twitter") and its Chief Executive Officer, Jack Dorsey, individually. The allegations herein of Plaintiff and Putative Class Members are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and upon information and belief as to all other matters.

2.      Defendant Twitter is a social media platform with more than three hundred fifty (350) million active Users worldwide, including approximately seventy (70) million daily active

Users in the United States. Since 2018, approximately 500 million tweets are sent out, or "tweeted," each day. Twitter reported $3.72 billion in annual profit in 2020.

3.      Twitter has increasingly engaged in impermissible censorship resulting from threatened legislative action, a misguided reliance upon Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and willful participation in joint activity with federal actors. Defendant Twitter's status thus rises beyond that of a private company to that of a state actor, and as such, Defendant is constrained by the First Amendment right to free speech in the censorship decisions it makes.

4.      Legislation passed twenty-five (25) years ago intended to protect minors from the transmission of obscene materials on the Internet, and to promote the growth and development of social media companies, has enabled Defendant Twitter to grow into a commercial giant that now censors (flags, shadow bans, etc.) and otherwise restricts with impunity the constitutionally protected free speech of the Plaintiff and Putative Class Members.

5.      The immediacy of Defendants' threat to its Users' and potentially every citizen's right to free speech cannot be overstated. Defendants' callous disregard of its Users' constitutional rights is no better exemplified than in the matter currently before the Court.

6.      On January 7, 2021, Defendants permanently banned the sitting President of the United States from their platform for exercising his constitutional right of free speech.

7.      Twitter's censorship runs rampant against the entire Class, and the result is a chilling effect on our Nation's pressing political, medical, social, and cultural discussions.

8.      Plaintiff, a sitting President of the United States, was deplatformed by the Defendants, as were Putative Class Members, using non-existent, broad, vague, and ever-shifting standards. While Twitter's deplatforming and prior restraint of the Plaintiff are well-documented, the untold stories of Putative Class Members are now stirring the public conscience.

9.      Using the unconstitutional authority delegated to them by Congress, Defendants have mounted an aggressive campaign of prior restraint against a multitude of Putative Class Members through censorship (flagging, shadow banning, etc.) resulting from legislative coercion and collusion with federal actors.

10.      Defendants deplatformed Plaintiff at the behest of, with cooperation from, and with the approval of, Democrat lawmakers.

11.      Akin to forcing a round peg into a square hole, Twitter declared that specific Twitter posts of Plaintiff had violated its self-composed "Twitter Rules." Countless other Twitter Users have not been as fortunate, with Twitter taking detrimental action against their accounts with no explanation whatsoever.

12.      If Defendants' use of an unconstitutional delegation of authority to regulate free speech under pressure from Congress can effectively censor and impose a prior restraint on the protected political speech of a sitting President of the United States, then the threat to Putative Class Members, our citizens, and our United States Constitution and form of government, is imminent, severe, and irreparable.

13.      Plaintiff respectfully asks this Court to declare that Section 230 on its face is an unconstitutional delegation of authority and that the Defendants' actions directed at Plaintiff and Putative Class Members are a prior restraint on their First Amendment right to free speech, to order the Defendants to restore the Twitter account of Plaintiff, as well as those deplatformed Putative Class Members, and to prohibit Defendants from exercising censorship, editorial control, or prior restraint in its many forms over the posts of President Trump and Putative Class Members.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1332, 28 U.S.C. §§ 2201-2202, and the Constitution of the United States, for the unconstitutional violation of the First Amendment right to free speech as pleaded below.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

16.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), because: (i) the proposed class consists of well over 1,000,000 Members; (ii) the parties are minimally diverse, as Members of the proposed class, including Plaintiff, are citizens of states different from defendants' home states; and (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), (d), and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and Plaintiff brings this suit for actions taken by Defendants that occurred while Plaintiff was serving in his capacity as President of the United States, and Defendants' prior restraint of Plaintiff's speech continues to this day.

## PARTIES

### Plaintiff

18.     Donald J. Trump ("Plaintiff"), the 45th President of the United States, is a private citizen and is domiciled in Palm Beach, Florida.

**Class**

19.     All Twitter platform Users ("Putative Class Members") who have resided in the United States between June 1, 2018, through today, who had their Twitter account censored by Defendants and were damaged thereby.

20.     Linda Cuadros ("Plaintiff"), a United States citizen, domiciled in the state of Florida.

21.     Plaintiff American Conservative Union ("Plaintiff"), is a social welfare organization in the United States, established in 1964 in the District of Columbia.

**Defendants**

22.     Defendant Twitter, Inc. ("Twitter), is a foreign corporation with its principal place of business located at 1355 Market Street, Suite 900, San Francisco, California, and conducts business in the state of Florida. Throughout the United States and internationally, Twitter has eleven (11) offices in the United States and twenty-one (21) offices located worldwide.

23.     Defendant Jack Dorsey ("Dorsey") is the co-founder and CEO of Twitter.


**STATEMENT OF FACTS**

I.     **DEFENDANTS TWITTER AND DORSEY**

  A.  **Defendant Twitter**

24.     The United States Supreme Court has recognized that social media platforms such as Twitter provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017). These platforms have been revolution[ary]," not least because they have transformed civic engagement by allowing elected officials to communicate instantaneously and directly with their constituents. *Id.* Twitter enables ordinary citizens to speak directly to public officials and listen to and debate

others about public issues, in much the same way they could if gathered on a sidewalk or in a public park or city council meeting or town hall.

