**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

DONALD J. TRUMP, the Forty-Fifth President
of the United States, LINDA CUADROS,
AMERICAN CONSERVATIVE UNION,
RAFAEL BARBOZA, DOMINICK LATELLA,
WAYNE ALLEN ROOT AND NAOMI WOLF,
INDIVIDUALLY, AND ON BEHALF OF
THOSE SIMILARLY SITUATED,

       Plaintiffs,

    v.

TWITTER, INC. and JACK DORSEY,

       Defendants.

Civil Action No. 1:21-cv-22441-RNS

**PLAINTIFFS' RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT TWITTER, INC.'S MOTION TO TRANSFER**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 1

   I.  DEFENDANT'S FORUM SELECTION CLAUSE DOES NOT APPLY TO PLAINTIFF
   DONALD J. TRUMP................................................................................................................ 1

   II.  NO ENFORCEABLE FORUM SELECTION CLAUSE EXISTS AS A MATTER OF
   FACT AND LAW ..................................................................................................................... 5

   III.  THE FORUM SELECTION CLAUSE IS AMBIGUOUSLY DRAFTED........................ 7

   IV.  THE CLAIMS DO NOT ARISE FROM THE TERMS.................................................... 10

   V.  PUBLIC INTEREST COMPELS THAT THE COURT RETAIN JURISDICTION........ 13

   VI.  RETENTION IS APPROPRIATE UNDER 28 U.S.C. § 1404(A).................................... 18

CONCLUSION.......................................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ageless Found., Inc. v. Quincy Invs., Corp.*,
   No. 06-20293-CIV, 2006 WL 8432572 (S.D. Fla. Aug. 15, 2006) ........................................ 7

*Ahearn v. Mayo Clinic*, 180 So. 3d 165 (Fla. 1st DCA 2015) ..................................................... 13

*Am. Online, Inc., v. Pasieka*, 870 So.2d 170 (1st DCA 2004) ..................................................... 12

*America Online, Inc., v. Booker*, 781 So.2d 423 (3rd DCA 2001) ............................................... 13

*Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49 (2013)...... 7, 14, 18, 19, 20

*Biden v. Knight First Amdt. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021)........................ 6, 17

*Caribbean Gardens Condo. Ass'n, Inc. v. Markel Ins. Co.*,
   No. 1:16-CV-21329-UU, 2016 WL 11201233 (S.D. Fla. May 12, 2016) ............................... 7

*Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231 (11th Cir. 1985) ......................................... 7

*Contractor's Mgmt. Sys. of N.H., Inc., v. Acree Air Conditioning, Inc.*,
   799 So.2d 320 (2nd DCA 2001) ..................................................................................... 12, 13

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)......................................................................... 5

*Day v. Le–Jo Enters., Inc.*, 521 So. 2d 175 (Fla. 3d DCA 1988) ................................................ 12

*DEUTZ Corp. v. City Light & Power, Inc.*,
   No. 1:05-CV-3113-GET, 2006 WL 8432920 (N.D. Ga. Aug. 15, 2006) ................................. 7

*Dura-Cast Prod., Inc. v. Rotonics Mfg., Inc.*,
   No. 810-CV-1387-T-24AEP, 2010 WL 3565725 (M.D. Fla. Sept. 10, 2010).......................... 9

*e-ventures Worldwide, LLC, v. Google, Inc.* 2017 WL 2210029 (M.D. Fla. February 8, 2017).. 18

*First Pacific Corp. v. Sociedade de Empreendimentos E Construcoes, Ltda.*,
   566 So. 2d 3, 15 Fla. Law W. D 1285 (Fla. 3d DCA 1990)................................................... 11

*Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955 (5th Cir. 1974) ................................................. 8

*Knight First Amdt. Inst. at Columbia Univ. v. Trump*,
   928 F.3d 226 (2d Cir. 2019)................................................................................... 3, 4, 5, 6

*Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279 (11th Cir. 2009) ....................................... 14

*Loomer v. Facebook, Inc.*,
   No. 19-CV-80893, 2020 WL 2926357 (S.D. Fla. Apr. 13, 2020) ......................................... 17

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020).......................... 18

*Management Computer Controls, Inc. v. Charles Perry Constr., Inc.*,
   743 So.2d 627 (1st DCA 1999)........................................................................................ 11,12

*Manuel v. Convergys Corp.* 430 F.3d 1132 (11th Cir. 2005) ..................................................... 19

*Mindbasehq LLC, v. Google, LLC*, 2021 U.S. Dist. Lexis 91089 (S.D. Fla. May 12, 2021) ....... 19

*Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271 (1984)...................................... 6

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ............................................................. 17

*Pincus v. Speedpay, Inc.*, 161 F. Supp. 3d 1150 (S.D. Fla. 2015) .............................................. 12

*PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So2d 773 (Fla. 2003)............................................. 12

*Reno v. Am. C.L. Union*, 521 U.S. 844 (1997)............................................................................ 17

*Robinson v. Giamarco & Bill, P.C.*, 74 F.3d 253 (11th Cir. 1996) ............................................. 19

*SAI Ins. Agency, Inc., v. Applied Sys*, 858 So2d 401 (1st DCA 2003) ........................................ 13

