# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| DONALD J. TRUMP, the Forty-Fifth President of the United States, ELIZABETH ALBERT, KIYAN AND BOBBY MICHAEL, JENNIFER HORTON, ANDRES CABOS, MAGALYS RIOS, AND MARIA RODRIGUEZ-FRESNEDA, INDIVIDUALLY, AND ON BEHALF OF THOSE SIMILARLY SITUATED, Plaintiffs, v. FACEBOOK, INC., and MARK ZUCKERBERG, Defendants. | Civil Action No. 1:21-cv-22440-KMW-CMM **AMENDED CLASS ACTION COMPLAINT FOR:** **FIRST AMENDMENT VIOLATION DECLARATORY JUDGMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT** **FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201** *et seq.* **(INJUNCTIVE RELIEF, FLORIDA STATUTES § 501.211(1))** **FLORIDA DECEPTIVEAND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201** *et seq.* **(INCONSISTENT APPLICATION OF STANDARDS, FLORIDA STATUTES § 501.2041)** |

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States, Putative Class

Members, Elizabeth Albert, Kiyan and Bobby Michael, Jennifer Horton, Andres Cabos, Magalys

Rios, Maria Rodriguez-Fresneda, individually, and on behalf of those similarly situated, pursuant

to Fed. R. Civ. P. 15(a)(1)(A), files this Amended Complaint as a matter of right prior to service of the Complaint [D.E. 1], and states:

## INTRODUCTION

1.      Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States, Putative Class Members, Elizabeth Albert, Kiyan and Bobby Michael, Jennifer Horton, Andres Cabos, Magalys Rios, Maria Rodriguez-Fresneda, individually, and on behalf of those similarly situated, by and through the undersigned counsel, brings this action against Defendant Facebook, Inc., ("Facebook"), and its Chief Executive Officer, Defendant Mark Zuckerberg ("Zuckerberg"), individually. The allegations herein of the Plaintiff and Putative Class Members are based upon personal knowledge and belief as to their own acts, and upon the investigation of their counsel, and upon information and belief as to all other matters.

2.      Facebook promotes itself as a service for people "to talk openly about the issues that matter to them, even if some may disagree or find them objectionable." Facebook's power and influence are immense. It currently boasts close to three (3) billion registered Users worldwide and over 124 million Users in the United States. Facebook had $86.0 billion in total revenue, for a net profit margin of 33.9%, in fiscal year 2020.

3.      Facebook has increasingly engaged in impermissible censorship in response to coercive measures by congressional legislators and the Executive Branch, including the U.S. Department of Health and Human Services ("HHS") and the Centers for Disease Control and Prevention ("CDC"), threatened detrimental legislative action against it, a misguided reliance upon Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230, and willful participation in joint activity with federal actors. Facebook's status regarding the regulation of speech has thus risen beyond that of a private company to that of a state actor. As such,

Defendant is constrained by the First Amendment right to free speech in the censorship decisions it makes regarding its Users.

4. Legislation passed twenty-five (25) years ago intended to protect minors from the transmission of obscene materials on the Internet, and to promote the growth and development of social media companies, has enabled Facebook to grow into a commercial giant that now censors (flags, removes, shadow bans, etc.) and otherwise restricts with impunity the constitutionally protected free speech of the Plaintiff and the Putative Class Members.

5. The immediacy of Defendants' threat to their Users, and potentially every citizen's right to free speech, cannot be overstated. Defendants' callous disregard of its Users' constitutional rights is no better exemplified than in the matter currently before the Court.

6. On January 7, 2021, Defendants indefinitely banned the sitting President of the United States from their platform for exercising his constitutional right of free speech.

7. Defendants extended their conditional and unconstitutional prior restraint of the Plaintiff's right to free speech as a private citizen until at least January of 2023.

8. Defendants then served warnings to members of President Trump's family, Team Trump, other Facebook Users, and Putative Class Members that its ban extends to anyone attempting to post Donald J. Trump's "voice." Censorship runs rampant against the Putative Class Members, and the result is a chilling effect cast over our nation's pressing political, medical, social, and cultural discussions.

9. The Plaintiff, a sitting President of the United States, was banned by the Defendants, as were the Putative Class Members, using non-existent or broad, vague, and ever-shifting standards. While Facebook's ban and prior restraint of the Plaintiff are well-documented, the untold stories of Putative Class Members are now stirring the public conscience.

10.    Using the unconstitutional authority delegated to them by Congress, Defendants have also mounted an aggressive campaign of censorship against a multitude of Putative Class Members through censorship (flagging, shadow banning, etc.) resulting from legislative coercion.

11.    Defendants de-platformed the Plaintiff, and Putative Class Members, at the behest of, in cooperation with, and with the approval of Congress and the Executive Branch.

12.    Akin to forcing a round peg into a square hole, Facebook declared that specific posts of the Plaintiff had violated Facebook's self-imposed "Community Standards."  Countless other Facebook Users have been censored by Facebook with no explanation given.

13.    If Defendants can effectively censor and impose a prior restraint on the protected political speech of a sitting President of the United States, then the threat to Putative Class Members, our citizens, and our United States Constitution is imminent, severe, and irreparable.

14.    The Plaintiff and the Putative Class Members respectfully ask this Court to declare that Section 230(c)(1) and (c)(2) of the Communications Decency Act of 1996, on their face and as applied in this matter are an unconstitutional delegation of authority, and that the Defendants' actions directed at the Plaintiff and the Putative Class Members are a prior restraint on their First Amendment right to free speech. The Plaintiff and Putative Class Members also respectfully asks this Court to order the Defendants to restore the Facebook account of the Plaintiff, as well as those de-platformed Putative Class Members, and to prohibit Defendants from exercising censorship, editorial control, or prior restraint in its many forms over the posts of the Plaintiff and/or the Putative Class Members.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1332, 28 U.S.C. §§ 2201-2202.

16.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), because: (i) the proposed class consists of well over 1,000,000 Members; (ii) the Members of the proposed Class, including the Plaintiff, are citizens of states different from Defendant's home states; and (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), (d), and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and the Plaintiff brings this suit for actions taken by Defendants that occurred while the Plaintiff was serving in his capacity as President of the United States.  Also, the Defendants' prior restraint of the Plaintiff's, and the Putative Class Members' speech continues to this day.

## PARTIES

### A.     Plaintiff And The Putative Class Members

18.     Donald J. Trump ("Plaintiff"), the Forty-Fifth President of the United States, is a private citizen and is domiciled in Palm Beach, Florida.

19.     Putative Class Member Elizabeth Albert, a United States citizen, domiciled in the state of Florida.

20.     Putative Class Member Kiyan and Bobby Michael, United States citizens, domiciled in the state of Florida.

21.     Putative Class Member Jennifer Horton, a United States citizen, domiciled in the state of Michigan.

22.     Putative Class Member Andres Cabo, a United States citizen, domiciled in Miami-Dade County, state of Florida.

23.     Putative Class Member Magalys Rios, a United States citizen, domiciled in Miami-Dade County, Florida.

24.     Putative Class Member Maria Rodriguez-Fresneda, a United States citizen, domiciled in Miami-Dade County, Florida.

**Class**

25.     All Facebook platform Users ("The Class") who have resided in the United States between June 1, 2018, and today that had their Facebook account censored by Defendants and were damaged thereby.

**Defendants**

26.     Defendant Facebook is a foreign corporation with a principal place of business at 1601 Willow Road, Menlo Park, California, and conducts business in the State of Florida, throughout the United States, and internationally.  Facebook has forty-one (41) offices in the United States and forty-five (45) offices located worldwide. Facebook has been registered in Florida as a foreign profit corporation since 2011.

27.     Defendant Zuckerberg is the Chairman and Chief Executive Officer of Facebook, Inc. Zuckerberg owns a controlling interest in Facebook's stock, and upon information and belief, resides in Palo Alto, California.

## STATEMENT OF FACTS

**I.    DEFENDANTS FACEBOOK AND ZUCKERBERG**

### A. Defendant Facebook

28.    The United States Supreme Court has recognized that social media platforms such as Facebook provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737. These platforms have been revolution[ary]," not least because they have transformed civic engagement by allowing elected officials to communicate instantaneously and directly with their constituents. *Id.* Facebook enables ordinary citizens to speak directly to public officials and listen to and debate others about public issues, in much the same way they could if gathered on a sidewalk or in a public park or city council meeting or town hall.

29.    In 2007, Facebook launched the Facebook platform, which allowed for the integration of third-party applications, known as "Apps," and for the website to be integrated into the larger worldwide web through search-engine indexing.

30.    Facebook actively encourages Users to express their ideas and communicate via its platform in the forms of comments and "likes" on postings. While encouraging extensive User engagement, Facebook also collects massive amounts of its Users' data to sell to advertisers.

31.    As a social media conglomerate, Facebook allows Users to publish personal pages with personal message postings, links to news articles, videos, photographs, and publicly interact with other Users through speech.  The speech posted on Facebook pages ranges from Users' mundane musings on everyday life to the most important new topics of the day, including political speech.

32.     A Facebook "User" is an individual who is permitted to create an account on its platform. A User can post on their "wall," a type of message board, a variety of speech, including their own commentary, videos, photographs, and links to news articles.  Other Users can view, share and comment on the content on the User's wall.  Users rate other Users' content and speech by giving it "likes."  Users also can send messages directly to each other and are updated by postings within their network of friends.  By communicating with each other, Users create valuable communications that may become newsworthy.

