PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile:  (650) 858-6100

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

*Attorneys for Defendants Twitter, Inc.
  and Jack Dorsey*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| DONALD J. TRUMP, et al., | Case No. 21-cv-08378-JD |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| TWITTER, INC., et al., | |
| Defendants. | Hearing Date: February 24, 2022 |
| | Courtroom: 11, 19th Floor |
| | Time: 10:00 a.m. |
| | Judge: Hon. James Donato |

# **TABLE OF CONTENTS**

Page(s)

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................... 1

STATEMENT OF REQUESTED RELIEF ........................................................................... 1

    A.   Twitter And Its Content-Moderation Policies ................................................ 2

    B.   Plaintiffs' Twitter Accounts ........................................................................ 3

    C.   Plaintiffs' Allegations About Government Officials ...................................... 4

STANDARD OF REVIEW ............................................................................................... 5

ARGUMENT .................................................................................................................. 5

I.    Plaintiffs Fail To State A First Amendment Claim Because The Defendants Are Private Parties,

    Not State Actors .................................................................................................... 6

    A.   Plaintiffs Fail To Plausibly Allege Government Compulsion .......................... 7

    B.   Section 230 Does Not Make Twitter And Mr. Dorsey State Actors ................... 9

    C.   The Complaint Fails To Allege Joint Action ............................................... 10

II.    Plaintiffs Cannot Obtain A Declaration That Section 230 Is Unconstitutional ............................ 12

    A.   This Suit Against Private Parties Is Not A Vehicle For A Constitutional Attack ............... 12

    B.   Section 230 Is Not Unconstitutional .......................................................... 13

III. The Complaint Fails To State A Claim Under FDUPTA Section 501.211(1) ................................. 14

    A.   Plaintiffs' FDUTPA Claim Is Barred By The Applicable Choice-Of-Law Provision ......... 14

    B.   Plaintiffs Root, Wolf, And ACU Cannot Invoke FDUTPA .......................... 15

    C.   Plaintiffs Have Failed To Allege An Actionable FDUTPA Claim ...................... 15

IV. Plaintiffs' Claim Under Florida SB 7072 Fails Because That Law Was Not In Effect When The

    Challenged Content Moderation Occurred (Count IV) ...................................................... 18

V.    Plaintiffs' Claims Are Barred By The First Amendment ................................................. 19

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abu-Jamal v. National Public Radio*, 1997 WL 527349 (D.D.C. 1997) ................................................8

*American Freedom Defense Initiative v. Lynch*, 217 F. Supp. 3d 100 (D.D.C. 2016), *aff'd*, 697 F.
    App'x 7 (D.C. Cir. 2017) ............................................................................ 12

*American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999) ...................... 10

*Asghari v. Volkswagen Group of America, Inc.*, 42 F. Supp. 3d 1306 (C.D. Cal. 2013) .............................17, 18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................................5

*Atkinson v. Meta Platforms, Inc.*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)  ...................................9

*Bank of America, N.A. v. Zaskey*, 2016 WL 2897410 (S.D. Fla. 2016) ...................................... 15

*Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009) .........................................................................12, 14

*Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020) .......................................................................... 10

*Blum v. Yaretsky*, 457 U.S. 991 (1982).............................................................................. 7, 9

*Buentello v. Boebert*, 2021 U.S. Dist. LEXIS 117825 (D. Colo. 2021)..........................................7

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ....................................................................... 14

*Children's Health Defense v. Facebook Inc.*, 2021 WL 2662064 (N.D. Cal. 2021) .......................................*passim*

*Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) ...................................................... 20

*Daniels v. Alphabet Inc.*, 2021 WL 1222166 (N.D. Cal. 2021) ...........................................7, 8, 12

*Davis v. Powertel, Inc.*, 776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ......................................15, 18

*Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015) ........................ 12

*Divino Group LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. 2021)...........................................9, 13

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. 2021)...............................................7, 8, 12

*Easter v. American West Financial*, 381 F.3d 948 (9th Cir. 2004) ............................................. 13

*Federal Agency of News, LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295 (N.D. Cal. 2019)......................................6

*Federal Agency of News, LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal. 2020)................................ 11

*Florida Insurance Guaranty Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187 (Fla. 2011)..........................18, 19

*Green v. AOL*, 318 F.3d 465 (3d Cir. 2003) ................................................................................ 13, 14

*Hanes Corp. v. Millard*, 531 F.2d 585 (D.C. Cir. 1976) ..................................................................... 13

*Heineke v. Santa Clara University*, 965 F.3d 1009 (9th Cir. 2020) .........................................................9

*Herssein Law Group v. Reed Elsevier, Inc.*, 2014 WL 11370411 (S.D. Fla. 2014) ............................... 15

*Hope Clinic v. Ryan*, 249 F.3d 603 (7th Cir. 2001) (per curiam) ........................................................ 12

*Howard v. AOL*, 208 F.3d 741 (9th Cir. 2000) .....................................................................................6

*Ixcot v. Holder*, 646 F.3d 1202 (9th Cir. 2011) ................................................................................. 19

*Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827 (1990) ............................................ 18

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ..................................................................................2

*La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981 (S.D. Tex. 2017) ............................................... 13, 19

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) .................................................................... 18, 19

*Levine v. Vilsack*, 587 F.3d 986 (9th Cir. 2009) ................................................................................. 12

*Lewis v. Google LLC*, 461 F. Supp. 3d 938 (N.D. Cal. 2020) ............................................................ 12

*Lewis v. Google LLC*, 851 F. App'x 723 (9th Cir.), *cert. denied*, 2021 WL 5043635 (U.S. 2021) ........................................................................................................................................... 13, 14

*Librizzi v. Ocwen Loan Services, LLC*, 120 F. Supp. 3d 1368 (S.D. Fla. 2015) ............................... 15, 16

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ........................................................................... 10

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) .......................................................... 20

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ........................................ 6, 7

*Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429 (9th Cir. 1989) ................................................ 10

*Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498 (9th Cir. 1996) ............................................... 7, 10

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) .........................................................................5

*Meyer v. Aabaco Small Business, LLC*, 2018 WL 306688 (N.D. Cal. 2018) ...................................... 16

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ....................................................... 19

*Murphy v. Twitter*, 60 Cal. App. 5th 12 (2021) ............................................................................... 16

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ......................... 20

*NetChoice LLC v. Moody*, 2021 WL 269087 (N.D. Fla. 2021), *appeal filed sub. nom. NetChoice, LLC v. Att'y Gen.*, No. 21-12355 (11th Cir.) ............................................................................ 18, 19, 20

*NetChoice, LLC v. Paxton*, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) ................................................ 18, 19

*Newman v. Google, LLC*, 2021 WL 2633423 (N.D. Cal. 2021) ................................................ 13, 17

*Palomino v. Facebook, Inc.*, 2017 WL 76901 (N.D. Cal. 2017) ................................................ 15

*Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161 (9th Cir. 2021) ................................................ 10

*Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 667 (S.D. Fla. 2008) ................................................ 16

*Prager University v. Google LLC,* 951 F.3d 991 (9th Cir. 2020) ................................................ 6, 12, 18

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................ 20

*Reno v. ACLU*, 521 U.S. 844 (1997) ................................................ 19

*Rutenburg v. Twitter, Inc.*, 2021 WL 1338958 (N.D. Cal. 2021) ................................................ 6

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) ................................................ 20

*Snyder v. Phelps*, 562 U.S. 443 (2011) ................................................ 19

