PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile:  (650) 858-6100

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile:   (617) 526-5000

*Attorneys for Defendant Twitter, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

DONALD J. TRUMP, et al.,

        Plaintiffs,

    v.

TWITTER, INC., et al.,

        Defendants.

Case No. 21-cv-08378-JD

**TWITTER, INC.'S OPPOSITION TO PLAINTIFF TRUMP'S MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: February 24, 2022
Courtroom: 11, 19th Floor
Time: 10:00 a.m.
Judge: Hon. James Donato

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

BACKGROUND....................................................................................................................2

    A.    Twitter And Its Content-Moderation Policies.......................................................2

    B.    Twitter's Moderation Of Mr. Trump's Accounts ..................................................3

    C.    Mr. Trump's Allegations About Government Officials.........................................5

    D.    This Litigation.......................................................................................................6

STANDARD OF REVIEW ...................................................................................................7

ARGUMENT .........................................................................................................................7

I.    An Injunction Compelling Twitter To Reinstate Mr. Trump's Account Would Violate The First Amendment ......................................................................................................7

II.    All Non-Merits Factors Weigh Decisively Against A Preliminary Injunction ...........9

    A.    Mr. Trump Cannot Show Irreparable Harm.........................................................9

    B.    The Balance Of The Equities Weighs Against Any Injunction .........................11

    C.    The Public Interest Weighs Against A Preliminary Injunction...........................12

III.    Mr. Trump Cannot Show A Likelihood Of Success On The Merits...........................14

    A.    Mr. Trump Cannot Make Out A First Amendment Claim Against Twitter..................14

        1.    Mr. Trump Has Not Demonstrated Government Compulsion ...............15

        2.    Section 230 Does Not Turn Twitter Into A State Actor ...........................19

        3.    Mr. Trump Cannot Show Twitter Was A Government Actor Based On A "Joint Action" Theory.......................................................................21

    B.    Mr. Trump Has No Prospect Of Prevailing On His Claim That Section 230 Is Unconstitutional, Nor Can Such A Claim Be A Basis For A Preliminary Injunction.........................................................................................25

    C.    Mr. Trump Cannot Make Out His State Law Claims.........................................26

        1.    Mr. Trump Has Not Stated A Claim Under FDUTPA (Count III)........26

        2.    Mr. Trump Has Not Stated A Claim Under SB 7072 (Count IV) ...........29

        3.    The First Amendment Bars Mr. Trump's FDUTPA and SB 7072 Claims ..............30

CONCLUSION .....................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abu-Jamal v. National Public Radio*, 1997 WL 527349 (D.D.C. 1997), *aff'd*, 159 F.3d 635 (D.C. Cir. July 8, 1998), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998) ................................................................ 16

*Ahlman v. Barnes*, 445 F. Supp. 3d 671 (C.D. Cal. 2020) ......................................................... 12

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ....................................... 7

*American Freedom Defense Initiative v. Lynch*, 217 F. Supp. 3d 100 (D.D.C. 2016), *aff'd sub nom. American Freedom Defense Initiative v. Sessions,* 697 F. App'x 7 (D.C. Cir. 2017) ........................................... 26

*American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999) ........................................ 21, 22

*Asghari v. Volkswagen Group of America, Inc.*, 42 F. Supp. 3d 1306 (C.D. Cal. 2013) ................................ 28

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ................................................................ 8

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) ............................................................ 13

*Atkinson v. Meta Platforms, Inc.*, 2021 WL 5447022 (9th Cir. 2021) .................................................. 14

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) ............................................................ 17

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ................................................................. 17

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) .................................................................... 20

*Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020) ..................................................................... 21

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ...................................................................... 17, 18, 25

*Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016) .................................................... 12

*Buentello v. Boebert*, 2021 WL 2588856 (D. Colo. 2021) .............................................................. 16

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) ........................................................ 24

*Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ............................................. 11

*Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) ........... 9, 17, 18

*Carroll v. President & Commissioners of Princess Anne*, 393 U.S. 175 (1968) ........................................ 7, 9

*Children's Health Defense v. Facebook Inc. ("CHD")*, 2021 WL 2662064 (N.D. Cal. 2021) .................... *passim*

*Daniels v. Alphabet,* 2021 WL 1222166 (N.D. Cal. 2021) ......................................................... 16, 21

*Davis v. Powertel, Inc.*, 776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ........................................27, 29

*Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621 (E.D. Va. 2019), *aff'd*, 774 F. App'x 162 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1111 (2020) ...................................................................................... 14

*Divino Group LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. 2021)........................................ 19, 20, 26

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. 2021) ................................................................*passim*

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ........................................................................................ 13

*Dollar Rent A Car of Washington, Inc. v. Travelers Indemnity Co.*, 774 F.2d 1371 (9th Cir. 1985).................. 9

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................................................................... 12

*Federal Agency of News, LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295 (N.D. Cal. 2019) ........................... 14

*Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal. 2020) ........................21, 23

*First Franklin Financial Corp. v. Franklin First Financial, Ltd.*, 356 F. Supp. 2d 1048 (N.D. Cal. 2005)...... 10

*Florer v. Congregation Pidyon Shevuyim*, 639 F.3d 916 (9th Cir. 2011) ............................................... 14

*Florida Insurance Guaranty Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187 (Fla. 2011) ........................... 29

*Fonda v. Gray*, 707 F.2d 435 (9th Cir. 1983) ...................................................................................... 22

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002) ................................................................................... 24

*Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp.3d 30 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020), *cert. denied* 141 S. Ct. 2466 (2021) ........................................................................ 14

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) .................................................. 24

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ........................................................................... 7

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .................................................................................. 11

*Goodson v. Republican State Leadership Committee – Judicial Fairness Initiative*, 2018 WL 6430825 (E.D. Ark. 2018)............................................................................................................................................ 8

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ............................................................................... 13

*Gorenc v. Salt River Project Agricultural Improvement & Power District*, 869 F.2d 503 (9th Cir. 1989) ........... 24

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ................................................... 15

*Heineke v. Santa Clara University*, 965 F.3d 1009 (9th Cir. 2020) ......................................................... 15

*Howard v. AOL*, 208 F.3d 741 (9th Cir. 2000) ................................................................................14, 26

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995).............1, 8, 15

*In re Horizon Organic Milk Plus DHA Omega-3 Marketing & Sales Practice Litig.*, 955 F. Supp. 2d 1311 (S.D. Fla. 2013) ................................................................................................................ 27

*International Ass'n of Plumbing & Mechanical Officials v. International Conference of Building Officials,* 79 F.3d 1153, 1996 WL 117447 (9th Cir. 1996) ............................................................. 10

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) .............................................. 21

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018) .... 21

*Johnson v. Knowles*, 113 F.3d 1114 (9th Cir. 1997) ............................................... 15

*Kim v. Apple, Inc.*, 2014 WL 3056136 (D.D.C. 2014), *aff'd sub nom. Seungjin Kim v. Apple, Inc.*, 582 F. App'x 3 (D.C. Cir.) ......................................................................................... 14

*La Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981 (S.D. Tex. 2017) ..................................... 8

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ................................................. 29

*Lewis v. Google, LLC*, 851 F. App'x 723 (9th Cir. 2021), *cert. denied*, 2021 WL 5043635 ................... 26

*Librizzi v. Ocwen Loan Services, LLC*, 120 F. Supp. 3d 1368 (S.D. Fla. 2015) ............................ 27

*Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir. 1980) ........ 11

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982) ..........................................19, 21

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) ........................................ 9

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ..............................14, 15

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) .................... 7

*Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498 (9th Cir. 1996) .................................... 22

*Merle Norman Cosmetics, Inc. v. Martin*, 914 F.2d 263, 1990 WL 131758 (9th Cir. 1990) ................... 10

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ...................................1, 8, 15

*NetChoice v. Paxton*, 2021 WL 5755120 (W.D. Tex. 2021) ........................................... 13

*NetChoice, LLC v. Moody*, 2021 WL 2690876 (N.D. Fla. 2021), *appeal filed sub. nom. NetChoice, LLC v. Att'y Gen.*, No. 21-12355 (11th Cir. July 13, 2021) ......................................... 30

*Newman v. Google LLC*, 2021 WL 2633423 (N.D. Cal. 2021) .......................................... 29

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374 (9th Cir. 1985) ....................... 10

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam) ....................................... 17

*Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885 (N.D. Cal. 2014) .................................... 10

*Palomino v. Facebook, Inc.*, 2017 WL 76901 (N.D. Cal. 2017) ................................................. 27

*Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161 (9th Cir. 2021) ...............................22, 24

*Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020)...........................................................14, 28

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005)................................................................. 13

*Railway Employees' Department v. Hanson*, 351 U.S. 225 (1956) ................................................. 20

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ...................................................... 8

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)........................................................ 13

*Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017) .................................................... 14, 19, 21

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002), *abrogated in part on other grounds by Winter*, 555 U.S. 7 ................................................................................. 13

*Siegel v. Salisbury*, 379 F. Supp. 317 (W.D. Pa. 1974) ........................................................... 25

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) .................................................................. 8

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) ...............................................19, 20

*Smith v. People of California*, 361 U.S. 147 (1959) .................................................................. 8

*Standing Committee on Discipline of U.S. District Court for Central District of California v. Yagman*, 55 F.3d 1430 (9th Cir. 1995) ................................................................................. 29

*Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207 (Fla. Dist. Ct. App. 2019).......................... 29

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) ........................................16, 18

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) ...................................................................... 22

*Tory v. Cochran*, 544 U.S. 734 (2005) ............................................................................... 8

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ............................................ 13

*University of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................................................ 25

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013)............................................................ 13

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ........................................................27, 29

*Westlake Fitness LLC v. Cty. of Ventura*, 2021 WL 971148 (C.D. Cal. 2021) ............................................ 12

*Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018)..................................................... 27

*Wilson v. Twitter*, 2020 WL 3410349 (S.D.W. Va. 2020) ................................................................ 14

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................................ 7

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................................................ 8

*Writers Guild of America, West, Inc. v. FCC*, 423 F. Supp. 1064 (C.D. Cal. 1976), *rev'd on other grounds*, 609 F.2d 355 (9th Cir. 1979) .............................................................................. 17

