JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER , JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI,
P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON *(pro hac vice)*
GARDNER BREWER MARTINEZ
MONFORT
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al.,<br><br>                  Plaintiffs,<br><br>     v.<br><br>TWITTER, INC. et al.,<br><br>                  Defendants. | Case No: 21-cv-08378-JD<br><br>**PLAINTIFFS'OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date:     February 24, 2022<br>Time:               10:00 a.m.<br>Place:              Courtroom 11, 19th Floor<br>Judge:              Hon. James Donato |

## TABLE OF CONTENTS

I.     **INTRODUCTION** .................................................................................................. 1

II.    **STATEMENT OF FACTS** ................................................................................... 2

   A.   Procedural Background ................................................................................. 2

   B.   Factual Allegations ...................................................................................... 3

III.    **ARGUMENT** ....................................................................................................... 5

   A.   Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True ................. 5

   B.   The State Action Issue Is Inherently Unsuited for Disposition on a Motion to Dismiss. 6

   C.   Plaintiffs Have Pleaded State Action by Means of Compulsion..................... 7

     1.   Origins of the Compulsion Theory ................................................... 7

     2.   The Specificity Issue:  Plaintiffs Belong to a Class of Citizens Targeted by the Government. .... 9

        (a)   Laws of General Applicability—No State Action ................. 9

        (b)   State Action That Targets Identified Groups—This Case ...................... 10

        (c)   The "Particular Case" Fallacy—*Doe*, *Daniels*, and *CHD*........................ 11

     3.   Plaintiffs Have Amply Alleged Coercive Statements by State Actors. ........ 13

     4.   Threats by Individual Officials Suffice to Create State Action. ............... 16

     5.   Plaintiffs Have Pleaded the "Something More" Needed to Maintain a Claim Against a Private Party. .......... 17

   D.   Section 230(c) Provides Government Encouragement of Defendants' Conduct. .......... 17

     1.   State Action Can Consist of Enabling Discriminatory Private Conduct....................... 18

     2.   The State Also "Acts" When It Allocates Property Rights. .......................... 19

     3.   Defendants' Cases Are Inapposite ................................................... 20

   E.   Joint Action Also Is Sufficiently Pleaded ................................................. 20

   F.   Plaintiffs Have Standing to Challenge the Constitutionality of Section 230. .............. 21

   G.   Plaintiffs' Claims Under Florida Law Are Viable. ................................. 22

     1.   The Choice of Law Provision Does Not Foreclose the FDUTPA Claim....................... 22

     2.   Defendants' Failure to Disclose Material Information Is Actionable. ..................... 23

     3.   Plaintiffs' Allegations in Count IV Are Sufficient.................................... 24

     4.   The First Amendment Is Not a Defense to FDUTPA. .................................. 24

IV.    **CONCLUSION**.................................................................................................... **25**

1

## TABLE OF AUTHORITIES

2

Cases

3

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144............................................................................ 13, 23

4

*Ahern v. Mayo Clinic*, 180 So.3d 165 (1st DCA 2015) ................................................................. 25

5

*American Family Ass'n v. City of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) ........................ 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................... 6

6

*Atkinson v. Meta Platforms*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021).................................... 23

7

*Backpage.com v. Dart*, 807 F.3d 229 (7th Cir. 2015) ................................................................... 18

8

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963)......................................................... 1, 3, 17, 18

9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 6, 18, 24

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ..................................................................... 16

10

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ........................................................ 13

11

*Blum v. Yaretsky*, 457 U.S. 991 (1982)................................................................................... passim

12

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ........................... 8

13

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009) .......................................................................... 18

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1962)............................................................. 2

14

*Callahan v. Equifax Information Services LLC*, 2013 WL 4425852 (N.D. Cal. Aug. 15, 2013).. 25

15

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164 (4th DCA 2015)................................................................................................................................... 26

16

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987)......... 10

17

*Central Hudson v. Public Service Comm'n*, 447 U.S. 557 (1980) ................................................ 27

18

*Children's Health Defense v. Facebook Inc. ("CHD")*, 2021 WL 2662064 (N.D. Cal. June 29, 2021) .................................................................................................................................... passim

19

*Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989)................................................................. 23

20

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)................................. 7, 20

21

*Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ............................. passim

22

*Divino Group LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ....................... 20, 22

23

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021........................................ passim

24

*Doe v. Twitter*, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021)..................................................... 24

*Donald J. Trump, et al., v. Facebook Inc, et al.,* Civ. 4:21-cv-09044-JSW ................................... 3

25

*Donald J. Trump, et al., v. YouTube, LLC, et al.,* Civ. No: 4:21-cv-08009-JSW ........................... 3

26

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................... 11

27

*Fed. Agency of News, LLC v. Facebook, Inc.*, 395 F.Supp.3d 1295 (N.D. Cal. 2019)............ 17, 24

28

*Fed. Trade Comm'n v. Gratz*, 253 U.S. 421 (1920) ..................................................................... 27

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ........................................... 16

*Heineke v. Santa Clara University*, 965 F.3d 1009 (2020)......................................... 11, 14, 15, 16

*Howard v. AOL*, 208 F.3d 741 (9th Cir. 2000) .............................................................................. 17

*Howey v. U.S.*, 481 F.2d 1187 (9th Cir. 1973)............................................................................... 28

*In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp.3d 1155 (N.D. Cal. 2016).... 25

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738 (N.D. Cal. May 9, 2011) ........................................................................................................................................... 7

*Investors Research Company, v. U.S. Dist. Ct.*, 877 F.2d 777 (9th Cir. 1989).............................. 3

*Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239 (1931) .................................................... 19

*Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018) .............................................................................. 7

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........................................................................... 5

*Knight First Amendment Inst. et al v. Trump, et al.*, 928 F.3d 226 (2d Cir. 2019)......................... 2

*Lavigne v. Herbalife, Ltd.* 2019 WL 6721619 (C.D. Cal. Oct. 22, 2019)..................................... 25

*Lombard v. Louisiana*, 373 U.S. 267 (1963) ......................................................................... passim

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982).......................................................... 7, 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).................................................................... 24

*Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989) .................................. 13, 17, 18

*Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999)..................................... 23

*Miami Herald v. Tornillo*, 418 U.S. 241 (1974) ........................................................................... 27

*Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646 (9th Cir. 1988) ...................................................... 5

*Netchoice v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021)............................................. 27

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003)........................................................................ 18

*Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730 (2017) ........................................ 1

*Pennie v. Twitter, Inc.*, 281 F.Supp.3d 874 (N.D. Cal. 2017)...................................................... 24

*Peterson v. City of Greenville*, 370 U.S. 935 (1963) ............................................................. 8, 9, 12

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ............................................................ 27

*Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956) ........................................................ 21

*Reitman v. Mulkey*, 387 U.S. 369 (1967)......................................................................... 8, 20, 21

*Reno v. ACLU*, 521 U.S. 844 (1997).............................................................................................. 1

*Robinson v. Florida*, 378 U.S. 153 (1964) ............................................................................... 9, 12

*Romer v. Evans*, 517 U.S. 620 (1996)........................................................................................... 8

*Rutenburg v. Twitter, Inc.*, 2021 WL 1338958 (N.D. Cal. 2021) ................................................ 17

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F.Supp.3d 1088 (N.D. Cal. 2015).............. 25

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989)........................................ 21, 22

*Starbuck v. City & County of San Francisco*, 556 F.2d 450 (9th Cir. 1977)................................ 11

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) ................. 9, 12, 19

*Terry v. Adams*, 345 U.S. 461 (1952) ........................................................................ 19

*Townsend v. Univ. of Alaska*, 543 F.3d 478 (9th Cir. 2008) ........................................ 28

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ........................................ 23

*Tuttle v. Sky Bell Asset Management, LLC*, 2011 WL 2224535 (N.D. Cal. June 8, 2011) ........... 25

*United States v. Classic*, 313 U.S. 299 (1941) ........................................................... 19

*United States v. Davis*, 482 F.2d 893 (9th Cir. 1973) ................................................. 13

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ................................................ 5

*United States v. Ross*, 32 F.3d 1411 (9th Cir. 1994) .................................................... 13

*Willis v. City of Fresno*, 2014 WL 4211087 (E.D. Cal. Aug. 26, 2014) .......................... 11

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................................ 27

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ........................................................ 17

*Zimmerman v. Facebook, Inc.*, 2020 WL 5877863 (N.D. Cal. 2020) ............................ 17


Statutes

15 U.S.C. §1 ......................................................................................................... 6

42 U.S.C. § 1983 .................................................................................................. 21

47 U.S.C. § 230(c) ................................................................................................. 1

Cal. Bus. & Prof. Code §§ 17200 et seq. ................................................................ 24

Cal. Bus. & Prof. Code §§ 17204 .......................................................................... 24

F.S. § 501.2041 et seq. ........................................................................................ 25

F.S. § 501.2041(2)(a) & (b) .................................................................................. 25

Fla. Deceptive and Unfair Trade Prac. Act, F.S. §§ 501.201 et seq. ....................... 3, 24, 25

Fla. Stat. § 501.211(a) .......................................................................................... 24


Rules

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 6, 7, 13

Fed. R. Civ. P. 42 ................................................................................................. 3

Fed. R. Civ. P. 8(a)(2) ........................................................................................... 6

*"It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments … [T]he freedoms of expression must be ringed about with adequate bulwarks."*

– Justice Brennan in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963).