25.    On March 21, 2006, Jack Dorsey, Biz Stone, and Evan Williams launched Twitter. By July 15, 2006, Twitter's microblogging service was officially available to the public. Twitter is a social networking service that allows its Users to post and interact with each other through short messages known as "tweets."

26.    Since the birth of Twitter, the platform has grown immensely. In November 2008, one (1) billion tweets were generated. In October 2009, five (5) billion tweets were generated. In March 2011, one (1) billion tweets were generated every week. As of January 25, 2021, Twitter reached a User base of one hundred and ninety-two (192) million Users who post over five hundred (500) million tweets every day.

27.    In *Biden v. Knight* 141 S. Ct. 1220 (2021), the Supreme Court discussed the Second Circuit's decision in K*night First Amendment Inst. at Columbia Univ. v. Trump*, No. 18-1691, holding that Plaintiff's threads on Twitter from his personal account were, in fact, official presidential statements made in a "public forum."

28.    Likewise, President Trump would discuss government activity on Twitter in his official capacity as President of the United States with any User who chose to follow him, except for seven (7) Plaintiffs in the Knight case, *supra*., and with the public at large.

29.    Twitter is a social networking service that allows its Users to post and interact with each other through short messages known as "tweets."

30.    Speech posted on Twitter ranges from observations on everyday life to the most important news events of the day, including political speech.  Users' tweets are freely available to anyone connected with the Internet.

31.     A Twitter "User" is an individual who has created an account on the Twitter platform. A User can post "tweets," up to 280 characters in length, to a webpage on Twitter that is attached to the User's account.

32.     A "tweet" comprises the tweeted content (i.e., the message, including any embedded photograph, video, or link), the User's account name (with a link to the User's Twitter webpage), the User's profile picture, the date and time the tweet was generated, and the number of times the tweet has been replied to, retweeted by, or liked by other Users.

33.     Twitter webpages and their associated timelines are visible to everyone with Internet access, including those who are not Twitter Users. Twitter Users can subscribe to other Users' messages by "following" those Users' accounts. Beyond publishing tweets to their followers, Twitter Users can engage with one another in a variety of ways. For example, they can "retweet"—i.e., republish—the tweets of other Users, either by publishing them directly to their own followers or by "quoting" them in their own tweets. The reply will also appear on the original User's feed in a "comment thread" under the tweet that prompted the reply. Other Users' replies to the same tweet will appear in the same comment thread.

34.     Twitter's platform has been the catalyst for social movements across the globe, allowing Users to connect and collectively organize. In the world of American politics, Twitter is used by elected officials to make policy announcements, for those with political aspirations to announce they are running for office, and by political supporters to express their support or disapproval of politicians and major political figures, including President Trump.

35.     Today, Twitter is a social media platform with more than 350 million active Users worldwide, including some 70 million in the United States.

36.      Twitter's Terms of Service ("TOS") is comprised of its Privacy Policy, the Twitter Rules and Policies, and all other incorporated policies of Twitter. The Twitter TOS,

User Agreement, and Privacy Policies span seventy-six (76) pages. In addition, Twitter's Rules and Policies contains sixty-five (65) hyperlinks to topics incorporated into the User Agreement. Understanding the confusing TOS requires a continuous cross-reference to other sections and previously defined terms. Twitter further reserves the right to change its TOS from time to time and states that it "will try to notify" Users of any changes in its TOS. By using Twitter after it has changed its TOS, even without notification, a User is bound by those terms.

37. Twitter has in its TOS what it refers to as its "Twitter Rules," which Twitter claims outline its standards regarding the content you can post to Twitter and other Twitter products."

38. The "Twitter Rules" guidelines regarding hate speech, incitement, or praise of violence are vague, broad, ill-defined, or not defined at all.

39. "The Rules" on Twitter state:

Violence: "You may not threaten violence against an individual or a group of people. We also prohibit the glorification of violence."

Violent Threats: "We prohibit content that makes violent threats against an identifiable target. Violent threats are declarative statements of intent to inflict injuries that would result in serious and lasting bodily harm."

Incitement against protected categories: "We prohibit inciting behavior that targets individuals or groups of people belonging to protected categories."

**B. Defendant Jack Dorsey**

40. Defendant Jack Dorsey is a co-founder of Twitter, Inc., and at all times relevant hereto has served as Twitter's Chairman, Chief Executive Officer, and controlling shareholder. He resides in the Northern District of California and is a "person" who may be sued under 18 U.S.C. § 1961(3).

**II. PRESIDENT TRUMP'S USE OF TWITTER'S PLATFORM**

**A. The Donald J. Trump Twitter account (@realDonaldTrump)**

41.     Plaintiff established his Twitter account in May of 2009 and used the account for several years to engage with his followers about politics, celebrities, golf, and his business interests, among other topics. After he announced his campaign for the presidential nomination of the Republican Party, Plaintiff used his Twitter account to speak directly to his followers and to the public at large. By using social media, including Twitter, Plaintiff strategically circumvented what he saw as a mainstream media that was biased against him.

42.     After his inauguration in January of 2017, Plaintiff's Twitter account became an instrument of his presidency. Plaintiff's tweets became an important source of news and information about the government, as did his followers' tweets associated with Plaintiff's posts. Plaintiff's account became a public forum for speech by, to, and about government policy.

43.     When Plaintiff utilized his Twitter account in his official capacity as President: (a) it became an important outlet for news organizations and the U.S. government; and (b) his Twitter account operated as a public forum, serving a public forum, serving a public function.