*Seaman v. Priv. Placement Cap. Notes II, LLC*,
   No. 16-CV-00578-BAS-DHB, 2017 WL 1166336, at *1 (S.D. Cal. Mar. 29, 2017)............... 15

*Stewart Organization, Inc., v. Ricoh Corp.*,
   810 F.2d 1066 (11th Cir. 1987), *aff'd*, 487 U.S. 22 (1988) ................................................ 10, 11
*Travelcross, S.A. v. Learjet, Inc.*,
   No. 10-61842-CIV, 2011 WL 13214118 (S.D. Fla. Mar. 28, 2011)................................. 7, 8, 9
*World Vacation Travel v. Brooker*, 799 So.2d 410 (3rd DCA 2001) ........................................ 13

**Statutes and Regulations**

28 U.S.C. § 1404 ...................................................................................................................... 1, 9, 18
31 U.S.C. § 1341 ......................................................................................................................... 5, 6
36 C.F.R § 1220 ...................................................................................................................... 5, 6, 17
41 C.F.R. § 1 ................................................................................................................................... 5
44 U.S.C. § 2904 ............................................................................................................................. 5
47 U.S.C. § 230................................................................................................................................ 18
Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Chapter 501, Part II
   ("FDUTPA") ................................................................. 1, 11, 12, 13, 15, 19, 20
Florida Stop Social Media Censorship Act............................................................ 11, 14, 18, 19

## <u>INTRODUCTION</u>

Plaintiff Donald J. Trump ("Plaintiff") and plaintiffs Linda Cuadros, American Conservative Union, Rafael Barboza, Dominick Latella, Wayne Allen Root and Naomi Wolf, individually, and on behalf of those similarly situated (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to the Motion by Defendant Twitter, Inc. ("Defendant") pursuant to 28 U.S.C. § 1404, dated September 1, 2021, to transfer venue to the United States District Court for the Northern District of California ("Motion").

As set forth herein, Defendant's Motion should be denied on six grounds. First, the forum selection clause in Defendant's Terms of Service ("TOS") does not apply to Plaintiff, as the 45th President of the United States. Second, the forum selection clause in Defendant's TOS is unenforceable. Third, under Florida law, the forum selection clause is ambiguous and should be construed against Defendant. Fourth, Plaintiff's claims in the instant action do not arise from the specific terms of the clause. Fifth, in the event that the Court deems the forum selection clause to be applicable, there is a strong public interest in keeping the claims under the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Chapter 501, Part II ("FDUTPA"), in Florida. Sixth, as the forum selection clause is inapplicable, the Motion should be decided by application of 28 U.S.C. § 1404(a), and under its parameters, the necessary conclusion is that this matter should remain before this Court.

## <u>ARGUMENT</u>

## I.     <u>DEFENDANT'S FORUM SELECTION CLAUSE DOES NOT APPLY TO PLAINTIFF DONALD J. TRUMP</u>

Defendant's Motion should be denied because the forum selection clause in Defendant's TOS does not apply to Plaintiff, who at all times relevant to this dispute was the sitting President of the United States and the head of the Executive Branch of the federal government.

Plaintiff created his account with Defendant in May of 2009. At that time, Defendant's User Agreement and TOS did not contain a forum selection clause or a choice of law clause. (*See* Defendant's TOS, annexed hereto as Exhibit ("Ex.") A.) When Plaintiff created his account, Defendant's User Agreement also did not contain any terms providing for Defendant's Users' automatic acceptance of Defendant's revisions to its TOS by simply continuing to access or use its services. (Ex. A.)

Since May of 2009, Defendant has amended its TOS numerous times. On September 10, 2009, Defendant revised its TOS to provide: "by continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised terms." (Ex. A.) Defendant also revised its TOS, under the heading "Controlling Law and Jurisdiction" to provide: "These Terms and actions related thereto will be governed by the laws of the State of California without regard to or application of its conflict of law provisions of your state or country of residence. All claims, legal proceedings or litigation arising in connection with the Services will be brought solely in San Francisco County, California, and you consent to the jurisdiction of and venue in such courts and waived any objection as to inconvenient forum." (Ex. A.)

Eight days later, on September 18, 2009, Defendant again amended its TOS, under the heading "Controlling Law and Jurisdiction," to provide:

> If you are accepting these Terms on behalf of a United States federal government entity that is legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you but instead these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of California (excluding choice of law).

(Ex. A.) On September 18, 2009, Defendant's TOS included the following under the heading "Entire Agreement: These Terms, the Twitter Rules and our Privacy Policy are the entire and

exclusive agreement between Twitter and you regarding the Services (excluding any services for which you have a separate agreement with Twitter that is explicitly in addition or in place of these Terms), and these Terms supersede and replace any prior agreements between Twitter and you regarding the Services." (Ex. A.)