33.     The general public can also access Facebook postings through the Internet if the User creates a public profile.

34.     Facebook created a Newsfeed for its Users to offer selective postings, news articles, and targeted advertisements that it determines a User may like, depending on the personal information and history of that User. Facebook determines which posts and advertisements appear on a User's Newsfeed by using an algorithm, which creates a ranking system that predicts which posts will be most valuable and meaningful to an individual.

35.     Facebook engages in targeted censorship decisions by using both algorithms and employees (referred to as "content moderators") utilizing an internal tool developed by Facebook called TASKS.

36.     Facebook's content moderators use TASKS to entertain censorship suggestions from employees. Facebook content moderators then often consult with their peers at other similarly situated social media platforms in deciding who, or what, to censor.

37.     Facebook and Twitter Inc. employees often coordinate their censorship efforts. A recent review of domain names on Facebook's TASKS platform referred to Twitter domain

names, as well as particular phrases, words, or individuals both Facebook and Twitter were considering censoring, or ultimately did censor.

38.     Within two (2) minutes of one another, Facebook and Twitter suspended President Trump on January 7, 2021. Such simultaneous censorship and its origins are suspicious and worthy of the Court's consideration when evaluating the conduct of the Defendants.

39.     Facebook also has developed a powerful tracking platform, Centra that allows Facebook to monitor its Users' speech and activity, not only on each individual User's Facebook page but also that Users' speech and activity on any other social media platform across the entire Internet—and across all of that User's Internet-connected devices as well.

40.     By utilizing its Centra tracking platform, Facebook has the ability not only to censor (*i.e.*, flag, shadow ban, etc.) or otherwise constrain its own Facebook Users' constitutionally protected speech, but also potentially to censor Facebook Users on other social media platforms.

41.     Facebook has what it refers to as its "Community Standards" and states: "These guidelines outline our standards regarding the content you post to Facebook and your other Facebook products."

42.     Facebook's Community Standards guidelines regarding hate speech, incitement, or praise of violence are vague, broad, ill-defined, or not defined at all.

43.     Facebook's Community Standards Guidelines on Hate Speech read as follows:

We define hate speech as a direct attack against people — rather than concepts or institutions— on the basis of what we call protected characteristics: race, ethnicity, national origin, disability, religious affiliation, caste, sexual orientation, sex, gender identity and serious disease. We define attacks as violent or dehumanizing speech, harmful stereotypes, statements of inferiority, expressions of contempt, disgust or dismissal, cursing and calls for exclusion or segregation. We also prohibit the use of harmful stereotypes, which we define as dehumanizing comparisons that have historically

9

been used to attack, intimidate, or exclude specific groups, and that are often linked with offline violence.

44.     Facebook's Community Standards Guidelines on Incitement of Violence read as

follows:

We aim to prevent potential offline harm that may be related to content on Facebook. While we understand that people commonly express disdain or disagreement by threatening or calling for violence in non-serious ways, we remove language that incites or facilitates serious violence. We remove content, disable accounts and work with law enforcement when we believe there is a genuine risk of physical harm or direct threats to public safety. We also try to consider the language and context in order to distinguish casual statements from content that constitutes a credible threat to public or personal safety.

45.     Facebook's Community Standards Guidelines on Praising Violence read as

follows:

In addition, we do not allow content that praises, substantively supports, or represents events that Facebook designates as violating violent events - including terrorist attacks, hate events, mass murders or attempted mass murders, multiple murders, or hate crimes.

46.     Additionally, Facebook directs Users to another website,

www.oversightboard.com, where Facebook states that an independent review board reviews

content removal and account suspension decisions selectively referred to it by Facebook.

47.     In October of 2020, Facebook formed an Oversight Board, which consists of

twenty (20) people around the world, six (6) members from the United States, and forty (40)

people when fully staffed. The Oversight Board is described by Zuckerberg as the Facebook

"Supreme Court." The purpose of the Board is to review "select" cases, review content decisions

of Facebook staff, analyze whether the decisions made by Facebook are compliant with their set

guidelines and standards, and ensure free speech flourishes on Facebook and Instagram

platforms.

48.     On January 7, 2021, Mark Zuckerberg unilaterally decided to "indefinitely suspend" Donald J Trump's Facebook and Instagram accounts.

49.     On January 21, 2021, the indefinite de-platforming of the Plaintiff was referred to Facebook's own Oversight Board.

50.     On May 5, 2021, the Oversight Board reviewed the decision made by Mark Zuckerberg to delete Facebook President Trump's Facebook account. The Oversight Board, operating with half the members intended, issued an order which stated in part:

> It is not permissible for Facebook to keep a user off the platform for an undefined period, with no criteria for when or whether the account will be restored. In applying this penalty, Facebook did not follow a clear, published procedure. 'Indefinite' suspensions are not described in the company's content policies. Facebook's normal penalties include removing the violating content, imposing a time-bound period of suspension, or permanently disabling the page and account. It is Facebook's role to create necessary and proportionate penalties that respond to severe violations of its content policies. The Board's role is to ensure that Facebook's rules and processes are consistent with its content policies, its values and its human rights commitments.

51.     The Oversight Board went on to state that they would not decide on how long the Plaintiff would be banned from the platform, instead ordering Facebook leadership to "supply and justify a defined penalty." The Oversight Board also made multiple recommendations, including some suggestions regarding Facebook standards and policies. The case of President Trump was, in essence, remanded back to Defendant Zuckerberg to define a penalty in accordance with their ruling.

52.     On June 4, 2021, Facebook responded to the Oversight Boards' ruling, changed its policies regarding political figures, and suspended President Trump for at least 2 years until January 2023.  Facebook included that if President Trump were reinstated in 2023, there would be a strict set of rapidly escalating sanctions applicable to his account.

At the end of this period, we will look to experts to assess whether the risk to public safety has receded. We will evaluate external factors, including instances of violence, restrictions on peaceful assembly and other markers of civil unrest…
-Nick Clegg, Facebook's Vice President of Global Affairs

53.     In a far more sweeping gesture, Facebook pivoted on its policy of assessing the newsworthiness of accounts and posts in its analysis of whether to delete content.  The newsworthiness balancing test is now allegedly applied equally by Facebook to all Users, and the political status of a User would no longer be considered.

54.     While Facebook's censoring of the Plaintiff was the most widely publicized action taken by Defendants, countless other Putative Class Members have had their views or content similarly de-platformed or censored by Defendants for arbitrary reasons, or no reason at all.

55.     These Putative Class Members censored by Defendants, without the benefit of any review, lost not only a primary means of communicating with friends and family but also their ability to access wide-ranging views and content on the most pressing issues of the day.

**B. Defendant Zuckerberg**

56.     Defendant Zuckerberg is a co-founder of Facebook, and at all times relevant hereto has served as Facebook's Chairman, Chief Executive Officer, and controlling shareholder. Upon information and belief, He resides in the Northern District of California and is a "person" who may be sued under 18 U.S.C. § 1961(3).

57.     According to its 2018 Proxy Statement, Defendant Zuckerberg has the sole power to elect or remove any director from Facebook's Board, as he controls a majority (53.3%) of Facebook's total voting shares. Zuckerberg directs and controls Facebook's business and is

personally responsible for the damages caused by his individual and controlled entities' misconduct as set forth herein.

58.     Defendant Zuckerberg was personally involved in, and personally responsible for, the decision to de-platform the Plaintiff. On the morning of January 7, 2021, Zuckerberg informed high-ranking Facebook officers of his decision that Plaintiff's Facebook account should be suspended indefinitely.

## II.  PLAINTIFF'S USE OF FACEBOOK'S PLATFORM

### A.  The Donald J. Trump Facebook Account

59.     The Plaintiff established his Facebook account in May of 2009 and used the account for several years to engage with his followers about politics, celebrities, golf, and his business interests, among other topics. After he announced his candidacy for President in the 2016 election, the Plaintiff used his Facebook account to speak directly to his followers and the public at large. By using social media, including Facebook, the Plaintiff strategically circumvented what he saw as a mainstream media that was biased against him.

60.     After his inauguration as President in January of 2017, the Plaintiff's Facebook account became an instrument of his presidency. By virtue of the way he used his account, the Plaintiff's messages became an important source of news and information about the government, as did his followers' comments associated with the Plaintiff's posts. The Plaintiff's account became a public forum for speech by, to, and about government policy.

61.     When the Plaintiff utilized his Facebook account in his official capacity as President: (a) it became an important outlet for news organizations and the U.S. government; and (b) his Facebook account operated as a public forum, serving a public function.

62.     The comments generated by the Plaintiff's Facebook posts also gave rise to important public discussion and debate about government policy. Typically, his posts would generate thousands of replies posted by other Users, some of which would generate hundreds or thousands of replies in return. The Plaintiff's account was a digital town hall in which the President of the United States communicated news and information to the public directly. The Plaintiffs' followers on Facebook used the reply function to respond directly to the Plaintiff and his office and to exchange views with one another. In addition, the general public could access the Plaintiff's postings on the Internet.

63.     The Plaintiff used his Facebook account to interact on a myriad of subjects with his followers and the public at large. Supporters and critics alike were welcome on the President's Facebook page. No one was excluded, regardless of their views.

64.     The Plaintiff used Facebook, and other social media platforms, to communicate directly with the American public more than any other President had in the past.