*Standing Committee on Discipline of U.S. District Court for Central District of California v. Yagman*, 55 F.3d 1430 (9th Cir. 1995) ................................................ 18

*Sutton v. Providence St. Joseph Medical Center*, 192 F. 3d 826 (9th Cir. 1999) ................................................ 9

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) ................................................ 11

*Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018) ................................................ 14, 15

*Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................ 19

*Zimmerman v. Facebook, Inc.*, 2020 WL 5877863 (N.D. Cal. 2020) ................................................ 6

*Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281 (11th Cir. 2007) ................................................ 16, 17

**STATUTES, RULES, AND REGULATIONS**

47 U.S.C. § 230 ................................................ *passim*

Fed. R. Civ. P. 9 ................................................ 15, 17

Fed. R. Civ. P. 12(b)(6) ................................................ 1, 2

Fla. Laws, ch. 32, § 7 (2021) ................................................ 19

**OTHER AUTHORITIES**

13A Charles A. Wright & Arthur R. Miller et al., Federal Practice & Procedure § 3531.5 (3d ed. 2021) ................................................ 12

10B Fed. Prac. & Proc. Civ. § 2758 (4th ed.) ................................................ 13

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2      PLEASE TAKE NOTICE THAT, on February 24, 2022 at 10:00 a.m., in Courtroom 11 of the

3   U.S. District Court for the Northern District of California, this Motion to Dismiss filed by Defendants

4   Twitter, Inc. ("Twitter") and Jack Dorsey will be heard.  Pursuant to Federal Rule of Civil Procedure

5   12(b)(6), Defendants hereby move this Court to dismiss all claims with prejudice.  This Motion is based

6   upon this Notice of Motion, the Memorandum of Points and Authorities, and the Sprankling Declaration.

7

## STATEMENT OF REQUESTED RELIEF

8      Defendants request that the Court dismiss Plaintiffs' Amended Complaint (hereinafter

9   "Complaint") in its entirety and with prejudice.

10

## MEMORANDUM OF POINTS AND AUTHORITIES

11      Plaintiffs—like all Twitter account holders—agreed to abide by Twitter's Rules, and yet proceeded

12   to repeatedly violate those Rules.  When Twitter responded by suspending or restricting their accounts,

13   Plaintiffs filed this putative nationwide class-action seeking, among other things, an injunction forcing

14   Twitter to carry Plaintiffs' speech and appointing a court-supervised monitor to oversee *all* of Twitter's

15   future content-moderation decisions for the hundreds of millions of Tweets posted on its platform every

16   day.  In support of such unprecedented relief, Plaintiffs assert four claims that would upend bedrock

17   principles of constitutional law, disregard standing and other procedural limitations, and stretch Florida

18   consumer protection laws far beyond their geographic, temporal, and substantive limits.

19      Each of Plaintiffs' claims is defective for multiple reasons.  To summarize just a few:  Plaintiffs'

20   lead claim—that Twitter's editorial judgments not to disseminate their messages violated Plaintiffs' First

21   Amendment rights—ignores both that Twitter is a private actor that is not constrained by the federal

22   constitution and that Twitter has its own First Amendment rights to make those judgments.  Plaintiffs'

23   invitation for this Court to invalidate a decades-old federal statute (47 U.S.C. § 230) as violative of the

24   First Amendment fails both because they have no standing to assert such a claim and because their

25   suggestion that the statute is unconstitutional is frivolous.  Plaintiffs' claim under the general consumer

26   protection provision of the Florida Unfair and Deceptive Trade Practices Act ("FDUPTA") founders

27   both because that provision does not apply in this case due to a binding contractual choice-of-law clause

28   and because the Complaint alleges no facts that support Plaintiffs' theories of consumer deception.  And

1   Plaintiffs' claim under a new (and recently enjoined) Florida statute that purports to regulate content

2   moderation by certain social media companies (Florida SB 7072) fails at the threshold because all of the

3   conduct challenged in the Complaint occurred *before* the statute took effect.  Plaintiffs' claims should all

4   be dismissed with prejudice.

5                                   **BACKGROUND**

6       **A.  Twitter And Its Content-Moderation Policies**

7           Twitter operates an Internet communications platform through which hundreds of millions of

8   people share views and follow current events.  *See* Compl. ¶¶ 2, 36.  Each day, approximately 500 million

9   Tweets are posted to the Twitter platform.  Compl. ¶ 2.  As explained in more detail in Twitter's opposition

10  to Mr. Trump's preliminary injunction (hereinafter "Opp."), Twitter has adopted and enforces its own

11  content-moderation policies, including the Twitter Rules, to minimize the reach of certain categories of

12  misinformation Twitter deems harmful and to otherwise foster healthy conversations on its platform.  *See*

13  Twitter, *The Twitter Rules*, Sprankling Decl. Ex. A.[1]

14          Twitter's Civic Integrity Policy, for example, prohibits posting false and misleading information

15  regarding elections and other civic processes, including "false or misleading information intended to

16  undermine public confidence in an election."  *See* Twitter, *Civic Integrity Policy*, Sprankling Decl. Ex. C.

17  Similarly, Twitter's COVID-19 Misleading Information Policy prohibits account holders from sharing

18  "[c]ontent that is demonstrably false or misleading and may lead to significant risk of harm," including

19  "the efficacy and/or safety of preventative measures, treatments, or other precautions."  Twitter, *COVID-*

20  *19 Misleading Information Policy*, Sprankling Decl. Ex. E.  And Twitter's Glorification of Violence Policy

21  prohibits "glorify[ing], celebrat[ing], prais[ing], or condon[ing] violent crimes, violent events where people

22  were targeted because of their membership in a protected group, or the perpetrators of such acts."

23  Twitter, *Glorification of Violence Policy*, Sprankling Decl. Ex. B.

24          As a condition of using the Twitter platform, individuals agree to Twitter's User Agreement, which

25  incorporates the Twitter Terms of Service (herein, "Terms") and Twitter Rules and Policies (herein,

26  _____

27  [1] The Complaint references the Terms of Service and Twitter's Rules, such as the Civic Integrity Policy, as well as Twitter's public reasoning for suspending Mr. Trump's account; these materials are therefore

28  integral to the allegations of the Complaint and may be considered in deciding this motion under Rule 12(b)(6).  *See Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).  For the Court's convenience, Defendants attach these materials to the accompanying declaration of Thomas G. Sprankling.

1   "Rules").   Order Granting Mot. to Transfer 1-2 (S.D. Fla. 2021), ECF No. 87.   In the Terms, Twitter

2   reserves its right to remove content that violates its Rules.   Twitter, *Terms of Service*, Sprankling Decl.

3   Ex. F.   At the same time, the Terms also provide that Twitter "may ... remove or refuse to distribute any

4   Content," that it "may suspend or terminate your account … at any time for any or no reason," and that

5   Twitter is also free to "not monitor or control the Content posted" on its platform.   *Id.*

6       **B. Plaintiffs' Twitter Accounts**

7       Twitter allegedly suspended or restricted Plaintiffs' Twitter accounts for violating the Twitter

8   Rules.   Compl. ¶¶ 113, 124, 129, 137, 146, 155, 167.

9       *1. Plaintiff Trump.*   Following the November 2020 presidential election, Mr. Trump repeatedly

10  violated Twitter's Civic Integrity Policy by tweeting false information concerning the election results.