*Xponential Fitness v. Arizona*, 2020 WL 3971908 (D. Ariz. 2020) ......................... 12

*Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281 (11th Cir. 2007) ................... 28

## STATUTES, RULES, AND REGULATIONS

47 U.S.C. § 230 .................................................................................................... *passim*

2021 Fla. Laws, ch. 32, § 7 ................................................................................... 29

Fla. Stat. § 501.2041 ............................................................................................. 29

Fed. R. Civ. P. 9 .............................................................................................. 27, 29

## OTHER AUTHORITIES

Biron, *Trump's digital media venture says it has lined up $1 billion from investors for his forthcoming social media platform, TRUTH Social*, Business Insider (Dec. 4, 2021) https://www.businessinsider.com/trump-digital-media-venture-enters-agreement-to-raise-1-billion-2021-12 ................................ 11

Spangler, *Twitter Has Flagged 200 of Trump's Posts as 'Disputed' or Misleading Since Election Day. Does It Make a Difference?*, VARIETY (Nov. 27, 2020), https://tinyurl.com/rpm5uja9 ....................... 3

Subramanian, *A Minute-by-Minute Timeline of Trump's Day as the Capitol siege unfolded on Jan. 6,* USA Today (Feb. 11, 2021), https://tinyurl.com/bdhjkaux/ ......................................................... 3

Haggin and Bender, *Trump's Social-Media Platform Joins Crowded Conservative Media Field*, Wall Street Journal (Oct. 23, 2021), https://www.wsj.com/articles/trumps-social-media-platform-joins-crowded-conservative-media-field-11635010334 ............................................................. 11

1

**INTRODUCTION**

2          In early January 2021, after former President Donald Trump had repeatedly used Twitter's

3   privately operated communications platform to falsely attack the validity of the 2020 Presidential election,

4   and in the immediate wake of the violent mob attack at the U.S. Capitol, Twitter made an editorial

5   judgment that his messages should no longer appear on its platform.  Accordingly, Twitter permanently

6   suspended his Twitter account.

7          Now, nearly a year after this suspension and five months after filing this action, Mr. Trump is

8   asking this Court to upend the status quo by issuing a mandatory preliminary injunction—a particularly

9   disfavored form of relief—that would compel Twitter to disseminate Mr. Trump's messages against its

10  will.  There can be no serious argument that any court in America could lawfully issue such an

11  extraordinary injunction.   First and foremost, any such order would violate Twitter's own First

12  Amendment right to "exercise … editorial control and judgment" over what content is and is not

13  published through its communications platform.  *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257-58

14  (1974).  Just as a newspaper cannot be forced to print editorials over its objection, *see id.*, and a parade

15  organizer cannot be forced to include groups who wish to promote an unwelcome message, *see Hurley v.*

16  *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), Twitter too cannot be

17  forced to disseminate speech with which it disagrees.  The requested injunction would thus cause (rather

18  than avoid) irreparable injury.  This by itself dooms Mr. Trump's motion.

19          In addition, all of the traditional non-merits factors that courts consider on motions for

20  preliminary injunction militate heavily against Mr. Trump.  His own extended delays in seeking a

21  preliminary injunction belie any suggestion that he faces irreparable harm or urgently needs relief.  And

22  his claim to irreparable injury rings especially hollow when, as one of the most public figures in the world,

23  he has ample other opportunities to reach an audience (including through his *own* social media platform).

24  For similar reasons, the balance of interests between the parties overwhelmingly favors Twitter because,

25  again, an injunction would irreparably injure Twitter.  And the strong public interest in protecting First

26  Amendment rights, which as between these parties belongs to Twitter, likewise strongly favors Twitter.

27          Finally, Mr. Trump's motion also must be denied because Mr. Trump cannot show a likelihood

28  of success on the merits for all the reasons outlined in Twitter's concurrently filed motion to dismiss.  His

claim that Twitter violated his First Amendment rights fails because the federal Constitution does not constrain Twitter's editorial activities.  Twitter is a private entity that suspended Mr. Trump's account after concluding that he had repeatedly violated the Rules it created to govern content on its platform.  Twitter was not transformed into a state actor simply because some members of Congress have expressed their view that social media companies should do more to limit "misinformation" or "fraudulent or illicit" content on their platforms.  Nor does Section 230, which limits government involvement in editorial decisions of companies like Twitter, render Twitter's content-moderation decisions state action.  And Mr. Trump's claims under Florida law entitle him to no relief, not least because the choice-of-law provision in the Twitter Terms of Service precludes a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and he has alleged no conduct occurring after enactment of S.B. 7072.  All of these defects require not only denial of any preliminary injunction, but dismissal of this entire action.

## BACKGROUND

### A.  Twitter And Its Content-Moderation Policies

Twitter operates an Internet communications platform that allows hundreds of millions of people around the world to share views and follow current events.  *See* Amended Complaint (hereinafter "Complaint" or "Compl.") ¶¶ 2, 36 (Dkt. 21).  There are approximately 500 million Tweets posted to the Twitter platform daily.  Compl. ¶ 2.

Twitter has adopted and applies content-moderation policies, including the Twitter Rules, to minimize the reach of certain types of harmful or misleading information on its platform.  *See* Twitter, *The Twitter Rules*, Declaration of Thomas G. Sprankling, Ex. A.[1]  Twitter's Civic Integrity Policy, for example, prohibits posting false and misleading information regarding elections and other civic processes, including "false or misleading information intended to undermine public confidence in an election."  Twitter, *Civic Integrity Policy*, Sprankling Decl. Ex. C.  And its Glorification of Violence Policy prohibits glorifying, celebrating, praising, or condoning violent crimes, violent events where people were targeted because of their membership in a protected group, or the perpetrators of such acts.  Twitter, *Glorification of Violence*

---

[1] Twitter is supplying copies of the Twitter Rules, Terms of Service, and news articles it cites through the Carome Declaration that accompanies this Opposition and the Sprankling Declaration.  The latter declaration accompanies Twitter's concurrent motion to dismiss and includes only items that the Complaint incorporates by reference.

*Policy*, Sprankling Decl. Ex. B.  Twitter enforces these Rules by, among other things, labeling or requiring account holders to remove Tweets that violate the policies, by temporarily locking access to the violator's account, or, after repeated violations, permanently suspending the violator's account.  *Id.*

As a condition of using the Twitter platform, individuals agree to Twitter's User Agreement, which incorporates the Twitter Terms of Service (herein, "Terms") and Twitter Rules and Policies (herein, "Rules").   Order Granting Mot. to Transfer 1-2 (S.D. Fla. 2021), ECF No. 87.  In the Terms, Twitter reserves its right to remove content that violates the Twitter Rules.  Twitter, *Terms of Service*, Sprankling Decl. Ex. H.  At the same time, the Terms also provide that Twitter "may … remove or refuse to distribute any Content," that it "may suspend or terminate your account … at any time for any or no reason," and that Twitter is also free to "not monitor or control the Content posted" on its platform.  *Id.*

**B.  Twitter's Moderation Of Mr. Trump's Accounts**

Mr. Trump tweeted prolifically, both before and during his presidency.  Compl. ¶ 43.  Leading up to and immediately following the November 2020 presidential election, he used the platform to perpetuate an assertion that the election had been illegitimate.  Twitter appended warning labels to about 200 Tweets or Retweets by Mr. Trump about the 2020 election, flagging them as containing "false, disputed or misleading information."[2]  Yet he continued to tweet misleading information about the election results.  Compl. ¶ 110.

Early in the morning of January 6, 2021, the day Congress was set to meet to count the electoral votes of the presidential election, Mr. Trump posted a series of Tweets that Twitter determined violated its Civic Integrity Policy.  @TwitterSafety (Jan. 6, 2021), Sprankling Decl. Ex. J.  At 12:43 a.m., he retweeted a post suggesting that Republican legislators should "go to the wall" for the president, with the added comment: "Get smart Republicans. FIGHT!"[3]  At 1:00 a.m., he tweeted about then Vice-President Pence's role in presiding over the electoral vote count: "If Vice President @Mike_Pence comes through for us, we will win the Presidency.  Many States want to decertify the mistake they made in certifying

---

[2] Spangler, *Twitter Has Flagged 200 of Trump's Posts as 'Disputed' or Misleading Since Election Day.  Does It Make a Difference?*, VARIETY (Nov. 27, 2020), https://tinyurl.com/rpm5uja9; Carome Decl. Ex. A.

[3] Subramanian, *A minute-by-minute timeline of Trump's day as the Capitol siege unfolded on Jan. 6,* USA Today (Feb. 11, 2021), https://tinyurl.com/bdhjkaux/ (hereinafter, "Timeline of Trump's Day"); Carome Decl. Ex. B.

incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be.)  Mike can send it back!"  *See* Timeline of Trump's Day, *supra*.  At 9:15 a.m., he wrote: "The States want to redo their votes.  They found out they voted on a FRAUD.  Legislatures never approved. Let them do it.  BE STRONG!"  *Id.*

Starting around noon, Mr. Trump then delivered live remarks to a large crowd, telling them "you'll never take back our country with weakness," and encouraging them to "fight like hell" and to march to the Capitol.  *Id.*  As he did so, a violent mob began to storm the Capitol, breaking barricades and breaching the building.  *Id.*  While the violent mob was inside the Capitol, and as Members of Congress were being evacuated, Mr. Trump tweeted an attack on the Vice President: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!"  *Id.*  The insurrection ultimately led to multiple deaths.  *Id.*

The next day (January 7), Twitter publicly announced that, "[a]s a result of the unprecedented and ongoing violent situation in Washington, D.C.," it had required Mr. Trump to remove three Tweets for "repeated and severe violations of [Twitter's] Civic Integrity policy."  @Twitter Safety (Jan. 6, 2021), Sprankling Decl. Ex. J.  Twitter explained that Mr. Trump's account would be "locked for 12 hours following the removal of these Tweets," warning that "[f]uture violations of the Twitter Rules, including [its] Civic Integrity or Violent Threats policies, will result in permanent suspension."  *Id.*

Despite this warning, on January 8, 2021, Mr. Trump posted additional Tweets that Twitter determined could encourage further violence, including: "The 75,000,000 great American Patriots who voted for me, AMERICA FIRST, and MAKE AMERICA GREAT AGAIN, will have a GIANT VOICE long into the future.  They will not be disrespected or treated unfairly in any way, shape or form!!!"  Shortly thereafter, he tweeted, "To all of those who have asked, I will not be going to the Inauguration on January 20th."  Twitter, *Permanent suspension of @realDonaldTrump*, Sprankling Decl. Ex. K.