## I.    INTRODUCTION

This case raises one of the most important First Amendment issues of the current era:  Can the government coerce or co-opt a private, multi-billion dollar social media company to achieve a goal—the censorship of disfavored political speech—that the Constitution prohibits it from achieving directly?  Social media platforms are "the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730, 1735 (2017).  The Twitter platform boasts nearly 400 million users.  Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c), protects Defendants from liability for, *inter alia*, content they choose to ban from their platform.  Enacted in 1996, Section 230 was originally a federal subsidy to facilitate the growth of the Internet in its infancy, but its beneficiaries have since overtaken large segments of the economy.  Twitter's market capitalization now exceeds $32 billion; this value is directly attributable to this congressional grace.[1]  Twitter ostensibly is an ordinary privately-owned, privately-operated company.  However, beholden as they are to this multi-billion-dollar federal subsidy, Defendants must adhere to the preferences of their government overseers, who hold the power to dismantle, not just their business model, but the entire industry.

Defendants permanently banned then-President Trump from their platform for engaging in constitutionally protected speech, in his official capacity, on a government account with millions of active participants—an account that, as the Second Circuit has held, constituted a public forum.  *Knight First Amendment Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot*, 141 S.Ct. 1220 (2021).  Defendants' overtly partisan censorship resulted in the prior restraint of millions of Americans' freedom to participate in the public discourse, contrary to First

---

[1] *See* Plaintiffs' Request for Judicial Notice ("RJN"), filed herewith, ¶ 6.

1    Amendment principles that are deeply rooted in American history and law.

2           Against this sweeping backdrop, this Court need only answer a limited question—whether

3    Plaintiffs' exhaustively detailed First Amended Complaint ("FAC") contains sufficient

4    allegations to make out the claims pleaded.  Plaintiffs have alleged in great detail that the federal

5    government's entanglement with Defendants' "content moderation" program (a euphemism

6    Orwell would have loved) creates state action and thus makes Defendants' actions subject to First

7    Amendment limitations.[2]  More specifically, state action exists by virtue of (1) government

8    coercion, including directing Defendants and other social media platforms to target then-President

9    Trump and his supporters; (2) substantial encouragement of Defendants' censorship by official

10   exhortations coupled with threatened withdrawal of Section 230 immunity; and (3) as Defendants

11   have admitted, joint action with the government to suppress disfavored speech.  Plaintiffs' claims

12   are consistent with and supported by decades of Supreme Court and Ninth Circuit jurisprudence

13   holding that even officials' informal statements urging private entities to discriminate against

14   classes of citizens give rise to state action, whether or not specific individuals were targeted by

15   name.  *See, e.g.*, *Lombard v. Louisiana*, 373 U.S. 267 (1963).

16          This is a quintessentially fact-intensive inquiry.  "Only by sifting facts and weighing

17   circumstances can the nonobvious involvement of the State in private conduct be attributed its

18   true significance."  *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1962).  Plaintiffs

19   have alleged ample facts demonstrating that public officials "deliberately set about to achieve the

20   suppression of [speech] deemed 'objectionable.'"  *Bantam Books*, 372 U.S. at 68.  That is enough

21   for this case to move forward.

22   **II.    STATEMENT OF FACTS**

23          **A.    Procedural Background**

24          This case was filed on July 7, 2021, in the Southern District of Florida, simultaneously

25   with virtually identical cases against YouTube and Facebook.  The FAC was filed on July 27,

26

27   [2] Plaintiffs also allege that Section 230 is unconstitutional as applied and that, by enforcing content-removal policies in an inconsistent and discriminatory manner, Defendants have violated state laws against unfair and deceptive business practices.

28

1   2021.  Dkt. 21.  Plaintiffs, who seek to represent a nationwide class, allege that government

2   officials coerced, encouraged, and/or collaborated with Defendants to censor Plaintiffs' speech.

3   *See, e.g.*, FAC ¶¶ 27-167.  As a result, Defendants' censorship is subject to constitutional

4   constraints by virtue of the state action doctrine.  Accordingly, Defendants violated the First

5   Amendment when they banned Plaintiffs from their platform.  Plaintiffs further allege that

6   Section 230(c) of the Communications Decency Act is unconstitutional as applied and that

7   Defendants' conduct is unlawful under the Florida Deceptive and Unfair Trade Practices Act

8   ("FDUTPA").  Plaintiff Trump filed a motion for preliminary injunction on October 2, 2021.

9   Dkt. 62.  This case was transferred to this Court on October 26, 2021.[3]

10         **B.    Factual Allegations**

11         The FAC details a litany of events in which members of Congress and the Executive

12   Branch coerced Defendants to censor disfavored speech on pain of catastrophic legal and/or

13   regulatory consequences.  *See* FAC ¶¶ 51-64 (detailing officials' statements).  Legislators

14   publicly threatened to take punitive measures against the Defendants if they continued to provide

15   a platform for President Trump and those who espoused his views.  In particular, these public

16   officials made it clear that they wanted then-sitting President Trump permanently banned from

17   Twitter.  *See, e.g.*, FAC ¶ 55 ("Look, let's be honest, @realDonaldTrump's Twitter account

18   should be suspended."  Sen. Kamala Harris, Sept. 30, 2019).  The threatened sanctions for

19   Defendants' noncompliance included increased regulation, antitrust scrutiny, and repeal of the

20   Defendants' Section 230 immunity.  *See, e.g., id*. ("But I do think that for the privilege of 230,

21   there has to be a bigger sense of responsibility on it.  And it is not out of the question that that

22   could be removed."  House Speaker Nancy Pelosi, Apr. 12, 2019); ("Section 230 should be

23   revoked, immediately should be revoked, number one.  For Dorsey and other platforms."

24

25   ───────────────
     [3] The *YouTube* and *Facebook* cases also were transferred to this District and assigned to the Hon.
26   Jeffrey White.  *Donald J. Trump, et al., v. YouTube, LLC, et al.*, Civ. No: 4:21-cv-08009-JSW;
     *Donald J. Trump, et al., v. Facebook Inc, et al.*, Civ. 4:21-cv-09044-JSW.  Plaintiffs have filed a
27   motion in *YouTube* to consolidate the three cases pursuant to *Investors Research Company, v.
     U.S. Dist. Ct.*, 877 F.2d 777 (9th Cir. 1989) ("The district court has broad discretion under [Rule
28   42] to consolidate cases pending **in the same district**.") (emphasis added).