44.     The comments generated by Plaintiff's tweets also gave rise to important public discussion and debate about government policy. Typically, his posts from Plaintiff would generate thousands of replies posted by other Users, some of which would generate hundreds or thousands of replies in turn. Plaintiff's account was a digital town hall in which Plaintiff communicated news and information to the public directly. Members of the public used the reply function to respond directly to Plaintiff and his office and would retweet to exchange views with one another.

45.     Plaintiff used his Twitter account and other social media platforms to communicate directly with the American people more than any other President in U.S. history.

46.     Plaintiff used his Twitter account to interact on a myriad of subjects with the public at large. Supporters and critics alike were welcome on the President's Twitter page, with the exception of the seven (7) Plaintiffs in the <u>Knight</u> case.

47.     The Putative Class Members used their Twitter accounts in a similar fashion. They created their accounts to share information, opinions, pictures, videos, and news with their networks ranging from friends and family to larger public audiences.

### III. DEMOCRAT LEGISLATORS COERCED DEFENDANTS TO CENSOR THE PLAINTIFF AND PUTATIVE CLASS MEMBERS

48.     Democrat legislators in Congress feared Plaintiff's skilled use of social media as a threat to their own re-election efforts. These legislators exerted overt coercion, using both words and actions, to direct Defendants to censor the views and content which Democrat Members of Congress disagreed with, of both Plaintiff and Putative Class Members.

49.     Not only did Democrat legislators openly voice their displeasure with Defendants for providing a platform to Plaintiff and Putative Class Members, but they also spoke publicly of the steps they would take against Defendants if Defendants continued to provide a platform for the expression of views and content contrary to the legislators' own agendas.

50.     Legislators (and in multiple instances, the current Vice President of the United States, Kamala Harris, and the former First Lady of the United States, Michelle Obama) made it increasingly clear that they wanted President Trump, and the views he espoused, to be banned from Defendants' platform.

51.     With Defendants shielded from liability for engaging in censorship by Section 230, the Democrat legislators then wielded that immunity, combined with threats to revoke that immunity or to otherwise regulate Defendants, to use Defendants as a tool to effect censorship

and viewpoint discrimination against Plaintiff and the Putative Class Members that the Democrat legislators knew they could not accomplish on their own.

52. Below are just some examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if Twitter did not censor views and content with which these Members of Congress disagreed, including the views and content of Plaintiff and the Putative Class Members:

- "Look, let's be honest, @realDonaldTrump's Twitter account should be suspended." (Vice President of the United States, Kamala Harris, September 30, 2019);

- "But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed." (Rep. Nancy Pelosi, Speaker of the House, April 12, 2019);

- "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Dorsey and other platforms." (Joe Biden/Interview in December of 2019 and published January 2020);

- "We can and should have a conversation about Section 230. – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight." (Statement of US Sen. Mark Warner on Section 230 Hearing on October 28, 2020.);

- "It's long past time to hold the social media companies accountable for what's published on their platforms." (Bruce Reed, Biden's Top Tech Advisor/December 2, 2020);

- @jack (Jack Dorsey) Time to do something about this Tweet. (Sen. Kamala Harris' Tweet, October 2, 2019)

- 2020 Presidential candidate Sen. Kamala Harris calls on Twitter to suspend President Trump's account – ABC News (go.com) 10/2/2019;

- If the president goes on Facebook and encourages violence, that you will make sure your company's algorithms don't spread that content and you will immediately remove those messages? (Sen. Markey October 23, 2020 (Dorsey Senate Testimony));

- "Senator, yes. Incitement of violence is against our policy and there are not exceptions to that, including for politicians." (Mark Zuckerberg response, (November 17, 2020 Mark Zuckerberg and Jack Dorsey, Senate Tech Hearing);

- "Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media. The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters… Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age." (Sen. Blumenthal (13:35) October 23, 2020: Tech CEO's Senate Testimony);

- I have urged, in fact, a breakup of tech giants because they've misused their bigness and power. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court. (Sen. Blumenthal (14:48) October 23, 2020: Tech CEO's Senate Testimony);

- "Now is the time for Silicon Valley companies to stop enabling this monstrous behavior and go even further than they have already by permanently banning this man (Trump) from their platforms. (Michelle Obama on Twitter, January 7, 2021);

- "The law (230) acts as a shield allowing them (Internet platforms) to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." (Sen. Mazie Hirono's Tweet, February 5, 2021);

- "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. Industry self-regulation has failed. We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation." (March 2021 Joint Hearing of the Communications and Technology Subcommittee, statement issued by Democrat Chairman);

- "There's no Constitutional protection for using social media to incite an insurrection. Trump is willing to do anything for himself no matter the danger to our country. His big lies have cost America dearly. And until he stops, Twitter must ban him. Which is to say, forever." (Rep. Adam Schiff's Tweet, May 5, 2021).

53. Democrat legislators not only voiced their threats (e.g., new regulations and removing Section 230 immunity) to social media platforms, but they also employed additional measures to deliver their unmistakable message that they were prepared to act against the social media platforms if Defendants did not increase their censorship of disfavored views and content of Plaintiff and Putative Class Members.

54.     These additional measures included convening public hearings, issuing subpoenas, dragging in the CEOs of the largest social media companies to testify publicly before Congress, and subjecting these CEOs to lengthy, embarrassing questioning.