When Plaintiff was sworn in as Forty-Fifth President on January 20, 2017, he continued using the same Twitter account that he opened in May, 2009:  @realDonaldTrump.  As the Forty-Fifth President, Plaintiff continued to use his Twitter account as head of the Executive Branch (Exhibit B "Stipulation" in *Knight*, *infra*, case: 1:17-cv-05205-NRB, filed September 28, 2017 ¶ ¶ 32, 37.)  As such, Plaintiff's account became one of the White House's main vehicles for conducting official business." *Knight First Amdt. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 232 (2d Cir. 2019).  For example, Plaintiff repeatedly used his account to report to the Citizens of the United States on virtually every aspect of Presidential activity, including but not limited to meetings with foreign leaders, and inform America as to the Administration's positions on health care, immigration, foreign affairs, and other matters affecting the lives of all Americans (Ex. B ¶ 38.)  Plaintiff, together with White House Social Media Director Daniel Scavino, used Plaintiff's account, "often multiple times per day . . . to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; to challenge media organizations whose coverage of his Administration he believes to be unfair; and for other statements, including, on occasion, statements unrelated to official government business." (Ex. B ¶ 38)

Moreover, the Trump administration promoted the President's Twitter account as a key channel for official communication.  (Ex. B ¶ ¶ 32, 37.)  Specifically, and as an example, Plaintiff used his account to "announce on June 7, 2017, for the first time, that he intended to nominate Christopher Wray for the position of FBI director" and "to acknowledge for the first time that he

did not possess tapes of conversations with former FBI Director James Comey." (Ex. B ¶ 38) White House Press Secretary Sean Spicer stated at a press conference that tweets from President Trump should be understood as "official statements by the President of the United States," and Plaintiff's account was operated in tandem with the official account of the President of the United States, @POTUS (Ex. B ¶ 37.)

Accordingly, Plaintiff's account consists of "official responses," for the purposes of The Presidential Records Act of 1978, and has been relied upon, including by foreign heads of state (Ex. B ¶ 40.) As a result, the Second Circuit determined that at all times relevant to this action, Plaintiff's account was not privately owned by Plaintiff or by Defendant, but was subject to "public ownership." *Id.* (citing 44 U.S.C. § 2202).

On December 18, 2017, Twitter introduced "New Rules on Violence and Physical Harm" which stated expressly that: "This policy does not apply to military or ***government entities*** and we will consider exceptions for groups that are currently engaging in (or have engaged in) peaceful resolution." (Ex. C; emphasis added)  As of June 18, 2020, Defendant's TOS provided, in part:

> 6. General
>
> We may revise these Terms from time to time.  The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos (https://twitter.com/en/tos), will govern our relationship with you.  We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account.  By continuity to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms. . . .
>
> ***If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you***.  For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of

California (excluding choice of law).

(Ex. A) (emphasis added.)

At all times relevant to this action, Plaintiff was the sitting President of the United States, and used his account and Defendant's services in that capacity as a public forum. *Knight First Amdt. Inst. at Columbia Univ.*, 928 F.3d at 226. Plaintiff was clearly a "federal … government entity in the United States using the Services" in his "official capacity." Further, he was "legally unable to accept the controlling law, jurisdiction, or venue clauses" contained in Twitter's TOS without input from other agencies, including the National Archives and Records Administration, in accordance with the requirements of the Federal Acquisition Regulation. *See* 44 U.S.C. § 2904, *et seq.*; 36 C.F.R § 1220, *et seq.*; *see also* 31 U.S.C. § 1341; 41 C.F.R. § 1, *et seq.*

As of January 7, 2021, Twitter had not further revised its TOS with its clearly stated "government entity" exemption for choice of law, forum or venue, or amended its policy exempting government entities from its rules relating to physical violence and harm. As a result, under the government entity exemption, the forum selection clause contained in Defendant's TOS does not apply to Plaintiff.

## II.    NO ENFORCEABLE FORUM SELECTION <u>CLAUSE EXISTS AS A MATTER OF FACT AND LAW</u>

One thing is undeniably clear in this case: Plaintiff's account was a government account, and not a private one when he was censored. In *Knight First Amdt. Inst. at Columbia Univ.*, 928 F.3d at 236 the Second Circuit held, "the [Twitter] account is not private," that Plaintiff acted in a government capacity when operating his account, and that he could not constitutionally limit public access to his account.[1]  *Id.* Incongruously, Defendant lightly mentions *Knight*, but asserts

---

[1] The Court commandeered the President's entire account, holding in 2019, "[t]his litigation concerns what the Account is <u>now</u>." *Id*. at 231 (emphasis added.) Consequently, the Court held the account constituted a public forum. *Id*.; *see also Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019).

the exact opposite of its holding to ground its entire motion. *Knight* was appealed, but its precedent was not overruled, with Justice Thomas asserting, "the principal legal difficulty that surrounds digital platforms—namely, that applying old doctrines to new digital platforms is rarely straightforward." *Biden v. Knight First Amdt. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021).[2] Accordingly, Twitter's argument fails on both the facts and law.

In *Knight*, the Second Circuit evaluated Plaintiff's entire account, its use, various views on what it was, including from numerous *amici*, with the government representing President Trump's interests in the protracted litigation where "the government conceded that the Account is not "independent of [Trump's] presidency." *Knight*, 928 F.3d at 234 (brackets in the original). Ultimately, the Court affirmed the trial court's declaratory judgment that the account was a government account, irrespective of the fact that the government control over the property was temporary. *Id*. at 235. Plaintiff was expressly prevented from using his account as he had been under the declaratory judgment, dictating the new terms of his entire account. *Id*.