65.     Not only were the Plaintiff's Facebook posts accessible to his followers, but other members of the public could, and did, access his posts at any time on the Internet.

66.     The Putative Class Members used their Facebook accounts in a similar fashion, sharing information, opinions, photographs, videos, and news with their networks ranging from friends and family to larger public audiences.

### III. DEMOCRAT LEGISLATORS COERCED DEFENDANTS TO CENSOR THE PLAINTIFF AND PUTATIVE CLASS MEMBERS

67.     Democrat legislators in Congress feared the Plaintiff's skilled use of social media as a threat to their own re-election efforts. These legislators exerted overt coercion, using both words and actions, upon Defendants to have Defendants censor the views and content of both the Plaintiff and the Putative Class Members that these Members of Congress disagreed with.

68.     Not only did Democrat legislators openly voice their displeasure with Defendants for providing a platform to the Plaintiff and Putative Class Members, but they also spoke publicly of the steps they would take against Defendants if Defendants continued to provide a platform for the expression of views and content contrary to the legislators' own agendas.

69.     Legislators (and in one instance Michelle Obama, the former First Lady) made it increasingly clear that they wanted the Plaintiff and the Putative Class Members, and the views and content they espoused, to be banned from Defendants' platform.

70.     Democrat legislators then threatened to revoke the unconstitutional limited immunity for "good faith" censorship under Section 230 and coerced Defendants to act as their agent to exercise content and viewpoint censorship against the Plaintiff and the Putative Class Members that the Democrat legislators knew they could not accomplish on their own.

71.     Below are just some examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if Facebook did not censor views and content with which these members of Congress disagreed, including the views and content of the Plaintiff and the Putative Class Members:

- "But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed." (Rep. Nancy Pelosi, Speaker of the House, April 12, 2019);

- "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms." (Joe Biden, Interview in December of 2019 and published January 2020);

- "We can and should have a conversation about Section 230 – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight." (Statement of US Sen. Mark Warner on Section 230 Hearing on October 28, 2020.);

- "It's long past time to hold the social media companies accountable for what's published on their platforms." (Bruce Reed, Biden's Top Tech Advisor, December 2, 2020);

- @jack (Jack Dorsey) Time to do something about this Tweet. (Sen. Kamala Harris' Tweet, October 2, 2019);

- 2020 Presidential candidate Sen. Kamala Harris calls on Twitter to suspend President Trump's account – (ABCNews.go.com October 2, 2019);

- If the president goes on Facebook and encourages violence, that you will make sure your company's algorithms don't spread that content and you will immediately remove those messages? (Sen. Markey October 23, 2020, Zuckerberg Senate Testimony);

- "Senator, yes. Incitement of violence is against our policy and there are not exceptions to that, including for politicians." (Mark Zuckerberg response, November 17, 2020, Mark Zuckerberg and Jack Dorsey, Senate Tech Hearing);

- "…Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media. The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters… Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age." (Sen. Blumenthal (13:35) October 23, 2020: Tech CEO's Senate Testimony)

- I have urged, in fact, a breakup of tech giants because they've misused their bigness and power. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in Court. (Sen. Blumenthal (14:48) October 23, 2020: Tech CEO's Senate Testimony)

- "Now is the time for Silicon Valley companies to stop enabling this monstrous behavior and go even further than they have already by permanently banning this man (Trump) from their platforms. (Michelle Obama on Twitter, January 7, 2021)

- "The law (230) acts as a shield allowing them (Internet platforms) to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." (Sen. Mazie Hirono's Tweet, February 5, 2021)

- Before a March 2021 Joint Hearing of the Communications and Technology Subcommittee, the following statement was issued by the respective Democrat Chairmen: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. Industry self-regulation has failed. We must begin the work of changing incentives

driving social media companies to allow and even promote misinformation and disinformation."

- "There's no Constitutional protection for using social media to incite an insurrection. Trump is willing to do anything for himself no matter the danger to our country. His big lies have cost America dearly. And until he stops, Facebook must ban him. Which is to say, forever." (Rep. Adam Schiff's Tweet, May 5, 2021)

72.    Democrat legislators not only voiced their threats (e.g., new regulations and removing Section 230 immunity) to Facebook and the other major social media platforms, but also employed additional measures to deliver their unmistakable message that they were prepared to act against Defendants if Defendants did not increase their censorship of disfavored views and content of the Plaintiff and Putative Class Members.

73.    These additional measures included convening public hearings, issuing subpoenas, dragging in the CEOs of the largest social media companies to testify publicly before Congress, and subjecting these CEOs to lengthy, embarrassing questioning.

74.    Some specific examples of when these above measures were exerted on Defendants:

On July 29, 2020, Four Big Tech CEOs testified before the House in an antitrust hearing. Amazon Founder and CEO Jeff Bezos, Defendant Zuckerberg, Apple CEO Tim Cook, and Alphabet and Google CEO Sundar Pichai attempted to defend their companies against accusations of anticompetitive practices. (Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | U.S. House of Representatives Judiciary Committee); and

On October 23, 2019, Defendant Zuckerberg Testified on Facebook cryptocurrency Libra and was confronted on child exploitation on Facebook. (Zuckerberg Testifies on Facebook Cryptocurrency Libra | October 23, 2019); and

On November 17, 2020, Defendant Zuckerberg and Twitter CEO Jack Dorsey testified before the Senate Judiciary Committee on November 17, 2020. They were questioned on speech moderation policies. (Censorship, Suppression, and the 2020 Election | Hearings | November 17, 2020); and

On March 25, 2021, Defendant Zuckerberg, Twitter's Jack Dorsey, and Google's Sundar Pichai appeared virtually before the House Energy and Commerce Committee. (House Hearing on Combating Online Misinformation and Disinformation | March 25, 2021).

75.     With this coercion directed at Defendants by repeatedly requiring Zuckerberg's appearance at hearings, and reinforcing their ability to impose regulations against Facebook, and strip it of its Section 230 immunity, Democrat legislators intended to force Defendants into permanently banning the Plaintiff's access to his Facebook account, his followers, and the public at large.  The other intended result of the legislators' coercion was to deny the Putative Class Members and the public access to the Plaintiff's content and views.

76.     The message conveyed by Democrat legislators to Defendants was clear: exercise your authority to ban the Plaintiff and Putative Class Members who posted views contrary to the legislator's points of view or risk losing the immunity afforded by Section 230 and the tens of billions of dollars of market share that came with it.

77.     The legislators who pressured Defendants to censor the Plaintiff and the Putative Class Members who supported his views employed social media themselves extensively to communicate with their own constituents, promote their accomplishments in office, and fundraise and campaign.

78.     With the Plaintiff removed from Facebook, it is considerably more difficult for the Plaintiff to act as head of the Republican Party, campaign for Republican candidates, fundraise, express his opinions related to the COVID-19 virus, and lay the groundwork for his own potential campaign run for the 2024 Republican Party nomination for President of the United States.

79.     With the Plaintiff removed from Facebook and other social media platforms, balanced, direct public discussions between competing political views on national and local issues have ended.

80.     By banning the Plaintiff and Putative Class Members, Defendants made it more difficult for them directly to communicate with the American public. This also furthered the desires expressed by Congress and the Executive Branch Members in limiting speech related to race, medicine, the election process, the economy, and immigration.

## IV. CONGRESSIONAL LEGISLATION SIGNIFICANTLY ENCOURAGED DEFENDANTS' CENSORSHIP OF PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

81.     Facebook is currently one of the largest, if not the largest, of the social media platforms. Its very existence and growth have been directly enabled by congressional legislation.

82.     In 1996, Congress passed the Communications Decency Act of 1996, which included Section 230(c) intending to promote the growth and development of Internet commerce and protect against the transmission of obscene materials over the Internet to children.

83.     Facebook relies upon 47 U.S.C. § 230, commonly referred to as "Section 230," or the "Good Samaritan" provision, to censor constitutionally permissible free speech of the Plaintiff and the Putative Class Members. Section 230(c) provides:

(1).  TREATMENT OF PUBLISHER OR SPEAKER

No provider or User of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2).   CIVIL LIABILITY

No provider or User of an interactive computer service shall be held liable on account of—

       A.  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or User considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or

otherwise objectionable, whether or not such material is constitutionally protected; or

B. any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

84.     The Internet is a government-created and publicly accessible medium/place, and has been found by Congress to be an important public forum for the expression of economic, social, and political information and business in interstate commerce and is regulated under federal law, including the Communications Decency Act of 1996, and Section 230 thereof.

85.     Section 230(c) has accomplished and exceeded its original purpose in terms of promoting the growth and development of social media platforms.

86.     For example, founded in 2007, Facebook has grown to close to three (3) billion Users, had revenue in 2020 of roughly eighty-six (86) billion dollars, and recently attained market value surpassing one (1) trillion dollars.

87.     However, Facebook has failed to adhere to the congressional preference spelled out in initially enacting Section 230(c), and that was preventing the transmission of obscene material to youths over the Internet.

88.     Facebook has now become a place where pedophiles can use the platforms to target their intended audience. It has failed to engage with the nuances of grooming and sexual exploitation.

89.     In passing Section 230(c), Congress permitted but did not mandate censorship action be taken by social media platforms. Section 230(c) permits Facebook to take down or block speech deemed "objectionable . . . whether or not such material is constitutionally protected." Section 230(c) also pre-empts all conflicting state laws, preventing such censorship from being "made illegal . . . by any provisions of the laws of a State."