11  Opp. 3; *see also* Compl. ¶ 110.   Pursuant to its Rules, Twitter initially responded to these violations by

12  labeling the offending Tweets as "misleading" (but left them available for viewing).   *Id.* ¶ 111.   Mr. Trump

13  nevertheless continued to post violative content.   On January 6, 2021, the day a large mob stormed the

14  United States Capitol as Congress met to count electoral votes, Mr. Trump posted three Tweets that again

15  violated Twitter's Civic Integrity Policy. @TwitterSafety (Jan. 6, 2021), Sprankling Decl. Ex. J.  As Twitter

16  publicly explained at the time, "[a]s a result of the unprecedented and ongoing violent situation in

17  Washington, D.C.," Twitter removed the three Tweets for "repeated and severe violations of our Civic

18  Integrity policy."   *Id.*   Twitter also locked Mr. Trump's account for 12 hours and warned that future

19  violations of its Rules would result in his "permanent suspension."   *Id.*

20      Two days later, Mr. Trump yet again posted Tweets that Twitter determined could encourage

21  further violence.  *See* Twitter, *Permanent suspension of @realDonaldTrump*, Sprankling Decl. Ex. K.  That same

22  day, true to its warning, Twitter permanently suspended Mr. Trump's account.  It immediately and publicly

23  explained its reasoning, noting that Mr. Trump's most recent Tweets, particularly in the context of "the

24  ongoing tensions in the United States" and in light of "the people who violently stormed the Capitol,"

25  could "be mobilized by different audiences, including to incite violence."  *Id.*[2]

26

27  ---

28  [2] The Complaint also refers to Twitter's policies concerning misleading information about COVID-19 and to Tweets from Mr. Trump saying that "COVID-19 originated in a laboratory in Wuhan, China" and advocating for "the use of hydroxychloroquine."  Compl. ¶¶ 89-91.  But it does not allege that Twitter's challenged actions with respect to *Mr. Trump's* account pertained to those Tweets or those policies.

2. ***The Other Plaintiffs.***  The Complaint alleges that Twitter permanently suspended the accounts of five other Plaintiffs (Cuadros, Barboza, Latella, Root, and Wolf) for posting election- and COVID-19-related information that Twitter deemed to violate various Twitter Rules, *see* Compl. ¶¶ 124, 132, 135-137, 142-43, 150, 159.  The Complaint also alleges that the account of Plaintiff American Conservative Union ("ACU") experienced "a marked decrease in followers," without attributing the alleged decrease to any particular action by Twitter.  *Id.* ¶¶ 128-129.

### C.  Plaintiffs' Allegations About Government Officials

The Complaint posits that Twitter's decisions regarding Plaintiffs' accounts were not really Twitter's but were actually acts of *the federal government*.  Its sole basis for this theory is a disparate collection of statements by various members of Congress, executive branch officials, and private citizens—none joined as defendants—that supposedly put pressure on Twitter to take action against Plaintiffs' accounts.

The Complaint implies, for example, that Twitter was pressured to take action against Plaintiffs' accounts by statements of various lawmakers and non-government actors calling for Congress to amend Section 230 of the Communications Decency Act, 47 U.S.C. § 230, or contemplating antitrust reform.  Compl. ¶ 55.  None of those statements mentioned Mr. Trump's or any other Plaintiffs' use of Twitter's platform, much less did they indicate that the future of Section 230 might somehow change if Twitter took some action with respect to any of their accounts.  The Complaint also points to other statements that mention Trump's Twitter use, none of which threatened any regulatory or legislative action.  Compl. ¶¶ 53, 55.  As to the other Plaintiffs, the Complaint does not allege a single statement by anyone, federal office holder or otherwise, calling for Twitter to remove any of them (or their content) from its platform.  Indeed, many of the statements on which the Complaint relies were made *after* Twitter's suspensions of Mr. Trump's and the other Plaintiffs' accounts.  Compl. ¶¶ 55 (last four bullets), 96-97, 105-110.

Finally, the Complaint quotes various statements by public health and other officials regarding the federal government's COVID-19 response, all of which were made after all of the content-moderation decisions referenced in the Complaint.  Compl. ¶¶ 96-97, 112.  It also references an October 2019 statement from the Centers for Disease Control and Prevention (before the COVID-19 pandemic and during Mr. Trump's term as President) that simply noted that the CDC was "engaging … partners," including Twitter, to "curb the spread of vaccine misinformation."  *Id.* ¶ 78.

1

**STANDARD OF REVIEW**

2

To survive a motion to dismiss, a complaint must "plausibly (not merely conceivably) entitle

3

plaintiff to relief." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067–68 (9th Cir. 2011).  A claim is plausible

4

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

5

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

6

**ARGUMENT**

7

Each of the four counts in the Complaint fails to state a valid claim.  Count I, which asserts that

8

Twitter's enforcement of its Rules violated Plaintiffs' First Amendment rights, runs headlong into a legion

9

of cases holding that private enterprises like Twitter are not subject to constitutional constraints.  Plaintiffs

10

try to circumvent this bedrock principle by asserting that statements made by people within the

11

government—expressing concern about misinformation online—somehow transformed Twitter's own

12

editorial decisions into acts of the government.  But this hodgepodge of statements does not establish the

13

sort of coercion or entwinement that would be necessary to convert private conduct into "state action."

14

Count II—which seeks a declaration that Section 230 of the federal Communications Decency

15

Act, 47 U.S.C. § 230, is unconstitutional—fails for several reasons, not least of which is that Plaintiffs are

16

suing Twitter rather than the federal government.  Plaintiffs have no standing, nor any cause of action to

17

assert a facial challenge to a federal statute in this case against a non-government actor.  In any event,

18

every court to address the question has held that Section 230 is constitutional.

19

Counts III and IV, which allege that Twitter violated two Florida consumer-protection statutes,

20

similarly fail as a matter of law.  These Counts attempt to cast Twitter's content-moderation decisions as

21

unfair commercial practices on the theory that the decisions were allegedly inconsistent either with

22

Twitter's public statements about its platform (Count III) or with how Twitter did (or did not) moderate

23

content originating from other people who use the platform (Count IV).  Count III fails both in light of

24

the California choice-of-law provision in the Twitter Terms of Service and because the Complaint fails to

25

allege any act or practice that would deceive a reasonable consumer.  Count IV fails because the Florida

26

statute on which it relies did not take effect until after every content-moderation decision challenged in

27

the Complaint and because that statute, as one court has already recognized, violates the First Amendment

28

rights of platform operators like Twitter.

Finally, Plaintiffs ignore that the First Amendment protects Twitter's decisions to exercise editorial control and judgment over what content is and is not published through its communications platform. The government (and courts) cannot force the private operator of an online platform, such as Twitter, to disseminate speech with which the operator disagrees. This basic principle independently requires dismissal of all of Plaintiffs' claims.

## I. PLAINTIFFS FAIL TO STATE A FIRST AMENDMENT CLAIM BECAUSE THE DEFENDANTS ARE PRIVATE PARTIES, NOT STATE ACTORS

In Count I of the Complaint, Plaintiffs claim that Twitter's enforcement actions against them violated the First Amendment. This claim fails as a matter of law because neither Defendant is a state actor subject to the First Amendment.[3] When a private entity like Twitter "provides a forum for speech," it "is not ordinarily constrained by the [Constitution] because the private entity is not a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). The Ninth Circuit made that clear in *Prager University v. Google LLC*, holding that YouTube is not a state actor and cannot be sued under the First Amendment for its editorial decisions about whether to display content on its private platform. 951 F.3d 991, 997 (9th Cir. 2020). A long and unbroken line of cases—before and after *Prager*—have rejected similar attempts to turn the First Amendment on its head through claims against private online service providers. *See, e.g., Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000); *Rutenburg v. Twitter, Inc.*, 2021 WL 1338958, at *2 (N.D. Cal. 2021); *Zimmerman v. Facebook, Inc.*, 2020 WL 5877863, at *2 (N.D. Cal. 2020); *Fed. Agency of News, LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1308-1314 (N.D. Cal. 2019) ("*FAN I*").