In response, that same day, Twitter permanently suspended Mr. Trump's account.  It explained: "In the context of horrific events this week, we made it clear on Wednesday [January 6, 2021] that additional violations of the Twitter Rules would potentially result in [permanent suspension]."  *Id.* Twitter elaborated that Mr. Trump's most recent Tweets needed to be read in the context of "the ongoing

tensions in the United States, and an uptick in the global conversations in regards to the people who violently stormed the Capitol." *Id.* And read in that context, Twitter explained, Mr. Trump's statements "can be mobilized by different audiences, including to incite violence." *Id.*

### C.  Mr. Trump's Allegations About Government Officials

Like the Complaint, Mr. Trump's Motion purports to tie Twitter's decision to permanently suspend him to a disparate collection of statements by various Members of Congress, executive branch officials, and other people who hold no government office.  Mot. for Prelim. Injunction 8 (Dkt. 62) (hereinafter "Mot.").[4]   Out of all those statements, the Motion identifies only a few instances in which any federal office holder called for Mr. Trump's removal from Twitter.  Declaration in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 62-2) (hereinafter "Homberg Decl.") ¶¶ 6-7.  Many of the statements reflect the White House and CDC's concern about COVID-19 misinformation, which has nothing to do with Mr. Trump's suspension. *Id.* ¶¶ 8, 44-51.  Others come from a random assortment of individual members of Congress and White House officials, expressing general concern over misinformation on social media platforms and a perceived lack of meaningful competition in their markets.  *Id.* ¶¶ 23-43.  Some of the cited statements were directed at other social media platforms or their employees—not Twitter.  *See, e.g.*, *Id.* ¶¶ 44, 48.

Mr. Trump's Motion also points to statements by various lawmakers and non-government actors—some made *after* Twitter's suspension of his account—calling for changes to Section 230 of the Communications Decency Act, antitrust reform, or greater accountability for social media companies more generally.  Homberg Decl. ¶¶ 27-30, 35, 41.  Trump asserts these statements amounted to threats to repeal Section 230 unless Twitter removed content with which individual legislators disagreed.  Mot. 8.

---

[4] The Homberg Declaration selectively quotes from and fails to provide the full context of many of the referenced statements.  As just one example, in presenting Congressman Jerrold Nadler's statements, the Homberg Declaration quotes the following:  "Let's see what happens by just pressuring them," Homberg Decl. ¶ 23, but fails to include what immediately follows:  "I'm reluctant to have regulation of speech.  It usually goes too far.  I don't know we have to get there yet."  *Id.* Ex. P(i).  Elsewhere, the same declaration grossly overstates the record.  It claims, for example, that "Rep. Frank Pallone, Jr., Chairman of the House Commerce Committee, tweeted that "Trump is inciting violence and spreading dangerous misinformation" and called on social media companies "to remove Trump from their platforms," and further claims that shortly thereafter, Rep. Pallone "explicitly threatened social media companies with retaliatory legislation if they refused to comply with censorship demands."  *Id.* ¶ 6.  But the cited exhibit contains no such "threat [of] … retaliatory legislation" for failure to comply.  *Id.* Ex. B.

1    Yet none of the cited statements regarding Section 230 mentioned suspension or restriction of Mr.

2    Trump's account; and none of the (few) statements calling for his suspension mentioned Section 230.

3    **D. This Litigation**

4    In early July 2021, seven months after Twitter permanently suspended his account, Mr. Trump

5    (along with other plaintiffs) filed this putative class action against Twitter and its then-Chief Executive

6    Officer Jack Dorsey, purportedly on behalf of all Twitter users in the United States who "had their access

7    to social media accounts wrongly restricted" during the prior three years.  Mr. Trump and his co-plaintiffs

8    amended their complaint to add additional claims and plaintiffs on July 27, 2021.  Dkt. 21.  No motion

9    for preliminary injunction accompanied, or followed on the heels of, either the original or the Amended

10   Complaint.  There is no evidence that Mr. Trump or his co-plaintiffs sought to serve either pleading on

11   Defendants until September 1, 2021, nearly eight months after his suspension.  Carome Decl. ¶ 3.

12   The first mention in this litigation of a possible motion for preliminary injunction on behalf of

13   Mr. Trump came on August 13, 2021, when he filed a motion seeking leave to submit an overlength brief

14   in support of a motion for preliminary injunction.  Dkt. 30.  On August 16, 2021, the federal district court

15   in Miami, where the case was then pending, denied that motion, directing Mr. Trump's legal team to first

16   confer with Twitter and then refile the motion.  Dkt. 31.  Mr. Trump then waited another 45 days—nearly

17   nine months after the suspension and nearly four months after commencing suit—before filing any

18   motion for preliminary injunction, ultimately filing it on October 1, 2021.  Dkt. 62.  This Motion, filed

19   solely on Mr. Trump's own behalf, seeks reinstatement of his Twitter account during the pendency of

20   these proceedings in addition to other immediate, temporary relief.

21   Even after filing this Motion, Mr. Trump exhibited no urgency to have it briefed or decided.

22   Within days of filing it, Mr. Trump's legal team stipulated (Dkt. 64) that Twitter's opposition to the Motion

23   could be postponed indefinitely, until after the court in Miami decided Twitter's motion to transfer (Dkt.

24   41), which had been pending since September 1, 2021.  Dkt. 64.  The court in Miami instead directed that

25   Twitter file its opposition to the present Motion by November 11, 2021.  Dkt. 69.  Before that deadline

26   arrived, the court in Miami transferred the case to this District.  Dkt. 88.

27   Shortly after the transfer, Mr. Trump's legal team proposed to Twitter's counsel that the briefing

28   schedule for his preliminary injunction motion proceed much more slowly, with the filing of Twitter's

opposition postponed until December 31, 2021, and Mr. Trump's reply due on February 22, 2022. Carome Decl. ¶ 4.  Mr. Trump's lawyers explained that they wanted this extended schedule in light of the briefing schedule in a different but similar action Mr. Trump and others had filed against a different online platform, *Trump v. YouTube*, No. 4:21-cv-08009.  *Id.*  Twitter declined to consent to such a drawn-out schedule, *id.*, and instead requested a briefing schedule in which its opposition to the present Motion would be filed on November 18, 2021 (Dkt. 121).  Mr. Trump again requested a different, slower schedule. Dkt. 124.  Ultimately this Court ordered a briefing schedule under which briefing of the Motion will finish January 10, 2022.  Dkt. 126.

STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To obtain such emergency relief, the plaintiff must show: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without a preliminary injunction; (3) that the threatened injury to the plaintiff outweighs any harm that might result to the defendants; and (4) that an injunction would not be adverse to the public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135-38 (9th Cir. 2011).  Alternatively, a plaintiff must show "serious questions" going to the merits, a likelihood of irreparable injury, and that "the balance of hardships tips sharply in the plaintiff's favor."  *Id.* at 1135.  In either case, the burden of proof remains with the plaintiff.  *Id.*  The plaintiff's burden is "doubly demanding" where, as here, he seeks to upend the status quo rather than preserve it.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc); *see also id.* ("The 'district court should deny such relief unless the facts and law clearly favor the moving party.'").  "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases . . . .'"  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).

ARGUMENT

**I.  AN INJUNCTION COMPELLING TWITTER TO REINSTATE MR. TRUMP'S ACCOUNT WOULD VIOLATE THE FIRST AMENDMENT**

Mr. Trump asks this Court to order that Twitter immediately reinstate his Twitter account against its will.  That relief would violate Twitter's First Amendment rights by interfering with its editorial decisions and compelling it to publish speech that it does not want to publish.  *See Carroll v. President &*

*Comm'rs of Princess Anne*, 393 U.S. 175, 183–84 (1968); *Tory v. Cochran*, 544 U.S. 734, 738 (2005).

The First Amendment protects "both the right to speak freely and the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Because "all speech inherently involves choices of what to say and what to leave unsaid," courts have recognized as an "important manifestation of the principle of free speech . . . that one who chooses to speak may also decide what not to say." *Hurley*, 515 U.S. at 573 (citation and quotation marks omitted). That protection encompasses the right to refuse to accommodate or host others' messages. *Id.*

When Twitter adopts and enforces policies to determine whether to disseminate certain content or to host certain speakers—as it did when it adopted its Civic Integrity Policy and Glorification of Violence Policy, when it labeled Mr. Trump's Tweets as misleading or dangerous, and when it permanently suspended him from its platform—the First Amendment protects those decisions as an "exercise of editorial control and judgment." *Tornillo*, 418 U.S. at 256 ("[c]ompelling editors or publishers to publish that which 'reason tells them should not be published'" violates the First Amendment). This is analogous to a newspaper's editors deciding the paper will not publish certain articles, editorials, or advertisements, *id.* at 258, or a bookstore's selection of books or magazines it will or will not offer for sale, *Smith v. People of California*, 361 U.S. 147, 152 (1959). The protections of the First Amendment fully apply to online platforms just as they do to newspapers and bookstores. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997) (holding there was "no basis for qualifying the level of First Amendment scrutiny that should be applied to" the Internet); *La Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) ("Facebook [has a] First Amendment right to decide what to publish and what not to publish on its platform.").

The injunction that Mr. Trump requests would co-opt Twitter's private website to disseminate his messages—content that Twitter has expressly barred under its policies and decided that it does not wish to convey. That would constitute court-ordered compelled speech and would be subject to strict scrutiny. *See Sindi v. El-Moslimany*, 896 F.3d 1, 30-32 (1st Cir. 2018) ("The First Amendment forbids the government, including the Judicial Branch, 'from dictating what we see or read or speak or hear.'" (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002)); *Goodson v. Republican State Leadership Comm. – Jud. Fairness Initiative*, 2018 WL 6430825, at *3 (E.D. Ark. 2018). Indeed, the scrutiny applied to injunctions that

infringe on First Amendment rights requires even "more stringent application of general First Amendment principles" than in other contexts. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764–66 (1994). That is because "[i]njunctions … carry greater risks of censorship and discriminatory application than do general ordinances." *Id.* Requiring Twitter to reinstate Mr. Trump's account cannot be justified under this stringent standard. No compelling governmental interest would support such an intrusion on Twitter's First Amendment rights. As explained below, *infra* pp. 14-25, Mr. Trump has no right to express his views on Twitter's private platform. This Court accordingly has no compelling—much less overriding—interest in forcing Twitter to accommodate him. *Carroll*, 393 U.S. at 183.