PLAINTIFFS' OPP. TO MOT. TO DISMISS—3                    Case No: 21-cv-08378-JD

1   President-elect Joe Biden, *New York Times,* Jan. 19, 2020).

2         Legislators also held hearings to which Twitter's CEO was summoned, during which

3   legislators threatened to impose regulations and strip Twitter of its Section 230 immunity.  The

4   coercive, viewpoint discriminatory statements by legislators at these official proceedings shock

5   the conscience of any American concerned with the erosion of First Amendment rights:

6       The time has come to hold online platforms accountable for their part in the rise of
disinformation and extremism. … [T]herefore, **it is time for Congress and this**
7   **Committee to legislate and realign these companies' incentives** to effectively deal with
disinformation and extremism. … So when a company is actually promoting this harmful
8   content, **I question whether existing liability protections should apply**.  Members on
this Committee have suggested legislative solutions and introduced bills.  The Committee
9   is going to consider all these options so that we can finally align the interests of these
companies with the interests of the public and hold the platforms, and their CEOs,
10   accountable when they stray.  That is why you are here today, Mr. Zuckerberg, Mr. Pichai,
and Mr. Dorsey. …**The time for self-regulation is over.  It is time we legislate to hold**
11   **you accountable**.  FAC ¶ 58; "Disinformation Nation: Social Media's Role in Promoting
Extremism and Misinformation": Hearing before H. Comm. on Energy and Com., 117th
12   Cong. (2021) (Opening Stmt. of Comm. Chairman Frank Pallone, Jr. (Dem.)) (emphasis
added); RJN ¶ 2.[4]
13

14       Your companies need to be held accountable—we need rules, regulations, technical
experts in government, and audit authority of your technologies.  Ours is the committee of
15   jurisdiction, and **we will legislate to stop this**.  *Id.* (Opening Stmt. of Rep. Mike Doyle
(Dem)); (emphasis added); RJN ¶ 3.
16

17       What our witnesses need to take away from this hearing is that self-regulation has come to
the end of its road, and that this democratically elected body **is prepared to move**
18   **forward with legislation and regulation**.  Misinformation regarding the election dropped
by 73% across social media platforms after Twitter permanently suspended Trump ….
19   The question is, what took so long?  *Id.* (Opening Stmt. of Rep. Janice D. Schakowsky
(Dem.)); (emphasis added); RJN ¶ 4.
20

21       These efforts bore fruit.  Defendant Dorsey admitted in congressional testimony that

22   Defendants "partnered" with the federal government to "share information" and "gather input" to

23   "inform [Twitter's] policy and enforcement decisions."[5]  And according to an official House

---

24   [4] A court may consider judicially noticeable materials without converting a motion to dismiss into
a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Mir*
25   *v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).  Furthermore, under the
"incorporation by reference" doctrine, a court may "take into account documents 'whose contents
26   are alleged in a complaint and whose authenticity no party questions, but which are not physically
attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).
27   [5] FAC ¶¶ 57-58; "Breaking the News: Censorship, Suppression, and the 2020 Election": Hearing
before S. Comm. on the Judiciary, 116th Cong. (2020) (testimony of Jack Dorsey); RJN ¶ 1.
28

source, "These platforms [Twitter, YouTube, and Facebook] often **ramp up their efforts** against [conservative] content in response to social **and political** pressure."[6]  Officials in the Executive Branch, including the current President and leaders of federal agencies, have publicly stated that they have coordinated with Defendants and other social media platforms to censor speech that the government regards as undesirable, including former President Trump's views on election fraud and the origin of, and treatments for, COVID.  *Id*.  ¶¶ 78-79.  The White House has officially confirmed that Executive Branch officials regularly "engage" with social media platforms at the highest levels to promote speech preferred by the government, including creating a "robust enforcement strategy" to ban contrary views:  "There are also proposed changes that we have made to social media platforms … we have recommended [] that they create a robust enforcement strategy."  *Id*. ¶ 96.  The White House made clear that bans should be implemented consistently across platforms: "You shouldn't be banned from one platform and not others if you—for providing misinformation out there."  *Id*. ¶ 98.  The White House has gone so far as to point out specific narratives to be censored:  "So we are . . . regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing …."  *Id*.  Defendants banned President Trump from their platform on January 7, 2021.  Due to sustained government pressure, the ban continues to this day.  FAC ¶ 6.  In effect, the government has acted as a "Ministry of Truth" and has conscripted and/or enlisted Defendants to act as its agents in blocking disfavored speech.

## III.    ARGUMENT

### A.    Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Supreme Court explained in *Ashcroft v. Iqbal*, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-

---

[6] FAC ¶ 58; "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation": Hearing before H. Comm. on Energy and Com., 117th Cong. (Mar. 22, 2021) (Memo. from Chairman Pallone prepared by Staff) (emphasis added); RJN ¶ 5.

1    me accusation." 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

2    555 (2007)).[7]  On this motion, all well-pleaded allegations of material fact are taken as true and

3    construed most favorably to the non-moving party.  *Keates v. Koile*, 883 F.3d 1228, 1234 (9th

4    Cir. 2018).  Moreover, "plaintiffs should be given the full benefit of their proof **without tightly**

5    **compartmentalizing the various factual components** and wiping the slate clean after scrutiny

6    of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (emphasis

7    added); *see In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *10-

8    11 (N.D. Cal. May 9, 2011) (applying *Cont'l Ore* on motion to dismiss).

9          Despite having moved under Rule 12(b)(6), Defendants repeatedly interject extraneous

10   and impermissible factual assertions into their argument.  *See, e.g.*, MTD at 1 (Plaintiffs

11   "repeatedly violated" Twitter's rules); *id*. at 3 (President Trump tweeted "false information";

12   Twitter determined the President's tweets "could encourage further violence"); *id*. at 10 (Twitter

13   "exercised independent judgment" when censoring Plaintiffs' speech).  The Court not only

14   should, but must, disregard Defendants' factual assertions when deciding this motion.

15        **B.      The State Action Issue Is Inherently Unsuited for Disposition on a Motion to**
16                  **Dismiss.**

            In determining whether state action exists, the Court must engage in a nuanced and
17
     "necessarily fact-bound" inquiry, *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982), to
18
     which no single rubric can supply the answer.  "[T]o fashion and apply a precise formula for
19
     recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which
20
     '[t]his Court has never attempted.'"  *Burton*, 365 U.S. at 722 (citation omitted).  *See also*
21
     *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (existence of
22
     state action "is a matter of normative judgment, and the criteria lack rigid simplicity … [no] one
23

24   ───────────────
     [7] *Ashcroft* and *Twombly* are frequently erroneously cited by defendants, and even some courts, for
25   the proposition that, to survive a Rule 12(b)(6) motion, a complaint must be "plausible on its
     face."  *See* MTD at 5.  That is incorrect.  In both of those cases, the Supreme Court applied the
26   "plausibility" standard in assessing the viability of Sherman Act § 1 *conspiracy* allegations.  *See,*
     *e.g.*, *Twombly*, 550 U.S. at 556 (pleading a Section 1 claim requires complaint to provide
27   "plausible grounds to infer an agreement").  That rule makes sense in a cartel case that otherwise
     could sweep defendants into years of litigation, with the threat of treble damages, based on a bare
28   allegation of what could be lawful parallel conduct.  It has no application here.

1    fact can function as a necessary condition across the board ... nor is any set of circumstances

2    absolutely sufficient").  The state's entanglement can consist solely of "winks and nods."  *Id.* at

3    301.  The weighing of the opposing values and interests found in different cases will lead to

4    different results.  This inquiry is ill-suited to a Rule 12(b)(6) motion.

5          **C.     Plaintiffs Have Pleaded State Action by Means of Compulsion.**

6          Under the compulsion theory, a private decision has sufficiently received the imprimatur

7    of government as to make it state action where the state has exercised coercive power to shape

8    private conduct.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  The requisite nexus between the

9    State and the challenged private actions has been found in a wide variety of circumstances,

10   ranging from the State expressly mandating odious distinctions by private entities, *Peterson v.*

11   *City of Greenville*, 370 U.S. 935 (1963) (requiring racial separation in restaurants), to removing

12   legal barriers that would have kept private parties from trampling on constitutional rights,

13   *Reitman v. Mulkey*, 387 U.S. 369 (1967) (state law repealed legal barrier prohibiting private

14   actors from discriminating in housing sales and rentals).  *Cf. Romer v. Evans*, 517 U.S. 620

15   (1996) (state law precluding any government action designed to protect persons based on sexual

16   orientation violated Equal Protection Clause).  Plaintiffs' allegations fit comfortably on the

17   spectrum of fact patterns which the courts have found to constitute compulsion, and thus state

18   action.[8]

19         **1.     Origins of the Compulsion Theory**

20         The Supreme Court's compulsion theory cases amply support its application on the facts

21   alleged here.  The doctrine had its genesis in three civil rights cases where the interplay of

22   government and private businesses maintained racial segregation.  Finding state action in

23   *Peterson,* 370 U.S. 935, was easy.  A private lunch counter had barred Black customers in

24   compliance with a city ordinance requiring segregation in restaurants.  The Supreme Court found

---

[8] *Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020), is irrelevant.  Plaintiff in *Prager* argued that YouTube is a state actor because it performs a "public function," one of four categories of state action.  *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999).  Plaintiffs here do not invoke the public function theory; they allege state action only by means of government compulsion and joint action.

that the private actor's conduct violated the Equal Protection Clause because the State had commanded that particular result.  Notably, the Court did not require that the targets of state action be identified *specifically and individually*.  It was enough that the ordinance targeted a broad and undifferentiated, but identifiable, class of citizens.