55.     Some specific examples of when these coercive measures were extended on Defendants:

> On July 29, 2020, Four Big Tech CEOs testified before the House in an antitrust hearing. Amazon Founder and CEO Jeff Bezos, Facebook Founder and CEO Mark Zuckerberg, Apple CEO Tim Cook, and Alphabet and Google CEO Sundar Pichai defended their companies against accusations of anticompetitive practices. (Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | U.S. House of Representatives Judiciary Committee); and

> On October 23, 2020, Mark Zuckerberg Testimony Transcript: Zuckerberg Testifies on Facebook Cryptocurrency Libra and Is Confronted on Child Exploitation on Facebook. (Zuckerberg Testifies on Facebook Cryptocurrency Libra | October 23, 2019); and

> On November 17, 2020, Facebook CEO Mark Zuckerberg and Dorsey testified before the Senate Judiciary Committee on November 17. They were questioned on speech moderation policies. (Censorship, Suppression, and the 2020 Election | Hearings | November 17, 2020); and

> On March 25, 2021, Facebook's Mark Zuckerberg, Dorsey, and Google's Sundar Pichai appeared virtually before the House Energy and Commerce Committee. (House Hearing on Combating Online Misinformation and Disinformation | March 25, 2021); and

56.     With this coercion directed at Defendants by repeatedly requiring their appearance at hearings, and reinforcing their potential to impose regulations, and strip them of 230 immunity, Democrat legislators were intended to force Defendants into permanently banning Plaintiff's access to his Twitter account, his followers, and the public at large. The ancillary benefit was to deny the public access to Plaintiff's content and views.

57.     The message conveyed by Democrat legislators to Defendants was clear: use the authority of Section 230 to ban Plaintiff and those Putative Class Members who posted content and views contrary to these legislators' preferred points of view or lose the competitive protections of Section 230 and tens of billions of dollars of market share altogether.

58.     The legislators who pressured Defendants to censor Plaintiff and Putative Class Members who supported his views employed social media themselves extensively to communicate with their own constituents, promote their accomplishments in office, and fundraise and campaign.

59.     With Plaintiff removed from Twitter, it is considerably more difficult for Plaintiff to act as head of the Republican Party, campaign for Republican candidates, fundraise, and lay the groundwork for his own potential campaign for the 2024 Republican Party nomination for President of the United States.

60.     Likewise, with Plaintiff now removed from Twitter and other social media platforms, it has ended balanced, direct public discussions between competing political views on national and local issues.

61.     By banning Plaintiff, Defendants have made it more difficult to communicate directly with the American public. Our national discourse is becoming immeasurably more altered and one-sided on race, medicine, the election process, the economy, immigration, etc.

### IV. LEGISLATION SIGNIFICANTLY ENCOURAGED DEFENDANTS' CENSORSHIP OF PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

62.     Twitter is currently one of the largest of the social media platforms. Its growth, and very existence, have been directly authorized by Congressional legislation.

63.     In 1996, Congress passed the Communications Decency Act of 1996, which amended the Telecommunications Act of 1934 with Section 230(c), intending to promote the growth and development of social media platforms, as well as to protect against the transmission of obscene materials over the Internet to children.

64.     It is Congressional legislation commonly referred to as simply Section 230, or the "Good Samaritan" protection, that Twitter relied on to constrain otherwise constitutionally permissible free speech of Plaintiff and the Putative Class Members.

65.     Section 230(c) provides:

(1).   TREATMENT OF PUBLISHER OR SPEAKER
No provider or User of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2).   CIVIL LIABILITY
No provider or User of an interactive computer service shall be held liable on account of—

      A.  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or User considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

      B.  any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

66.     Section 230(c) has accomplished and exceeded its original purpose in terms of promoting the growth and development of social media platforms.

67.     According to Twitter's latest released figures from the fourth quarter of 2020, the platform boasts one hundred ninety -two (192) million daily active Users. Fifty-five (55) million of Twitter's daily active Users are in the U.S. Since 2018, approximately 500 million tweets are sent out or "tweeted" each day. Twitter reported $3.72 Billion in annual profit in 2020.

68.     However, in terms of addressing the transmission of obscene materials over the Internet, Twitter has failed.

69.     Allegations that Twitter is allowing for the exploitation of children on its platform continue to mount. Twitter has been cited for knowingly violating several obscenity and sex trafficking laws. Twitter is not only promoting child exploitation in the United States, but is allegedly doing so globally.

70.     As discussed in the Harvard Journal of Law & Public Policy, Leary, Mary Graw,

*The Indecency and Injustice of Section 230 of the Communications Decency Act, Vol. 41, No. 2,*

pg. 564, 565 (2018):

> Congress expressly stated that th[is] is the policy of the United States 'to ensure vigorous
> enforcement of Federal criminal laws to deter and punish trafficking in obscenity,
> stalking, and harassment by means of computer.'  That said, Congress appeared to
> recognize that unlimited tort-based lawsuits would threaten the then-fragile Internet and
> the 'freedom of speech in the new and burgeoning Internet medium.'
> Although these two goals required some balancing, it was clear from the text and
> legislative history of § 230 that it was never intended to provide a form of absolute
> immunity for any and all actions taken by interactive computer services.  Section 230 is
> not 'a general prohibition of civil liability for web-site operators and other content hosts.'
> Rather, Congress sought to provide limited protections for limited actions.

71.     In passing 230 (c), Congress permits, but does not mandate, action be taken by

social media platforms.

- Section 230(c) permits Twitter to take down or block speech deemed
"objectionable… whether or not such material is constitutionally protected."

- Section 230(c) also pre-empts all conflicting state laws, preventing such censorship
from being "made illegal… by any provisions of the laws of a State."