In addition, as part of its commandeering of Plaintiff's entire account, the Court used the fact that Plaintiff's tweets were archived with the National Archives, demonstrating that it already was a government account before it was declared as such by the trial court in 2018. *Id*. at 235. Just as the public has "no constitutional right to force the government to listen to [its] views," as asserted in *Knight*, Defendant has no right to force a private contract on the federal government. *Id*. at 238 (citing, *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283 (1984)). Of course, several laws and ordinary procurement processes prevent the imposition of private contracts upon the federal government.[3] Here, contrary to Defendant's assertions, it has made no effort to notify users of its sporadic and frequent changes, irrespective of the changing conditions

---

[2] Justice Thomas, noting further ambiguity, also asserted, "We will soon have no choice but to address how our legal doctrines apply to highly concentrated, privately owned information infrastructure such as digital platforms." *Id*.

[3] *See generally* 31 U.S.C. § 1341, The Antideficiency Act.

of Plaintiffs, such as is the case with Plaintiff.  Defendant cannot plausibly assert that it has an enforceable forum selection clause relating back to 2009 as it has argued because the burden is on it to negotiate, "bargain," and achieve settled "legitimate expectations" as to the same, all of which are absent here.  *Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63 (2013).

## III.   THE FORUM SELECTION CLAUSE IS AMBIGUOUSLY DRAFTED

Defendant's forum selection clause is ambiguously drafted.  In cases such as these, involving the question of transfer, any ambiguity is construed against the drafter.  *Travelcross, S.A. v. Learjet, Inc.*, No. 10-61842-CIV, 2011 WL 13214118, at *1 (S.D. Fla. Mar. 28, 2011)*.  As such, the clause is to be construed against the drafter, Defendant, and the Court may properly deem this a permissive rather than a mandatory forum selection clause.

Federal courts interpret forum selection clauses pursuant to federal common law standards, and courts apply ordinary contract principles.  *Caribbean Gardens Condo. Ass'n, Inc. v. Markel Ins. Co.*, No. 1:16-CV-21329-UU, 2016 WL 11201233, at *1 (S.D. Fla. May 12, 2016).  Federal, Florida and California law are all in general harmony in the application of the same principles of contract law to forum selection clauses. *Ageless Found., Inc. v. Quincy Invs., Corp.*, No. 06-20293-CIV, 2006 WL 8432572, at *5 (S.D. Fla. Aug. 15, 2006).

Permissive clauses allow for actions to be brought in a certain location without requiring it, while mandatory clauses dictate exclusive forums for a lawsuit.  *Caribbean Gardens Condo. Ass'n*, 2016 WL 11201233, at *1.  Importantly, when a court cannot determine if a forum selection clause is permissive or mandatory, the clause is deemed ambiguous, and construed against the drafter. *Id*. at *4; *Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231 (11th Cir. 1985). Furthermore, before a court can deem a clause to be mandatory, it must conclusively find that the clause dictates an exclusive forum for litigation.  *DEUTZ Corp. v. City Light & Power, Inc.*, No. 1:05-CV-3113-GET, 2006 WL 8432920, at *2 (N.D. Ga. Aug. 15, 2006).

7

The scope of forum selection clauses are, therefore, driven by the precise wording of the clauses themselves, and Defendant's forum selection clause reads as follows:

> All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum.

Defendant's forum selection clause contains terminology that suggests it could be either mandatory or permissive. Specifically, while it references exclusivity in that "all disputes . . . will be brought solely" in California, it then proceeds to state that parties to this clause "consent to personal jurisdiction and waive any objection" to actions brought in California. This combination of exclusive jurisdiction ("brought solely") with permissive language ("consent to jurisdiction") creates an ambiguity in the clause which is fatal to its effectiveness.

The use of "consent" in Defendant's clause suggests that Users cannot raise an objection if Defendant were to initiate an action in the courts located in San Francisco County, while nevertheless leaving the door open to Defendant initiating actions in a different court. When this permissive aspect of the clause is combined with what Defendant suggests is the mandatory provision—all claims being "brought solely" in San Francisco County—there is an inherent ambiguity. As Defendant drafted the forum selection clause, this ambiguity is to be read against Defendant, and this Court should deem the clause to be permissive, not mandatory, in nature. *Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955 (5th Cir. 1974) (holding that when analyzing conflicting permissive and mandatory language in a forum selection clause the, "Court adopted the traditional rule whereby, 'an interpretation is preferred which operates more strongly against the party from whom [the words] proceed.'").

The flaw in Defendant's forum selection clause is clearly demonstrated by Judge Jordan's analysis of a similar clause in *Travelcross, S.A.*, 2011 WL 13214118 at *1. The clause in that case

read as follows (emphasis added):

> This Agreement shall be governed by and interpreted and construed in accordance with the substantive laws of the State of Kansas, U.S.A., excluding any conflicts of law provisions thereof. **The courts of Kansas shall have exclusive jurisdiction** to hear and determine all claims, disputes, actions or suits which may arise hereunder. **[Travelcross] expressly consents to jurisdiction and venue** in the state and federal courts of Kansas for any claims or disputes arising hereunder.