90.     Democrat legislators and Executive Branch officials have more recently made it clear that they have a "strong preference" for Defendants to rely on the permissive language of Section 230 and censoring the views and content of the Plaintiff and the Putative Class Members regarding certain topics including:

- So-called COVID-19 "misinformation," including the lack of safety and efficacy of hydroxychloroquine and the use of face masks;

- That COVID-19 originated from a government laboratory in Wuhan, China; and

- Questioning the integrity and the results of the 2020 Presidential election.

91.     Federal actors also share the fruits of Facebook's censorship of the Plaintiff and the Putative Class Members. These benefits include (without limitation):

- CDC and the White House have used Defendants to inexpensively and effectively promote their directives, messages, and policies concerning COVID-19; and suppress contradictory medical views and content;

- Suppression of information suggesting or showing flaws in CDC and/or other federal governmental policy;

- Increasing the number of visitors to the CDC's website;

- Boosting the CDC's highly questionable reputation as reliable and authoritative in its factual and policy determinations;

- Creating a false impression of unequivocal support in the scientific community for the CDC and other governmental directives; and

- Suppression of opinions and information that might lead people to take actions contrary to the federal government's preferences.

## V. DEFENDANTS' WILLFUL PARTICIPATION IN JOINT ACTIVITY WITH FEDERAL ACTORS TO CENSOR PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

92.     The CDC has publicly stated that it works with "social media partners," including Facebook, to "curb the spread of vaccine misinformation."  In a document dated October 11,

2019, the CDC expressly stated that it was "engaging . . . partners" to "contain the spread of [vaccine] misinformation" and specifically stated that the CDC would "work with social media companies" to that end.

93.    Facebook is among the social media "partners" referred to by the CDC.



94.    According to publicly available emails that recently came from a Freedom of Information Act ("FOIA") release, Defendants worked directly and in concert with the CDC and Dr. Anthony Fauci, the Director of National Institute of Allergy and Infectious Diseases ("NIAID") to advance only the narrative subscribed to by Defendants and Dr. Fauci.

95.    In an email chain from March 15 through 17, 2020, between Defendant Zuckerberg and Dr. Fauci, it is clear that the CDC, a government agency, was more than engaging "partners" merely to contain the spread of vaccine "misinformation." The following is a copy of a March 15, 2020, email from that chain:

From: Mark Zuckerberg (b) (6)
Sent: Sunday, March 15, 2020 12:18 PM
To: Fauci, Anthony (NIH/NIAID) [E] (b) (6)>
Subject: Thanks and Ideas

Tony:

I wanted to send a note of thanks for your leadership and everything you're doing to make our country's response to this outbreak as effective as possible. I also wanted to share a few ideas of ways we could help you get your message out, but I understand you're incredibly busy, so don't feel a need to reply unless these seem interesting.

This isn't public yet, but we're building a Coronavirus Information Hub that we're going to put at the top of Facebook for everyone (200+ million Americans, 2.5 billion people worldwide) with two goals: (1) make sure people can get authoritative information from reliable sources and (2) encourage people to practice social distance and give people ideas for doing this using internet tools. This will be live within the next 48 hours.

As a central part of this hub, I think it would be useful to include a video from you because people trust and want to hear from experts rather than just a bunch of agencies and political leaders. This could be done in a number of formats if you're open to it. Probably best would be recording a Q&A where you answer people's top questions, but we'd be open to other formats too.

I'm also doing a series of livestreamed Q&As with health experts to try to use my large following on the platform (100 million followers) to get authoritative information out as well. I'd love to have you do one of these Q&As. This could be the video we put in the Coronavirus Hub or it could be a different thing that we distribute separately, but I think it could be effective as well.

Finally, ████████████████████████████████████████████████ (b) (4)
████████████████████████████████████████████████████████
████████████████████████

Again, I know you're incredibly busy, so don't feel the need to respond if this doesn't seem helpful. If it's easy to talk live, give me a call anytime on my mobile phone: ████ (b) (6).

Thanks again for everything you're doing.

Mark

96.    In response to Zuckerberg's email, National Institute of Health ("NIH")

Communications Director, Courtney Billet, sent Dr. Fauci an email the next day, March 16,

2020, which read:

23

From: Billet, Courtney (NIH/NIAID) [E]      (b) (6) >
Sent: Monday, March 16, 2020 6:53 PM
To: Fauci, Anthony (NIH/NIAID) [E] <     (b) (6) >
Cc: Folkers, Greg (NIH/NIAID) [E]        (b) (6) ; Conrad, Patricia (NIH/NIAID) [E]
      (b) (6) ; Stover, Kathy (NIH/NIAID) [E]       (b) (6) >; Routh, Jennifer
(NIH/NIAID) [E]     (b) (6) >
Subject: ASF: offer from Mark Zuckerberg

Per email below, Mark Zuckerberg has extended a few offers to do videos with you that we would be
happy to seek clearance on for you to do, if you are amenable. These would have the weight and impact
of television – really, more so. Please advise if you want to do and we will seek clearance with VP office
and work with Patty to sort out the logistics.

But an even bigger deal is his offer                  (b) (4)
     The sooner we get that offer up the food-chain the better. I gave Bill Hall a heads-up about this
opportunity and he is standing by to discuss this with HHS and WH comms, but I didn't want him to do
anything without you being aware of the offer. Is it OK if I hand this aspect off to Bill to determine who
the best point of contact would be so the Administration can take advantage of this offer, soonest?

Do you plan to call MZ? His cell number is in his message below.

97.       Dr. Fauci responded to Billet by email the following day, March 17, 2020.

From:             Fauci, Anthony (NIH/NIAID) [E]
Sent:             Tue, 17 Mar 2020 00:23:16 +0000
To:               Billet, Courtney (NIH/NIAID) [E]
Cc:               Folkers, Greg (NIH/NIAID) [E];Conrad, Patricia (NIH/NIAID) [E];Stover, Kathy
(NIH/NIAID) [E];Routh, Jennifer (NIH/NIAID) [E]
Subject:        RE: offer from Mark Zuckerberg

I will write to or call Mark and tell him that I am interested in doing this. I will then tell him
that you will get for him the name of the USG point of contact. I agree it should be Bill Hall
who could then turf to the White House Comms if he wishes

98.       Dr. Fauci also responded by email to Zuckerberg that same day, March 17, 2020,

agreeing to the collaboration Zuckerberg proposed.

From:        Fauci, Anthony (NIH/NIAID) [E]
Sent:        Tue, 17 Mar 2020 00:22:45 +0000
To:          Mark Zuckerberg
Cc:          Conrad, Patricia (NIH/NIAID) [E];Billet, Courtney (NIH/NIAID) [E];Barasch,
Kimberly (NIH/NIAID) [C]
Subject:     RE: Thanks and ideas

Mark:
        Thank you for your kind note.  I tried to call you, but got voice mail.  FYI, my cell phone
number is ⬛⬛⬛⬛ (b) (6)  Your idea and proposal sound terrific.  I would be happy to do a
video for your team.  We need to reach as many people as possible and  convince them to take
mitigation strategies seriously or things will get much, much worse.  Also, your idea about ⬛(b) (4)
is vey exciting.  I am copying my Special Assistant, Patty Conrad.  Her office number is ⬛(b) (6)
⬛⬛⬛ (b) (6).  Please have your people contact her to arrange for the video.  I am also copying the
Director of my Communications and Government Relations group.  She can put your people in
contact with the best person who could be the US Government point of contact fo ⬛⬛⬛ (b) (4)
Best regards,
Tony

99.    All the redactions referred to in the above emails are notated "(b)(4)" indicating

that the purported legal basis for the redaction was commercial or financial information." *See* 5

U.S.C. § 552(b)(4).

100.   In April of 2020, following the emails between Dr. Fauci, NIH Communications

Director Billet, and Defendant Zuckerberg, Defendants would begin what became a concerted,

massive, system-wide, and worldwide program of monitoring COVID-related views and content.

Defendants would censor posts deemed "false claims" flagged by government actors.

101.   Facebook's "COVID and Vaccine Policy" states Facebook does "not allow false

claims about the vaccines or vaccination programs which *public health experts have advised us*

could lead to COVID-19 vaccine rejection" and other "false claims" that "could lead to negative

outcomes."  Facebook, COVID-19 and Vaccine Policy Updates & Protections.

102.   The Policy clarifies that what Facebook means by "false" is not based upon actual

or factual falsity, but rather whether the claim contradicts or challenges the pronouncements or

recommendations propounded by public health authorities, including the CDC.  *See id*. (stating

that Facebook removes vaccine-related content).

103.     A senior official in the Biden Administration stated that when the White House has been involved in "direct engagement" with social media companies, specifically including Facebook, to remove so-called COVID or vaccine "misinformation," and Facebook has publicly confirmed that it assisted the White House in achieving this objective.

104.     Defendants thus acted to censor other medical opinions that did not uphold that narrative of Dr. Fauci and the CDC.

105.     Facebook's censorship (i.e., flagging, shadow banning, etc.) of Users who engaged in speech with a different opinion or posted differing opinions of others regarding the COVID-19 vaccinations was closely coordinated censorship of free speech between Defendants, a specific government actor, Dr. Fauci, and specific government agencies, including the CDC, NIH, and NIAID to constrain free speech.