Plaintiffs attempt to circumvent these precedents by arguing that Twitter was transformed into a "state actor" under the so-called compulsion and joint-action tests, *see* Compl. ¶ 3, two of the "few limited circumstances" in which a private entity can qualify as a "state actor" and therefore be constitutionally constrained, *see Halleck*, 139 S. Ct. at 1928. But these tests are demanding. The state action doctrine is designed to "protect[] a robust sphere of individual liberty," especially where private actors are exercising First Amendment-protected "editorial control over the speech and speakers on their properties or platforms." *Id.* at 1932, 1934. Plaintiffs' allegations concerning Twitter's enforcement of its own Rules—

---

[3] Plaintiffs appear to treat these allegations as a basis for deeming Mr. Dorsey a state actor as well. Private individuals, like private entities, are not state actors subject to the First Amendment. Plaintiffs' First Amendment claim as to Mr. Dorsey therefore fails, at a minimum, for the same reasons.

1  decisions "made by [a] private part[y] according to professional standards that are not established by the

2  State"—fall far short of any plausible assertion of state action.  *Blum v. Yaretsky*, 457 U.S. 991, 1008 (1982).

3     **A.  Plaintiffs Fail To Plausibly Allege Government Compulsion**

4        For compulsion to convert private conduct into state action, a plaintiff must plausibly allege that

5  the state "has exercised coercive power or has provided such significant encouragement, either overt or

6  covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004-1005.  Courts

7  in this District have repeatedly held that analogous, and even identical, statements to those alleged here

8  do not meet this standard.

9        None of the statements the Complaint attributes to government officials threatened adverse

10  regulatory or legislative action against Twitter unless it took a specific action with respect to any of the

11  Plaintiffs' accounts.  Not one of the statements attributed to individual legislators could have—or even

12  purported to—speak on behalf of even their entire Chamber, let alone the entire Congress.  As Judge

13  DeMarchi has held, "[t]he publicly expressed views of individual members of Congress—regardless of

14  how influential—do not constitute 'action' on the part of the federal government." *Daniels v. Alphabet Inc.*,

15  2021 WL 1222166, at *6 (N.D. Cal. 2021); *see Buentello v. Boebert*, 2021 U.S. Dist. LEXIS 117825, at *13 (D.

16  Colo. 2021) ("Congress, not its individual members, commands the federal government, and it is that

17  body that the First Amendment sought to constrain.").  And Plaintiffs' allegations (Compl. ¶¶ 55, 57-59)

18  that members of Congress convened hearings or expressed interest in Section 230 reform at some

19  undefined time in the future evince, at most, some "regulatory interest in a problem," and that is simply

20  not enough to "transform[] any subsequent private efforts to address the problem … into state action."

21  *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996); *see also Doe v. Google LLC*, 2021 WL 4864418,

22  at *3-4 (N.D. Cal. 2021).

23        Judges in this District have repeatedly dismissed nearly identical First Amendment claims against

24  other online platforms (specifically, YouTube and Facebook).  In *Children's Health Defense v. Facebook Inc.*,

25  2021 WL 2662064 (N.D. Cal. 2021) ("*CHD*"), for example, a non-profit organization alleged that

26  Facebook's removal of certain health-related content was state action because individual members of

27  Congress had made statements (including some identical to those cited here) implying Facebook would

28  face regulation and revocation of Section 230 unless it did more to block and remove "COVID-19

disinformation" and "fraudulent or illicit" content more generally.  *Id.* at *15 n.10.  Judge Illston disposed of that argument, reasoning that such statements were "too general and amorphous to constitute coercive action with respect to the specific challenged actions."  *Id.* at *15 & n.10.  Confronting some of the very same statements by government officials, Judge DeMarchi likewise held in *Daniels v. Alphabet* that allegations that state actors "wanted certain kinds of [content] removed and that [plaintiff's content] fell within that category … do not reflect the kind of governmental involvement" that would be needed to transform the content-moderation decisions of YouTube into state action.  2021 WL 1222166, at *7.

And in *Doe v. Google*, Judge Freeman dismissed the theory that "broad lawmaker proclamations regarding 'misinformation' or 'QAnon-related speech' … are sufficient to show that the government 'commanded' the suspension of [the p]laintiffs' accounts."  2021 WL 4864418, at *3.  There, plaintiffs alleged that YouTube removed their videos and suspended their accounts in response to the purported threat of "various government penalties" that Plaintiffs also rely on here:  "the repeal of CDA Section 230 protections, 'show trials' in front of the U.S. Senate, and a DOJ antitrust suit."  *Id.*; *see* Compl. ¶ 55.  Judge Freeman held that these types of threats were not coercive and therefore did not transform YouTube's content-moderation into state action.  *Id.* at *3-4. *See also Abu-Jamal v. Nat'l Pub. Radio*, 1997 WL 527349, at *5 (D.D.C. 1997) (rejecting theory that "public statements by a [U.S.] Senator and the Fraternal Order of Police condemning a decision by NPR to air [the plaintiff]'s commentaries could be considered government … compulsion" even though individual members of Congress had specifically targeted plaintiff's content and NPR received funding from Congress).

Plaintiffs allege no facts that would justify a different outcome here.  As to Mr. Trump, the Complaint points to statements by a member of Congress that called for Twitter to suspend Mr. Trump's Twitter account but did not threaten any sanctions against Twitter for failure to do so.  Compl. ¶¶ 53, 55. It alleges even less as to the remaining Plaintiffs, quoting only general statements—none mentioning those Plaintiffs—urging Twitter to act on misinformation.  *See id.* ¶¶ 54-56.  The Complaint's reliance on an assortment of other statements on topics as varied as misinformation, antitrust, and Section 230 (many of which do not even concern Twitter) do nothing to further Plaintiffs' compulsion theory.  As in *CHD*, *Daniels*, and *Doe*, none of these statements levied an actionable threat of regulatory action premised on Twitter's failure to remove Plaintiffs' content.  *See id.* ¶ 55.

And there is yet another problem with Plaintiffs' compulsion theory: They cannot clear the additional barriers to holding a *private* actor like Twitter liable for the *government*'s allegedly coercive acts. The paradigmatic compulsion cases are brought against the government, challenging actions carried out through private parties. *See, e.g., Blum*, 457 U.S. at 1003 ("This case is obviously different from those cases in which the defendant is a private party…."); *see also Sutton v. Providence St. Joseph Med. Ctr.*, 192 F. 3d 826, 838 (9th Cir. 1999) (ordinarily "only the state actor, and not the private party should be held liable for the constitutional violation that resulted from the state compulsion"). Under Ninth Circuit law, the plaintiff must allege "something more" than government coercion to hold a private actor like Twitter liable on a compulsion theory. *Sutton*, 192 F. 3d 838. Plaintiffs here have not even alleged coercive government acts, *supra* pp. 7-8, let alone "something more" that could warrant imposing liability on the private defendants.