Indeed, even if (contrary to what Twitter has demonstrated elsewhere) Mr. Trump could demonstrate that government officials coerced Twitter to remove him from its platform and that such coercion rendered that removal "state action," the only remedy that would be consistent with the First Amendment would be to enjoin the government officials—whom Mr. Trump elected not to sue—from engaging in such coercion, leaving Twitter free to make its own decision. *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1293, 1295-97 (9th Cir. 1987) (vacating injunction against private party and noting that once the prosecutor's threats had been removed the private party may "thereafter decide independently" to stay the course). If, in fact, the government compelled Twitter to remove Mr. Trump's account from its platform, it was that action that violated the Constitution, and the Court should remove that compulsion rather than compound it by issuing an injunction against Twitter.

## II.   ALL NON-MERITS FACTORS WEIGH DECISIVELY AGAINST A PRELIMINARY INJUNCTION

### A.   Mr. Trump Cannot Show Irreparable Harm

"An essential prerequisite to the granting of a preliminary injunction is a showing of irreparable injury to the moving party in its absence," *Dollar Rent A Car of Washington, Inc. v. Travelers Indemnity Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985), and Mr. Trump cannot establish that he will be irreparably injured absent entry of an injunction. This, by itself, requires denial of Mr. Trump's Motion. *See id.*

As an initial matter, Mr. Trump's entire approach to this controversy, both before and since he commenced this action five months ago, shows the lack of any need for a preliminary injunction. Twitter made the editorial decision to permanently remove him from its platform in early January 2021. *Supra* pp. 4-5. Mr. Trump then waited six months before filing suit, and then was strikingly lackadaisical

1    in moving the case forward.  He made no apparent efforts to serve Twitter for months, waited almost

2    four months before moving for a preliminary injunction, and thereafter pressed to put briefing and

3    decision on his Motion on a leisurely track—slower than what even Twitter had proposed.  *See supra* pp.

4    6-7.

5         Where, as here, a plaintiff waits many months to ask for an injunction and thereafter shows no

6    interest in pressing to have that relief granted quickly, he undermines any basis for believing that he faces

7    imminent harm or requires urgent relief.  *See Int'l Ass'n of Plumbing & Mech. Offs. v.Int'll Conf. of Bldg. Offs.*,

8    79 F.3d 1153 (Table), 1996 WL 117447, at *2 (9th Cir. 1996) ("[T]he fact that [plaintiff] waited seven

9    months before seeking injunctive relief undermines its claim of immediate threatened irreparable injury.");

10   *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay

11   before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").  Courts in this

12   District routinely deny preliminary injunctions on this basis.  *See, e.g., Open Text, S.A. v. Box, Inc.*, 36 F.

13   Supp. 3d 885, 908-09 (N.D. Cal. 2014) ("A defendant can rebut a plaintiff's argument of irreparable harm

14   by a showing that the moving party delayed in bringing its … action."); *First Franklin Fin. Corp. v. Franklin*

15   *First Fin., Ltd.*, 356 F. Supp. 2d 1048, 1055 (N.D. Cal. 2005) (similar).  Indeed, a delay of many months

16   can serve as a basis for denying an injunction even where a plaintiff has demonstrated likelihood of success

17   on the merits.  *See Merle Norman Cosms., Inc. v. Martin*, 914 F.2d 263 (Table), 1990 WL 131758 at *2 (9th

18   Cir. 1990).

19        Even if Mr. Trump had exhibited some sense of urgency, he still would be unable to demonstrate

20   the irreparable harm necessary to warrant a preliminary injunction.  In the First Amendment context,

21   irreparable harm does not exist absent some serious prospect of establishing a violation of the plaintiff's

22   First Amendment rights, and here Mr. Trump has not only failed to show any such prospect, *see infra* pp.

23   14-25, but it is clear as a matter of law that he has no viable First Amendment claim, MTD at 6-12.  Indeed,

24   while his theory for treating Twitter's actions as those of the federal government is meritless because it

25   flies in the face of established state-action doctrine, *see infra* pp. 14-25, Twitter has demonstrated its own

26   clear, well-established right to be free from an order compelling it to amplify his speech, *see supra* pp. 7-9.

27   Granting the injunction sought here would create irreparable constitutional harm—not prevent it.  *See id.*

28        Mr. Trump also fails to identify any meaningful irreparable harm apart from his supposed (but

non-existent) First Amendment injury.  He argues that being barred from speaking on the Twitter platform will affect his electoral prospects, asserting that Twitter is "an essential platform for communicating in today's global environment."  Mot. 26.  But as a national figure and former president, Mr. Trump has multitudes of other avenues to convey his opinions and engage in expression.  For example, he has his own personal website, nearly unparalleled access to news media, and use of other online platforms, including one that he himself created.[5]  *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974) (noting public figures' increased ability to access media to influence public conversation and noting a corresponding lesser state interest in protecting such individuals in defamation context).

Mr. Trump plainly does not require a Twitter account to broadly disseminate his opinions, and therefore no irreparable harm will follow from this Court rejecting his invitation to upend the status quo during the pendency of this litigation.  His entirely speculative assertion that his immediate return to Twitter is essential to his ability to win or influence future elections (Mot. 27) is a wholly insufficient basis to grant the extreme relief of an injunction forcibly coopting Twitter into disseminating speech it believes is dangerous and otherwise harmful.  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).[6]

## B.  The Balance Of The Equities Weighs Against Any Injunction

The balance of hardships strongly favors Twitter and strongly weighs against any injunction.  As explained, Twitter engages in editorial judgment as an exercise of its First Amendment rights.  *See supra*

---

[5] *See* Haggin and Bender, *Trump's Social-Media Platform Joins Crowded Conservative Media Field*, Wall Street Journal (Oct. 23, 2021), https://tinyurl.com/pmernsjb (Mr. Trump's media company will include a social media platform along with "a subscription streaming service that would feature entertainment programming, news and podcasts."), Carome Decl. Ex. E; Biron, *Trump's digital media venture says it has lined up $1 billion from investors for his forthcoming social media platform, TRUTH Social*, Business Insider (Dec. 4, 2021), https://tinyurl.com/3eendkmj; Carome Decl. Ex. C.

[6] To the extent Mr. Trump's Motion relies on predicted harms to the Republican Party, his former Twitter followers, or other Twitter account holders (Mot. 26), he lacks standing to assert them and they are entirely speculative and unsupported.  And his allegations about fall-offs in his fundraising or merchandising operations (*id.*) are also speculative and are insufficiently supported by the conclusory evidence he cites.  *See, e.g.,* Decl. of Mr. Lewandowski ¶ 27 (explaining only Mr. Lewandowski's opinion regarding Mr. Trump's contribution to the "marketplace of ideas"); Decl. of Ms. Mahfouz ¶ 25 (conclusory assertion that the removal led to the "demise" of his fundraising campaign with no supporting evidence or explanation).  Moreover, "monetary injury is not normally considered irreparable."  *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

pp. 7-9.  Any interim relief awarded to Mr. Trump would force Twitter to propound views and amplify content that it does not wish to express.  That compelled speech injury would compound with each new Tweet from Mr. Trump and each day that his Tweets remain available on the platform.  Although a future order vacating any preliminary injunction could end that harm from continuing to compound indefinitely, it could not undo the permanent injury that would already have been inflicted.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  Particularly because "the purpose of a preliminary injunction is to preserve the status quo" for a merits decision, not to replace it, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016), Mr. Trump cannot show that any harm to him outweighs or justifies a clear infringement of Twitter's own rights.

## C.  The Public Interest Weighs Against A Preliminary Injunction

Permitting Mr. Trump once again to post information on Twitter's platform that promotes violence, undermines the democratic process, or conveys inaccurate information about public health issues would actively harm the public interest.  Where an injunction would risk serious harm to the public, the balance of the equities is, standing alone, a sufficient basis for denying relief—even in cases alleging infringement of a constitutional right.  *See Westlake Fitness LLC v. Cty. of Ventura*, 2021 WL 971148, at *2 (C.D. Cal. 2021) (refusing injunction to protect constitutional rights where "the requested injunction would present a risk of serious harm to public health").  Twitter removed Mr. Trump from its platform because it determined it would help protect the public interest and prevent offline violence.  *See supra* pp. 3-5.  If the Court ordered Twitter to restore Mr. Trump's account during the pendency of this litigation, Mr. Trump would have carte blanche to violate any Twitter Rule or societal norm he wished, leaving Twitter and other online platforms powerless to prevent online rhetoric from leading to real world harm.  This Court should not permit its equitable powers to be used for that purpose.  *Xponential Fitness v. Arizona*, 2020 WL 3971908, at *11 (D. Ariz.  2020) (deciding that "the public's interest in controlling the spread of COVID-19 outweigh[ed] its interest in preventing the constitutional violations alleged" and declining to issue an injunction because "otherwise avoidable human suffering" would result); *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 693 (C.D. Cal. 2020) (denying injunction based on public interest in preventing "myriad risks of releasing incarcerated individuals without any consideration of crime committed,

propensity to violence, or flight risk").

There also is a strong public interest in protecting Twitter's First Amendment rights. *First*, as a general matter, "all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *see also Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) ("[G]overnment actions in contravention of the Constitution are 'always contrary to the public interest.'" (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013))).   Accordingly, "'[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles.'"  *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (citation omitted); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("[T]the public interest favors the exercise of First Amendment rights.").  Here, denying Mr. Trump's motion for a preliminary injunction will promote the public interest by avoiding infringement of Twitter's First Amendment rights.