In *Robinson v. Florida*, 378 U.S. 153 (1964), again, a restaurant denied service to Black customers.  While segregated dining was not mandated by law, health regulations required separate restroom facilities in any establishment serving both races.  Defendants, Black restaurant patrons who refused to leave, were arrested and convicted of trespass; they challenged their conviction as a violation of Equal Protection.  The Supreme Court reasoned that, while the restroom regulations did not forbid integrated service, "they certainly embody a state policy putting burdens upon any restaurant which serves both races."  *Id.* at 156-57.  This government entanglement, although indirect, rendered otherwise private conduct as state action.  Again, the offending regulation did not specifically target any individual.

Most significantly for present purposes, *Lombard*, 373 U.S. 267, involved *no formal governmental action* at all.  Black patrons were denied service at an all-White restaurant.  The restaurant manager summoned the police after the group refused to leave, they were arrested and convicted of trespass.  The *Lombard* Court located no government ordinance condoning or encouraging segregation.  Nevertheless, the Supreme Court found state action in the fact that the Mayor and Police Chief of New Orleans had given speeches disclaiming that "sit-in" demonstrations would not be tolerated.  The Court reasoned that these public statements "must be treated exactly as if [the City] had an ordinance prohibiting such conduct," *id*. at 273, and found the statements sufficient to render the resulting discrimination state action.  Even though no law or other official act had required segregation, the public officials had encouraged private discriminatory practices, and thus participated in segregation of public accommodations.

Ninth Circuit law is in accord.  *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987), cited *Peterson* as support for finding state action where a county attorney had "advised" the telephone company to disconnect a customer's service or face prosecution if it did not comply.  *Carlin* confirms that the state action inquiry focuses on the

1  substance of government coercion rather than the form.

2  **2.    The Specificity Issue:  Plaintiffs Belong to a Class of Citizens Targeted by the Government.**

3

4  Defendants urge this Court to follow a trio of recent district court decisions holding that,

5  for state action to exist, the government must have compelled or encouraged the unconstitutional

6  treatment in *a specific plaintiff's particular case*.  *Doe v. Google LLC*, 2021 WL 4864418 (N.D.

   Cal. Oct. 19, 2021; *Children's Health Defense v. Facebook Inc.* ("*CHD*"), 2021 WL 2662064

7  (N.D. Cal. June 29, 2021); *Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31,

8  2021); MTD at 7-9.[9]  To the extent that these cases require the targeting of specific individuals as

9  a prerequisite to finding state action, they are contrary to the Supreme Court and Ninth Circuit

10  precedents on which they relied.

11  It is undisputed that a private actor's mere compliance with a generally applicable law is

12  not enough to constitute state action.  But that is not the case Plaintiffs have alleged.  The public

13  officials' coercive conduct here was directed at former President Trump individually, and also at

14  an identifiable group—speakers who publicly supported President Trump's views on election

15  fraud or the COVID-19 pandemic.  Such government conduct compelling Defendants to censor a

16  distinct group of citizens is state action, just as if officials had exhorted Defendants to ban all

17  Republicans, or women, or LGBTQ people from their platform.  And silencing a group based on

18  their political beliefs is the core evil the First Amendment was designed to avert.  "[P]olitical

19  belief and association constitute the core of those activities protected by the First Amendment."

20  *Elrod v. Burns*, 427 U.S. 347, 356 (1976).

21  **(a)    Laws of General Applicability—No State Action**

22  To the extent the state action doctrine incorporates a "specificity" requirement, it is no

23  more than that "compliance with **generally applicable laws** [is not] sufficient to convert private

24  conduct into state action."  *Heineke v. Santa Clara University*, 965 F.3d 1009, 1014 (2020)

25

26  _____

   [9] CHD is currently on appeal to the Ninth Circuit (No. 21-16210).  Moreover, "[i]t is axiomatic
27  that district court decisions do not create binding precedent on other district courts."  *Willis v. City of Fresno*, 2014 WL 4211087, at *2 n.1 (E.D. Cal. Aug. 26, 2014), citing *Starbuck v. City & County of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977).
28

1  (emphasis added) (citing *Sutton*, 192 F.3d 826).  *Sutton* explains the common sense reason behind

2  this requirement:

3      To accept [that] argument would be to convert every employer—whether it has one
       employee or 1,000 employees—into a governmental actor every time it complies with a
4      presumptively valid, generally applicable law, such as an environmental standard or a tax-
       withholding scheme.  Private employers would then be forced to defend those laws and
5      pay any consequent damages, even though they bear no real responsibility for the
       violation of rights arising from the enactment of the laws.
6

7  192 F.3d at 838-39.  That scenario bears no resemblance to the facts here.  Plaintiffs do not rely

8  on the existence of a "generally applicable law" as the source of state compulsion.

9                    **(b)      State Action That Targets Identified Groups—This Case**

10       The public officials' challenged actions here were either directed at then-President Trump

11  individually, or else targeted a distinct and identifiable group of citizens—those who echoed his

12  views—for censorship.  *See, e.g.,* FAC ¶¶ 55-60, 75, 84-98, 101-08.  As to then-President Trump,

13  he clearly was identified individually, and thus was the subject of state action even under the

14  overly restrictive "particular case" test applied in *Doe, Daniels,* and *CHD*.  As to the other groups

15  of targeted speakers, they were identified with the particularity required by the Supreme Court

16  civil rights cases discussed above, as well as subsequent decisions.  The Supreme Court had no

17  difficulty finding state action in *Robinson*, *Peterson*, and *Lombard* even though the governmental

18  conduct had not targeted any specific individuals by name.  The conduct in each of those cases

19  was directed at a particular group—Black Americans—and not at identified individuals.  *See also*

20  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 195-96 (Brennan, J., concurring) (state law leaving

21  decision whether to serve any individual to unfettered discretion of private restaurants imbues

22  private decision with state action).

23       Later Ninth Circuit decisions have found state action based on similar fact patterns.  For

24  example, in *Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989), a worker at a

25  nuclear power plant brought a *Bivens*[10] suit claiming that he had been excluded from the plant

26  without due process for alleged drug use.  The Ninth Circuit found the requisite state action

27  _____

28  [10] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

PLAINTIFFS' OPP. TO MOT. TO DISMISS—10                          Case No: 21-cv-08378-JD

existed in the form of warnings by the Nuclear Regulatory Commission that nuclear licensees needed to control their employees' drug use, or the NRC would do it for them.  At the time, the NRC had not yet taken any formal action—the NRC's first policy statement on drug use was not published until a year later.  Mathis alleged only that the NRC had "pressured" nuclear plant operators.  The NRC's informal actions were not directed at Mathis individually; the Commission didn't even know he existed.  The Ninth Circuit held that, despite this "bare record," "we cannot agree with the conclusion that Mathis' allegations of governmental coercion or encouragement are frivolous or wholly without substance," and allowed his claim to proceed.  *Id.* at 1434.  *See also United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973) (passenger search by private airline was state action due to FAA's incipient efforts to create anti-hijacking program, although no federal regulation existed at the time; no claim that FAA specifically directed the particular search); *United States v. Ross*, 32 F.3d 1411, 1413-14 (9th Cir. 1994) (airline's search of passenger's luggage to conform to non-binding FAA guidelines was governmental action; FAA did not mandate searching this or any other individual passenger).[11]  As in these cases, Plaintiffs have alleged government involvement in censorship aimed at a particular group, defined by political viewpoint instead of race, employment, or travel.

### (c)    The "Particular Case" Fallacy—*Doe*, *Daniels*, and *CHD*

*Doe* and *Daniels* purport to take their "treatment of a specific plaintiff" formulation from *Blum* and *Heineke*.  *See Doe*, 2021 WL 4864418, at *3; *Daniels*, 2021 WL 1222166, at *6.  *CHD*, in turn, relies on *Daniels* for the same proposition, 2021 WL 2662064, at *15, and thus its provenance traces back to the same sources.  But *Blum* and *Heineke* stand for no such rule.