72.      In relying on the permissive language of Section 230 and statements and actions

of Democrat legislators, those legislators made it clear that they had a "strong preference" for the

censoring of the views and content of the Plaintiff and Putative Class Members regarding, for

example:

- COVID-19 "misinformation," including the lack of safety and efficacy of
hydroxychloroquine and the use of face masks.

- COVID-19 originated in the Wuhan province of China and was a transmission
from scientists in a government.

- Questioning the integrity and results of the 2020 Presidential election.

73. Neither Plaintiff nor Putative Class Members were free to decline the speech restrictions imposed by Twitter in its TOS if they wished to use the Twitter platform. Use of its platform was expressly conditioned on agreeing to these restrictions, or User access was denied.

74. Federal actors are also sharing the fruits of Twitter censorship of Plaintiff and Members of the Class. These benefits include:

- The Center for Disease Control (CDC) and the White House have used Defendants to inexpensively and effectively promote their directives, messages, and policies concerning COVID-19, and to suppress contradictory medical views and content;

- Suppression of information suggesting or showing flaws in CDC and/or other federal governmental policy;

- Increasing the number of visitors to the CDC's website;

- Boosting the CDC's highly questionable reputation as reliable and authoritative in its factual and policy determinations;

- Creating a false impression of unequivocal support in the scientific community for the CDC and other governmental directives;

- And suppression of opinions and information that might lead people to take actions contrary to the government's preferences.

75. Democrat legislators coerced Twitter to censor the views and content of Plaintiff, and Putative Class Members that COVID-19 originated in China was attributable to person-to-person transmissions from workers in a laboratory in Wuhan.

76. Democrat legislators coerced Twitter to suppress the views and content of Plaintiff and Putative Class Members questioning the integrity and results of the 2020 Presidential election.

Rep. David Cicilline (D-RI), chair of the House antitrust subcommittee, called for the Defendants to step in against Trump for "posting lies and misinformation at a breathtaking clip," stating "it is a threat to our democracy and should be suspended until all the votes are counted." (www.politico.com)

Rep. Gerry Connolly (D-VA) urged the Defendants to "suspend his account," adding that he believed President Trump was spreading "pure disinformation." (www.politico.com)

## V. DEFENDANTS' WILLFUL PARTICIPATION IN JOINT ACTIVITY WITH FEDERAL ACTORS TO CENSOR PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

77.     The CDC has publicly stated that it works with "social media partners," including Twitter, to "curb the spread of vaccine misinformation."  In a document dated October 11, 2019, the CDC expressly stated that it was "engaging . . . partners" to "contain the spread of [vaccine] misinformation" and specifically states that the CDC would "work with social media companies" to that end.

78.     Twitter is among the social media "partners" referred to by the CDC.



79.     Dorsey and Twitter acted to censor other medical opinions that did not uphold that narrative of Dr. Fauci and the CDC, which took on both a political and medical nature, given the interconnection between government policy and pending and science.

80.     On January 20, 2020, Twitter released a statement on its website entitled, "Helping the world find credible information about novel #coronavirus."  The statement explained Twitter's censorship policy, "As ever, those who engage in these practices will be removed from our service. We do not permit platform manipulation, and we encourage people to think before sharing or engaging in deliberate attempts to undermine the public conversation." (Twitter Blog - Authoritative Information About Novel Coronavirus)

81.     The company announced that it would prevent automated search results that are "likely to direct individuals to non-credible content" and, instead, use search to direct Users to authoritative information from organizations like the <u>Centers for Disease Control and Prevention</u> (CDC). See Below.

> Dr. Anthony Fauci, the director of the National Institute of Allergy and Infectious Diseases (NIAID), had previously disputed that the virus was made in a lab. On February 21, 2020, Fauci asked a Deputy Director at NIAID to "Please handle" an email Fauci received by a group of doctors and scientists, including a virologist, that opined that "we think there is a possibility that the virus was released from a lab in Wuhan (sic)." Whatever Fauci meant by "Please handle," Twitter's actions corresponded to censor those like Yen, who had information that contradicted Fauci's narrative.

> In February 2020, Twitter <u>permanently suspended Harry Chen Ph.D</u>. after he reported about the coronavirus directly from Wuhan.  His Twitter account was @IsChinar (Harry Chen Ph.D.).  Reporter Stephania Becker broke the news about this development, saying that the suspension came after the User "spent weeks posting insider video from Wuhan about coronavirus & rampant abuses by CCP (Chinese Communist Party)."

> Twitter suspended the account of Li-Meng Yan, a Chinese virologist and former researcher at the Hong Kong School of Public Health who has publicly claimed that the novel coronavirus was developed in a Wuhan laboratory. She said the virus was "man-made" and "not from nature."

> Her account was taken down in September of 2020 after she accused China of intentionally manufacturing and releasing COVID-19. The Twitter message on her page read: "Account suspended. Twitter suspends accounts which violate the Twitter Rules."

82.     Twitter's censorship (i.e., flagging, shadow banning, etc.) of Users who engaged in speech with a different opinion regarding the COVID-19 vaccination than Twitter advanced for Dr. Fauci and the CDC, irrespective of the credentials of those posting said different opinions, was a closely coordinated interaction between Defendants and a specific government actor (Dr. Fauci) and government agency (CDC) to constrain free speech.