*Id.* at *2. Addressing the issue of exclusive jurisdiction, Judge Jordan held that "exclusive jurisdiction" as used in the clause did not mandate venue in Kansas, as he held that "jurisdiction" and "venue" were separate concepts, and that the clause did not specify that venue was required in Kansas. Importantly, Judge Jordan went on to hold that:

> The next sentence—"[Travelcross] expressly consents to jurisdiction and venue in the state and federal courts of Kansas for any claims or disputes arising hereunder"—is not apparently mandatory. **That Travelcross consents to venue and jurisdiction in Kansas does not require that Kansas courts be the exclusive forum or exclusive venue. Nowhere are words like "shall" or "only" used**. **The agreement's forum-selection clause is simply murky and ambiguous. Hence, I must read the clause against the drafter, which is Learjet.** After interpreting the clause against the drafter, I hold that the forum-selection clause here is permissive.

*Id.* at *2 (emphasis added); *see also Dura-Cast Prod., Inc. v. Rotonics Mfg., Inc.*, No. 810-CV-1387-T-24AEP, 2010 WL 3565725, at *2 (M.D. Fla. Sept. 10, 2010) ) ("The parties must do more than merely consent to jurisdiction in a particular forum in order for the FSC to be interpreted as mandatory; instead, the parties must use language that clearly expresses the exclusivity of the designated forum."). While Judge Jordan denied the transfer motion on the basis of a mandatory forum selection clause, he nevertheless transferred the case under a 28 U.S.C. § 1404(a) analysis; the traditional private/public interests subject to a § 1404(a) analysis is addressed below.

As with the clause at issue in *Travelcross, S.A.*, Defendant's forum selection clause contains contradictory terms. The clause at once combines language suggesting an exclusive

forum, as well as consensual language indicating that it is permissive in nature. Plaintiffs respectfully submit that the Court should find that the combination of exclusive and permissive language in the same forum selection clause renders Defendant's clause ambiguous, and deny Defendant's Motion.

## IV.    <u>THE CLAIMS DO NOT ARISE FROM THE TERMS</u>

If the Court finds the forum selection clause is not ambiguous and is mandatory, it must still find that the claims arise from within the scope of the clause.  *Stewart Organization, Inc., v. Ricoh Corp.*, 810 F.2d 1066 (11th Cir. 1987), *aff'd*, 487 U.S. 22 (1988).  In *Stewart*, the Eleventh Circuit analyzed a contract where the clause referred, "to *any* 'case or controversy arising under or in connection with this Agreement.'"  *Id.* at 1070 (emphasis in original).  The *Stewart* court held that where a clause referred to "any" case or controversy arising under or in connection with this agreement, this would include all causes of action, directly or indirectly related to the business relationship established by the contract. *Id*.

By its terms, Defendant's forum selection clause is more limited than that addressed in *Stewart*.  Defendant's clause is limited to "[a]ll disputes related to these Terms or the Services." Defendant defines each as follows:

> These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our <u>other covered services</u> (<u>https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates</u>) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

"Terms" therefore refers to a User's "access to and use of" Defendant's Services, with "Services" in turn defined as Defendant's various websites, ads, applications, email notifications,

10

and the like.  Replacing "Terms" in the clause with its definition, the pertinent portion of the forum selection clause's scope reads as follows: "All disputes related to the user's access to and use of (*i.e.*, the 'Terms') the Services will be brought … "  Unlike the contract in *Stewart*, this clause does not refer to *any* claim between a User and Defendant—just those related to a User's "access to and use of" the Services.  Plaintiffs' claims are not based on their "access to and use of" Defendant's Services, but rather Defendant's deceptive practices towards Florida consumers.

As noted above, the scope of the forum selection clause is limited to those claims related to a User's access to and use of Defendant's Services.  Plaintiffs' FDUTPA and SSMCA[4] claims relate not to their access to and use of the Services, but Defendant's deceptive practices towards all current and prospective users in Florida.

Numerous Florida courts have analyzed forum selection clauses in cases where a plaintiff has pled a FDUTPA action, and found the claims to be outside the scope of the clause.  The leading case on the scope of such clauses to FDUTPA is *Management Computer Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So.2d 627 (1st DCA 1999).  The scope of the clause in that case encompassed, "[a]ny action . . . arising out of this Agreement . . . "  *Id.* at 629.  The plaintiff brought several claims related to breach of contract, but the court held that the FDUTPA claim was an independent claim, outside the scope of the forum selection clause, stating:

> The unfair trade claim is an independent statutory claim that is severable from all the remaining claims. It does not arise out of the contract, nor does it exist solely for the benefit of the parties to the contract … The use of the venue clause as a defense to the statutory claim in this case would undermine the effectiveness of the statute.

*Id.* at 632 (citing *First Pacific Corp. v. Sociedade de Empreendimentos E Construcoes, Ltda.*, 566 So. 2d 3, 15 Fla. Law W. D 1285 (Fla. 3d DCA 1990)).

---

[4] Violations of the SSMCA are deemed to be violations of FDUTPA as well; unless otherwise noted, henceforth the use of "FDUTPA" will necessarily encompass the SSMCA as well.

Akin to *Management Computer Controls,* the causes of action in this case do not "arise out of the contract, nor [do they] exist solely for the benefit of the parties to the contract."  Plaintiffs' action seeks injunctive relief that is no less pertinent to themselves as it is to each Florida User of Defendant's services, and, in fact, every Floridian who may be tempted on rely on Defendant's deceptive policy statements.