106.     When Facebook censored the Plaintiff or Putative Class Members for spreading "false" information regarding the safety and efficacy of the vaccine, it was an act of bad faith. It is necessary for people to have a robust exchange of ideas, yet Defendant Zuckerberg and Facebook have worked closely with government actors to silence any opposing views on COVID-related issues.

107.     Before, during, and after the 2020 Presidential election, the Plaintiff's Facebook account was censored multiple times for the views he expressed or content he shared on Facebook related to COVID-19. For example:







108.    Defendants also worked directly with government actors to censor the Plaintiff and Putative Class Members when they supported the view or posted others who supported the view that hydroxychloroquine might be an effective, preventative option to protect against the coronavirus.

109.    On July 15, 2021, White House Press Secretary Jennifer Psaki confirmed that Executive Branch officials regularly act with social media platforms at the highest levels to promote speech preferred by the government and to identify and censor the content of other speech related to COVID-19, which the government views as false. The transcript from the White House press briefing held on July 15, 2021, reads as follows:

> Q    Can you talk a little bit more about this request for tech companies to be more aggressive in policing misinformation? Has the administration been in touch with any of these companies and are there any actions that the federal government can take to ensure their cooperation, because we've seen, from the start, there's not a lot of action on some of these platforms.

28

MS. PSAKI: Sure. Well, first, we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic.

We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation. We're working with doctors and medical professionals to connect — to connect medical experts with popular — with popular — who are popular with their audiences with — with accurate information and boost trusted content. So we're helping get trusted content out there.

We also created the COVID-19 — the COVID Community Corps to get factual information into the hands of local messengers, and we're also investing, as you all have seen in the President's, the Vice President's, and Dr. Fauci's time in meeting with influencers who also have large reaches to a lot of these target audiences who can spread and share accurate information.

You saw an example of that yesterday. I believe that video will be out Fri- — tomorrow. I think that was your question, Steve, yesterday; I did a full follow-up there.

There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps.

One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching.

That will help us ensure we're getting accurate information to people. This should be provided not just to researchers, but to the public so that the public knows and understands what is accurate and inaccurate.

Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social

media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns.

Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly.

Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact.

110.     At the same press conference, Surgeon General Vivek H. Murthy explicitly stated that the CDC desired to limit speech related to COVID-19 by working with technology companies to take action against those it considers to be spreading misinformation:

[W]e're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms.

The misinformation that we're seeing comes from multiple sources. Yes, there is disinformation that is coming from bad actors. But what is also important to point out is that much of the misinformation that is circulating online is often coming from individuals who don't have bad intentions, but who are unintentionally sharing information that they think might be helpful.

We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives.

The problem right now is that the voices of these credible health professionals are getting drowned out, and that's one of the reasons we are asking technology companies to help lift up the voices of credible health authorities. It's also why they have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through.

111.     On July 16, 2021, White House Press Secretary Jennifer Psaki again confirmed that government representatives regularly interact with social media platforms to achieve its goal to limit speech related to COVID-19:

Q    And just — you went through kind of the topline details of this yesterday, but can you elaborate a little bit on the Facebook . . . the administration to Facebook flagging of disinformation.  And there's also some reporting that we've had that Facebook maybe hasn't been as proactive as the White House would like it to be in response to some of the flagging.  So, the process of how the flagging works, and then whether Facebook has been amenable to those requests.

MS. PSAKI:  Well, I would say first, it shouldn't come as any surprise that we're in regular touch with social media platforms — just like we're in regular touch with all of you and your media outlets — about areas where we have concern, information that might be useful, information that may or may not be interesting to your viewers.

You all make decisions, just like the social media platforms make decisions, even though they're a private-sector company and different, but just as an example. So we are . . . regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies.

So let me give you an example, just to illustrate it a little bit.  The false narrative that remains active out there about COVID-19 vaccines causing infertility — something we've seen out there, flowing on the Internet quite a bit, in other places as well — which has been disproven time and time again.  This is troubling, but a persistent narrative that we and many have seen, and we want to know that the social media platforms are taking steps to address it. That is inaccurate, false information.

If you are a parent, you would look at that information and then that would naturally raise concerns, but it's inaccurate. And that is an example of the kind of information that we are flagging or raising.

So a couple of the steps that we have — you know, that could be constructive for the public health of the country are providing for — for Facebook or other platforms to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public, with all of you to create robust enforcement strategies that bridge their properties and provide transparency about rules.

You shouldn't be banned from one platform and not others if you — for providing misinformation out there.
Taking faster action against harmful posts. As you all know, information travels quite quickly. If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box.

And, of course, promoting quality information algorithms. I don't know how they work, but they all do know how they work.
So those are some of the steps that we think could be constructive for public health, for public information, for public — and, you know, the right of the public to know.

Q    Just to quickly follow up on the Facebook aspect of this: You said yesterday that 12 people were producing 65 percent of the misinformation on vaccines on social media platforms. Do you have a sense of who those people are? Are they bad actors like Russia? And Facebook responded yesterday after the press briefing. They say that they removed 18 million pieces of COVID misinformation; they've connected more than 2 billion people to reliable information. So does the White House find that sufficient?

MS. PSAKI:  Clearly not, because we're talking about additional steps that should be taken. And frankly, information that media organizations could detr- — could decide whether you're going to report on or not. I'm not talking just about the misinformation storyline; I'm talking about these individuals. I'm talking about, you know, how prevalent the spreading of this information is.

MS. PSAKI:  Our biggest concern here — and I, frankly, think it should be your biggest concern — is the number of people who are dying around the country because they're getting misinformation that is leading them to not take a vaccine —Young people, old

people, kids, children — this is all being — a lot of them are being impacted by misinformation.

Q   The big concern though, I think, for a lot of people on Facebook is that now this is Big Brother watching you.

MS. PSAKI:  They're more concerned about that than people dying across the country because of a pandemic where misinformation is traveling on social media platforms?  That feels unlikely to me.  If you have the data to back that up, I'm happy to discuss it.

Q   Okay, and just about things that are on Facebook: I looked this morning, there are videos of Dr. Fauci from 2020, before anybody had a vaccine, and he's out there saying there's no reason to be walking around with a mask.  So, is the administration going to contact Facebook and ask them to take that down?

MS. PSAKI:  Well, first, I think what Dr. Fauci has said himself — who's been quite public out there — is that science evolves, information evolves, and we make that available in a public way to the American people.

Q   Exactly —

112.   The comments at the press conference by Ms. Psaki and Dr. Murthy specifically reference Facebook and make it clear that Facebook acts with the current administration and federal agencies to promote the federal government's preferred narrative and speech, and to curtail and silence other narratives and speech that the government disapproves.

113.   The White House Press Conference of July 15, 2021, indicates that Facebook was functioning as an agent of the Executive Branch in censoring uploads of the Plaintiff and Putative Class Members that challenged the origins and treatment of the COVID-19 virus.

114.   As admitted by Ms. Psaki at her press conferences on July 15 and July 16, the federal government has been provided social media information related to twelve (12) individuals that it is claimed spread 65% of the "misinformation" related to COVID-19, and that

the Executive Branch has increased tracking of what it deems to be the spread of COVID-19 misinformation.

115.     As stated by Ms. Psaki, the federal government has deemed that Facebook and the other social media platforms act on certain information, explicitly stating that Facebook in particular should manipulate its internal algorithms to promote what the government deems to be quality information or preferred speech.

116.     As stated by Surgeon General Murthy, the CDC has asked Facebook and the other social media platforms "to do more to reduce the misinformation that's out there so that the true voices of experts can shine through."

117.     As stated by Ms. Psaki, it is a goal of the federal government to ensure uniformity in the restriction of speech related to COVID-19 across social media platforms: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there."

118.     Other members of Congress have expressed the desire to restrict speech related to the COVID-19 virus, including Senator Amy Klobuchar who, on February 5, 2021, announced the SAFE TECH Act which threatens to remove certain legal immunities that social media platforms enjoy under Section 230.

119.     On May 14, 2021, Senator Klobuchar stated that "[g]etting Americans vaccinated is critical to putting this pandemic behind us.  Vaccine disinformation spread online has deadly consequences, which is why I have called on social media platforms to take action against the accounts propagating the majority of these lies[.]"

120.     On March 25, 2021, Representative Mike Doyle called upon Defendant Zuckerberg, Jack Dorsey, and Sundar Pichai to immediately remove the twelve (12) individuals

dubbed the "Disinformation Dozen" from their platforms during a congressional session on misinformation.

121.    On July 20, 2021, White House Communications Director, Kate Bedingfield, responded to a question from Mika Brzezinski of MSNBC regarding the repeal of the immunity granted by Section 230 to Facebook, Twitter, and other social media platforms in the following exchange:

> MS. BRZEZINSKI: As a candidate, the president said he was open to getting rid of Section 230. And I'm just wondering if he's open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way? . . . Shouldn't they be liable for publishing that information and then open to lawsuits?
>
> MS. BEDINGFIELD: We're reviewing that and certainly they should be held accountable. And I think you heard the president speak very aggressively about this….

122.    Upon information and belief, representatives of the federal government, including the Biden White House, CDC, and Members of Congress, have contacted Facebook to discuss the implementation of the government's goals of restricting and censoring the content of speech related to the COVID-19 virus on Facebook's platforms.

123.    Democrat legislators continue their push to have Defendants use their authority and immunity pursuant to Section 230 to censor disfavored information, such as views contrary to their COVID-19 narrative.