## B. Section 230 Does Not Make Twitter And Mr. Dorsey State Actors

Unable to identify any coercive government acts targeting Twitter, Plaintiffs contend that the mere existence of a decades-old federal statute—Section 230—transformed Twitter's content-moderation decisions into state action. Compl. ¶¶ 65-77. Plaintiffs' theory seems to be that because Section 230 protects Twitter's content-moderation decisions from liability, all of its editorial decisions aimed at mitigating misinformation should be deemed to have been "significant[ly] encourage[d]" or compelled by the government. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).

This gambit fails. As the Complaint concedes (¶ 70), Section 230 "does not require private parties to do anything," *Divino Grp. LLC v. Google LLC*, 2021 WL 51715, at *6 (N.D. Cal. 2021). Rather, it reflects a "deliberate *absence* of government involvement in regulating online speech." *Id.* That is why the Ninth Circuit and multiple judges in this District have rejected precisely this theory, and why no judge anywhere has held otherwise. *See Atkinson v. Meta Platforms, Inc.,* No. 20-17489, 2021 WL 5447022, at *2 (9th Cir. Nov. 22, 2021) ("Section 230 of the Communications Decency Act does not independently transform Meta Platforms into a government actor for First Amendment purposes."); *Divino*, 2021 WL 51715, at *6 (rejecting theory that Section 230 transformed YouTube's content-moderation decisions into state action); *CHD*, 2021 WL 2662064, at *14 (rejecting argument that protections afforded to online platforms by Section 230, when combined with "pressure" on Facebook from a Congressmember to act on vaccine misinformation, turned Facebook's private decisions into state action). The same result is required here.

**C.  The Complaint Fails To Allege Joint Action**

Plaintiffs fare no better in trying to allege that Twitter's content-moderation decisions were state action under a "joint action" theory.  That theory requires that "the claimed constitutional deprivation" "result[] from the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state."  *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020); *accord Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  Joint action thus does not exist where the governing "statutory and regulatory scheme leaves the challenged decisions to the judgment of [private actors]."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 58 (1999).  The theory also requires that the private entity's "particular actions [be] inextricably intertwined with those of the government," and that there be "'substantial coordination' and 'significant financial integration' between the private party and government."  *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1167-68 (9th Cir. 2021) (citation omitted).  Plaintiffs allege nothing of the sort.

To start, the Complaint does not identify any government-created right or rule of conduct that mandated the content-moderation decisions they challenge.  This alone dooms Plaintiffs' joint action theory.  Plaintiffs explicitly acknowledge that Twitter makes content-moderation decisions based on its own Rules—not on the basis of any law or government regulation.  Compl. ¶¶ 37-40 (describing these Rules).  And while Plaintiffs point to general statements from the CDC and other government officials relating to vaccine and COVID-19 misinformation, *id.* ¶¶ 78-79, 96, and to the fact that Twitter removed certain content regarding the origins of COVID-19 and the efficacy of vaccines that was contrary to views expressed by public health officials, *see id.* ¶¶ 87, 90, that does not advance their cause.  The government's general guidance on COVID-19 is not mandatory and certainly does not dictate how Twitter implements its platform Rules.  *See Mathis*, 75 F.3d at 502 ("generalized federal concern with drug use at nuclear … plants" did not dictate plant's decision to discharge employee for alleged drug transaction); *CHD*, 2021 WL 2662064, at *12 ("express[ing] … concern" regarding vaccine misinformation to Facebook cannot "be interpreted as providing a specific standard of decision that mandated" Facebook's actions).  If anything, allegations that Twitter relied in part on CDC guidance suggests, at most, that it exercised independent judgment and chose to look to information from public health authorities when moderating content.  *See Mathis*, 891 F.2d at 1432 ("The requisite nexus to the government is absent when the decisions are 'based on *independent professional judgments* and were not subject to state direction.'").

Further, statements by the CDC that it "work[s] with" social media companies to promote "trustworthy vaccine information," and by other officials that the government "engage[s]" social media platforms regarding COVID-19 misinformation, fall far short of "substantial coordination" or "significant financial integration" between Twitter and government actors. Such statements suggest, at most, a general alignment to promote accurate health information and not misinformation. A private entity's mere sharing of the government's goals raises no plausible inference of any coordination with the government to remove any content—let alone any of the Plaintiffs' content in particular. *See Taylor v. List*, 880 F.2d 1040, 1048 (9th Cir. 1989). That is especially so as to the July 2021 statements contained in the Complaint, which mostly concern the White House's coordination with Facebook—not Twitter—and which post-date all of the conduct alleged in the Complaint. *See* Compl. ¶ 96; *Fed. Agency of News, LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1125 (N.D. Cal. 2020) ("*FAN II*") (noting that statements by the government that "Facebook is 'working more closely' with the U.S. government and law enforcement" were not probative of joint action when they "post-date[d] the relevant conduct that allegedly injured [p]laintiffs").

*CHD* is, again, directly on point. The plaintiff in *CHD* alleged that Facebook's decisions to label, remove, and/or demote its vaccine-related content satisfied the joint action test based, in part, on the *same* CDC statement alleged in the Complaint here—that the CDC "works with" social media companies. *See* 2021 WL 2662064, at *4; Compl. ¶ 78. Judge Illston rejected that argument, reasoning that "general statements by the CDC and [Facebook's CEO] about 'working together'" are too amorphous to raise a plausible inference that "the government was a 'joint participant in the challenged activity.'" *CHD*, 2021 WL 2662064, at *11. She further reasoned that even if Facebook had "relied on CDC information about vaccines to determine what information is 'misinformation,'" that would not be enough to show that the CDC had supplied the "standard of decision" for Facebook's content-moderation decisions. *Id.* at *12 (citation omitted). That is because such allegations fail to establish a "'link' connecting the government 'standard of decision' to the allegedly unconstitutional act*." *Ibid.* Plaintiffs' Complaint here relies on similar—if not identical—allegations of cooperation and also fails to plausibly allege joint action. *See also Doe*, 2021 WL 4864418, at *4-5; *Daniels*, 2021 WL 1222166, at *7.[4]

---

[4] Any argument that state action exists because Mr. Trump's Twitter account was a "public forum," Compl. ¶¶ 44-49, is foreclosed by *Prager*, in which the Ninth Circuit held that private corporations do not become public fora merely by hosting speech that is generally accessible to the public. 951 F.3d at 997.

## II.   PLAINTIFFS CANNOT OBTAIN A DECLARATION THAT SECTION 230 IS UNCONSTITUTIONAL

Count II of the Complaint—which asks this Court to declare that Section 230 of the Communications Decency Act, 47 U.S.C. § 230, is unconstitutional on its face and as applied—is both procedurally improper and substantively frivolous.

### A.   This Suit Against Private Parties Is Not A Vehicle For A Constitutional Attack

Plaintiffs' constitutional challenge to Section 230 is procedurally improper because Plaintiffs did not sue any government actor charged with enforcing Section 230 and because Defendants, at this stage, have not invoked Section 230 as a defense against their claims.

Where a person seeks to bring a pre-enforcement challenge to a statute, he must sue the relevant official charged with enforcing the law against him. *See Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 105 (D.D.C. 2016) (collecting authority), *aff'd*, 697 F. App'x 7 (D.C. Cir. 2017).   But because Section 230 confers immunity and is not a law enforced against Plaintiffs, there is no such actor and a pre-enforcement challenge is barred. *See id.*; *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015) ("[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, … standing requires the named defendants to possess authority to enforce the complained-of provision."); *Hope Clinic v. Ryan*, 249 F.3d 603, 606 (7th Cir. 2001) (per curiam); 13A Charles A. Wright & Arthur R. Miller et al., Federal Practice & Procedure § 3531.5 (3d ed. 2021).