*Second*, the public interest also favors denying Mr. Trump's motion because an injunction would negatively impact the rights and interests—including the First Amendment rights—"of many persons who are not parties to this lawsuit," *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 829 (9th Cir. 2013):  namely, the millions of people in the United States who use Twitter to receive and disseminate news, commentary, and other information.  *See* Homberg Decl. Ex. L at 2 (asserting that Twitter had nearly 70 million accountholders in the United States as of January 2021); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) ("[T]he First Amendment goes beyond protect[ing] … self-expression of individuals to prohibit[ing] government from limiting the stock of information from which members of the public may draw.").  As Mr. Trump recognizes, Twitter plays an important role in the "public discourse."  *See* Mot. 4. That is, at least in part, due to Twitter's content-moderation policies and practices, which promote the "free exchange of ideas" by sustaining the platform as one on which individuals want to post and receive content.  *Sammartano v. First Jud. Dist. Ct.,* 303 F.3d 959, 974 (9th Cir. 2002), *abrogated in part on other grounds by Winter*, 555 U.S. 7; *see, e.g., NetChoice v. Paxton*, 2021 WL 5755120, at *14 (W.D. Tex. 2021) ("content moderation" is the "tool that social media platforms employ to make their platforms safe, useful, and enjoyable for users").  Twitter's account holders have an interest in being able to post and receive information on a platform that is moderated in accordance with these policies and practices, rather than a platform overrun with the sort of harmful content that would proliferate if sources of such harmful

1  content could obtain injunctions overriding Twitter's editorial judgments.  *See Turner*, 502 F. Supp. 3d at

2  386 (reaching "inevitable conclusion that enforcement of VOA [Voice of America] and network editors'

3  and journalists' First Amendment rights is in the public interest").

4  **III.    MR. TRUMP CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS**

5      **A.  Mr. Trump Cannot Make Out A First Amendment Claim Against Twitter**

6          Mr. Trump's claim that Twitter's decision to remove him from its platform violates his First

7  Amendment rights is meritless.  Courts have long rejected similar First Amendment claims against private

8  online service providers.  *See, e.g., Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000); *Fed. Agency of News,*

9  *LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1308-1314 (N.D. Cal. 2019) ("*FAN I*").[7]  And just last year

10  the Ninth Circuit squarely held that "the state action doctrine precludes constitutional scrutiny of

11  YouTube's content moderation pursuant to its Terms of Service and Community Guidelines."  *Prager*

12  *Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020).  There is no reason for this case to come out

13  differently.

14          Mr. Trump's constitutional claim "faces a formidable threshold hurdle": Twitter is a private entity.

15  *Prager*, 951 F.3d at 996.  The First Amendment "does not prohibit *private* abridgment of speech."  *Manhattan*

16  *Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *see also Roberts v. AT&T Mobility LLC*, 877 F.3d

17  833, 837 (9th Cir. 2017) ("A threshold requirement of any constitutional claim is the presence of state

18  action.").  Thus, when a private actor "provides a forum for speech," it "is not ordinarily constrained by

19  the [Constitution]."   *Halleck*, 139 S. Ct. at 1930; *see also Florer v. Congregation Pidyon Shevuyim*, 639 F.3d 916,

20  922 (9th Cir. 2011) ("We start with the presumption that conduct by private actors is not state action.").

21          To try to get around this problem, Mr. Trump argues that Twitter was transformed into a "state

22  actor" because its enforcement of its own Rules occurred against a backdrop of statements from members

23  of Congress suggesting they were concerned about "disinformation and extremism" on social media

24

25

26

27

28

---

[7] *See also Atkinson v. Meta Platforms, Inc.*, 2021 WL 5447022, at *1-2 (9th Cir. 2021); *Wilson v. Twitter*, 2020
WL 3410349, at *2 (S.D.W. Va. 2020), *report and rec'n adopted*, 2020 WL 3256820; *Freedom Watch, Inc. v.*
*Google, Inc.*, 368 F. Supp.3d 30, 40 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020), *cert. denied* 141
S. Ct. 2466 (2021); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019), *aff'd*, 774 F. App'x
162 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1111 (2020); *Kim v. Apple, Inc.*, 2014 WL 3056136, at *2 (D.D.C.
2014), *aff'd sub nom. Seungjin Kim v. Apple, Inc.*, 582 F. App'x 3, 4 (D.C. Cir.).

platforms, including Twitter.  There are only a "few limited circumstances" in which a private entity can qualify as a state actor: "(i) when the private entity performs a traditional, exclusive public function"; "(ii) when the government compels the private entity to take a particular action"; or "(iii) when the government acts jointly with the private entity." *Halleck*, 139 S. Ct. at 1928.  Mr. Trump does not, and cannot, claim Twitter performs a traditional, exclusive public function because that argument is squarely foreclosed by *Prager*.  Instead, he appears to invoke the compulsion and joint-action tests for state action.  These tests are designed to "protect[] a robust sphere of individual liberty" and the bar for satisfying them is high.  *Halleck*, 139 S. Ct. at 1934 ("Expanding the state-action doctrine beyond its traditional boundaries would expand governmental control while restricting individual liberty and private enterprise.").  A narrow construction of the state action doctrine is particularly crucial where, as here, the plaintiff challenges the defendant's own First-Amendment-protected content-moderation decisions.  *See Hurley*, 515 U.S. at 573; *see also Tornillo*, 418 U.S. at 257-58.

### 1.   Mr. Trump Has Not Demonstrated Government Compulsion

Twitter permanently suspended Mr. Trump from its platform for egregiously and repeatedly violating its own Rules, not because the government "compelled it to take [that] particular action." *Halleck*, 139 S. Ct. at 1928.  Government compulsion requires both an actionable threat from a government official and a demand that a private party take a particular action.  *See, e.g.*, *Johnson v. Knowles*, 113 F.3d 1114, 1120 (9th Cir. 1997) (plaintiffs must identify some "state regulation or custom having the force of law that compelled, coerced, or encouraged the Defendants to discriminate against the Plaintiffs."); *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) (no compulsion where government body had no "power to impose sanctions"); *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020) (no state action where plaintiff did not allege that the state government "commanded a particular result in, or otherwise participated in, his specific case").  Both are lacking here.

First, the statements of government actors on which Mr. Trump principally relies as a supposed source of compulsion could not constitute an actionable threat because they were made by individual members of Congress or, in one instance, by the authors of a congressional committee report.[8]  The

---

[8] Mr. Trump's Motion also refers to pressure from now-President Joe Biden, but the only statements it cites were made when Mr. Biden was a private citizen.  *See* Homberg Decl. ¶ 29 (quoting statements from

statements of individual legislators cannot amount to government compulsion because these "individual members, unlike executive branch officials, generally do not have authority to act on behalf of the state." *Buentello v. Boebert*, 2021 WL 2588856, at *4 (D. Colo. 2021).  Similarly, the committee report cannot amount to government compulsion because a committee cannot pass legislation on its own.  *See, e.g.*, Homberg Decl. Ex. P(ii) at 377 (recommending "reforms for further examination").  As a result, as courts have repeatedly held, pressure from members of Congress cannot convert a private party into a state actor. *See, e.g.*, *Abu-Jamal v. Nat'l Pub. Radio*, 1997 WL 527349 (D.D.C. 1997), *aff'd*, 159 F.3d 635 (Table) (D.C. Cir. July 8, 1998) (holding that NPR's refusal to broadcast plaintiff's political commentary after receiving pressure from Senator Dole and other members of Congress not to air the program was not state action because "not one of th[o]se people has any legal control over NPR's actions"), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998); *Daniels v. Alphabet,* 2021 WL 1222166, at *6 (N.D. Cal.  2021) ("The publicly expressed views of individual members of Congress—regardless of how influential—do not constitute 'action' on the part of the federal government.").[9]  Mr. Trump presents no reason that could justify departing from this consensus to find government coercion—for the first time ever—based solely on the statements of individual legislators and a committee report.

Second, all of the statements that Mr. Trump's Motion cites lack the specificity required for government compulsion.  They were directed at a host of social media platforms, not just Twitter, and none demanded that Twitter remove Mr. Trump's account at penalty of any particular enforcement or regulatory action.  *See, e.g.*, *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 843 (9th Cir. 1999) (state action requires "the government [to] direct[] a specific entity to take a specific (allegedly unconstitutional) action against a specific person").  Instead, most of the statements were calls on social media companies to moderate content in categories as amorphous as "misinformation" or "fraudulent or illicit"

---

November 2019 and January 2020).  Actions of individuals outside of government clearly cannot show state action.

[9] *See also Doe v. Google LLC*, 2021 WL 4864418, at *3 (N.D. Cal. 2021) (holding that similar statements by members of Congress did not make YouTube's content moderation decisions state action because "[p]laintiffs fail[ed] to point to any penalties that necessarily or even likely would have followed if Defendants did not suspend their accounts"); *Buentello*, 2021 WL 2588856, at *5 ("Individual legislators do not have the constitutional power to either make law or abridge speech, and thus their individual actions are not within the First Amendment's coverage.").

information.  *See, e.g.*, Homberg Decl. ¶ 28 (statement by Rep. Schiff) ("[I]f the social media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether [Section 230] immunity still makes sense.").[10]  Such vague demands cannot strip a private party of discretion to decide, for itself, how to act.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Doe v. Google LLC*, 2021 WL 4864418, at *3 (N.D. Cal. 2021) (declining to find state action based on similar comments by legislators because "[e]ven if Defendants had complied with these lawmaker statements to the letter, they would still have had the ultimate discretion on what videos or accounts fit into buckets like 'misinformation'"); *Children's Health Defense v. Facebook Inc.* ("*CHD*"), 2021 WL 2662064, at *15 (N.D. Cal. 2021) (no state action where plaintiff did not allege that anyone from the government "directed [defendants] to take any specific action with regard to [plaintiff]").