The claims in *Blum* and *Heineke* were challenges to the impact of generally-applicable laws on particular individuals.  *Blum* concerned a private nursing home that participated in the

---

[11] *See also U.S. v. $124,570 U.S. Currency*, 873 F.2d 1240, 1246  (9th Cir. 1989) (government provided $250 reward when TSA agents reported finding currency or drugs while conducting X-ray scan for weapons; search held to be unconstitutional:  "the policy of 'work[ing] hand-in-hand with [U.S. Customs] regarding the detection and reporting of drugs and U.S. currency' will very likely influence [TSA] officers to conduct more searches, and more intrusive searches, than if they focus on air safety alone.").

1    Medicaid program and thus was heavily regulated by the state.  Medicaid regulations required

2    nursing-home physicians to periodically assess patients as to what level of care they required.  If

3    the physicians found patients who no longer needed nursing home care, the regulations required

4    the nursing home to downgrade or discharge them.  Plaintiffs, who had been downgraded to a

5    lower level of care, sued the state officials in charge of the Medicaid program, seeking to hold

6    those officials liable for the physicians' decisions.  *Blum* held that the relevant question was not

7    whether the nursing home was regulated, but whether the state's regulations encouraged the

8    nursing home to downgrade the plaintiffs' care without affording due process.  The Court

9    emphasized that the decision about the necessary level of medical care was entirely in the

10   physician's discretion, noting, "[t]here is no suggestion that those decisions were emphasized in

11   any degree by [the Medicaid regulations]."  457 U.S. at 1005.  Because the state did not coerce or

12   encourage making the care decision as to any particular patient, the state was not a participant in

13   the alleged due process deprivation.  *Id*. at 1007-12.  Plaintiff in *Heineke* was a professor at a

14   private university who was terminated for sexually harassing a student.  He claimed that the

15   university had deprived him of due process, and had done so as a result of government coercion

16   by conditioning the university's receipt of federal funds on its compliance with anti-

17   discrimination laws.  The court held that the university did not become a state actor merely

18   because it was subject to these general laws.  965 F.3d at 1013-14.

19        In both these cases, the private entity was subject to, and in turn enforced, laws or

20   regulations that applied broadly to all similarly situated private entities—nursing homes in *Blum*,

21   and universities in *Heineke*.  The courts in those cases could choose only between two fact

22   patterns: either everyone affected by a regulation, or the specific result for an individual plaintiff.

23   The former was not enough to create state action, and neither plaintiff succeeded in showing the

24   latter.  Neither case said that actions taken in response to government coercion aimed an

25   identifiable group, but not identifying any group members by name, were unredressable.  The

26   courts' statements regarding "particular case" must be read as distinguishing the facts before them

27   from simply enforcing a law of general applicability.  *Daniels*, *Doe*, and *CHD* plucked these

28   unexceptionable holdings out of context and transmogrified them into a much broader, and

insupportable rule—that state action can only exist where the government has compelled the allegedly unlawful result in a specific plaintiff's individual case.  The fallacy of their holdings is easily demonstrated by returning to the Supreme Court's civil rights decisions.[12]

The infirmity of the "particular case" test adopted by *Doe*, *Daniels*, and *CHD* is evident when mapping it onto, e.g., the *Lombard* facts.  In *Lombard*, no law, regulation, or municipal ordinance required or encouraged segregation.  The mayor and police chief had simply made speeches inveighing against sit-in protests.  If *Doe*, *Daniels*, and *CHD* correctly stated the law, the courts would have been compelled to dismiss the *Lombard* case because the government officials had not identified the affected individuals in their public statements.  The only difference here is that the targeted speakers were identified by their political viewpoint rather than their race.

Neither *Blum* nor *Heineke* addressed this issue of group identification.  Because the plaintiffs in those cases sued as individuals and not as members of groups, the courts did not need to, and did not, consider the question of the requisite granularity of identification where government action incentivized a private entity to target an identifiable group for discrimination. For that reason, *Blum* and *Heineke* do not compel the result Defendants advocate here.

**3.     Plaintiffs Have Amply Alleged Coercive Statements by State Actors.**

Defendants also argue that government officials' extensive pronouncements demanding that social media platforms, including Defendant Twitter, censor then-President Trump and those who supported his views do not rise to the level of coercion as a matter of law.  But this is an extremely fact-intensive issue.  Statements made by public officials "require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech."  *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39

---

[12] In addition to this fatal defect, all three of these courts disregarded the Rule 12(b)(6) standards and instead resolved factual issues at the pleadings stage or held that plaintiffs' claims failed as an evidentiary matter.  *See Daniels* at *6 (allegations of government actions do not amount to "coercion" or "encouragement"); *id*. at *7 (facts alleged "do not reflect the kind of government involvement" sufficient to support state action); *id*. at *21 (CHD did not "establish" that defendants money from CHD); *Doe* at *3 ("The Court disagrees" that statements by federal lawmakers are sufficient to show state coercion or encouragement; alleged threatened penalties are "insufficient" to convert private to state action).

(2d Cir. 1983).  A court's decision whether such a statement is "sufficiently coercive" to constitute state action depends on a factual judgment: can "the comments of governmental officials [] reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow failure to accede to the officials' request."  *Id*.  That judgment cannot be made based on a few snippets quoted out of context in Defendants' brief.  Instead, the Court must consider the entirety of the Defendants' words and actions in determining whether they could reasonably be interpreted as an implied threat.  *See Bantam Books,* 372 U.S. at 67 (court must "look through forms to the substance" to assess whether "coercion, persuasion, and intimidation" by state amounted to impermissible "informal censorship"); *see also Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005) (explaining that "adverse effect" in a retaliation claim "depends on context").  A number of factors bear on this inquiry, including: (1) the defendants' regulatory or other decision-making authority over the targeted entities; (2) the language of the allegedly threatening statements; (3) allegedly retaliatory exercises of regulatory authority over the targeted entities; and (4) the perception of a threat by the targeted entities and their response.  *Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007).  The FAC contains numerous allegations relevant to this analysis, all of which eventually must be weighed by the Court to determine whether Plaintiffs have proven a First Amendment claim—but not on this motion.

  The line between mere government expression and intimidation is crossed when there is an "actual or threatened imposition of government power or sanction."  *American Family Ass'n v. City of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002).  The threat need not be explicit; an indirect threat suffices.  In *Bantam Books,* the Supreme Court held that state officials violated the First Amendment by sending letters to booksellers warning that the sale of "objectionable" books could bring legal repercussions.  It made no difference that the officials who communicated the threats lacked the "power to apply formal legal sanctions."  372 U.S. at 68.  Nor did it matter that the letters were framed as mere "exhort[ation]" or that booksellers were "free" to ignore them.  As the Court sensibly observed, "people do not lightly disregard public officers' veiled threats."  *Id*. at 66-68.  The coercion alleged in *Mathis*, which the Court found sufficient to invoke state action, was even more diffuse.  Mathis made only "bare" allegations that he had been injured due

1    to NRC pressure on power plant operators to screen out drug users.  That was enough to tie the

2    NRC to his dismissal and preserve his *Bivens* claim.  *Mathis*, 891 F.2d at 1434.[13]

3            There can be no doubt that a plausible inference can be drawn from Plaintiffs' allegations

4    that the public officials "deliberately set about to achieve the suppression of [speech] deemed

5    'objectionable.'"  *Bantam Books*, 372 U.S. at 68.  As detailed in the FAC and summarized above,

6    some of the most powerful legislators and Executive Branch officials, with the power to make

7    good on their threats, repeatedly called for social media to undertake a coordinated campaign to

8    quash what officials deemed to be unacceptable speech—including in statements made at

9    congressional hearings and from the West Wing.  *See supra* at 3-5.  Defendants argue that they

10    made their own independent "content-moderation decisions."  MTD at 10.  To the contrary,

11    Defendant Dorsey admitted in testimony before the Senate that Twitter "partnered" with federal

12    government to "share information" and "gather input" to "inform [Twitter's] policy and

13    enforcement decisions."  *See supra* at 3-5.  The Biden White House's explicit call for social

14    media companies to "ensure uniformity" in banning speech further contradicts Defendants' self-

15    serving assertions.  FAC ¶¶ 98, 105.  Defendants are asking the Court to accept Defendants'

16    version of events over Plaintiffs' allegations, an argument that cannot be countenanced on a