83.     When Twitter states or implies that Users who espouse a different narrative regarding the safety and efficacy of the vaccination are spreading "false" information, it is an act

of bad faith. It is necessary in society for people to have a robust exchange of ideas, yet Dorsey and Twitter have worked closely with government actors to silence any opposing views.

84.    Before, during, and after the 2020 Presidential election, Plaintiff's Twitter account was censored multiple times, as were Putative Class Members for the views they expressed or content they shared on Twitter.



Around 1 a.m. on Wednesday, the @TwitterSafety account posted a notice that it had labeled the president's tweets as misleading under its civic integrity policy.

"Some or all of the content shared in this tweet is disputed and might be misleading about an election or other civic process," the notice said.



85.    Another example of Defendants working directly with government actors to censor free speech was when Plaintiff and Putative Class Members supported the view that hydroxychloroquine might be an effective, preventative option to protect against the coronavirus.

86.    Plaintiff's support of the use of hydroxychloroquine was censored by Twitter, as only the narrative crafted by Dr. Fauci, NIAID, and CDC regarding best practices for treating the novel COVID-19 was allowed on Twitter.

87.     Plaintiff also expressed the view on Twitter that COVID-19 originated in the

Wuhan laboratory in China and would specifically refer to it as the "China virus."



88.     Subsequently, Twitter Users posting tweets discussing the Wuhan laboratory in

China as the origin of COVID-19 or referring to COVID-19 as the "China virus" were similarly

censored (flagged, shadow banned, etc.)

89.     Other instances when Defendants also worked directly with government actors to

censor free speech included when Plaintiff challenged the integrity of the 2020 Presidential

election process and the results of the 2020 Presidential election.

90.     Tweets concerning a lack of integrity in the 2020 Presidential election were then

similarly censored.

91.     Defendants' ban on Plaintiff and Putative Class Members continues to this day.

The ban has directly impacted Plaintiff's ability to communicate with family and friends and to

exercise his right to political speech, including (1) daily communications necessitated by his

unquestioned position as head of the Republican Party; (2) campaigning for Republican 2022

candidates; (3) fundraising for the Republican Party; (4) laying a foundation for a potential 2024

Presidential campaign.

## VI. PRESIDENT TRUMP AND THE CLASS DEPLATFORMED

### A. **Plaintiff President Trump**

92.     On January 7, 2021, Twitter, at the direction of Defendant Dorsey, permanently banned President Trump from his Twitter account, blocking his ability to communicate with his approximately 89 million followers and the ability of Plaintiff's approximately 89 million followers to hear, reply to, or retweet the content and speech Plaintiff was expressing.

93.     On January 8, 2021, Twitter issued a public statement from its **@TwitterSafety** account explaining the motive for removing **@realDonaldTrump.** It states:

> After a close review of recent Tweets from the **@realDonaldTrump** account and the context around them we have permanently suspended the account due to the risk of further incitement of violence.

94.     At the time Defendant Dorsey was directing these decisions of constitutional import regarding Plaintiff's free speech, Defendant was in French Polynesia.

95.     Expressing his obvious discomfort with his decision in banning Trump from the Twitter platform, Jack Dorsey issued a public statement from his Twitter account on January 13, 2021. It states:

> I do not celebrate or feel pride in our having to ban **@realDonaldTrump** from Twitter, or how we got there. After a clear warning we'd take this action, we made a decision with the best information we had based on threats to physical safety both on and off Twitter. Was this correct?

96.     As for Plaintiff returning to Twitter one day, the company's CFO, Ned Segal, made it clear Wednesday that is not an option. Segal told CNBC's "Squawk Box" on Wednesday, February 10, 2021, that Trump would never be allowed to return to the site, even if he decides to run for office again.

97.     While Twitter's censoring of Plaintiff was the most widely publicized action taken by Twitter, countless other Putative Class Members have had their views or content been similarly censored by Twitter for arbitrary reasons or no reason at all.

B. **Plaintiff Linda Cuadros**

98.    Plaintiff Linda Cuadros ("Ms. Cuadros") is a United States citizen residing in Florida.

99.    Ms. Cuadros has had a personal Twitter account (@wakeupwithlinda) since 2018. Before her account was suspended, she had approximately 10,000 followers.

100.    Ms. Cuadros used her Twitter to read news, push out content about large pharmaceutical companies and conservative ideals, and connect with her community.

101.    In 2019, Ms. Cuadros began noticing the Defendants were censoring her account.

102.    In 2019, Ms. Cuadro's account was suspended for 12 hours due to a post that said "shut up and twerk" to Cardi-B (@iamcardib).

103.    Plaintiff has also experienced doxing by other Twitter account users. Plaintiff had reported the incidences multiple times to Defendant, and nothing was done to stop the sharing of her personal information.

104.    In 2020, the Plaintiff's account was permanently banned due to a post about vaccines.



Hello,

Your account has been suspended and will not be restored because it was four to be violating Twitter's Terms of Service, specifically the Twitter Rules against hateful conduct.

It is against our rules to promote violence against or directly attack or threaten other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or disease.

Additionally, if we determine that the primary purpose of an account is to incite harm towards others on the basis of these categories, that account may be suspended without prior warning.

You can learn more about our policy against hateful conduct here: https://help.twitter.com/rules-and-policies/hateful-conduct-policy.

---

✈ Found in Sent – Wake up with Linda Mailbox

 **Linda Cuadros**                                    September 20, 2019 at 4:30 PM
Re: Case# 0126831045: Appealing an account suspension - @wakeupwithlinda  [ ref:_00DA0K0A8._5...     Details
To:  Twitter Support

How is anything that I said "hate speech" and why am I permanently banned and not even given a chance to restate my account after 30 days?