This is a key aspect to FDUTPA.  Courts have long held that FDUTPA must be "construed liberally" to "protect the consuming public and legitimate business enterprises" from unfair or deceptive business practices. *Id.* § 501.202; *see also Pincus v. Speedpay, Inc.*, 161 F. Supp. 3d 1150, 1157 (S.D. Fla. 2015) ("Courts have regarded FDUTPA as 'extremely broad'" (*quoting Day v. Le–Jo Enters., Inc.*, 521 So. 2d 175, 178 (Fla. 3d DCA 1988)).  The Florida Supreme Court defines deception as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  *PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So2d 773 (Fla. 2003).

Plaintiffs' FDUTPA claims are, by definition, claims which must speak to a larger public interest, and the relief sought here—injunctive relief regarding practices and statements to the public at large—is necessarily of benefit to parties other than a specific plaintiff.  This aspect of FDUTPA claims—a larger public benefit—runs through cases where courts have held that a FDUTPA claim is outside the scope of the forum selection clause. *E.g. Am. Online, Inc., v. Pasieka*, 870 So.2d 170 (1st DCA 2004) ("And as indicated in *Management Computer*, the FDUTPA does not exist solely for the benefit of the individual parties, and is instead designed to afford a broader protection to the citizens of Florida.").  In *Contractor's Mgmt. Sys. of N.H., Inc., v. Acree Air Conditioning, Inc.*, 799 So.2d 320 (2nd DCA 2001) the court reviewed a clause encompassing, "[a]ny lawsuit litigation or arbitration concerning this Agreement … " and held that as to the FDUTPA claim:

12

> We affirm on the venue issue because the forum selection clause in the license agreement does not apply to the claim that CMS violated the Little FTC Act. … That claim does not arise from the agreement, nor does it exist solely for the benefit of the parties to the agreement. …

*Id.* at 321 (citations omitted).[5]

Similarly, the case before the Court is independent of any agreement that may exist between Plaintiffs and Defendant, and the relief sought is of benefit to countless parties outside of this lawsuit.  Standing to bring a claim for injunctive relief under Florida Statutes § 501.211(1) is granted to anyone who has been "aggrieved," a term which has been defined as a person, "angry or sad on grounds of perceived unfair treatment" and, importantly, there is no requirement of financial injury.  *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015).  Plaintiffs' standing is not related to any breach of any prior agreement they may have had with Defendant, but to Defendant's ongoing deceptive practices towards its Users regarding Defendant's ongoing and continued treatment of Plaintiffs—treatment which affects far more speakers (or potential speakers) than the Plaintiffs, namely all of Defendant's current and prospective Florida Users.

Furthermore, Defendant's defenses do not relate in any way to its TOS.  Unlike a traditional contract case, there is no issue as to Defendant's performance *vis-a-vis* duties to the Plaintiffs.

## V.      <u>PUBLIC INTEREST COMPELS THAT THE COURT RETAIN JURISDICTION</u>

Public interest compels that the Court retain jurisdiction in this action.  A strong public policy can outweigh even a valid forum selection clause, negotiated at arm's length between fully informed parties, which Defendant concedes in its Motion is not the case in this action.  *See*

---

[5] It should be noted that several Florida courts have held that a forum selection clause did mandate transfer, but in the cases cited here the clause's contractual language was far broader than in the case before the Court: *SAI Ins. Agency, Inc., v. Applied Sys*, 858 So.2d 401, 402 (1st DCA 2003) (contract language stated, "any action or claim between the parties"); *World Vacation Travel v. Brooker*, 799 So.2d 410, 411 (3rd DCA 2001) (contract language stated, "[i]n case of any controversy or dispute in the interpretation of this agreement"); *America Online, Inc., v. Booker*, 781 So.2d 423, 424 n.1 (3rd DCA 2001) (contract language stated, "any claim or dispute with AOL").

*Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009); (Motion at 8).   The Supreme Court has recognized that such factors include "the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 62 n.6 (2013).

This case should remain before the Court because the FDUTPA claims in Counts III and IV allege what is in essence a localized controversy.  The relief sought here will primarily affect the way Defendant engages in business in Florida.  No relief this Court may grant under FDUTPA will affect any California consumers.  The impact on California will be limited to a burden on software engineers and marketers to ensure that Defendant's practices in Florida are compliant with Florida law.  Plaintiffs respectfully submit that as California has no particular interest in how Florida regulates businesses within its borders, California courts should not be burdened with enforcing Florida's laws, and matters concerning Florida consumers should not be vested in the care of Californian jurors.

Under *Atlantic Marine*, a valid forum selection clause can be ignored in "exceptional cases." *Id.* at 64.  Plaintiffs submit that this is, in fact, an exceptional case.  Plaintiff was removed from his account while sitting as President of the United States.  As a resident of Florida, Plaintiff has been unable to re-establish his account with Defendant.  Plaintiff is uniquely suited to bring the FDUTPA claim of Count III, and Plaintiffs have clear standing to bring the SSMCA claim of Count IV, as well as the constitutional claims in Counts I and II.  As to Count III, the Plaintiff need not establish any contractual relationship nor any financial loss to have standing—merely his status as an aggrieved party grants him standing.  Few other jurisdictions have such generous standing provisions for injunctive relief.  Furthermore, unlike FDUTPA, Florida's SSMCA is possibly the first social media law in the nation of its kind, and there is no parallel law to SSMCA in California.