124.    Democratic Sens. Amy Klobuchar (Minn.) and Ben Ray Luján (N.M.) introduced legislation that would hold social media companies accountable for allowing the spread of "health-related misinformation" on their platforms during "public health emergencies."

125.    The Health Misinformation Act would make an exception to digital platform's liability protections granted to them under Section 230 of the Communications Decency Act. The senators are looking for platforms with algorithms that promote "health-related misinformation"

regarding existing public health emergencies, such as the coronavirus pandemic, to be held legally responsible.

126.    The Secretary of HHS would determine what would be considered to be health misinformation.

127.    The Plaintiff's and Putative Class Members' posts about hydroxychloroquine were also censored by Facebook, as only the narrative crafted by Dr. Fauci, NIAID, and the CDC was allowed on Facebook regarding best practices for treating the novel COVID-19. Defendant Zuckerberg has admitted to this in his House Anti-trust Hearing testimony on July 29, 2020.  "So we do take that down," Zuckerberg told a House panel, referencing posts about hydroxychloroquine. "It has not been proven to cure COVID," Zuckerberg told Rep. Jim Sensenbrenner (R-WI). "Some of the data suggests that it might be harmful to people," although medical professionals openly disagreed with Zuckerberg's conclusion, and it has been approved for other ailments like malaria for decades.

128.    The Plaintiff also expressed the view on Facebook that COVID-19 originated in the Wuhan laboratory in China and would specifically refer to it as the "China virus."

129.    Subsequently, Facebook Users posting comments discussing the Wuhan laboratory in China as the origin of COVID-19 or referring to COVID-19 as the "China virus" were similarly censored (flagged, shadow banned, etc.)

130.    Other instances when Defendants also worked directly with government actors to censor free speech included when the Plaintiff challenged the integrity of the 2020 Presidential election process and the results of the 2020 Presidential election.

131.    Posts concerning a lack of integrity in the 2020 Presidential election were then similarly censored.

## VI. PRESIDENT TRUMP AND THE PUTATIVE CLASS MEMBERS DE-PLATFORMED

132.     The Plaintiff and the Putative Class Members were each de-platformed by Defendants for posts that discussed a variety of topics, including the January 6, 2021, Capitol Hill events, the 2020 Presidential Election, and COVID-19, the wearing of masks and alternative treatments for COVID-19.

133.     Notwithstanding, members of Congress and the Executive Branch, as well as foreign dictators, have posted speech and videos on Facebook that are as, if not more, provocative than anything posted by the Plaintiff and the Putative Class Members.

134.     Former Attorney General Loretta Lynch uploaded a video statement for the Senate Democrats' Facebook page, where she extended her endorsement of anti-Trump protests. Lynch talked about the extent others went to in order to get change: "they've marched, they've bled and yes, some of them died." Her videos remain active and available on Facebook on several accounts.

135.     Representative Ayanna Pressley posted a video on Facebook calling for "unrest in the streets" over Trump-backing GOP members. She called for violence and rage.  The video is active and circulating on the Facebook platform currently.

136.      Bashar al-Assad, the President of Syria, is still an active user of Facebook. Since 2011, he has prosecuted an uncompromising war against his own population. He has committed many of his most egregious war crimes strategically—sometimes to eliminate civilians who would rather die than live under his rule, sometimes to neutralize an international order that occasionally threatens to limit his power, and sometimes, as with his use of chemical weapons against his own citizens



137.    Representative Maxine Waters, who told people to "get more confrontational" if the "right" verdict did not come down in the Derek Chauvin trial, is still an active Facebook User.

A.  **Donald J. Trump**

138.    The Plaintiff's Facebook posts of January 6, 2021, were made in his official capacity as President of the United States and were political rhetoric addressed to those who had attended his rally that day.

139.    On January 7, 2021, Facebook, at the personal direction of Defendant Zuckerberg, censored the Plaintiff's Facebook account, blocking his ability to communicate with his approximately thirty-five (35) million followers and the ability of the Plaintiff's followers and the general public to hear, and comment on, the views and content of the speech he was expressing.

140.    On January 7, 2021, Defendant Zuckerberg issued a public statement claiming that the Plaintiff had posted messages on his Facebook page on January 6, 2021, that could be

interpreted by Facebook as inciting violence, specifically citing the events of January 6, 2021,

stating in part:

> We believe the risks of allowing the President to continue to use our service during this period are simply too great. Therefore, we are extending the block we have placed on his Facebook and Instagram accounts indefinitely and for at least the next two weeks until the peaceful transition of power is complete.

141.    On January 7, 2021, at the direction of Defendant Zuckerberg, Facebook not only

blocked the Plaintiff's Facebook accounts, but also threatened to censor the Plaintiff's family and

associates' personal accounts if they attempted to post in the "voice" of Donald J. Trump. The

warnings read as follow:





## B. **Elizabeth Albert**

142.    Putative Class Member Elizabeth Albert ("Mrs. Alpert") is a United States citizen residing in Greenacres, Florida.

143.    In 2007, Mrs. Albert opened a personal Facebook account where she regularly posted photos of her family and used the platform to share news such as her wedding day, the birth of her children, birthdays, and vacations. Mrs. Albert's personal Facebook account had never been warned, censored, or flagged by Facebook for the content of her posts.

144.    In 2018, Mrs. Albert became an administrative member of the Facebook page called "#WalkAway Campaign." "WalkAway Campaign" was a Facebook group and page that allowed Users to share their personal stories of why they decided to leave the Democrat party.

145.    On January 8, 2021, without warning, the Defendants deleted the "#WalkAway Campaign" group and page. They additionally banned the personal accounts of all page administrators and the business pages they managed, including Mrs. Albert.

146.     Defendants banned Mrs. Albert's personal Facebook account, which resulted in her loss of thousands of treasured family photos and memories.

**C.  Kiyan and Bobby Michael**

147.     Putative Class Members Kiyan and Bobby Michael (the "Michaels") are United States citizens residing in Florida.

148.     In 2019 the Michaels opened a joint Facebook page where they shared family photos, religious beliefs as Christians, tips on gardening, recipes, and their political views.

149.     Before 2020, the Michaels' account had never been warned, censored, or flagged by Facebook for the contents of its posts.

150.     Beginning in January of 2020, the Michaels began to have content on their Facebook page censored by Facebook. To the Michaels' knowledge, the censorship took place more than three (3) times and censored content related to COVID-19 and support for President Trump and his policies.

151.     The Michaels now experience a delay when they post things to their personal page and notice that their page is heavily monitored and "fact-checked." Below are a few examples of censorship the Defendants have used against them.



**D. Jennifer Horton**

152.    Putative Class Member Jennifer Horton ("Ms. Horton") is a United States citizen residing in Fenton, Michigan. Ms. Horton has been an elementary school teacher since 1994.

153.    In or about 2009, Ms. Horton created a personal Facebook account where she regularly shared photos of her family, posted updates on major life events, shared professional accomplishments, and used the page to post her opinions on the news of the day.

154.    To her recollection, Ms. Horton had been censored on one occasion when she saved another user's post regarding vaccines to read later. She received a warning from the Defendant that the post she saved was false information.

155.    As a teacher, Ms. Horton was frustrated as she could not find data to support the benefits of masking children all day, while in school both inside and outside.

156.    Ms. Horton posted on her Facebook wall an article listed on the NIH website that challenged the safety and efficiency of children wearing masks. Ms. Horton posted with the article, "If your child wears a mask all day at school, this article from the National Institute of Health is a must-read. Link in comments." Screenshot below:



157.     On April 17, 2021, Ms. Horton's brother in Tennessee went missing, and she began using Defendant's platform to communicate with missing persons pages and others living in Tennessee.

158.     On April 29, 2021, Ms. Horton's account was suspended for 24 hours, and she was notified it was due to her post.

159.     The Plaintiff felt helpless and hopeless not being able to access the platform that she had turned to for over 10 years to distribute information and that she used to communicate with larger networks that may have helped her locate her brother.

160.     After being shut down, Plaintiff was confused and afraid of how to operate within the boundaries of the Defendants' Terms of Service because she did not want to lose her ability to communicate again.

161.     Nearly 2 months later, Plaintiff's brother was found deceased. She was left devastated, wondering if she could have prevented his death had she been able to communicate with her network on Facebook.

162.     For years, Plaintiff was reliant on the platform as a communication tool with friends, family, and community.

163.     At one of the most difficult times of her life, when communication with her "network" was the most important, Defendants took her voice away from her due to her post regarding masks.

**E.  Magayls "Maggie" Rios**

164.     Putative Class Member Magalys Rios ("Ms. Rios") is a United States citizen residing in Miami-Dade County, Florida.

165.     Ms. Rios established her Facebook account in June 2013 and had approximately 2,500 Facebook friends on her personal page.

166.     She created a second Facebook account, "Maggie Rios CrossPosting", which was dedicated to advocating for animals in animal shelters facing euthanasia. This account was entirely dedicated to the animals, and most of her personal page was dedicated to the animals as well.

167.     In March of 2020, Ms. Rios began posting about inconsistencies in the way media reported on President Trump's COVID-19 press conferences and shared her concerns regarding COVID-19.

168.     Ms. Rios was first censored on March 22, 2020, because of a religious post praying for victims of COVID-19 and those who caught the virus. Defendants deleted the post and labeled it as a violation of community standards.