Because there is no threat of enforcement against them, Plaintiffs lack standing.   They cannot demonstrate that Section 230 has caused or will imminently cause them injury.   Section 230 simply immunizes online platforms from claims seeking to hold them liable for acting as a "publisher or speaker" of content submitted by another, § 230(c)(1), or for moderating content they deem objectionable, § 230(c)(2).   *See generally Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009).   As such, Section 230 neither requires nor forbids Plaintiffs from doing anything, and therefore does not injure them. *See Lewis v. Google LLC*, 461 F. Supp. 3d 938, 952 (N.D. Cal. 2020); *Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009) (regulation or lack of regulation of a third party is insufficient to establish standing).

Plaintiffs' only alleged injury—their inability to post on Twitter's platform—is traceable not to Section 230 but to Twitter and its own independent (and First-Amendment-protected) editorial decisions. *Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) ("[S]tanding requires a plaintiff to demonstrate …

traceability, i.e., a causal connection between the injury and the actions complained of."). "Section 230 does not apply to [Plaintiffs'] conduct or provide a mechanism for sanctions that could affect [them]"; instead, their alleged injuries "all arose from the actions of a private entity [Twitter], as it enforced its own standards." *Lewis v. Google LLC*, 851 F. App'x 723, 723-24 (9th Cir.), *cert. denied*, 2021 WL 5043635 (U.S. 2021). For these reasons, a judicial declaration that Section 230 is unconstitutional would not require Twitter to reinstate Plaintiffs' accounts and would not remedy their injury. They thus have no standing.

To the extent Plaintiffs stake their standing on potential future application of Section 230 to bar their claims, it is improper to "use[] the Declaratory Judgment Act to anticipate an affirmative defense." *Divino*, 2021 WL 51715, at *11. Section 230 is an affirmative defense that Twitter can invoke—if and when Twitter chooses. Absent such invocation, it cannot be challenged in this suit, as numerous courts in this District have concluded in rejecting claims like Plaintiffs'. *See id.*; *Newman v. Google, LLC*, 2021 WL 2633423, at *14 (N.D. Cal. 2021); *see also Hanes Corp. v. Millard*, 531 F.2d 585, 592–93 (D.C. Cir. 1976); 10B Fed. Prac. & Proc. Civ. § 2758 (4th ed.).

**B. Section 230 Is Not Unconstitutional**

Plaintiffs' theory as to why Section 230 is unconstitutional—that it "induce[s] … social media companies to … censor … protected speech," *id.* ¶¶ 195-197, and has been applied to "furnish[] immunity to social media companies for … block[ing] … constitutionally protected speech," *id.* ¶ 192—is wrong for much the same reasons that it is improper. Namely, Section 230 does not govern their conduct or dictate whether or how online platforms moderate their content or accounts, and therefore does not violate their rights. Courts have uniformly rejected similar constitutional challenges to Section 230, which courts in this District and elsewhere have applied for more than a quarter century. *See, e.g.*, *Green v. AOL*, 318 F.3d 465, 472 (3d Cir. 2003) (Section 230 does not violate the First Amendment); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 994-995 (S.D. Tex. 2017) (same). As the Third Circuit reasoned in *Green*, "Section 230(c)(2) does not require [online platforms] to restrict speech; rather it allows [them] to establish standards of decency without risking liability for doing so." 318 F.3d at 472; *Lewis*, 851 F. App'x at 724 n.2. It thus protects private, voluntary self-regulation, precisely to "promote the free exchange of information and ideas over the Internet," *Barnes*, 570 F.3d at 1099-1100, and to avoid the threat of *government* censorship. Such protection does not violate anyone's rights.

1    Also meritless is any attempt by Plaintiffs to invoke the private non-delegation doctrine.  *See*

2    Compl. ¶¶ 13, 238 (mentioning in passing that Section 230(c) is an "unconstitutional delegation" of

3    authority).  That doctrine prohibits the government from handing off its own regulatory power to a private

4    entity.  *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).  But Section 230 does not confer any

5    governmental power at all upon Twitter or any other private company; it merely limits liability for certain

6    acts service providers may take (or fail to take) in self-regulating their own platforms.

7    **III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER FDUPTA SECTION 501.211(1)**

8        **A.  Plaintiffs' FDUTPA Claim Is Barred By The Applicable Choice-Of-Law Provision**

9        Count III, which is asserted under Section 501.211(1) of Florida's general consumer protection

10   statute (FDUTPA), must be dismissed because the Twitter Terms provide that "[t]he laws of the State of

11   California … will govern these Terms and any dispute that arises between [users] and Twitter."  *Terms of*

12   *Service*, Sprankling Decl. Ex. F.  As Judge Scola already held in enforcing this forum-selection clause in this

13   case, each Plaintiff is bound by the Twitter Terms, which has long included this choice-of-law provision.

14   Order Granting Mot. to Transfer 4-7, ECF No. 87.  Indeed, in opposing Twitter's motion to transfer to

15   this Court, Plaintiffs conceded that enforcing the forum-selection clause would also require enforcing the

16   choice-of-law provision.  Pls.' Opp. 14, ECF No. 58; *see also* Pls.' Mot. to Consolidate 5, *Trump v. YouTube*,

17   No. 21-cv-08009 (N.D. Cal. 2021), ECF No. 125 (stating that if the choice-of-law provision is enforced,

18   the Complaint must "be amended to assert claims under California's Unfair Competition Law").  Thus,

19   there can be no question that California, not Florida, law presumptively governs this dispute.

20       Plaintiffs have no basis for overcoming the presumptive application of this choice-of-law

21   provision to Count III because California "has a substantial relationship to the parties" and application of

22   California law with respect to the sort of claim Plaintiffs assert in this count is not "contrary to a

23   fundamental policy" of Florida.  *See Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018)

24   (citation and quotation marks omitted).  To the first point, because Twitter is a California corporation

25   with its principal place of business in San Francisco, "California has an obvious substantial relationship to

26   the parties and a reasonable basis to enforce its choice of law.'"  *Id.*; *see also* Compl. ¶ 25.  And application

27   of California law will not be contrary to any fundamental policy of Florida because "California … has its

28   own robust body of consumer protection law that strives to prevent consumer deception by prohibiting

1   unlawful business practices," including "fraudulent business practices." *Palomino v. Facebook, Inc.*, 2017 WL

2   76901, at *4 (N.D. Cal. 2017).  Plaintiffs' FDUTPA claim should therefore be dismissed.  *See id.* at *5;

3   *Herssein Law Grp. v. Reed Elsevier, Inc.*, 2014 WL 11370411, at *9 (S.D. Fla. 2014) ("[A] choice-of-law

4   provision for the application of non-Florida law precludes a claim under the FDUTPA.").

### B.  Plaintiffs Root, Wolf, And ACU Cannot Invoke FDUTPA

6          The FDUTPA claim on behalf of Plaintiffs ACU, Root, and Wolf independently must be

7   dismissed because they are not Florida residents, *see* Compl. ¶¶ 20, 23, 24, and they do not allege any

8   pertinent conduct that occurred in Florida.  To invoke FDUTPA, a plaintiff must either be a Florida

9   resident or allege "conduct [that] took place predominantly or entirely in Florida." *Bank of Am., N.A. v.*

10  *Zaskey*, 2016 WL 2897410, at *9 (S.D. Fla. 2016).  They do not, and cannot, make such an allegation.