Compare the broad policy statements at issue here with the coercive statements in the cases on which Mr. Trump relies.  In *Backpage.com, LLC v. Dart*, 807 F.3d 229, 236 (7th Cir. 2015), a sheriff demanded that a credit card company "cease and desist" processing transactions from Backpage.com and implied the company would face "investigation and prosecution" if it did not comply.  In *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam), the Borough President of Staten Island wrote an official letter to a billboard company condemning two billboards and implying that failure to take them down would be met with official sanction.  In *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291, 1293, 1295 (9th Cir. 1987), a state prosecutor threatened to bring criminal charges against a public telephone utility company, under a state law prohibiting distribution of sexually explicit material to minors, if it did not terminate a specific entity's adult message service.  In *Writers Guild of America, West, Inc. v. FCC*, 423 F. Supp. 1064, 1150 (C.D. Cal. 1976), *rev'd on other grounds*, 609 F.2d 355 (9th Cir. 1979), the Federal Communications Commission threatened regulatory action if networks did not adopt particular programming.  And in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 62-63, 66-67 (1963), a State Commission with power to recommend prosecutions of "purveyors of obscenity" wrote official letters to book distributors designating specific books as "objectionable."  In each of these cases, a

---

[10] Mr. Trump quotes two members of Congress calling for his removal from social media but neither threatened any penalty if social media companies declined to remove him.  *See* Homberg Decl. ¶ 6 ("Rep. Frank Pallone, Jr. … called on social media companies 'to remove Trump from their platforms.'"); *id.* ¶ 36 ("Sen. Mark Warner stated that Twitter's then-temporary suspension of Plaintiff was 'both too late and not nearly enough'").

government official with power to impose sanctions if the plaintiff failed to comply made a specific demand of the plaintiff; that is not the case here.

Moreover, even if Mr. Trump had alleged specific actionable threats directed at Twitter, his claim would still fail because he has sued the wrong party—the private party that was allegedly subjected to the supposed threats, rather than the governmental actors who allegedly delivered them. Mr. Trump ignores this fatal problem by eliding the difference between two types of government compulsion cases: those brought directly against a government official (for allegedly compelling a private party to stifle speech) and those brought against a private party (who allegedly acted under the compulsion of the government). Most of the cases he discusses (*Dart*, *Okwedy*, *Writers Guild of America*, and *Bantam Books*) involved claims brought only against a government body or actor. But claims against private defendants, like Mr. Trump's, are subject to a different—higher—standard than claims against government actors.

Ordinarily, "only the state actor, and not the private party should be held liable for the constitutional violation that resulted from the state compulsion." *Sutton*, 192 F. 3d at 838. In this context, the government defendant "can be held responsible for a private decision only if it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. But in at least the mine run of circumstances of government compulsion, an injunction against the private party who was assertedly the object of that compulsion is not proper. The only appropriate remedy, rather, is simply to *remove* the compulsion while leaving the private party free to make its own choice—even if that means making precisely the same choice as before. *See, e.g., Carlin Commc'ns*, 827 F.2d at 1293, 1295-97 (vacating injunction against private party and noting that once the prosecutor's threats had been removed the private party may "thereafter decide independently" to stay the course). To establish a claim against a private defendant, like Twitter, the plaintiff must plausibly establish not only "state compulsion" but also "'something more.'" *Sutton*, 192 F.3d at 838; *see also Doe*, 2021 WL 4864418, at *3 ("[A] compulsion claim against a private party requires pleading 'some *additional* nexus that [makes] it fair to deem the private entity a governmental actor in the circumstances.'" (quoting *Sutton*, 192 F.3d at 839) (emphasis added)). As explained below, *infra* pp. 21-25,

1    Mr. Trump has alleged nothing of the sort. [11]

2               **2.   Section 230 Does Not Turn Twitter Into A State Actor**

3           Mr. Trump further errs in claiming that Section 230 transforms Twitter's content moderation

4    decisions into state action.  His argument appears to be that because Section 230 provides immunity for

5    Twitter's removal decisions and because individual government actors said they believed certain categories

6    of content should be removed from Twitter's platform, Twitter's decisions regarding his account were

7    "significantly encouraged" or compelled by the government.   That theory is meritless, and courts have

8    already rejected it.

9           State action requires that "the party charged with the deprivation must be a person who may fairly

10   be said to be a state actor." *Roberts*, 877 F.3d at 838 (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922,

11   937 (1982)).  Twitter cannot "fairly be said to be a state actor" simply because Section 230 is available to

12   it as a litigation defense.  Section 230 "does not require private parties to do anything"; rather, it reflects

13   a "deliberate *absence* of government involvement in regulating online speech." *Divino Group LLC v. Google*

14   *LLC*, 2021 WL 51715, at *6 (N.D. Cal. 2021); *see also* Compl. ¶ 74 ("In passing 230(c), Congress permitted

15   but did not mandate, action be taken by social media platforms.").  For precisely this reason, another court

16   in this District recently dismissed a nearly identical First Amendment claim against Facebook that sought

17   to establish state action by claiming that immunity under Section 230, when combined with "pressure"

18   from Representative Schiff to act on vaccine-related misinformation, turned Facebook's private content

19   moderation decisions into state action. *CHD*, 2021 WL 2662064, at *13.  And in *Divino Group*, 2021 WL

20   51715, at *5, yet another court in this District rejected the plaintiff's theory that Section 230 immunity

21   transforms YouTube's private content-moderation decisions into state action.  This Court should likewise

22   reject Mr. Trump's misguided reliance on Section 230.

23          Neither of the cases on which Mr. Trump relies (*see* Mot. 10-11) justifies departing from these

24   precedents.   In particular, *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), is plainly

25   inapposite.   There, a comprehensive federal drug testing regime required private railroad companies to

---

[11] Mr. Trump also attempts to establish coercion by arguing that courts "take into account the economic dependence of the employees on their employers" in determining whether a statement could chill an employee's speech. Mot. 7. But he does not explain why that principle has any relevance here.  Obviously, Twitter is not a government employee, nor is it economically dependent on individual members of Congress or the White House.

subject railroad employees to drug and alcohol tests after accidents, and authorized private companies to subject railroad employees to substance tests after other safety violations. *Id.* at 606. The Supreme Court held that those mandatory tests constituted state action because the government required the companies to fire any employee who declined testing, had the right to receive "certain biological samples and test results," and barred the companies from divesting themselves of the authority conferred by the regulations. *Id.* at 615; *see also id.* (these "specific features" convinced the Court that there was state action). But as the court in *Children's Health Defense* recently observed, unlike the federal regulations that mandated private railroad companies to subject employees to drug tests in *Skinner*, Section 230 does not require private entities to do anything—let alone to take down specific content. 2021 WL 2662064 at *13-14; *see also Divino Group*, 2021 WL 51715, at *6. Nor does it give the government a right to supervise or obtain information about private activity. *See id.* To the contrary, Section 230 is *deregulatory*. It "was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the medium to a minimum." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see also* 47 U.S.C. § 230(b)(2) ("It is the policy of the United States … to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."). Because Section 230 imposes no affirmative legal obligations of the sort at issue in *Skinner*, it cannot turn Twitter's decision to suspend Mr. Trump's account into state action.

Also unavailing is Mr. Trump's reliance on *Railway Employees' Department v. Hanson*, 351 U.S. 225, 232 (1956), which he cites for the erroneous proposition that a statute that permits (but does not require) private actors to engage in certain behavior can transform the permitted conduct into state action. *See* Mot. 10. *Hanson* involved a challenge under the Nebraska Constitution's right-to-work provision to private employers' agreements requiring union membership as a condition of employment. 351 U.S. at 227. When the defendant-employers responded that the agreements were authorized by the federal Railway Labor Act, the Court reached the question of that Act's constitutionality because the Act—which expressly countermanded contrary state laws—was "the source of the power and authority by which any private rights are lost or sacrificed" by the union-membership requirement. *Id.* at 228-232. In other words, absent the Act, state law would have precluded the employers' requirement of union-membership.

*Hanson* thus fails to support Mr. Trump's argument for two reasons. First, unlike in *Hanson*, it is

not the case that Twitter's actions would have been unlawful but for Section 230.  Section 230 protects internet service providers from liability for their content-moderation decisions, but it is not the source of their authority to make such decisions.  Second, and in any event, *Hanson* did not hold, nor has any court interpreted it to mean, that the Railway Labor Act transformed the private agreements at issue there into state action merely because the Act preempted contrary state law.  Indeed, such a reading would have precluded the Ninth Circuit's decision in *Roberts*, which held that AT&T did not become a state actor by relying on the Federal Arbitration Act to preempt state law that would have precluded enforcement of an arbitration agreement.  877 F.3d at 836, 844-845.  *Roberts* made clear that laws that give federal protection and "mere approval of private action"—and have nothing "even resembling the sort of coercive regulations that met the encouragement test in *Skinner*"—do not give rise to state action.  *Id.* at 844-45.  And the Supreme Court recently called into doubt whether *Hanson* was even right to conclude that "Congress's enactment of a provision allowing, but not requiring, private parties to enter into union-shop arrangements was sufficient to establish governmental action."  *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2479 n.24 (2018).  The Supreme Court emphasized in *Janus* that *Hanson*'s analysis was "debatable" as far back as 1977, and in light of the Court's intervening state action cases, is "even more questionable today."  *Id.* (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53 (1999); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974)).

Further, unlike in *Hanson* where "the federal statute [was] the source of the power and authority by which" the employers were allowed to operate as union-only shops, it is not Section 230 that authorizes Twitter to remove content from its private platform that it disagrees with.  That right arises from the First Amendment, which confers on all communications platforms the ability to control what content they do and do not disseminate, *see infra* 7-9.  For this reason as well, *Hanson* is no help to Mr. Trump.

### 3. Mr. Trump Cannot Show Twitter Was A Government Actor Based On A "Joint Action" Theory

Mr. Trump's effort to establish state action based on a "joint action" theory (Mot. 11) likewise fails.  Indeed, courts in this District have repeatedly rejected very similar arguments in cases involving Facebook or YouTube.  *See CHD*, 2021 WL 2662064 at *3; *Doe*, 2021 WL 4864418, at *4-6; *Fed. Agency of*

1  *News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1124-27 (N.D. Cal. 2020) ("*FAN II*"); *Daniels*, 2021 WL

2  1222166, at *6-7.