17    motion to dismiss.  Moreover, "[t]he mere fact that [a defendant] might have been willing to act

18    without coercion makes no difference if the government did coerce."  *Mathis*, 891 F.2d at 1434.[14]

19    Indeed, the restaurants in *Peterson*, *Robinson* and *Lombard* may have been perfectly happy to

20

21    [13] None of Defendants' cited cases, MTD at 6, impair the state action argument here.  Plaintiffs in
*Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000), presented no evidence of state action; rather,

22    the court rejected the theory that AOL should be treated as a "quasi-public utility," which is not
alleged here.  *Rutenburg v. Twitter, Inc.*, 2021 WL 1338958, at *2 (N.D. Cal. 2021), rejected

23    plaintiff's argument that Twitter was a state actor solely because it "administered" Mr. Trump's
account.  In *Zimmerman v. Facebook, Inc.*, 2020 WL 5877863, at *2 (N.D. Cal. 2020), plaintiff

24    argued state action premised on the theory that Facebook was a "digital town square" and
provided a "public speech forum," an argument that is not made here and which the court rejected

25    based on *Prager*.  Finally, *Fed. Agency of News, LLC v. Facebook, Inc.*, 395 F.Supp.3d 1295,
1308-1314 (N.D. Cal. 2019), also relied on *Prager* to reject a "public forum" claim.  While

26    plaintiff also pleaded state action based on joint action, the only facts alleged in support of that
theory were Facebook's provision of information to the federal government.  The court held that

27    "supplying information [to the state] alone does not amount to" joint action.  *Id.* at 1312.
[14] *See also Backpage.com v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (state action exists even

28    where threatened party denies they perceived or were moved by government threat).

1    segregate; they may have appreciated the government's cover for doing so.  It made no

2    difference.  Plaintiffs have alleged far more than "unadorned, the-defendant-unlawfully-harmed-

3    me accusation[s]."  *Twombly*, 550 U.S. at 555.  This issue can only be resolved conclusively after

4    evidence is introduced, not now.[15]

5              **4.      Threats by Individual Officials Suffice to Create State Action.**

6              Defendants also argue that Plaintiffs' First Amendment claim must be dismissed because

7    government officials were not speaking on behalf of Congress or the Executive Branch when they

8    called for then-President Trump and those who supported his views to be censored.  MTD at 7-8.

9    To the contrary, the bulk of the statements identified in the FAC were made *ex cathedra*—on the

10   floor of Congress or from the White House.  *See supra* at 3-5.  Even if that were not the case,

11   however, what Plaintiffs have alleged is enough.  Informal conduct by state actors can give rise to

12   state action.  *See Lombard* (speeches by public officials).  Not even the fact that the actions of the

13   state agents are *illegal* makes the action unattributable to the state for purposes of the Fourteenth

14   Amendment.  "Misuse of power, possessed by virtue of state law and made possible only because

15   the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state

16   law."  *United States v. Classic*, 313 U.S. 299, 326 (1941).  *See also Iowa-Des Moines Nat'l Bank*

17   *v. Bennett*, 284 U.S. 239, 246 (1931) ("[A]cts done 'by virtue of public position under a State

18   government . . . and . . . in the name and for the State' . . . are not to be treated as if they were the

19   acts of private individuals, although in doing them the official acted contrary to an express

20   command of the state law.") (Brandeis, J.)

21             Justice Frankfurter put this canard to rest when he wrote,

22             [t]he State, in these situations, must mean … those clothed with the authority and the
             influence which official position affords. … This phrase [state action] gives rise to a false
23           direction in that it implies some impressive machinery or deliberative conduct normally
             associated with what orators call a sovereign state.  The vital requirement is State
24           responsibility—**that somewhere, somehow, to some extent, there be an infusion of**

25

26   _____

     [15] Should the Court conclude that the governmental statements described in the FAC appear
27   ambiguous, the Court is required on this motion to draw a reasonable inference of coercion in
     Plaintiffs' favor.  *See Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003), cited with approval
28   in *Brodheim v. Cry*, 584 F.3d 1262, 1279 (9th Cir. 2009).

1  **conduct by officials, panoplied with State power, into any scheme [to deny protected
2  rights]**.

*Terry v. Adams*, 345 U.S. 461, 473 (1952) (concurring) (emphasis added).  If even misuse or

unlawful use of state power by those clothed with state authority can be state action, then official

action clothed in the formal trappings of a White House press briefing or a congressional hearing

is sufficient.

### 5.      Plaintiffs Have Pleaded the "Something More" Needed to Maintain a Claim Against a Private Party.

Defendants claim that the compulsion theory is available only when the government itself

is a defendant.  MTD at 9 (citing *Blum* and *Sutton*).  This argument misses the mark by a country

mile.  It is true that, in order to hold a private party, rather than the government, liable, a plaintiff

must show "something more."  But *Sutton* held that the "something more" required to hold a

private party liable could be any of four fact patterns, including *governmental compulsion or

coercion*, and *joint action*.  These are precisely the categories of "something more" that Plaintiffs

have alleged and will prove.  *See id*. at 835 (other two categories are "public function" and

"governmental nexus"); *accord Lugar*, 457 U.S. at 938-39.

### D.      Section 230(c) Provides Government Encouragement of Defendants' Conduct.

Private conduct also becomes state action when the government provides significant

encouragement, either overt or covert, to the private party's initiatives.  *Blum*, 457 U.S. at 1004.

The above-described official statements amount to coercion as well as constituting "significant

encouragement."  In addition, Defendants' censorship has been significantly encouraged by

Section 230(c), which immunizes Defendants from liability for imposing a prior restraint on

constitutionally protected speech.  As such, the state has taken affirmative steps designed to make

censorship of protected speech legally possible—indeed, risk-free.  Thus, the ultimate impact of

the statute has been to "encourage and significantly involve the State in private [viewpoint based]

discrimination." *Reitman*, 387 U.S. at 376 .  Read as a whole "without tightly

compartmentalizing the various factual components," *Cont'l Ore.*, 370 U.S. at 699, these

allegations plead encouragement.

PLAINTIFFS' OPP. TO MOT. TO DISMISS—17                     Case No: 21-cv-08378-JD

**1.      State Action Can Consist of Enabling Discriminatory Private Conduct.**

Defendants argue that Section 230 has no impact on the state action analysis because "it does not require private parties to do anything."  MTD at 9, citing *Divino Group LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021).  But the state "acts" not only when it coerces, but also when it permits.  In *Reitman*, California voters passed an amendment to the California Constitution prohibiting the state from enacting laws forbidding racial discrimination in private housing.  The amendment left private actors free to discriminate without fear of interference from state laws.  In the Court's words, "[t]he right to discriminate is now one of the basic policies of the State."  387 U.S. at 381.  Plaintiffs, who had been denied housing on account of their race, sued the property owners, who in turn cited the amendment as a defense.  The Supreme Court acknowledged that the amendment on its face, and thus the state, had done nothing to encourage the discrimination.  But, by making private discriminatory practices immune from the ordinary legislative process, the amendment impermissibly encouraged private racial discrimination and thus violated the Equal Protection Clause.  *Id*.  In just the same way, Section 230's grant of immunity impermissibly encourages social media platforms to block disfavored speech, free not merely from official restraint but private lawsuits as well.

The Supreme Court also has held that federal laws which, like Section 230, immunized private conduct from liability, convert such conduct into state action.  In *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 232 (1956), the Court found state action in private employers' union shop agreement because, under a federal statute, such agreements could not be "made illegal" by any state law.  Like Section 230, the federal law was permissive; it did not compel employers to enter into union shop agreements; it only prohibited states from banning them.  And in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), the Court found state action in drug testing conducted on private railroad employees after the federal government enacted regulations immunizing the private employers from liability if they performed such tests.  Once again, these regulations did not compel the testing, but merely immunized it from private lawsuits—just like Section 230.  *Id*. at 611.  The Court held that the regulations infused private employer's conduct with state action because the regulations "removed all legal barriers" to such

1    testing and thus provided "clear indices of the Government's encouragement, endorsement, and

2    participation" in the practice.  *Id.* at 615-16.  Similarly, Section 230(c) removed all legal barriers

3    to Defendants' censorship and thus is one of several "clear indices of the Government's

4    encouragement" of such censorship.