Who decides what is hate speech? Nothing that I said was towards: race, gender, or any of the things you stated above. The account I was arguing with literally said I sold nudes for a living, that is spreading false information about a professional like myself and you guys did nothing? He followers came after me saying i was gross, telling me I was a Snapchat premium thot, etc. You guys did nothing.

A few month ago, I was suspended for 7 days when a man tried doxing me and trying to find out information about me online. You guys did NOTHING.

I need to understand, what from those tweets was "hateful" conduct. This seems extremely unfair and biased, there are people literally asking for the president to be murdered and you guys do NOTHING.

Thanks,

Linda

**See More** from Twitter Support

## C. **Plaintiff American Conservative Union (ACU)**

105.    Plaintiff American Conservative Union (ACU) is a social welfare organization organized under section 501(c)(4) of the Internal Revenue Code and was established in 1964 in the District of Columbia. Its sister organization is the American Conservative Union Foundation and is organized as an educational organization under sec. 501(c)(3) of the Internal Revenue Code.

106.    Collectively, ACU and related organizations opened Twitter accounts as early as 2009, and together, they post content regularly. The Plaintiffs currently have 41,000,000 followers. Across all ACU-related platforms, the enterprise has 182,300 Twitter followers. Those Twitter accounts include: @ACUConservative (41,000 followers, established in July 2009), @ACUFoundation 1200 followers, joined in May 2017), @ACUFforJustice (2700 followers, joined in January 2017), and @CPAC (137,400 followers, joined in March 2010).

107.    The ACU is the oldest conservative grass roots organization in the United States. Founded nearly six decades ago by William F. Buckley, ACU is comprised of its advocacy arm (the American Conservative Union), its educational arm (the ACU Foundation) and its criminal justice reform operation (ACU Foundation Nolan Center for Justice).  In addition, ACU and the Foundation jointly operate the Conservative Political Action Conference, which is an annual gathering of conservative opinion leaders, activists and elected officials that in recent years has drawn between 13,000-18,000 physical attendees. During the CPAC conference, CPAC/ACU generates in excess of one (1) billion impressions across its social media platforms.  Finally, ACU operates CPAC-Now, an online broadcast that takes place three times a week and generates in excess of 200,000 viewers and over one (1) million impressions each week.

108.    In 2017, the ACU started noticing a reduction in engagement in its content.  This manifested itself during periods of well-below expected numbers of views, reduction in the number of re-tweets, and a marked decrease in followers.

109.    In June 2020 @CPAC twitter stood at 99.4K.  By 1/19/21 that number had shrank to 88K.  There was no indication from Twitter as to why followers were purged.


## COUNT ONE

## FIRST AMENDMENT VIOLATION

110.    Plaintiff restates the allegations set forth in Paragraphs 1-109.

111.    Pursuant to Section 230, Defendants are encouraged and immunized by Congress to censor constitutionally protected speech on the Internet, including by and among its one hundred and ninety-two (192) million Users that are citizens of the United States.

112.    Using its authority under Section 230 together and in concert with other social media companies, the Defendants regulate the content of speech over a vast swath of the Internet.

113.    Defendants are vulnerable to and react to coercive pressure from the federal government to regulate specific speech.

114.    In censoring the specific speech at issue in this lawsuit and in deplatforming Plaintiff, Defendants were acting in concert with federal officials, including officials at the CDC and on the Biden transition team.

115.    As such, Defendants' censorship activities amount to state action.

116.    Defendants' censoring the Plaintiff's Twitter account, as well as those accounts of Putative Class Members, violates the First Amendment to the United States Constitution because

it eliminates the Plaintiffs and Class Member's participation in a public forum and the right to communicate to others their content and point of view.

117. Defendants' censoring of the Plaintiff and Putative Class Members from their Twitter accounts violates the First Amendment because it imposes viewpoint and content-based restrictions on the Plaintiffs' and Putative Class Members' access to information, views, and content otherwise available to the general public.

118. Defendants' censoring of the Plaintiff and Putative Class Members violates the First Amendment because it imposes a prior restraint on free speech and has a chilling effect on social media Users and non-Users alike.

119. Defendants' blocking of the Individual and Class Plaintiffs from their Twitter accounts violates the First Amendment because it imposes a viewpoint and content-based restriction on the Plaintiff and Putative Class Members' ability to petition the government for redress of grievances.

120. Defendants' censorship of the Plaintiff and Putative Class Members from their Twitter accounts violates the First Amendment because it imposes a viewpoint and content-based restriction on their ability to speak and the public's right to hear and respond.

121. Defendants' blocking the Plaintiff and Putative Class Members from their Twitter accounts violates their First Amendment rights to free speech.

122. Defendants' censoring of the Plaintiff's by banning Plaintiff from his Twitter account while exercising his free speech as President of the United States was an egregious violation of the First Amendment.

123. Defendant Dorsey is sued in his personal capacity and is liable in damages because he was personally responsible for Twitter's unconstitutional censorship of the Plaintiff and the

Putative Class Members, including Twitter's deplatforming of Plaintiff and other Putative Class Members.

124.  Dorsey is also sued in his official capacity, along with Twitter itself, for injunctive relief to and the unconstitutional censorship of the Plaintiff and Putative Class Members, including Twitter's deplatforming of Plaintiff and other Putative Class Members.