Count III is a localized issue given the Florida Legislature's clear preference to ease of standing to obtain injunctive relief on behalf of Florida consumers, and the Florida Legislature's enactment of the SSMCA is similarly an example of how Count IV is truly a localized controversy.

*Seaman v. Priv. Placement Cap. Notes II, LLC*, No. 16-CV-00578-BAS-DHB, 2017 WL 1166336, at *1 (S.D. Cal. Mar. 29, 2017) is instructive as to when a Court may retain jurisdiction in an extraordinary case, even where there is a valid forum selection clause. There, the Securities and Exchange Commission brought a claim for violations of the securities laws, and obtained a receiver on the subject entities. *Id.* at *1-*2. Facing a binding forum selection clause mandating transfer to Colorado, the California court nevertheless retained jurisdiction, stating that the "Court finds that this is the rare and unusual case where public interest factors defeat transfer to the contractually designated forum." *Id.* at *7. It first held that transfer would generate additional costs to the receiver, which would deplete potential recovery for the victims of the Defendant's practices. *Id.* The Court went on to state as an additional factor for retaining jurisdiction:

> Second, the Southern District of California has a strong local interest in this controversy. The SEC Enforcement Action from which this case stems was filed in this District. The Receivership Entities' principal places of business are in this District. The largest concentration of defrauded investors is in this District. **The Court raises these points not to suggest this District is a more convenient forum but rather to emphasize that the fallout and damage from the alleged fraudulent conduct is overwhelmingly concentrated in this District, as opposed to the District of Colorado**.

*Id.* (emphasis added). As with the court in *Seaman*, this Court similarly confronts an issue where it is not so much the convenience of the District which should drive the Court's decision to retain this case, as it is the overwhelming Florida interest in the case. Defendant has availed itself so fully of this forum, and infiltrated the daily lives of so many of its citizens, that the State of Florida has taken a special interest in protecting those citizens from Defendant's documented abuses.

15

Under Counts III and IV, Defendant's deceptive acts took place within Florida, and all of the potential relief is to be directed to Florida consumers and the means and methods by which Defendant will engage in business in Florida. Any California nexus is negligible at most, particularly in light of the fact that California has not demonstrated the same interest in protecting its citizens as has Florida.

More generalized policy interests also compel that the Court retain jurisdiction. Parties to contracts are entitled to clarity and full disclosure about the nature and scope of the agreements into which they enter. Whistle blowers, psychologists and tech ethicists have gone on the record to document that social media companies intentionally engineer their software to be addictive, and to create dependency among their Users. For example, in testimony before the House Committee on Technology and Commerce on September 24, 2020, former Facebook Director of Monetization Tim Kendall testified that in engineering Facebook, "we sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun. We took a page from Big Tobacco's playbook, working to make our offering addictive at the outset." (A true and correct copy of Mr. Kendall's testimony is annexed hereto as Ex. D.) He further testified that social media is engineered such that it "preys on the most primal parts of your brain. The algorithm maximizes your attention by hitting you repeatedly with content that triggers your strongest emotions— it aims to provoke, shock, and enrage." (Ex. D.) Defendant has adopted a number of the intentionally manipulative techniques first employed by Facebook, including the "infinite scroll," the "like button" and algorithmically tailored content.

The total immersion that Defendant seeks to achieve on the part of its Users leads to a dependency that alters the relative bargaining positions of Defendant and those Users. Thus, even when Defendant prompts its Users to review its updated TOS, Defendant knows that its Users are dependent on its services and more than likely than not to accept its changes, whatever they may

be.  Further, Defendant updates its TOS and interface regularly, which can lead to fatigue and confusion among Users. Over time, the bargaining power between social media companies and their Users shifts dramatically.  As a result, it is likely that a relatively small percentage of Defendant's Users have ever read and developed an understanding of Defendant's updates to its TOS or to its policies.

Defendant's TOS state only that Defendant "will try to notify" its Users regarding "material revisions" to its TOS.  (Ex. A.)  Under Defendant's TOS, however, Users are bound by any and all of Defendant's changes, whether designated by Defendant as "material" or not, simply "[b]y continuing to access or use the Services after those revisions become effective." (Ex. A.)  Contrary to Defendant's assertion, Plaintiff does not allege that he entered into an agreement with Defendant. (Motion at 8.)  Rather, Defendant concedes that its Motion is predicated entirely upon Defendant's "acceptance by use" of its TOS.  (Motion at 8.)

In enforcing a forum selection clause contained in a different social media company's terms of service, this District has noted that "[s]ocial media is not a requirement of life." *Loomer v. Facebook, Inc.*, No. 19-CV-80893, 2020 WL 2926357, at *3 (S.D. Fla. Apr. 13, 2020).  That view, however, is at odds with the United States Supreme Court's prior acknowledgement that "[s]ocial media allows users to gain access to information and communicate with one another about it on any subject that might come to mind" and provides "what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  "These websites [ . . .] allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Id.* (quoting *Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997)).  Justice Thomas has described giant social media as "infrastructure." *Biden v. Knight First Amdt. Inst.*, 141 S. Ct.