169.     The second instance of censorship was May 25, 2020, when Ms. Rios posted about alternative treatments for COVID-19. Defendants deleted the post and labeled it as a violation of community standards, and banned Ms. Rios from posting for 24 hours.

170.     The third time Defendants deleted Ms. Rios's posts was on November 21, 2020, when she shared about an upcoming Trump rally. Defendants banned her for thirty (30) days and cited the Proud Boys' involvement in the rally as the reason.

171.     Overall, the content on Ms. Rios's personal Facebook page was religious, anti-abortion, conservative, about COVID-19, and President Trump.

172.     The thirty (30) day ban on Ms. Rios impacted her posting on "Maggie Rios CrossPosting," where she posted about animals.

**F.   Andres Cabo**

173.     Putative Class Member Andres Cabo ("Mr. Cabo") is a United States citizen residing in Miami-Dade County, Florida.

174.     Mr. Cabo established his Facebook account on June 23, 2012. In 2012, he also created a business account tied to his personal page for his small business.

175.     Mr. Cabo used his personal Facebook to connect with approximately 2,600 friends, family, and business contacts.

176.     Mr. Cabo used his business page to promote his business, grow his audience, and communicate with his client base. He has purchased Facebook advertisements for his business.

177.     Mr. Cabo's political posts and posts supporting President Trump were flagged by Defendants. He received twenty-four (24) hour suspensions on May 7, 2020, December 11, 2019, and November 27, 2019.

178.     Mr. Cabo's posts were flagged throughout the 2020 election cycle by Defendants. He was suspended from his personal account for thirty (30) days on January 6, 2021.

179.     Suspensions arbitrarily imposed by Defendants targeted political, pro-President Trump content.

180.     The suspensions have interfered with his ability to communicate with Mr. Cabo's contacts.  Mr. Cabo, through his business and personal account, has been harassed. The suspensions from posting have impacted his ability to conduct business through Facebook.

## G. **Maria Rodrigues-Fresneda**

181.     Putative Class Member Maria Rodriguez-Fresneda ("Ms. Rodriguez-Fresneda") is a United States citizen residing in Miami-Dade County, Florida.

182.     Ms. Rodriguez-Fresneda established her Facebook account in 2015.

183.    Ms. Rodriguez Fresneda used her personal page to connect with friends and family. She created a business page to promote her part-time real estate business and target new clients.

184.    Ms. Rodriguez-Fresneda's private Facebook page was permanently banned by Defendants five (5) days before the 2020 presidential election. She had not received any previous warnings, suspensions, or other forms of censorship prior to the full banning of her account.

185.    The post that led to the permanent suspension of her account pertained to the contents of Hunter Biden's laptop.

186.    Ms. Rodriguez-Fresneda's business page was also removed from Facebook because it was linked to her personal account. This resulted in an eighty percent (80%) loss of revenue from her part-time work. Ms. Rodriguez-Fresneda's lost both her private and professional contacts and is unable to advertise her business.

## COUNT ONE

## VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

187.    Plaintiff and the Putative Class Members restate the allegations set forth in paragraphs 1-186.

188.    Pursuant to Section 230 of the Communications Act, 47 U.S.C. § 230, Defendants are encouraged by Congress to censor constitutionally protected speech on the Internet, including by and among Facebook's approximately one hundred twenty-four (124) million Users in the United States.

189.    As such, censorship by Defendants of constitutionally protected free speech on Facebook is unconstitutional on its face.

190.   Using its authority under Section 230(c) together and in concert with federal government actors, including the White House, HHS, NIAID, Dr. Fauci, Dr. Murthy, the CDC, and Congress, the Defendants regulate the content of speech over a vast swath of the Internet.

191.   Defendants are vulnerable to and react to coercive pressure from the federal government to regulate specific speech.

192.   In responding to the aforementioned government actors' demands to regulate the specific speech at issue in this lawsuit and de-platform Plaintiff, Defendants were acting in concert with federal officials to censor protected speech.

193.   As such, Defendants' censorship activities resulting from their willful participation with government actors, as well as responding to congressional coercion, amounts to state action by Defendants.

194.   Defendants' censoring of the Plaintiff's Facebook account, as well as those of the Putative Class Members, violates the First Amendment to the United States Constitution because it eliminates the Plaintiff's and the Class Members' participation in a public forum and the right to communicate to others their content and point of view.

195.   This censorship is a collusive effort between the federal government and its officials and Facebook and other social media platforms and their agents.

196.   Congress authorized Internet platforms under Section 230(c)(2) to censor and impose a prior restraint on speech that Congress was constitutionally forbidden to censor or restrain, yet congressional committees and congressional leaders took specific steps using Facebook to coerce enforcement of censorship and prior restraint against political opponents in violation of the First Amendment.

197.   These acts by legislators to encourage Facebook to censor or restrain the Plaintiff and the Putative Class Members were malicious, intentional, intended to harm, involved personal misstatements of fact, and made for personal, political, and corporate profit and advantage.

198.   The authority Congress gave to Internet platforms under Section 230(c) was unconstitutional, and Defendants exercised that authority in intentional and reckless disregard to the Plaintiff's and the Putative Class Members' First Amendment right to free speech.

199.   Defendants' censoring of the Plaintiff's and Putative Class Members' Facebook accounts violates the First Amendment as applied in this matter because it imposes viewpoint and content-based restrictions on the Plaintiffs' and Putative Class Members' access to information, views, and content otherwise available to the general public.

200.   Defendants' censoring of the Plaintiff's and Putative Class Members' Facebook accounts violates the First Amendment as applied in this matter because it imposes a prior restraint on free speech and has a chilling effect on social media Users and non-Users alike.

201.   Defendants' blocking of the Plaintiff and the Putative Class Members from their Facebook accounts violates the First Amendment as applied in this matter because it imposes a viewpoint and content-based restriction on the ability of the Plaintiff and the Putative Class Members to petition the government for a redress of grievances.

202.   Defendants' censoring of the Plaintiff by banning the Plaintiff from his Facebook account while exercising his free speech as President of the United States was an egregious violation of the First Amendment as applied in this matter.

203.   Defendant Zuckerberg is sued in his personal capacity and is liable in damages because he was personally responsible for Facebook's de-platforming of the Plaintiff and other Putative Class Members that violated the First Amendment, as applied in this matter.

204.   Defendant Zuckerberg also is sued in his official capacity, along with Facebook itself, for injunctive relief to and for the unconstitutional censorship of the Plaintiff and the Putative Class Members, including Facebook's de-platforming of the Plaintiff and the Putative Class Members.

<u>**COUNT TWO**</u>

<u>**DECLARATORY JUDGMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT**</u>

205.   The Plaintiff and the Putative Class Members restate the allegations set forth in 1-204.

206.   In censoring (flagging, banning, etc.) the Plaintiff and the Putative Class Members, Defendants relied upon and acted pursuant to Section 230(c) of the Communications Decency Act.

207.   Upon information and belief, Defendants would not have de-platformed the Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered by Section 230(c).

208.   Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected."  47 U.S.C. § 230(c)(2).

209.   In addition, Section 230(c)(1) also has been interpreted as furnishing an immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

210.   Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social media companies to accomplish an objective—the censorship of

supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

211.   Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish.

212.   Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

213.   Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint.

214.   Such heightened scrutiny cannot be satisfied here because: (a) Section 230(c) is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; (b) the word "objectionable" in Section 230(c) is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; (c) Section 230(c) purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; (d) Section 230(c) has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and (e) the

legitimate interests behind Section 230(c) could have been served through far less speech-restrictive measures.

215.  Accordingly, the Plaintiff, on behalf of himself and the Putative Class Members, seeks a declaration that Section 230(c)(1) and (c)(2) are unconstitutional on their face insofar as they purport to immunize from liability social media companies and other Internet platforms for actions they take to censor constitutionally protected speech.

216.  Accordingly, the Plaintiff on behalf of himself and Putative Class Members also seeks a declaration that Section 230(c)(1) and Section 230(c)(2) are unconstitutional as applied to this matter insofar as they purport to immunize Defendants from liability for the actions taken against Plaintiff and the Putative Class Members to censor their constitutionally protected speech.

## **COUNT THREE**

## **FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201 _et seq._ (INJUNCTIVE RELIEF, FLORIDA STATUTES § 501.211(1))**

217.  The Plaintiff and the Putative Class Members restate the allegations in paragraphs 1 through 216 above.

218.  Defendants are engaged in trade or commerce, as defined by Florida Statutes § 501.203(8), within the State of Florida.

219.  The Plaintiff and the Putative Class Members have been aggrieved as a result of Defendants' deceptive and misleading practices.

220.  Defendants have repeatedly failed to act in good faith and accordance with their stated policies regarding the removal, demonetization, and moderation of content on their platform.

221.   While Defendants' policies ostensibly proclaim objective, uniform standards by which content may be censored (i.e., flagged, shadow banned, etc.) and Users suspended or banned from the platform, in practice, the Defendants have engaged in a subjective pattern of discriminating against disfavored parties, such as the Plaintiff and the Putative Class Members.

222.   Defendants' actions are in response to coercion from government actors who have the capacity to remove or alter the protections currently offered by Section 230 of the Communications Decency Act, 47 U.S.C. § 230.

223.   Defendants' actions demonstrate that their ostensibly objective standards omit that content may be removed by Defendants because government actors demand its removal.