### C.  Plaintiffs Have Failed To Allege An Actionable FDUTPA Claim

12         In any event, all Plaintiffs have failed to state a FDUTPA claim.  Under FDUPTA, to state a claim

13  for equitable relief—which is the only form of relief Plaintiffs seek on this claim—a plaintiff must allege

14  that she has been aggrieved by an act or practice that is "likely to deceive a consumer acting reasonably in

15  the same circumstances." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974-975 (Fla. Dist. Ct. App. 2000).  And

16  where, as here, such a claim sounds in fraud, it must also satisfy Rule 9(b)'s heightened pleading bar by

17  setting forth with particularity the circumstances of the alleged deception, including "the manner in which

18  [the allegedly deceptive act or practice] misled the plaintiff." *Librizzi v. Ocwen Loan Serv., LLC*, 120 F.

19  Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Fed. R. Civ. P. 9(b) applies to FDUTPA claims sounding in fraud).

20  Though the precise premise of the claim is difficult to discern, Plaintiffs seem to be trying to assert three

21  theories of deception: (1) that Twitter applies its content-moderation rules inconsistently, Compl. ¶ 212;

22  (2) that Twitter "omit[ted]" saying that it sometimes removes content "because government actors desire

23  its removal," *id.* ¶ 206; and (3) that Twitter's content-moderation practices deceived other users into

24  thinking that Plaintiffs' content violated the platform rules, *see id.* ¶ 208.  Each theory fails.

25         The first theory fails because the Complaint does not allege, let alone with the requisite

26  particularity, either the specific statement alleged to be deceptive or "the manner in which" any reasonable

27  person would be deceived into thinking that Twitter applies its content-moderation policies with perfect

28  uniformity and consistency, *Librizzi*, 120 F. Supp. 3d at 1381.  Indeed, Twitter's Glorification of Violence

policy and COVID-19 Misleading Information Policy each states just the opposite, explaining that the consequences for violating those policies will vary "depend[ing] on the severity of the violation and the account's previous history of violations." *Glorification of Violence Policy*, Sprankling Decl. Ex. B; *COVID-19 Misleading Information Policy*, Sprankling Decl. Ex. E.   Moreover, Twitter's Terms of Service expressly state that Twitter may take enforcement action against accounts or content for any reason or no reason at all.  *See* Sprankling Decl. Ex. F at 8; *see also Murphy v. Twitter*, 60 Cal. App. 5th 12, 35-38 (2021) (holding this provision of Twitter's Terms is enforceable).  And those Terms also grant Twitter exclusive discretion in determining whether and when to engage in content moderation, stating both that that Twitter "*may*" take such action when "we reasonably believe" an account holder has violated the User Agreement (among other reasons) and, more broadly, that Twitter "*may not* monitor or control" the content others post. *Terms of Service*, Sprankling Decl. Ex. F at 3. (emphases added).  Such discretion is indispensable in the context of online speech, where Twitter could not possibly predict *ex ante* all forms of violative content and their appropriate consequences.  As a matter of law, no reasonable consumer could understand Twitter's policies to mean that Twitter takes the same action against any and all content that could conceivably be considered to violate those policies.  *See Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1285 (11th Cir. 2007) (affirming dismissal at the 12(b)(6) stage of FDUTPA claim where "[t]he express terms of the [applicable] agreement undermine[d] [plaintiff's] claim"); *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 667, 685 (S.D. Fla. 2008); *accord Meyer v. Aabaco Small Business, LLC*, 2018 WL 306688, at *3 (N.D. Cal. 2018) (dismissing analogous UCL claim at the 12(b)(6) stage where terms of service stated Defendant could, at any time, "discontinue, temporarily or permanently, the Services").

Another reason why Plaintiffs' first theory of deception fails is that the Complaint does not allege that Plaintiffs were aggrieved by the supposedly deceptive act or practice.  Plaintiffs do not allege that more consistent application of its policies would have resulted in Twitter not removing their content or not suspending their accounts; rather, they appear to complain that Twitter should have also suspended the accounts of other people.  *See* Compl. ¶¶ 213-216.  But Plaintiffs do not and cannot allege that they have been aggrieved by Twitter's alleged non-removal of someone else's content or non-suspension of someone else's account.  Having failed to allege that they have been injured by any deceptiveness in Twitter's alleged inconsistent enforcement of its policies, Plaintiffs cannot succeed on this theory of

1   deception.  *See Newman*, 2021 WL 2633423, at *12.

2       Plaintiffs' second theory fails because they have not plausibly alleged any content-moderation

3   practice that Twitter deceptively failed to disclose.  Under FDUTPA and Rule 9(b), to state an omission-

4   based claim, a plaintiff must specifically set forth both an omission likely to mislead reasonable consumers,

5   *Zlotnick*, 480 F.3d at 1284, and "*why* [the] omission complained of was false and misleading," *Asghari v.*

6   *Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013) (emphasis added).  The Complaint

7   alleges Twitter omitted to inform consumers that it removes content when "government actors desire its

8   removal," but fails to allege Twitter ever took any enforcement action at the government's direction.  *See*

9   *supra* pp. 6-11.  Moreover, as above, given the express language of Twitter's Terms of Service, no

10  reasonable person would think either that Twitter removes content only under certain narrow and

11  objectively defined circumstances or that it always and completely removes all content that could violate

12  one of its Rules.  *See supra* p. 16.  The Complaint therefore fails to specifically allege any deceptive omission.

13      Plaintiffs' third theory fails because the Complaint does not allege that any reasonable person

14  could be deceived by Twitter's content-moderation actions themselves.  *See Zlotnick*, 480 F.3d at 1284 (a

15  deceptive act or practice must be likely to mislead reasonable consumers).  Though this theory of

16  deception is not well-articulated—itself fatal under Rule 9(b)—Plaintiffs seem to allege that consumers

17  would be deceived by Twitter's enforcement action against certain content into falsely thinking that that

18  content violated a Twitter policy.  *See* Compl. ¶¶ 208-211.  But no Plaintiff other than Mr. Trump has

19  alleged that Twitter made any public statements at all about why it removed or demoted their content or

20  suspended their accounts.  Instead, these Plaintiffs seem to suggest that others using Twitter would have

21  noticed that Plaintiffs' content was no longer on the platform and surmised that it must have been

22  removed for violating a particular content-moderation policy.  That is insufficient to allege how or why

23  Twitter's content-moderation actions were themselves "likely to deceive a consumer acting reasonably"

24  in the circumstances.  *Davis*, 776 So. 2d at 974.  Indeed, the Ninth Circuit has already rejected this theory

25  holding that content-moderation actions themselves "do[] not imply any specific representation about"

26  the relevant content.  *Prager*, 951 F.3d at 1000.  And as to Mr. Trump, the Complaint nowhere alleges that

27  his Tweets did not violate Twitter's Glorification of Violence Policy, only that Twitter did not similarly

28  enforce that Policy against others.  *See* Compl. ¶¶ 212-216.  But that is insufficient to explain how or why

Twitter's application of its policies as to Mr. Trump could possibly deceive a reasonable consumer. *Asghari*, 42 F. Supp. 3d at 1325.  And in any event, Twitter's public explanation of its decision to suspend Mr. Trump provided a detailed explanation of the facts supporting the conclusion that he violated the Policy.  The statement thus implied no "false assertion of fact" and is not actionable.  *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995).