3        The standard for showing joint action is rigorous, requiring that "the claimed constitutional

4  deprivation" "result[] from the exercise of some right or privilege created by the State or by a rule of

5  conduct imposed by the state." *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020) (citation omitted); *accord*

6  *Lugar*, 457 U.S. at 937.  Joint action thus does not exist where the governing "statutory and regulatory

7  scheme leaves the challenged decisions to the judgment of [private actors]." *Am. Mfrs. Mut. Ins. Co. v.*

8  *Sullivan*, 526 U.S. 40, 58 (1999).  Further, the joint action theory is a narrow exception to the rule that

9  private entities are not subject to constitutional restraints.  Thus, it applies only where a private entity's

10  "particular actions are inextricably intertwined with those of the government," and requires "substantial

11  coordination and significant financial integration between the private party and government." *Pasadena*

12  *Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1167-68 (9th Cir. 2021) (citation and quotation marks

13  omitted).  Alternatively, a plaintiff can seek to establish joint action on a conspiracy theory—but the bar

14  for that theory is equally demanding.  "Mere passive acquiescence in the direction of state officials

15  generally is not sufficient," nor even is an agreement to take some particular action. *Taylor v. List*, 880

16  F.2d 1040, 1048 (9th Cir. 1989).  Rather, the private and government actors must have specifically agreed

17  to "violate constitutional rights." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983).

18        Mr. Trump does not come close to meeting the exacting requirements of the joint action theory.

19  Critically, he does not identify any government-created right or rule of conduct that mandated the

20  suspension of his account.  Mr. Trump relies on a smattering of statements from White House officials

21  expressing concerns about the spread of COVID-19 misinformation through online platforms (Homberg

22  Decl. ¶¶ 45-51), but none expresses an intelligible rule that left Twitter without any discretion in choosing

23  to suspend Mr. Trump's account. *See Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 502 (9th Cir. 1996)

24  (noting that "generalized federal concern with drug use at nuclear … plants" was insufficient to

25  demonstrate that governmental standard of decision compelled nuclear plant's decision to discharge

26  employee for alleged drug transaction).  Nor could they have.  Twitter's decision to remove Mr. Trump's

27  account was not related to anything that he had tweeted regarding COVID-19.  And, if that were not

28  enough, nearly all the statements on which Mr. Trump relies were made several months *after* Twitter's

decision to permanently suspend his account.  There is no joint action here:  Twitter decided to remove Mr. Trump's account because it concluded that he had violated its own Rules—not because of any governmental law or regulation.

Further, the generalized statements on which Mr. Trump exclusively relies fall far short of demonstrating "significant cooperation" or "financial integration" between government actors and Twitter, much less anything of that sort that led Twitter to permanently suspend his Twitter account.   He points to one screenshot from the CDC's website stating that it "work[s] with" social media companies to combat vaccine misinformation, Homberg Decl. ¶ 45, and several statements—all made *after* his suspension—by federal officials stating that the White House "engage[s]" with social media companies on vaccine and COVID-19 misinformation, Homberg Decl. ¶¶ 46-51.  Based on these statements alone,[12] Mr. Trump claims that the White House and social media companies "agree[d] to 'work together' to 'get rid' of disfavored speech." Mot. at 12-13.

But as the *CHD* court explained, "general statements by the CDC and [Facebook's CEO] about 'working together' to reduce the spread of health or vaccine misinformation, or to promote universal vaccination do not show that the government was a 'joint participant in the challenged activity.'"  *See CHD*, 2021 WL 2662064, at *11.  Likewise, in *Doe v. Google*, the court rejected nearly identical allegations, noting that "[c]ourts have dismissed cases for lack of state action despite significantly more alleged cooperation between public and private actors compared to what Plaintiffs allege here." 2021 WL 4864418, at *15.  If anything, Mr.  Trump's theory of state action is even more attenuated than the *Doe* plaintiff's, because all but one of the statements on which he relies were made months after his suspension, and Twitter did not remove Mr. Trump for posting COVID misinformation—the alleged target of the government and Twitter's collaboration.  Mr. Trump does not explain how the government's working together with Twitter to reduce the spread of health or vaccine misinformation *after his suspension* could possibly support his claim that the government and Twitter worked in concert to remove his account for violating its rule against glorifying violence months earlier.  *See FAN II*, 432 F. Supp. 3d at 1125 (noting

---

[12] Mr. Trump also vaguely asserts that "White House administration officials" and "agencies" had "direct contacts" with Twitter to "flag content that they believed required action."  Mot. 12.  But he fails to allege, much less substantiate, any specific facts to support that conclusory speculation, which accordingly should be given no weight.

1    that statements by the government that "Facebook is 'working more closely' with the U.S. government

2    and law enforcement" were not probative of joint action when they "post-date[d] the relevant conduct

3    that allegedly injured [p]laintiffs").

4            Likewise unavailing is Mr. Trump's attempt to establish joint action with unsupported claims of a

5    conspiracy, which are even more implausible than the claims that were rejected in *CHD*.  Mr. Trump

6    alleges that he was suspended pursuant to some "mutual understanding" among the White House

7    (apparently formed while Mr. Trump himself headed the White House), the CDC, and social media

8    companies "to 'work together' to 'get rid' of disfavored speech" "specifically on the [COVID-19]

9    pandemic."  Mot. 11, 12.  These statements come nowhere close to demonstrating that Twitter entered

10   into an agreement with White House officials to "censor" Mr. Trump.  Mr. Trump's suspension had

11   nothing to do with speech about COVID-19 and none of the statements references his use of Twitter's

12   platform in particular.  But even if it the statements were at all relevant to his suspension, they evince, at

13   most, a shared goal, between Twitter and certain state actors, of preventing the spread of misinformation.

14   The Ninth Circuit has held that government officials and private actors merely having some common goal

15   is insufficient to establish conspiracy if there was no shared motive to violate the plaintiff's constitutional

16   rights.  *See Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002); *see also Gallagher v. Neil Young Freedom Concert*,

17   49 F.3d 1442 (10th Cir. 1995) (holding that a public university's acquiescence to private security officers'

18   allegedly unconstitutional pat-down searches of concert patrons did not amount to conspiracy, despite

19   shared goal of producing a profitable event).  Mr. Trump puts forward no evidence whatsoever of any

20   such shared unconstitutional motive.

21           Finally, without citing any Ninth Circuit case law, Mr. Trump appears to claim that joint action

22   exists because the government "knowingly accepts[] substantial benefits" from Twitter's alleged

23   "partnership" with the government.  Mot. 13. But all Mr. Trump points to as evidence of that partnership

24   are statements that the government "works with" social media companies to address COVID-19

25   misinformation.  Mot. 10-13.  Joint action does not exist merely because the government derives some

26   incidental benefit from engaging or communicating with private actors; instead, those benefits must arise

27   pursuant to a system of "substantial coordination and significant financial integration between the private

28   party and government."  *Pasadena Republican Club*, 985 F.3d at 1167 (citation and quotation marks omitted);

*accord Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 723 (1961).  As explained *supra* p. 22, Mr. Trump puts forth no evidence of any "substantial coordination" and "financial integration" between the government and Twitter.  And in any event, such intangible benefits as promoting or supporting government programs are insufficient to establish joint action.  *See Pasadena Republican Club*, 985 F.3d at 1170-71; *Gorenc v. Salt River Project Agr. Imp. & Power Dist.*, 869 F.2d 503, 508 (9th Cir. 1989).  If anything, any government-derived benefits from Twitter's treatment of COVID-19-related information are irrelevant to Twitter's decision to suspend Mr. Trump's account for violating its Glorification of Violence Policy.  And Mr. Trump makes no meaningful effort to argue otherwise.

*    *    *

Twitter concluded that Mr. Trump violated its Rules at least 200 times in the months leading up to his suspension and then issued a clear warning—on the day a violent mob attempted to stop Congress from counting electoral votes—that further violations of its Rules would result in permanent suspension. @TwitterSafety, (Jan. 6, 2021), Sprankling Decl. Ex. J.  When he ignored this warning, Twitter suspended his account, citing violations of its own platform Rules to explain its decision:  "We assessed the two Tweets … under our Glorification of Violence policy, which aims to prevent the glorification of violence that could inspire others to replicate violent acts and determined that they were highly likely to encourage and inspire people to replicate the criminal acts that took place at the U.S. Capitol on January 6, 2021." *Permanent suspension of @realDonaldTrump*, Sprankling Decl. Ex. K.  This kind of judgment—"made by [a] private part[y] according to professional standards that are not established by the State"—is not state action.  *Blum*, 457 U.S. at 1008.  This dooms Trump's claim that Twitter violated his constitutional rights, and bars that claim from serving as a basis for any preliminary (or other) injunction.

**B.  Mr. Trump Has No Prospect Of Prevailing On His Claim That Section 230 Is Unconstitutional, Nor Can Such A Claim Be A Basis For A Preliminary Injunction**

Mr. Trump's Motion seeks an order both "declaring" Section 230 to be invalid and "enjoin[ing]" it "as applied."  Mot. 28.    Even if Count II of the Complaint, which attacks Section 230 as unconstitutional, had any merit (it does not), that count would not be a basis for either a preliminary injunction or preliminary declaration.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S.

390, 395 (1981).  It is therefore "generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits" of a challenge to a statute.  *Id.*  And "[t]here is no such thing as a preliminary declaratory judgment."  *Siegel v. Salisbury*, 379 F. Supp. 317, 324 (W.D. Pa. 1974*)).*

In any event, Mr. Trump cannot demonstrate that Section 230 is unconstitutional, either facially or as applied, because his claim is procedurally improper.  He has not sued any government actor charged with enforcing that statute, nor has any party invoked that statute as an affirmative defense in this case. He accordingly lacks standing to challenge the statute because it has not caused him any injury.  It was Twitter, not Section 230, that restricted Mr. Trump from expressing himself on the Twitter platform, and a declaration that Section 230 is invalid would not redress that restriction.  *See Lewis v. Google, LLC*, 851 F. App'x 723 (9th Cir. 2021) (holding that plaintiff lacked standing to raise constitutional challenge to Section 230 after YouTube removed his video because "[n]one of the alleged injuries in [his] challenge … [were] fairly traceable to the application of § 230"), *cert. denied*, 2021 WL 5043635; *Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 106 (D.D.C. 2016) (noting lack of causation and redressability in challenge to Section 230 and explaining that "even absent the affirmative defense supplied by § 230, the private social-media companies could argue that they cannot be compelled to publish a particular message" under the First Amendment), *aff'd sub nom. Am. Freedom Def. Initiative v. Sessions,* 697 F. App'x 7 (D.C. Cir. 2017).  In addition, the Declaratory Judgment Act does not confer jurisdiction over an affirmative attack to a federal statute that is not raised as a defense.  *Howard v. Am. Online Inc.,* 208 F.3d 741, 754 (9th Cir. 2000); *see also* MTD at 13.