5             **2.       The State Also "Acts" When It Allocates Property Rights.**

6             The state actions here that met the "encouragement" test also can be understood as re-

7    allocating property rights.  Prior to passage of the California constitutional amendment in

8    *Reitman*, fair housing laws had granted the public the right to access housing without regard to

9    race.  The amendment stripped the public of that right and, instead, granted property owners the

10   power to refuse housing because of race—a right the prior law had denied them.  Either there was

11   a duty not to discriminate in the housing market on the basis of race, or there was no duty.  In

12   *Hanson*, railways and employees either had the "right to work" without joining a union, or they

13   did not.  According to the Supreme Court, "private rights [were] being invaded" and "the federal

14   statute is the source of the power and authority by which [] private rights [were] lost or

15   sacrificed."  351 U.S. at 232.  In *Skinner*, employees either were free from private drug testing, or

16   were not.  And under Section 230, private parties either retain their common law and statutory

17   rights to sue social media companies (like all other companies), or they do not.  Affirmatively

18   granting private parties the freedom to deny housing, maintain a union shop, drug test employees,

19   or censor otherwise protected speech involves the state in diminishing the other party's rights.

20   These laws embody choices about how to allocate conflicting rights that cannot co-exist.  When

21   the state takes overt action to allocate those rights among private parties, it necessarily encourages

22   the kind of conduct that its action favors.  Indeed, there would be no point in re-allocating such

23   rights if the government did not expect private parties to act in accordance with the new

24   allocation.

25            Under Section 230, Defendants are free to engage in invidious discrimination and the state

26   has granted them the right to do so free from liability; the state is delegating to them the power to

27   choke off speech the state disfavors.  Telling a class of speakers that they have no legal recourse

28   if the social media platforms do not wish to treat them as equal citizens puts the coercive power

1   of the state squarely on the side of viewpoint-based exclusion.  State action is always present

2   when the state acts through the legal system to allocate property rights, and private-actor partners

3   violate the Constitution when the state allocates property rights so as to allow some parties to

4   discriminate without fear of legal repercussions.

5              **3.        Defendants' Cases Are Inapposite**

6              Defendants argue that the courts have rejected the notion that Section 230 contributes to

7   government "encouragement" of their activities sufficiently to create state action.  MTD at 9.

8   Their cited cases are inapposite and, more importantly, cannot trump the Supreme Court and

9   Ninth Circuit authorities discussed above.  In *Divino*, 2021 WL 51715 at *5, the Magistrate Judge

10  rejected a similar Section 230 argument, in part on the ground that plaintiffs could not challenge a

11  federal law under Section 1983.  The court further held that state action might exist "when the

12  government compels the private entity to take a particular action," citing *Blum*, and found no state

13  action on the facts presented because "nothing about Section 230 is **coercive**."  The court

14  overlooked the "encouragement" portion of the state action test.  *Id.* at *6 (emphasis added).  The

15  Ninth Circuit's decision *Atkinson v. Meta Platforms*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)

16  (unpub.), is even further afield.  The Court upheld dismissal because, again, plaintiff had pleaded

17  an improper Section 1983 claim challenging a federal law, and had not adequately pleaded federal

18  coercion or joint action.  That decision does not even mention the word "encourage."

19             **E.        Joint Action Also Is Sufficiently Pleaded**

20             Defendants' actions also constitute state action under the joint action test, pursuant to

21  which a private entity acts under color of state law if it is "a willful participant in joint action with

22  the state or its agents."  *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).  The joint

23  action test asks "whether state officials and private parties have acted in concert in effecting a

24  particular deprivation of constitutional rights."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140

25  (9th Cir. 2012).  The test is satisfied by an "agreement" or "understanding" between the private

26  party and governmental officials to accomplish a common objective.  *See*, *e.g.*, *Adickes*, 398 U.S.

27  at 158-59 (allegation of tacit "understanding" between restaurant worker and police officer

28  sufficient to create state action).  "Such an agreement need not be overt, and may be inferred on

1   the basis of circumstantial evidence such as the actions of the defendants." *Mendocino Env. Ctr.*

2   *v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999).  Whether defendants were involved in

3   such an agreement "is generally a factual issue and should be resolved by the jury, 'so long as

4   there is a possibility that the jury can "infer from the circumstances" that [defendants] …reached

5   an understanding' to achieve [their unlawful] objectives."  *Id*. at 1301-02.

6          Plaintiffs' allegations are more than adequate to plead joint action under these standards.

7   The record is replete with facts from which a jury could infer a common understanding between

8   the government and Defendants to censor President Trump and those who echoed his views on

9   election fraud and/or the origins of, and treatments for, COVID-19.  Defendant Dorsey admitted

10  in congressional testimony that Twitter "shared information" and "sought input" from the

11  government to "inform [Twitter's] enforcement decisions."  The government, for its part, overtly

12  incentivized social media to coordinate the censorship of disfavored speech.  And the White

13  House admitted that social medial platforms respond to political pressure by ramping up their

14  "enforcement" efforts.  *See supra* at 5.  These allegations would survive a Rule 12(b)(6) challenge

15  even under the more rigorous standard applied to antitrust conspiracy claims.  *Twombly*, 550 U.S.

16  at 556.

17          **F.      Plaintiffs Have Standing to Challenge the Constitutionality of Section 230.**

18          Defendants argue that (i) Plaintiffs lack standing to claim that Section 230 is

19  unconstitutional, and (ii) the statute is not unconstitutional.  MTD at 12-13.  The second argument

20  raises a purely merits issue that should not be adjudicated on this record.  As to the first, Plaintiffs

21  have standing to challenge Section 230 as applied because it has been used to enable government-

22  sponsored censorship of Plaintiffs' speech.  Section 230 immunity confers an immensely valuable

23  benefit on Defendants, with concomitant harm to Plaintiffs.  The government's repeated threats to

24  repeal the immunity if social media companies don't toe the line is a sword overhanging

25  Defendants' heads, and the weapon government wields to enforce their compliance.  The statute

26  affords the government leverage to promulgate viewpoint discrimination via its social media

27  partners.  Plaintiffs have standing to challenge Section 230 because, as manifested by the

28  statements made in congressional hearings and by the White House, the possibility of repeal has

1  been explicitly used by state actors as a mechanism to compel censorship of Plaintiffs' speech.

2  Defendants banned former President Trump and speakers who support his views from the Twitter

3  platform in direct response to these threats.  The ban will remain in place so long as Section 230

4  remains as a cudgel government actors can use to menace social media companies.  That is

5  sufficient causation and injury to confer standing on Plaintiffs to bring this claim.  *Lujan v.*

6  *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (for standing, plaintiff must show injury in

7  fact, causal connection between injury and the conduct complained of, and likelihood that injury

8  will be redressed by a favorable decision).

9       Beyond that, social media companies repeatedly have availed themselves of Section 230

10  to escape liability for blocking speech on their online platforms.[16]  Defendants have carefully

11  avoided raising Section 230(c) as a defense in this case *thus far* but, if their motion to dismiss is

12  unsuccessful, they doubtless will do the same here.  This ploy—initially refraining from raising

13  the statutory immunity so as to be able to challenge standing—is a classic Catch-22.  Should the

14  Court determine that Plaintiffs lack standing in the present circumstances, Plaintiffs respectfully

15  request that the Court hold the motion to dismiss Count II in abeyance until after Defendants have

16  pleaded their affirmative defenses.[17]

17       **G.**    **Plaintiffs' Claims Under Florida Law Are Viable.**

18            **1.**    **The Choice of Law Provision Does Not Foreclose the FDUTPA Claim.**

19       A choice-of-law provision will not be enforced when it is contrary to the fundamental

20  policy of another state.  *In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp.3d

21  1155 (N.D. Cal. 2016) (holding Illinois' biometric law reflected state policy that "will suffer a

22  complete negation . . . if California law is applied").  Thus enforcement of the choice-of-law

23

24  [16] *See, e.g., Doe v. Twitter*, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021); *Federal Agency of
    News LLC v. Facebook, Inc.*, 395 F.Supp.3d 1295 (N.D. Cal. 2019); *Pennie v. Twitter, Inc.*, 281

25  F.Supp.3d 874 (N.D. Cal. 2017); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F.Supp.3d
    1088 (N.D. Cal. 2015).