## COUNT TWO

## DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT

125.  Plaintiff restates the allegations set forth in 1-124.

126.  In censoring (flagging, shadow banning, etc.) Plaintiff and the Class, Defendants relied upon and acted pursuant to Section 230 of the Communications Decency Act.

127.  Defendants would not have deplatformed Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered by Section 230.

128.  Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected."  47 U.S.C. § 230(c)(2).

129.  In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

130.  Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

28

131. Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

132. Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

133. Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996).

134. Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.

135.    Accordingly, Plaintiff, on behalf of himself and the Class, seeks a declaration that Section 230(c)(1) and (c)(2) are unconstitutional insofar as they purport to immunize from liability social media companies and other Internet platforms for actions they take to censor constitutionally protected speech.

## CLASS ACTION ALLEGATIONS

136.    Plaintiff and the Class brings this lawsuit pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class (the "Class"):

*All Twitter platform Members who reside in the United States, and between June 1, 2018, and today, had their access to their social media accounts wrongly restricted or curtailed by these Defendants and who were damaged thereby.*

137.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

138.    Specifically excluded from the Class are Defendants, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or any entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

139.    *Numerosity*. The Members of the Class are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff and the Class alleges that the Class contains

hundreds of thousands of Members. Although the precise number of Putative Class Members is unknown to Plaintiff and the Class, the true number of Putative Class Members is known by Defendants, and thus, may be notified of the pendency of this action by first class mail, electronic mail, social media, and/or published notice.

140. ***Existence and predominance of common questions of law and fact***. Common questions of law and fact exist as to all Members of the Class and predominate over any questions affecting only individual Putative Class Members. These common legal and factual questions include, but are not limited to, the following:

(a) whether  the Defendant's conduct violated the First Amendment of the Constitution of the United States.

(b) whether Section 230 is an unconstitutional delegation of power Congress cannot exercise.

(c) whether the Defendants conduct violates any other state or federal statutes.

141. ***Typicality***.  Plaintiff and the Class's claims are typical of the claims of the other Members of the Class in that Defendants arbitrarily prevented Plaintiff and the Class and Putative Class Members from using their social media accounts or curtailed or limited Plaintiff and the Class and the Class's use of their accounts to inhibit or prevent Plaintiff and the Class from engaging in speech that Defendants disliked or contrary to Defendants' opinions or beliefs, in violation of the First Amendment to the United States Constitution.

142. ***Adequacy of representation***. Plaintiff and the Class will fairly and adequately protect the interests of the Class. Plaintiff and the Class have retained counsel highly experienced in complex consumer class action litigation, and Plaintiff and the Class intend to vigorously prosecute this action. Further, Plaintiff and the Class have had no interests that are antagonistic to those of the Class.

143. ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Putative Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Putative Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court and presents no unusual management difficulties under the circumstances here.

89. The Class may also be certified because:

(a) the prosecution of separate actions by individual Putative Class Members would create
a risk of inconsistent or varying adjudication with respect to individual Putative Class Members that would establish incompatible standards of conduct for the Defendant;

(b) the prosecution of separate actions by individual Putative Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Putative Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the Members of the Class as a whole.

**DEMAND FOR JURY TRIAL**

90.     Plaintiff and the Class demand a trial by jury on all issues so triable.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donald J. Trump and the Class respectfully requests that the Court enter an Order certifying this case as a class action, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Class Counsel and that the Court Order, adjudge, and decree in favor of Plaintiff and the Class against the Defendants for:

A.  An award of Compensatory and Punitive damages to the Plaintiff and the Class in an amount to be determined at trial;

B.  An injunction and declaratory judgment ordering Twitter to immediately reinstate the Twitter accounts of Plaintiff and Putative Class Members;

C.  An injunction and declaratory judgment ordering Twitter to remove its warning labels and misclassification of all content of the Plaintiff and the Class and to desist from any further warnings or classifications;

D.  Adjudgment declaring Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 unconstitutional;

E.  An award of attorneys' fees and costs to Plaintiff and the Class in an amount to be determined at trial; and

F.  An award of punitive damages to Plaintiff and the Class in an amount to be determined at trial.

G.  An award of such other and further relief as the Court may deem just and proper.

Date: July 7, 2021

*/s/ Matthew Lee Baldwin*
Matthew L. Baldwin, Esq.
Florida Bar No. 27463

VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd.,
Third Floor
Coral Gables, FL  33134
Tel: 305.631.2528
E-mail: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

JOHN P. COALE
(*Pro Hac Vice Forthcoming*)
2901 Fessenden St. NW
Washington, D.C.  20008
johnpcoale@aol.com
Telephone: (202) 255-2096

THE DUDEHEFER LAW FIRM L.L.C
FRANK C. DUDENHEFER, JR.
*(Pro Hac Vice Forthcoming*)
fcdlaw@aol.com
2721 St. Charles Ave, Suite 2A
New Orleans, LA  70130
Telephone: (504) 616-5226

IVEY, BARNUM & O'MARA
JOHN Q. KELLY
(*Pro Hac Vice Forthcoming*)
jqkelly@ibolaw.com

MICHAEL J. JONES
(*Pro Hac Vince Forthcoming*)
mjones@ibolaw.com

ROLAND A. PAUL
*(Pro Hac Vice Forthcoming)*
rpaul@ibolaw.com

RYAN S. TOUGIAS
*(Pro Hac Vice Forthcoming)*
rtougias@ibolaw.com

SEAN M. HAMILL
*(Pro Hac Vice Forthcoming)*
shamill@ibolaw.com

170 Mason Street
Greenwich, CT  06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9462