1220, 1221.  In this regard, participating in social media is absolutely a requirement of being an active, engaged and informed American citizen in the 21st century, especially with respect to the health of the democratic process.

Justice Thomas also recently identified multiple cases that have been wrongly decided regarding 47 U.S.C. § 230, or in which courts have used an overbroad approach to the immunity it confers upon tech companies. *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) ("This modest understanding [of Section 230] is a far cry from what has prevailed in court. Adopting the too-common practice of reading extra immunity into statutes where it does not belong[.]"). Justice Thomas cited with approval a Middle District of Florida case which declined to follow Ninth Circuit and the Northern District of California cases interpreting 47 U.S.C. § 230 in such a way as to render portions of Section 230 superfluous. *Id.* at 17 (citing *e-ventures Worldwide, LLC, v. Google, Inc.* 2017 WL 2210029 (M.D. Fla. February 8, 2017) (holding that the Court would not follow Ninth Circuit case law which allows the general immunity of Section 230 (c)(1) to, "swallo[w] the more specific immunity in (c)(2).").  Plaintiffs respectfully submit that all of these claims, but in particular the FDUTPA and SSMCA claims, reflect localized issues upon which the Eleventh Circuit should decide how Section 230 applies, particularly in view of Justice Thomas's interpretation of Section 230 and warnings about continued error.

## VI.    RETENTION IS APPROPRIATE UNDER 28 U.S.C. § 1404(a)

In the absence of a binding forum selection clause, the analysis under 28 U.S.C. § 1404(a) shifts to include the private, as well as the public interests set out above.  *Atlantic Marine*, 517 U.S. at 62.  The public and private factors to be considered include:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's

> familiarity with the governing law; (8) the weight accorded a
> plaintiff's choice of forum; and (9) trial efficiency and the interests
> of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.* 430 F.3d 1132, n.1 (11th Cir. 2005). When weighed together, the balance of these nine criteria supports a conclusion that this Court should deny the Motion.

The first five criteria, witness convenience, location of evidence, convenience of parties, locus of facts, and availability of process are, in a case involving technology issues and in an era in which the entire world of business and law have become accustomed to virtual meetings and Xerox machines, essentially neutral in application. The vast majority of the evidence likely will be electronic.

As to the sixth criterion, the relative means of the parties, suffice it to say that Defendant Twitter has, as of September, 2021, a market capitalization of $47,950,000,000.00, making it roughly the 170th largest company in the United States. Plaintiffs' access to resources to conduct extensive litigation in Northern California are limited. The seventh criterion, this forum's familiarity with the law is, Plaintiff respectfully submits, a driving factor in favor of denying this Motion. This Court has frequently heard matters involving FDUTPA. The new SSMCA act is housed within FDUTPA, and while it is a new law, much of the analysis of FDUTPA cases with which this Court is already familiar will be applicable to an interpretation of the SSMCA. There will be a decided lack of familiarity with FDUTPA by a court in California, and thereby as a simple matter of judicial economy, a denial of the Motion would be appropriate.

The eighth criterion, the weight accorded to the Plaintiffs' choice of forum, also supports denial of the motion. Plaintiffs' choice of forum is accorded considerable deference. *Atlantic Marine*, 571 U.S. at 63; *Robinson v. Giamarco & Bill, P.C.*, 74 F.3d 253 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations."); *Mindbasehq LLC, v. Google, LLC*, 2021 U.S. Dist. Lexis 91089 *7 (S.D. Fla.

May 12, 2021) ("'Ultimately, transfer can only be granted where the balance of convenience of the parties strongly favors the defendant' . . . [t]raditionally, a plaintiff's choice of forum is accorded considerable deference.") (citations omitted).

The last criteria, trial efficiency and the interest of justice, also support denial of the Motion. Plaintiffs have set out above the point that the causes of action here are of benefit to parties well beyond the Plaintiffs, and that the relief sought is essentially prospective in nature, not retrospective. Defendant is seeking to have this Court transfer to a California court a matter involving Florida residents' claims about how Defendant's conduct does not comport with Florida's laws.

## CONCLUSION

Based upon the foregoing, Plaintiffs respectfully submit that this Court should deny Defendant's Motion, and allow this Florida matter to be heard in Florida.

Date: September 22, 2021

Respectfully submitted,

/s/ Matthew Lee Baldwin
Matthew L. Baldwin, Esq.
Florida Bar No. 27463
VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528
Email: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

/s/ Carlos Trujillo
Carlos Trujillo, Esq.
Florida Bar No. 42697
VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528

Email: Ctrujillo@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com
*Of Counsel*

JOHN P. COALE *(Pro Hac Vice)*
2901 Fessenden St. NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY (*Pro Hac Vice*)
E-mail: jqkelly@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

RYAN S. TOUGIAS *(Pro Hac Vice)*
E-mail: rtougias@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

MICHAEL J. JONES *(Pro Hac Vice)*
E-mail: mjones@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

RICHARD P. LAWSON, ESQ.
Florida Bar No. 165085
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: rlawson@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

LUIS MARTINEZ-MONFORT, ESQ.
Florida Bar No. 0132713
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: rlawson@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 22, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon all Counsel of Record via transmission of Notices of Electronic Filing generated by CM/ECF.

By:   */s/ Matthew Lee Baldwin*
Matthew L. Baldwin, Esq.