224.   These deceptive practices are likely to deceive consumers acting in a reasonable manner.

225.   As detailed above, a reasonable consumer, acting under the mistaken belief that the Defendants are equally and fairly applying their content standards, would be left to presume that the Plaintiff and the Putative Class Members improperly discussed the origins of the COVID-19 virus.

226.   Rather, the statements of the Plaintiff and Putative Class Members, in their statements regarding the origin of the COVID-19 virus, which were wrongfully suppressed by Defendants, were simply representing a viewpoint that was inconvenient to the more significant actors involved with the response to the virus.

227.   This demonstrates that reasonable consumers who rely on the Defendants' good faith application of their own standards to information about the COVID-19 virus would, to their detriment, be deceived.

228.    Consumers relying on Defendants' good faith application of their standards would have the false impression that the viewpoints suggesting the virus originated from a laboratory – either natural or man-made – was false, rather than simply running afoul of the Defendants' preferred viewpoints and desire to please legislators with outsized influence over the Defendants' business.

229.    Consumers relying upon Defendants to honor their content moderation standards and provide a full range of viewpoints are, accordingly, acting to consumers' detriment given that the Defendants have their "finger on the scale" and filter out inconvenient content.

230.    Consumers are not the only parties affected by Defendants' policies, as advertisers and content providers are also acting in reliance on the Defendants' stated policies.

231.    The Plaintiffs and the Putative Class Members are aggrieved by the Defendants' failure to act in good faith and to apply their stated policies to the Plaintiffs' content.

232.    Accordingly, the Plaintiff and the Putative Class Members respectfully request that the Court enter judgment in their favor and grant injunctive relief, restoring the Plaintiff and the Putative Class Members access to their platform; compelling Defendants to honor Defendants' own policies; imposing a monitor to ensure Defendants' compliance with this Court's order only to apply Defendants' published standards when evaluating content on the platform; for such other equitable relief as the Court deems appropriate and for costs and reasonable attorneys' fees.

## COUNT FOUR

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201 *et seq.* (INCONSISTENT APPLICATION OF STANDARDS, FLORIDA STATUTES § 501.2041)

233.    The Plaintiff and the Putative Class Members restate the allegations in paragraphs 1 through 232 above.

234.    Defendants own and operate a social media platform, as defined in Florida Statutes § 501.2041(1)(g).

235.    Defendants' platform does business within the State of Florida, has annual gross revenues of approximately $86.0 billion, and has over one hundred twenty-four (124) million Users in the United States.

236.    As detailed above, Defendants have acted in ways contrary to their published standards regarding censorship (i.e., flagged, shadow banned, etc.).

237.    These actions have resulted in inconsistent application of these standards, wherein content posted by the Plaintiff and the Putative Class Members have been removed from the platform, while other content, which by any reasonable standard must be viewed as more clearly in violation of the Defendants' standards is allowed to remain on the platform.

238.    Defendants have engaged in this activity since July 1, 2021, the date Florida Statutes § 201.2041 came into effect.

239.    Florida Statutes § 201.2041(2)(a) requires Social Media Platforms to publish their standards for moderating content on their platforms.

240.    Florida Statutes § 201.2041(2)(b) requires Social Media Platforms to apply the standards required in Section 201.2041(2)(a) in a consistent manner.

241.    Defendants have, since July 1, 2021, failed to apply their standards in a consistent manner.

242.    Specifically, *see* paragraphs 1-226 and examples contained therein.

243.   The Plaintiff and the Putative Class Members have accounts with the Defendants' platform, and therefore qualify as Users as that term is defined in Florida Statutes § 501.2041(1)(b).

244.   Florida Statutes § 201.2041(6)(a) allows Users to bring a private cause of action against Social Media Platforms that fail consistently to apply their standards for content moderation.

245.   Accordingly, the Plaintiff and the Putative Class Members respectfully request that the Court enter judgment in their favor and grant an Order for statutory damages of $100,000.00; actual damages to be established at trial; punitive damages as the acts in violation of this statute were perpetrated in knowing and willful violation of the Defendants' obligation to honor their own standards; injunctive relief allowing the Plaintiff and the Putative Class Members to resume posting content to the Defendants' platform; compelling Defendants to honor their own policies and to impose a monitor to ensure Defendants' compliance with this Court's order consistently to apply Defendants' own standards; only apply Defendants' published standards when evaluating content on the platform such other relief as the Court deems appropriate and for costs and reasonable attorneys' fees.

## CLASS ACTION ALLEGATIONS

246.   The Plaintiff and the Putative Class Members bring this lawsuit pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class (the "Class"):

*All Facebook platform Members who reside in the United States, and between June 1, 2018, and today, had*

*their access to their social media accounts wrongly restricted or curtailed by these Defendants and who were*

*damaged thereby.*

247.  Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

248.  Specifically excluded from the Class are Defendants, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or any entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

249.  ***Numerosity***. The Members of the Class are so numerous that individual joinder is impracticable. Upon information and belief, the Plaintiff and the Putative Class Members allege that the Class contains hundreds of thousands of members. Although the precise number of members is unknown, the true number of members is known by Defendants, and thus, may be notified of the pendency of this action by first class mail, electronic mail, social media, and/or published notice.

250.  ***Existence and predominance of common questions of law and fact***. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual questions include, but are not limited to, the following:

(a) whether the Defendants' conduct violated the First Amendment of the Constitution of the United States

(b) whether Section 230 is an unconstitutional delegation of power Congress cannot exercise.

(c) whether the Defendants conduct violates any other state or federal statutes.

251. *Typicality*. The Plaintiff and the Putative Class Members' claims are typical of the claims of the other members of the Class in that Defendants arbitrarily prevented the Plaintiff and the Putative Class Members from using their social media accounts or curtailed or limited the Plaintiff, the Putative Class Members and the Class use of their accounts to inhibit or prevent the Plaintiff, Putative Class Members from engaging in speech that Defendants disliked or contrary to Defendants' opinions or beliefs, in violation of the First Amendment of the United States Constitution.

252. *Adequacy of representation*. The Plaintiff and the Putative Class Members will fairly and adequately protect the interests of the Class. The Plaintiff and the Putative Class Members have retained counsel highly experienced in complex consumer class action litigation, and the Plaintiff and the Putative Class Members intend vigorously to prosecute this action. Further, the Plaintiff and the Putative Class Members have had no interests that are antagonistic to those of the Class.

253. *Superiority*. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Putative Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the

wrongs committed against them. Furthermore, even if members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court and presents no unusual management difficulties under the circumstances here.

89.   The Class may also be certified because:

(a)   the prosecution of separate actions by individual Class embers would create the risk of inconsistent or varying adjudication with respect to individual Putative Class Members that would establish incompatible standards of conduct for the Defendant;

(b)   the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)   Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the embers of the Class as a whole.

**DEMAND FOR JURY TRIAL**

90.   The Plaintiff and the Putative Class Members demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donald J. Trump and the Class respectfully request that the Court enter an Order certifying this case as a class action, appointing the Plaintiff as Class Representative and appointing the Plaintiff's counsel as Lead Class Counsel and that the Court Order, adjudge, and decree in favor of the Plaintiff and the Class against the Defendants for:

A. An award of Compensatory and Punitive damages to the Plaintiff and the Class in an amount to be determined at trial;

B. An injunction and declaratory judgment ordering Facebook immediately to retore access of the Plaintiff and Putative Class Members to their Facebook accounts;

C. An injunction and declaratory judgment ordering Facebook to remove its warning labels and misclassification of all content of the Plaintiff and the Class and to desist from any further warnings or classifications;

D. A judgment declaring Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 unconstitutional on its face and as applied to Plaintiff and the Class;

E. An injunction imposing a monitor to ensure Defendants' compliance with this Court's Order consistently to apply Defendants' own standards, only apply Defendants' published standards when evaluating content on the platform,

F. Damages and punitive damages pursuant to Florida Statutes §501.2041.

G. An award of attorneys' fees and costs to the Plaintiff and the Class in an amount to be determined at trial;

H. An award of punitive damages to the Plaintiff and the Class in an amount to be determined at trial; and

I. An award of such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Matthew Lee Baldwin
Matthew L. Baldwin, Esq.
Florida Bar No. 27463

VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd.,
Third Floor
Coral Gables, FL 33134
Telephone: (305) 631-2528
Email: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

/s/ Carlos Trujillo
Carlos Trujillo, Esq.
Florida Bar No. 42697
*Of Counsel*
Email: CTrujillo@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

JOHN P. COALE
(*Pro Hac Vice*)
2901 Fessenden St. NW
Washington, D.C. 20008
johnpcoale@aol.com
Telephone: (202) 255-2096

FRANK C. DUDENHEFER, JR.
THE DUDEHEFER LAW FIRM L.L.C
(*Pro Hac Vice*)
fcdlaw@aol.com
2721 St. Charles Ave, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226

RICHARD P. LAWSON, ESQ.
Florida Bar No. 165085

LUIS MARTINEZ-MONFORT, ESQ.
Florida Bar No. 0132713

Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, FL 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
E-mail:
rlawson@gbmmlaw.com
lmmonfort@gbmmlaw.com
litigation@gbmmlaw.com

JOHN Q. KELLY
(*Pro Hac Vice*)
jqkelly@ibolaw.com

MICHAEL J. JONES
(*Pro Hac Vice Forthcoming*)
mjones@ibolaw.com

RYAN S. TOUGIAS
(*Pro Hac Vice Forthcoming*)
rtougias@ibolaw.com

IVEY, BARNUM & O'MARA
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9462