For all these reasons, the Complaint alleges no actionable deception stemming from Twitter's content-moderation actions with respect to any of the Plaintiffs.

## IV.   PLAINTIFFS' CLAIM UNDER FLORIDA SB 7072 FAILS BECAUSE THAT LAW WAS NOT IN EFFECT WHEN THE CHALLENGED CONTENT MODERATION OCCURRED (COUNT IV)

Dismissal is also required for Plaintiffs' claim under Florida SB 7072, a statute that purports to restrict whether and how social media companies may enforce their content-moderation policies.  That statute is a dead letter because it violates the First Amendment, as one federal court has already held.  *See NetChoice LLC v. Moody*, 2021 WL 269087 (N.D. Fla. 2021), *appeal filed sub. nom. NetChoice, LLC v. Att'y Gen.*, No. 21-12355 (11th Cir.); *see also NetChoice, LLC v. Paxton*, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) (enjoining similar Texas law); *see infra* p. 20.  But this Court need not reach the statute's constitutionality for a simple reason:  These Plaintiffs cannot invoke SB 7072 because it was not in effect when Twitter took the actions challenged in the Complaint.

It is "deeply rooted in our jurisprudence" that laws may not have retroactive effect absent express legislative directive.  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 270 (1994).  The presumption, instead, is that conduct "'be assessed under the law that existed when the conduct took place.'"  *Id.* at 265 (*quoting Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)); *accord Florida Ins. Guar. Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 195 (Fla. 2011) ("The presumption against retroactive application is a well-established rule of statutory construction that is appropriate in the absence of an express statement of legislative intent . . . .").  These principles also sound in due process; imposing liability against Twitter for conduct that was lawful at the time would violate the requirement that legal restrictions give governed entities sufficient notice of what conduct is prohibited.  *See Landgraf*, 511 U.S. at 266; *Ixcot v. Holder*, 646 F.3d 1202, 1213 (9th Cir. 2011).

All of the conduct challenged in the Complaint occurred before the effective date of SB 7072.  The law did not become effective until July 1, 2021, Fla. Laws, ch. 32, § 7 (2021), and all of Twitter's

1    content-moderation decisions respecting Plaintiffs' accounts happened before June 6, 2021.  *See* Comp.

2    ¶ 113 (Trump suspended on January 7, 2021), ¶¶ 121-22 & 124 (Caudros suspended in 2019 and 2020),

3    ¶¶ 128-29 (ACU "notic[ed] a reduction in engagement" between 2017 and January 2021), ¶¶ 132 & 135

4    (Barboza suspended on January 8, 2021), ¶¶ 142-143 (Latella suspended in 2018), ¶ 150 (Root suspended

5    on February 6, 2021), ¶¶ 158-59 (Wolf suspended on June 5, 2021).  SB 7072 therefore did not govern the

6    Twitter actions challenged, and those actions could not have violated it.  *See Florida Ins.*, 67 So. 3d at 195.

7    Dismissal is also independently necessary as to Plaintiffs Root, ACU, and Wolf because they are not

8    Florida residents, allege no conduct in Florida, and thus cannot invoke SB 7072.  *See supra* p. 15.

9    **V.**    **PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT**

10          All of Plaintiffs' claims fail for yet another reason:  Granting any of the relief the Complaint seeks

11    would impermissibly infringe on Twitter's First Amendment right to "exercise … editorial control and

12    judgment" over what content it disseminates through its communications platform.  *See Miami Herald Pub.*

13    *Co. v. Tornillo*, 418 U.S. 241, 257-58 (1974).  That right applies with full force on the Internet.  *Reno v.*

14    *ACLU*, 521 U.S. 844, 870 (1997) ("Our cases provide no basis for qualifying the level of First Amendment

15    scrutiny that should be applied to this medium.").   Accordingly, it is well established that the First

16    Amendment safeguards online platforms' decisions about what content to moderate, filter, promote, or

17    restrict. *See, e.g.*, *Paxton*, 2021 WL 5755120, at *7 ("Social media platforms have a First Amendment right

18    to moderate content disseminated on their platforms."); *La'Tiejira*, 272 F. Supp. 3d at 991; *Moody,* 2021

19    WL 2690876, at *7; *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 440-441 (S.D.N.Y. 2014).  And Twitter's

20    First Amendment rights are at their apex here because the editorial decisions Plaintiffs attack—which

21    were intended to address societal harms such as interference with democratic processes, potential

22    incitement of violence threatening the peaceful transfer of power from one President to the next, and the

23    spread of deadly misinformation during a global pandemic—self-evidently pertained to "matters of public

24    concern." *Snyder v. Phelps*, 562 U.S. 443, 452-453 (2011).

25          Each of Plaintiffs' claims seeks to control or countermand Twitter's exercises of editorial

26    judgment, thereby infringing on Twitter's First Amendment rights.  Plaintiffs' state-law claims, for

27    example, are primarily based on allegations that Twitter failed to give identical treatment to similar content.

28    This type of "equal treatment" requirement is a quintessential content-based restriction on speech.  By

asking this Court to require Twitter to moderate some content in certain ways based on the views or messages it communicates, including vis-à-vis other content, both claims seek to impose an impermissible viewpoint- and content-based restriction on speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (laws that cannot be applied "without reference to the content of the regulated speech" are content-based). And any stated desire to level the playing field between different viewpoints cannot constitute a compelling governmental interest sufficient to satisfy the strict scrutiny that applies to such restrictions. *See id.* at 171 (content-based restrictions "can stand only if they survive strict scrutiny, 'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest'"). For that reason, the state laws that Plaintiffs invoke cannot be applied to punish Twitter for taking action against Plaintiffs' accounts while not taking action against others'. Indeed, it is precisely for this reason that another court recently held SB 7072 to be facially invalid and preliminarily enjoined its enforcement. *See Moody,* 2021 WL 2690876, at *7.

Finally, as explained more fully in Twitter's opposition to Mr. Trump's motion for preliminary injunction, the relief Plaintiffs seek on all their claims would itself be unconstitutional; indeed Count III seeks only injunctive relief. Plaintiffs ask the Court for an order forcing Twitter to reinstate their accounts and promulgate their messages against its will, and for "impos[ition of] a monitor" to oversee and override Twitter's editorial decisions in perpetuity. Compl. ¶ 220. Such orders would not only constitute government-compelled speech, *see Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018), but also unduly intrude on Twitter's internal editorial deliberations, *see Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) (requiring showing of heightened need to permit discovery into editorial processes). Such an extreme and overbroad infringement on Twitter's rights would be patently unconstitutional. *See Sindi v. El-Moslimany*, 896 F.3d 1, 30-32 (1st Cir. 2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764–66 (1994).

## CONCLUSION

For the reasons stated, the Court should dismiss Plaintiffs' Complaint with prejudice.

Dated:  December 9, 2021

Respectfully submitted,


/s/ Patrick J. Carome

PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-6000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile:  (650) 858-6100

*Attorneys for Defendants Twitter, Inc.
  and Jack Dorsey*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2021, I electronically filed the above document and the accompanying declaration of Thomas G. Sprankling and proposed order with the Clerk of the Court using CM/ECF which will send electronic notification of these filings to all registered counsel.


Dated:    December 9, 2021              By:    /s/ *Patrick J. Carome*
                                               PATRICK J. CAROME