Mr. Trump's challenge to Section 230 also fails on its merits.  He seems to argue that the statute is invalid "as-applied" because it unconstitutionally encourages Twitter to exercise its own right to exclude his speech from its platform.  Mot. at 19.  For reasons already explained, and as many courts have concluded, statutory permission for private actors to engage in conduct does not compel them to do anything, much less violate others' constitutional rights.  *See supra* pp. 19-21; *CHD*, 2021 WL 2662064, at 14; *Divino Group*, 2021 WL 51715, at *6.

### C.  Mr. Trump Cannot Make Out His State Law Claims

#### 1.  Mr. Trump Has Not Stated A Claim Under FDUTPA (Count III)

Mr. Trump's Motion appears to suggest that a preliminary injunction restoring his Twitter account

is somehow warranted based on his FDUPTA claim in Count III of the Complaint.  It contends that Twitter's Rules "deceiv[e] its Users into thinking that [Twitter] applies these standards with total viewpoint neutrality" when in fact, Twitter inconsistently applied its policies on election integrity, inciting violence, and COVID-19 misinformation in order "to placate government actors." Mot. 23.  Mr. Trump is unlikely to succeed on this FDUTPA claim for three reasons.

*First*, Twitter's Terms of Service—which have been held in this action to be binding on Mr. Trump, *see* Transfer Order (Dkt. 87)—provide that California law shall govern "any dispute that arises between [users] and Twitter."  Terms of Service, Sprankling Decl. Ex. F.  This choice-of-law provision bars Mr. Trump's FDUTPA claim because California "has a substantial relationship to the parties" as Twitter's "principal place of business," *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018), and the application of California law is not contrary to a fundamental policy of Florida given that "California … has its own robust body of consumer protection law," *Palomino v. Facebook, Inc.*, 2017 WL 76901, at *4 (N.D. Cal. 2017).  Dismissal—and denial of any preliminary injunction—is therefore required.

*Second*, even if Florida law could apply here, Mr. Trump has not alleged any deceptive act or practice, let alone with the specificity required under Rule 9(b), *see Librizzi v. Ocwen Loan Serv., LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Rule 9(b) applies to FDUTPA claims that purport to sound in fraud).  Under FDUTPA, a deceptive act or practice is one "likely to deceive a consumer acting reasonably in the same circumstances." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000).   This "requires a showing of 'probable, not possible deception.'" *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 955 F. Supp. 2d 1311, 1332 (S.D. Fla. 2013) (citation omitted).  And under Rule 9(b), Mr. Trump must specifically "set forth what is false or misleading" about the act or practice and "why" it is misleading. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Though Mr. Trump's Motion contends that Twitter users are misled by Twitter's content-moderation policies, Mot. 23, it makes no attempt to explain how or why users would understand those policies to mean that Twitter always or only takes enforcement action under certain objectively defined circumstances.  In any event, no such explanation could be reconciled with Twitter's Terms of Service.  Those Terms expressly state that Twitter may take enforcement action against accounts or content for any reason or no reason at all. *Terms of Service*, Carome Decl. Ex. F at 8.  They further grant Twitter

1    exclusive discretion to determine whether and when to engage in content moderation, stating both that

2    Twitter "*may*" take such action when "we reasonably believe" a user has violated the User Agreement

3    (among other reasons) and, more broadly, that Twitter "*may not* monitor or control" the content others

4    post. *Id.* at 8, 3 (emphases added).   And even the particular Twitter policies that Trump's Motion claims

5    were applied inconsistently expressly state that Twitter's enforcement actions will vary "depend[ing] on

6    the severity of the violation and [an] account's previous history of violations," *Glorification of Violence Policy*,

7    Sprankling Decl. Ex. B; *COVID-19 Misleading Information Policy*, Sprankling Decl. Ex. E.   Twitter also makes

8    clear that its decisions about Tweets from government officials such as Mr. Trump are particularly

9    contextual and case-specific.   *See* Twitter, *About public-interest exceptions on Twitter*, Carome Decl. Ex. D ("We

10   recognize the desire for these decisions to be clearcut yes/no binaries.   Unfortunately the reality is that

11   they can't be. … We believe it is critical that we evaluate every case individually and in a way that accounts

12   for context and history.").   Given Twitter's public clarity in disclaiming any commitment to consistent

13   application of its Rules and policies, Mr. Trump is plainly not likely to prevail on his FDUPTA claim

14   insofar as it depends on alleged inconsistency in Twitter's content-moderation judgments. *See Zlotnick v.*

15   *Premier Sales Grp., Inc.*, 480 F.3d 1281, 1285 (11th Cir. 2007) (affirming dismissal where "[t]he express terms

16   of the [contract] undermine[d] [plaintiff's] claim").   That is especially true of the action challenged here.

17        Nor is Mr. Trump likely to succeed on any claim based on Twitter's alleged failure to disclose that

18   "content may be removed … because government actors desire its removal," Compl. ¶ 206.   In light of

19   both Mr. Trump's inability to establish that any content was removed because the government so desired,

20   *see supra* pp. 15-19, 21-25, and the express statement in the Terms of Service that Twitter may remove

21   content or accounts for any reason, Mr. Trump has not explained "why [the purported] omission

22   complained of was false and misleading," as he must.   *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp.

23   3d 1306, 1325 (C.D. Cal. 2013).

24        And Mr. Trump has not shown that any reasonable person could be deceived by Twitter's content-

25   moderation decisions themselves. *See Zlotnick*, 480 F.3d at 1284 (a deceptive act or practice must be likely

26   to mislead reasonable consumers).   Mr. Trump argues that Twitter's allegedly inconsistent application of

27   its standards deceives users into thinking that parties who "have run afoul of [Twitter's] standards are less

28   trustworthy than the content they do find across the platform."   *See* Mot. 23.   The Ninth Circuit has

already rejected this theory, holding that content-moderation actions themselves "do[] not imply any specific representation about" the relevant content. *Prager*, 951 F.3d at 1000. And to the extent that Mr. Trump means to argue that users would be deceived not by Twitter's content-moderation actions but its public statements explaining the reasons for his removal, that, too, fails because he nowhere contends that his Tweets did not violate the Glorification of Violence Policy nor explains why Twitter's explanation of its application of that Policy as to him was misleading, as Rule 9(b) requires, *see Vess*, 317 F.3d at 1107. Indeed, because Twitter's public statements provide detailed explanations of the facts supporting Twitter's determination that Mr. Trump's actions violated the Glorification of Violence Policy, they imply no "false assertion of fact" and are not actionable. *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995). Mr. Trump has, therefore, not identified any act or statement "likely to deceive a consumer acting reasonably" in the circumstances. *Davis*, 776 So. 2d at 974.

*Third*, Mr. Trump cannot show that he was aggrieved by any allegedly deceptive act or practice. *See Newman v. Google LLC*, 2021 WL 2633423, at *12 (N.D. Cal. 2021). Again, his Motion does not even attempt to argue that Twitter was wrong in determining that any of his Tweets that prompted Twitter's enforcement actions with respect to his account (including its permanent suspension) actually violated the Rules cited by Twitter, nor does it (or could it) explain how any decisions by Twitter not to take enforcement action against other people's content or accounts that may have similarly violated its Rules (*see* Mot. 20, 21, 23) could have caused him any harm. He is, therefore, not entitled to the injunctive relief sought. *See Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 215 (Fla. Dist. Ct. App. 2019).

## 2.   Mr. Trump Has Not Stated A Claim Under SB 7072 (Count IV)

Mr. Trump has failed to state a claim under SB 7072 for the simple reason that it became effective only *after* the suspension of his account. Laws are presumed not to apply retroactively and can do so only with "an express statement of legislative intent." *Florida Ins. Guar. Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 195 (Fla. 2011); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 270 (1994). SB 7072 did not become effective until July 1, 2021. *See* 2021 Fla. Laws, ch. 32, § 7. Mr. Trump's account, however, was suspended six months earlier, on January 7, 2021. *See* Compl. ¶ 113. SB 7072, which is silent as to retroactivity, *see* Fla. Stat. § 501.2041, therefore did not govern the actions challenged here.

1

### 3.   The First Amendment Bars Mr. Trump's FDUTPA and SB 7072 Claims

2      The First Amendment bars Mr. Trump's claims under either FDUTPA or SB 7072.  FDUTPA

3  may not be deployed to second guess Twitter's determinations regarding what content violates its Rules

4  and Policies.  Defendants have the constitutionally protected right to decide what speech and speakers to

5  include or remove from its platform.  *See supra* pp. 7-9.   As one court has already held, SB 7072 is plainly

6  unconstitutional as its sole purpose is to restrict whether and how a social media company can enforce its

7  content moderation policies, *see NetChoice, LLC v. Moody*, 2021 WL 2690876, at *10-11 (N.D. Fla.  2021),

8  *appeal filed sub. nom. NetChoice, LLC v. Att'y Gen.,* No. 21-12355 (11th Cir. July 13, 2021), and FDUTPA

9  may not be invoked to achieve those same impermissible ends.

10                                  **CONCLUSION**

11      For all of the foregoing reasons, as well as for reasons set forth in Twitter's concurrently filed

12  Motion to Dismiss, the Court should deny Mr. Trump's motion for a preliminary injunction.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  December 9, 2021

Respectfully submitted,

/s/ *Patrick J. Carome*

PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile:  (617) 526-5000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile:  (650) 858-6100

*Attorneys for Defendant Twitter, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2021, I electronically filed the above document and the accompanying declaration of Patrick J. Carome and proposed order with the Clerk of the Court using CM/ECF which will send electronic notification of these filings to all registered counsel.


Dated:    December 9, 2021                          By:    _/s/ Patrick J. Carome_

PATRICK J. CAROME