26  [17] The Court has authority to hold this portion of the motion to dismiss in abeyance until it
    becomes clear whether Defendants intend to raise Section 230 as a defense in this case.  *Callahan*

27  *v. Equifax Information Services LLC*, 2013 WL 4425852, at *1 (N.D. Cal. Aug. 15, 2013); *Tuttle*
    *v. Sky Bell Asset Management, LLC*, 2011 WL 2224535, at *3 (N.D. Cal. June 8, 2011).

28

1   provision does not depend on Twitter's Terms of Service ("TOS"), but whether—as it does—

2   Florida has a fundamental policy at odds with California's Unfair Competition Law ("UCL").

3   Unlike California, Florida's legislature designed FDUTPA so that injunctive relief could be

4   obtained without financial injury.  Fla. Stat. § 501.211(a); *Ahern v. Mayo Clinic*, 180 So.3d 165,

5   172 (1st DCA 2015).  Under the UCL, a plaintiff is required to show that he "has lost money . . .

6   as a result of the unfair competition."  Cal. Bus. & Prof. Code §§ 17204.  As the UCL's narrow

7   standing requirements undermine Florida's policy allowing any aggrieved person to seek

8   injunctive relief, the choice of law provision should be rejected.[18]

9                    **2.      Defendants' Failure to Disclose Material Information Is Actionable.**

10           Defendants have violated their own TOS and deceived users by failing to disclose that

11   they put a "thumb on the scale" in determining what content to remove.  FAC ¶¶ 10, 55, 217.

12   This failure to disclose is a material omission under FDUTPA.  In *Caribbean Cruise Line, Inc. v.*

13   *Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164. 167 (4th DCA 2015), plaintiff

14   alleged that the local BBB chapter posted deceptive information to its website about the criteria

15   used to grade businesses.  The court held that this allegation properly established a deception by

16   omission claim under FDUTPA.  Defendants claim that their TOS give them the flexibility to

17   enforce, or not, their announced standards for moderation, and that they may use undisclosed

18   standards.  MTD at 16.  This goes directly to the harms addressed in *Caribbean* by demonstrating

19   that the standard for moderation is the caprice and whim of Defendants, not the announced

20   standards relied on by users.  Plaintiffs have been aggrieved in that they expected Defendants'

21   platform to apply their stated policies, and not moderate content to block disfavored political

22   views.  FAC ¶ 219.  Had Plaintiffs and other members of the class known that Defendants'

23   "standard" for moderation was political, they would not have engaged with the platform.[19]

24   _____

25   [18] To the extent Defendants' motion concedes that Plaintiffs have standing under the UCL,
     Plaintiffs have pleaded a UCL claim for injunctive relief for deceptive omissions.  *See Lavigne v.*
26   *Herbalife, Ltd.* 2019 WL 6721619, at *11 (C.D. Cal. Oct. 22, 2019) ("Where California and not
     Florida law applies … the court may consider the [FDUTPA] claim ... under California's …
27   Unfair Competition Law").
     [19] Defendants incorrectly claim that FDUTPA would require perfect uniformity and consistency
28   in applying their TOS.  Count III is not based on a failure to apply the TOS in any particular

### 3.     Plaintiffs' Allegations in Count IV Are Sufficient.

Florida's Stop Social Media Censorship Act ("SSMCA") requires subject companies to publish the standards by which they censor, deplatform, or shadow ban a user, and that they apply their standards in a consistent manner.  F.S. § 501.2041(2)(a) & (b).  The SSMCA does not impose any requirement on Defendants as to what content they may censor, deplatform, or shadow ban; it merely requires disclosure and consistency if they do so.  A plaintiff under the SSMCA only needs to be a user of the service, not the party affected by the inconsistent treatment; accordingly Plaintiffs' claims are not based on Defendants' treatment of them, but Defendants' failure to consistently apply their standards after the effective date.  FAC ¶¶ 213-216.  Such disclosure requirements, designed to combat deceptive practices, have long been held to be consistent with First Amendment protections.  *See Central Hudson v. Public Service Comm'n*, 447 U.S. 557, 563 (1980); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650-651 (1985).  Defendants assert that the phrase "consistent manner" is unconstitutionally vague, but the "consistent manner" at issue is the Defendants' application of their own standards.  The SSMCA is housed within FDUTPA, which itself is patterned on the Federal Trade Commission Act ("FTCA").  "Unfairness" as used under the FTCA has survived constitutional scrutiny for more than a century.  *Fed. Trade Comm'n v. Gratz*, 253 U.S. 421 (1920).  If "unfair" activity is not impermissibly vague, then certainly "consistent manner" provides fair notice as to what conduct runs afoul of the law.[20]  Finally, any constitutional infirmity in other provisions is immaterial as the SSMCA contains a severability clause.  Senate Bill 7072, § 6.

### 4.     The First Amendment Is Not a Defense to FDUTPA.

Defendants argue that they may moderate content as they see fit, citing *Miami Herald v. Tornillo*, 418 U.S. 241 (1974).  The facts here could not be more different.  *Tornillo* rested on the

---

(… cont'd)

manner; it is based on Defendants' failure to disclose a material aspect of the TOS—political favoritism.

[20] Defendants reference a recent decision affecting the SSMCA, *Netchoice v. Moody*, 2021 WL 2690876, at *11 (N.D. Fla. June 30, 2021).  That order is directed only to government actors.  As to vagueness, the court stated that the "order need not and does not decide whether vagueness would provide an independent ground for a preliminary injunction."

1    fact that a statute imposed an obligation on the *Herald* to carry content that could be contrary to

2    the *Herald's* own positions.  *Id*. at 256-58.  Some 500 million Tweets are hosted by Twitter each

3    day.  FAC ¶ 2.  This sheer volume of material rebuts any claim that Defendants have a carefully

4    curated institutional message that would be upset by Plaintiffs' Tweets.  In any event, this

5    concern could be accommodated easily by affixing a disclaimer to the content.  *See Pruneyard*

6    *Shopping Ctr. v. Robins*, 447 U.S. 74 (1980); *Prager*, 951 F.3d 991.  Defendants make the

7    spurious claim that the FDUTPA consumer protections standards are content-based regulations;

8    they overlook that the only regulations at issue are their very own TOS.  Plaintiffs merely seek to

9    have Defendants say what they mean and mean what they say; they do not ask this Court impose

10   a standard for content appearing on the Twitter platform.

11   **IV.    CONCLUSION**

12           For all of the foregoing reasons, Plaintiffs respectfully submit that the motion to dismiss

13   should be denied.  In the event of dismissal, justice requires that leave to amend be granted.[21]

14
15   Dated: January 10, 2022          Respectfully submitted,

16                                    ANDREI POPOVICI (234820)
                                      MARIE FIALA (79676)
17                                    LAW OFFICE OF ANDREI D. POPOVICI, P.C.

18                                    By:    */s/ Marie L. Fiala*
                                             Marie L. Fiala
19
20
21                                    JOHN P. COALE *(pro hac vice)*
                                      2901 Fessenden Street NW
22                                    Washington, DC 20008
                                      Telephone: (202) 255-2096
23                                    Email: johnpcoale@aol.com
24
25

26   ——————————————
     [21] *See Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008).  None of the factors that
27   would militate against granting leave to amend exist here.  *Howey v. U.S.*, 481 F.2d 1187, 1190
     (9th Cir. 1973) (factors include undue delay, bad faith, futility of amendment, and prejudice to
28   opposing party).

1

2      JOHN Q. KELLY *(pro hac vice)*
       MICHAEL J. JONES *(pro hac vice)*
3      RYAN TOUGIAS *(pro hac vice)*
       IVEY, BARNUM & O'MARA, LLC
4      170 Mason Street
       Greenwich, CT 06830
5      Telephone: (203) 661-6000
       Email: jqkelly@ibolaw.com
6      Email: mjones@ibolaw.com

7
       FRANK C. DUDENHEFER, JR. *(pro hac vice)*
8      THE DUDENHEFER LAW FIRM L.L.C.
       2721 Saint Charles Avenue, Suite 2A
9      New Orleans, LA 70130
       Telephone: (504) 616-5226
10      Email: fcdlaw@aol.com

11
       RICHARD POLK LAWSON (*pro hac vice*)
12     GARDNER BREWER MARTINEZ
       MONFORT
13     400 North Ashley Drive
       Suite 1100
14     Tampa, FL 33602
       Telephone: (813) 221-9600
15     Facsimile: (813) 221-9611
       Email: rlawson@gbmmlaw.com
16

17     *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28