JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER , JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON *(pro hac vice)*
GARDNER BREWER MARTINEZ MONFORT
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al.,<br><br>　　　　　Plaintiffs,<br>　v.<br>TWITTER, INC. et al.,<br><br>　　　　　Defendants. | Case No: 21-cv-08378-JD<br><br>**PLAINTIFF DONALD J. TRUMP'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:　February 24, 2022<br>Time:　　　　10:00 a.m.<br>Place:　　　　Courtroom 11, 19th Floor<br>Judge:　　　　Hon. James Donato |

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. IRREPARABLE HARM ................................................................................................ 1

III. THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF ....................... 3

IV. THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF ................................. 4

V. SUCCESS ON THE MERITS ........................................................................................ 5
   A. First Amendment and Unconstitutionality Claims ............................................ 5
   B. Florida State Law Claims .................................................................................. 6
   C. An Injunction Will Not Violate the First Amendment ...................................... 7
      1. *Tornillo* and *Hurley* Do Not Apply to Social Media Companies ................. 7
         (a) Section 230 Propelled the Growth of Social Media ................................ 7
         (b) Twitter Resembles a Quasi-Public Entity, Not a Newspaper ................. 9
         (c) Defendants' Arguments to the Contrary Are Unavailing ..................... 10
      2. Social Media Companies Are Common Carriers, Not Newspapers ............ 11

VI. CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

Cases

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................... 3

*Arc of Calif. v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ............................................................... 2

*Ashcroft v. Free Speech Coalition*, 525 U.S. 234 (2002) ........................................................... 11

*Backpage v. Dart*, 807 F.3d 229 (7th Cir. 2015) ......................................................................... 1

*Biden v. Knight First Amendment Inst. at Columbia Univ.*, ___ U.S. ___, 141 S. Ct. 1220 (2021) 2

*Carroll v. President and Com'rs of Princess Anne,* 393 U.S. 175 (1968) .................................. 11

*Children's Health Def. v. Facebook* ("*CHD*"), 2021 WL 2662064 (N.D. Cal. June 29, 2021 ...... 10

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) ............................................ 4

*Conservation Force v. Delta Air Lines, Inc.* 190 F. Supp. 3d 606 (N.D. Tex. 2016) .................. 13

*Dinsmore v. The Louisville, Cincinnati & Lexington Railway Company*, 2 F. 465 (Cir. Ct., D. KY, 1880) ....................................................................................................................................... 12

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................................ 1

*Enigma Software Group USA, LLC, v. Malwarebytes, Inc.* 946 F.3d 1040 (9th Cir. 2019) ........... 8

*Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214 (1989) ......................... 4

*FTC v. AT&T Mobility, LLC*, 883 F.3d 848 (9th Cir. 2017) ........................................................ 13

*Goodson v. Republican State Leadership Comm.—Jud. Fairness Initiative*, 2018 WL 6430825 (E.D. Ark. 2018) ...................................................................................................................... 11

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721 (7th Cir.2009) ................................................................................................................................... 3

*Hurley v. Irish American*, 515 US 557 (1995) ............................................................................. 9

*Madsen v. Women's Health Center*, 512 U.S. 753 (1994) .......................................................... 11

*Miami Herald v. Tornillo*, 418 U.S. 241 (1974) ....................................................................... 7, 9

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) .................................................................. 1

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ....................................................................... 9

*Packingham v. North Carolina*, 137 S.Ct. 1730 (2017) ............................................................... 7

*Prager Univ. v. Google LLC*, 951 F.3d 991(9th Cir. 2020) ........................................................ 10

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ........................................................... 10

*Reno v. ACLU*, 521 U.S. 844 (1997) ............................................................................................ 4

*Roth v. United States*, 354 U.S. 476 (1957) ................................................................................. 5

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002) ..................................... 4

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) .................................................................... 11

*Standard Oil Co. v. United States,* 221 U.S. 1 (1911) ............................................................... 12

*Taylor v. Philadelphia & Reading R. Co.*, 7 F. 386 (Cir. Ct., E.D. PA 1881) .............................. 12

*Trump v. International Refugee Assistance Project*, ___ U.S. ___, 137 S.Ct. 2080 (2017) ............ 3

*U.S. Telecom Ass'n v. FCC,* 825 F.3d 674 (DC Cir. 2016) ........................................................... 13

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) .................................................. 1


Statutes

47 U.S.C. § 230 ........................................................................................................................ 7, 12

47 U.S.C. § 414 ............................................................................................................................ 12

47 USC § 230(a)(3) ........................................................................................................................ 5

Cal. Bus. & Prof. Code §§ 17200 et seq. ....................................................................................... 6

F.S. § 501.2041 et seq. ................................................................................................................... 7

Fla. Deceptive and Unfair Trade Prac. Act, F.S. §§ 501.201 et seq. .......................................... 6, 7

## I. INTRODUCTION

By banning former President Trump and other speakers who share his political views from the Twitter platform, Defendants have prevented the free and open exchange of ideas that underpin our democracy and damaged the integrity of the election process. *See* Declaration of Alan M. Dershowitz ("Dershowitz Decl.") (Dkt. 62-1) ¶ 6 (Mr. Trump's right to speak and the rights of his audience to hear his views have been "seriously compromised"); ¶ 8 (Twitter ban will have "adverse and unknowable effect on the 2022 elections"); ¶ 10 ("Democracy demands a level playing field."). The proposed preliminary injunction does not ask the Court to impose new duties on Defendants. Rather, it simply seeks to restore *ex ante* Mr. Trump's access to the account that he had maintained for many years prior to his deplatforming by Defendants, pursuant to express directions from the legislators and the White House. The test to be applied on this motion is whether (i) Mr. Trump is likely to succeed on the merits; (ii) he is likely to suffer irreparable harm in the absence of preliminary relief; (iii) the balance of equities tips in his favor; and (iv) an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Mr. Trump satisfies each of these tests, thus entitling him to the injunctive relief requested.

## II. IRREPARABLE HARM

The preliminary injunction seeks to remedy partisan censorship that will "cause the plaintiff and the electorate irreparable harm." *Id*. ¶ 12. In addition, because Twitter has imposed an arbitrary prior restraint on speech in violation of the First Amendment, Plaintiff's motion seeks relief for issues that are *per se* irreparably harmful. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (prior restraint "unquestionably constitutes irreparable injury"). Prior restraints on speech present some of the "most serious and the least tolerable infringement" on free speech rights. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The loss or threatened infringement of free speech rights "for even minimal periods of time [] unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373 (1976); *see also Backpage v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (threat by public officials to ban speech "unquestionably constitutes irreparable injury").

PLAINTIFF TRUMP'S REPLY
ISO PRELIMINARY INJUNCTION —1                        Case No: 21-cv-08378-JD

Mr. Trump's injuries are not only ongoing, but *worsening*, because they flow from the silencing of Mr. Trump's *political speech* as the presumptive head of the Republican party at a time when the nation is drawing ever-closer to the 2022 elections, including his endorsement of candidates in primary races that are currently commencing throughout the nation. To the extent that Mr. Trump might use alternative platforms to advance his agenda—which is minimal, given that the principal social media platforms have all banned him, at the government's behest—such use would not diminish the harm he suffered at the hands of Defendants. The existence of purported alternative platforms for speech is irrelevant, particularly when the few available alternatives lack the Defendants' market penetration. As the Supreme Court recently held,

> It changes nothing that these platforms are not the sole means for distributing speech or information. A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail. But in assessing whether a company exercises substantial market power, what matters is whether the alternatives are comparable. For many of today's digital platforms [such as Twitter], nothing is."

*Biden v. Knight First Amendment Inst. at Columbia Univ.*, ___ U.S. ___, 141 S. Ct. 1220, 1225 (2021).

Defendants also argue that Mr. Trump was dilatory in pursuing preliminary injunctive relief. In the first place, Defendants ignore the fact that a great part of the delay from initiation of this lawsuit to the present time was caused by Defendants' procedural maneuverings, including the lengthy motion practice that resulted in the case being transferred from Florida to this Court. Furthermore, Defendants fundamentally misunderstand the nature of a prior restraint, which creates an ongoing injury while the restraint is in place, and is equally as ripe now as earlier. The Ninth Circuit has held that the issue of a purported delay in seeking injunctive relief is only "a single factor to consider" and that the courts should be "loath" to withhold preliminary injunctive relief solely on this ground. *Arc of Calif. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (delay in seeking relief "not particularly probative in the context of ongoing, worsening injuries). The Court is free to disregard Defendants' argument that Mr. Trump waited too long. The preliminary injunction motion was filed within a reasonable amount of time from the initial prior restraint and the resulting harm is just as severe now, if not even more so given the impending elections.

**III.    THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF.**

The purpose of interim injunctive relief is not to "conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. International Refugee Assistance Project*, ___ U.S. ___, 137 S.Ct. 2080, 2087 (2017). The "balance of equities" test means simply that "the injunction must do more good than harm." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011), quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir.2009).

Here, the balance of hardships tips decidedly in favor of Plaintiff. Mr. Trump has been denied access to the Twitter platform for the wide and rapid dissemination of speech on issues of national importance and central to the core of political debate. The harm to Mr. Trump and the public, as well as to the integrity of the electoral process itself, is incalculable. *See* Dershowitz Decl. ¶¶ 6, 8-12. By contrast, Defendants have demonstrated no hardship if the court temporarily enjoins their continued ban of Mr. Trump and requires a return to the status *quo ante*. For Defendants, the impact of injunctive relief would be only to require Twitter to host Mr. Trump's content, as it had done for decades before the heavy hand of the state compelled and encouraged Defendants' censorship.

Defendants cannot demonstrate that any potential harms might accrue to them if the injunction is granted. Any risk of legal liability is slim to non-existent. Anything Mr. Trump would say as the presumptive head of the Republican party most likely would be immunized by Section 230. That is the undisputed purpose of the statute. Mr. Trump's speech would be third-party content for which Twitter could not be sued. Defendants have made no showing that they have been sued successfully for damages over the last two-plus decades for anything that Mr. Trump has ever said on Twitter.

Furthermore, Defendants have not and cannot make a colorable argument that reinstating Mr. Trump would take considerable time and effort. Defendants could simply reactivate Mr. Trump's account, much like the "flipping" a light switch, and he would be back online within minutes, if not seconds. Nor would reinstatement harm Defendants' bottom line. Defendants have not even attempted to argue the contrary. In fact, their financial performance likely would

1  improve. According to news reports, Twitter's publicly traded share prices tumbled more than
2  10% after the site banned then-President Trump. According to publicly available information,
3  over the past year Twitter's stock price has been nearly cut in half. Given that Defendants
4  substantially profited while Mr. Trump was on the Twitter platform and that Twitter immediately
5  began losing significant net value when it illegally censored him, Defendants have no basis for
6  plausibly claiming that reinstating Mr. Trump's account would harm their financial performance.
7  Mr. Trump's right to fair treatment and harm inflicted on him while in office, as a political party
8  leader, and personally, weigh heavily in his favor.

## IV.   THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF

Access to the "vast democratic forums of the Internet" is a First Amendment right. *Reno v. ACLU*, 521 U.S. 844 (1997). That right reaches its zenith where speech affects the election process. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it. **The First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office.**" *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339 (2010) (emphasis added), quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223. (1989).

The public interest inquiry primarily addresses the impact of the challenged practice on non-parties. *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (emphasis added). "Courts considering requests for preliminary injunctions have consistently recognized the **significant public interest** in upholding First Amendment principles." *Id*. Defendant Dorsey himself has admitted that Twitter's platform is itself a subject of public interest: "There is a public interest in enabling the people to be informed and engage directly with their elected leaders." First Amended Complaint ("FAC") ¶¶ 57-58, "Breaking the News: Censorship, Suppression, and the 2020 Election": Hearing before S. Comm. on the Judiciary, 116th Cong. (2020) (testimony of Jack Dorsey).

Mr. Trump's right to participate meaningfully in the public discourse will remain restrained so long as Defendants continue to ban him from the Twitter platform to avoid the

government's threatened repeal of Section 230.  That point is indisputable.  Congress itself has found that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse …." 47 USC § 230(a)(3).  Removing Defendants' prior restraint is inherently in the public interest, especially because the public benefits from a robust marketplace of ideas.  The fact that a part of the electorate might disagree with Mr. Trump's political views is of no moment.  "Unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of [constitutional] guarantees." *Roth v. United States*, 354 U.S. 476, 484 (1957).  The public also benefits from safeguarding the integrity of the election process by allowing all perspectives to be heard and to inform voters' decisions.  In the present circumstances, that will not be possible.  As Professor Dershowitz asserted, "Censoring the 45th President of the United States, the leader of the Republican [p]arty, will have an adverse and unknowable effect on the 2022 elections." Dershowitz Decl. § 8.  Accordingly, the issuance of injunctive relief is necessary and proper.

Twitter argues that injunctive relief restoring Mr. Trump's Twitter account would somehow violate the First Amendment rights of non-parties, primarily other Twitter users.  Opp. Br. at 13.  This argument comes just *two pages* after Twitter argues that Mr. Trump lacks standing to argue that censoring him harms Twitter users who wish to hear what he has to say—users whose First Amendment rights must be considered.  Opp. Br. at 11 n.6.  The real question for the public interest remains the core issue that this action brings before the Court:  May Defendants deny Plaintiff access to social media, the world's greatest platform for the exchange of ideas.  Whatever burden Defendants could possibly face for having to host yet one more user is overwhelmed by the vital interest of Plaintiff, and those who follow him, of access to this forum.

V.  **SUCCESS ON THE MERITS**

Simultaneously with this brief, Plaintiffs are filing their Opposition to Defendants' Motion to Dismiss ("MTD Opp.").  To avoid burdening the Court with duplicate briefing, Plaintiffs refer to and incorporate herein by reference the merits arguments made in their Opposition brief.

A.  **First Amendment and Unconstitutionality Claims**

Plaintiffs have made the following arguments in support of their First Amendment

Claims:

- Plaintiffs have sufficiently pleaded state action by means of compulsion because legislators and Executive Branch officials directed Defendants and other social media platforms to censor speech by then-President Trump and other speakers who supported his views, and Defendants complied.  MTD Opp. at 7-17.

- Section 230 provides significant government encouragement of Defendants' actions by immunizing Defendants from liability for imposing a prior restraint on constitutionally protected speech and thus enabling their discriminatory conduct.  MTD Opp. at 17-20.

- Defendants' actions also constitute state action because Defendants have admitted "partnering" with the government in making decisions to censor speech.  The record is replete with facts from which a jury could infer a common understanding between the government and Defendants to censor President Trump and those who echoed his views.  MTD Opp. at 20-21.

- Plaintiffs have standing to challenge the constitutionality of Section 230 because, as manifested by the statements made in congressional hearings and by the White House, government officials have explicitly threatened the possibility of repealing Section 230 as a mechanism to compel censorship of Plaintiffs' speech.  MTD Opp. 21-22.

### B.     Florida State Law Claims

Defendants' arguments regarding the Florida state law claims also closely track the arguments they raised in the Motion to Dismiss.  A full response to the points raised by the Defendants can be found in the following sections of Plaintiffs' Opposition to the Motion to Dismiss.

- Florida's interest in allowing plaintiffs to challenge deceptive practices is fundamentally different than California's, as shown by the different standing requirements for obtaining injunctive relief under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") as compared to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.  MTD Opp. at 22.

- FDUTPA allows for claims to be based on deception by omission.  MTD Opp. at 23.
- Consumers may reasonably rely on the Twitter's Terms of Service disclosing accurately the grounds upon which content will be removed or moderated.  MTD Opp. at 23.
- As to the argument regarding the Stop Social Media Censorship Act ("SSMCA"), Plaintiff notes that the claims relate to events post-dating, not pre-dating, the SSMCA's enactment.  See MTD Opp. 22-25.

### C. An Injunction Will Not Violate the First Amendment

Plaintiffs submit the following argument responding to issues that Defendants have made in opposition to the Motion for Preliminary Injunction and that were not raised in their Motion to Dismiss.

#### 1. *Tornillo* and *Hurley* Do Not Apply to Social Media Companies

In addition to their arguments regarding the tests by which preliminary injunctions are granted—success on the merits, irreparable harm, the balance of equities, and public interest—Defendants assert that the First Amendment protects their continued censorship of President Trump.  Relying on *Miami Herald v. Tornillo*, 418 U.S. 241 (1974), the Defendants are in essence trying to compare themselves to a newspaper.  Plaintiffs respectfully submit that these Defendants, and their social media peers, not only are unlike newspapers, but unlike any other form of medium for mass communication the world has seen.  *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735-37 (2017).

##### (a) Section 230 Propelled the Growth of Social Media.

Social media's explosive growth and current ubiquity are no accident.  It is no stretch to say that Congress midwifed the rapid rise of social media through the enactment of Section 230 of the Communications Decency Act ("Section 230"), 47 U.S.C. § 230.[1]  Congress saw the

---

[1] The former president of the Internet Association, Michael Beckerman, stated that Section 230 is, "the one line of federal code that has created more economic value in this country than any other."  Declaration of Richard Lawson ("Lawson Decl."), Exh. A.

Internet as an extraordinary forum for diverse political discourse, and declared that it was the policy of the United States to, "promote the continued development of the Internet." 47 U.S.C. 230(a)(1), (a)(3), (b)(1). At the time of enactment, Congress was aware that social media websites would be incapable of traditional editorial oversight, and that the Internet was, "something far larger than our daily newspaper." *Cong. Rec.,* H 8471 (1995), statements of Rep. Goodlatte. The Ninth Circuit recently recognized the public purpose of Section 230 and the fact that it is to serve the public interest, not the narrow interests of social media companies. *Enigma Software Group USA, LLC, v. Malwarebytes, Inc.* 946 F.3d 1040 (9th Cir. 2019) (holding that if Section 230 could defeat a state law prohibiting unfair competition, it would "potentially motivate internet service providers to act for their own, **and not the public**, benefit.") (emphasis added).

Without Section 230's immunity, social media would not exist today.[2] With the stroke of a pen, the body of law regarding libel, defamation, and slander was held inapplicable to those who used binary code instead of ink and paper. FAC ¶¶ 69, 71. The growth fostered by this immunity has simply been extraordinary.[3] FAC ¶ 4. The largest social media companies, Twitter, Facebook, and Alphabet (YouTube's parent organization), have market capitalizations of $31 billion, $880 billion, and $1.7 trillion, respectively. All of these companies were created only *after* Section 230's enactment.[4] Each of these companies acknowledges in its SEC filings that

---

[2] David Post, former Temple University law professor and current Adjunct Scholar at the Cato Institute stated that the potential liability facing social media companies without Section 230 would have been "astronomical" and that it is unlikely that, "an investor [would provide] funds for any of these ventures in a world without Section 230." David Post, *"A bit of Internet history, or how two members of Congress helped create a trillion or so dollars of value,"* Washington Post, August 27, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/08/27/a-bit-of-internet-history-or-how-two-members-of-congress-helped-create-a-trillion-or-so-dollars-of-value, Lawson Decl., Exh. B. The industry trade group Internet Association commissioned a report in 2017 stating that the congressionally mandated safe harbors of Section 230 and the Digital Millennium Copyright Act combined provided more than $40 billion dollars a year of value to the economy. Lawson Decl., Exh. C.

[3] The Bureau of Economic Analysis shows that the value of internet related companies have grown nine-fold in the decades since enactment of Section 230. Lawson Decl., Exh. D.

[4] Based on market capitalization for each company on January 10, 2022. Lawson Decl., Exhibits E, F, and G.

Section 230 is vital to its business model, and that any changes would substantially affect its revenues.[5]

### (b) Twitter Resembles a Quasi-Public Entity, Not a Newspaper.

Congress' desire to have the free exchange of ideas on the Internet, coupled with social media company's reliance on immunity from liability based on their published content, demonstrates that Twitter is, in fact, a quasi-public entity. Far from being a newspaper with a coherent editorial message, Defendants solicit and host third-party content as a free-for-all, where users exchange roughly five hundred (500) million tweets daily, and all thanks to Section 230. Newspapers, still subject to the standards set forth in *New York Times v. Sullivan*, 376 U.S. 254 (1964) (for at least their print editions), can only dream of Twitter's immunity from liability for defamation and other legal claims.

But it is not just Twitter's immunity that makes the First Amendment protections for newspapers in *Tornillo* inapplicable to its platform. In *Tornillo*, a Florida law required newspapers to provide space for a right of reply from public officials who had been criticized in the *Miami Herald*. The Court expressed three concerns about how this law would affect the First Amendment: (i) a right of reply occupies space and incurs costs; (ii) it would have a chilling effect as the *Herald* would know it may have to publish a response; and, (iii) the choice of material going into the paper, the decisions made as to limitations on size and content, and the treatment of public issues combine to create a coherent message that may be contrary to the content of an official's reply. 418 U.S. at 256-58. Taking each of these concepts, it is implausible for Twitter to assert that it is any way similar to the *Herald*. Defendants cannot, and do not, claim that the among the roughly 500,000,000 tweets generated *daily* by *third parties*, Twitter is somehow curating a carefully tailored message like that of the *Miami Herald*.

Defendants similarly argue they should enjoy the First Amendment protections the Supreme Court recognized for parade organizers in *Hurley v. Irish American*, 515 US 557 (1995).

---

[5] SEC Form 10-Ks for Alphabet, Meta Platforms, and Twitter for the calendar year ending December 31, 2020 are attached to the Lawson Decl. as Exhs. H, I, and J.

1  However, the Court held that, like the *Miami Herald*, the organizers of Boston's St. Patrick's Day
2  Parade had a message to convey, and the regulation at issue might compel them to carry contrary
3  content. The Supreme Court recognized in *Hurley* that to the organizers of Boston's St. Patrick's
4  Day parade, such events are, "a form of expression, not just motion, and the inherent
5  expressiveness of marching to make a point explains our cases involving protest marches." 515
6  U.S. at 568.

7  Any concern Defendants might have that a user could believe that one of the five hundred
8  (500) million daily tweets from third parties somehow represents the beliefs or opinions of
9  Defendants themselves could be easily accommodated by affixing a disclaimer to the content.
10  The Supreme Court has held that, as to the operators of a shopping mall, the "concerns [regarding
11  newspapers as in *Tornillo*] obviously are not present," and that to the degree any burden was
12  suffered by shopping mall hosting speakers with contrary views, this could be managed by
13  affixing signs disavowing these messages. *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 88
14  (1980). *See also Prager Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020); *Children's
15  Health Def. v. Facebook* ("*CHD*"), 2021 WL 2662064 (N.D. Cal. June 29, 2021). This holding is
16  no less applicable to a social media company trafficking in hundreds of millions of tweets, by
17  hundreds of millions of users, on a daily basis. The issue in both *Prager* and *CHD* was that the
18  respective social media companies had, in fact, applied this *Pruneyard* remedy and placed
19  disclaimers on the plaintiffs' content. By contrast, Plaintiffs in this case have been *banned*
20  outright.

21  **(c)   Defendants' Arguments to the Contrary Are Unavailing.**

22  Mr. Trump's ban is, in fact, a prior restraint resulting from the improper application of
23  state action through government, coercion, joint activity, and the substantial encouragement of
24  Section 230. Importantly, all three of these forms of state action were *cumulative* both
25  horizontally and vertically in their effect: horizontal in that all three forms of state action
26  produced the prior restraint on Mr. Trump, and vertical as they violated the rights of millions of
27  citizens who participated with in this public forum.
28  To the extent that Twitter's argument, based in part on out-of-jurisdiction authority, that

an injunction would constitute "court-compelled speech" subject to strict scrutiny is meritless.[6] None of the three cases cited by Twitter in support of this proposition are germane, and none involved state action issues or state-coerced speech of the type at issue here. For example, *Ashcroft v. Free Speech Coalition*, 525 U.S. 234, 245 (2002), stands for the proposition that the First Amendment "bars the government from dictating what we see or read or speak or here"— exactly the conduct complained of in this case. *Madsen v. Women's Health Center*, 512 U.S. 753, 764-66 (1994), held that a *content-neutral* injunction would be upheld if it burdens no more speech than necessary. Again, this cuts in favor of Mr. Trump, who is not asking for content-based relief, but for reestablishment of the status quo through the reinstatement of his account— and he is a person, not content. Finally, *Carroll v. President and Com'rs of Princess Anne,* 393 U.S. 175, 183-84 (1968), involved an injunction that *prevented* private speech, whereas here the relief sought would encumber only state action.

### 2. Social Media Companies Are Common Carriers, Not Newspapers

As set forth above, social media companies like Twitter are not like newspapers. Plaintiff respectfully submits that the proper parallel for the Defendants is not an organization like *The New York Times*, but rather a business like the Union Pacific railroad. Twitter is, at its core, a common carrier.

As Section 230 is essential to social media companies, so too were Congress' grants of massive tracts of land to the growth of the railroads.[7] Congress intended that the railroads sell the

---

[6] *Sindi v. El-Moslimany*, 896 F.3d 1, 30-32 (1st Cir. 2018), Twitter's first out-of-jurisdiction citation, does not counsel against an injunction in this case. In *Sindi*, a defamation case, the First Circuit noted that injunctive relief is inappropriate where monetary damages can compensate the plaintiff. And the "prior restraint" occasioned by the injunction against future defamation in that case, which the First Circuit rejected, did not run against the government or a private party engaged in state action. *Goodson v. Republican State Leadership Comm.—Jud. Fairness Initiative*, 2018 WL 6430825, at *3 (E.D. Ark. 2018), Twitter's second out-of-jurisdiction citation, is similarly inapposite—in that case, there was no issue raised of state action in the form of government-coerced speech.

[7] Between 1862 and 1872, Congress donated to the railroads 131,230,358 acres of land – an area larger than Texas – and the states chipped in an additional 44,224,175 acres. Richard White, *The Republic for Which It Stands,* Oxford, 2019, pp. 117-119. 29,589 miles of track were laid between 1868 and 1873, with the transcontinental railroad completed in 1869. *Id.* p. 217.

land and use that revenue for transcontinental rail lines.

The parallels with the Internet are all readily apparent. Internet related companies have grown nine-fold since the enactment of Section 230, but unlike the one-time gift of land to the railroads, the social media companies live under the constant threat of Congressional changes to Section 230. Both the land grants in the 1860s and Section 230 immunity were granted when their respective industries—the railroads and social media—were in their infancy. As noted above, just as Congress wanted to further the national policy of connecting the country by rail, Section 230 was the means to a policy, "to promote the continued development of the Internet and other interactive computer services and other interactive media." 47 U.S.C. 230(b)(1). The fact that Section 230 is housed within the Telecommunications Act is no bar to a finding that Twitter meets a common law definition of a common carrier. The Act itself states that nothing within the Act "shall in any way abridge or alter the remedies now existing at common law or by statute." 47 U.S.C. § 414.

Another less pleasant aspect of the parallels between social media and the railroads can be seen in the fact each industry saw complaints about unfair discrimination rise in harmony with their size and wealth. The successful manipulation of discriminatory prices would be a significant factor in the success of Rockefeller's Standard Oil. *See Standard Oil Co. v. United States,* 221 U.S. 1 (1911). To address these complaints, courts across the nation held that, as the beneficiaries of massive gifts of land, the railroads were common carriers, bound by common law prohibitions against unfair discrimination. *See, e.g., Dinsmore v. The Louisville, Cincinnati & Lexington Railway Company*, 2 F. 465 (Cir. Ct. D. Ky. 1880) ("Railroads are quasi-public institutions . . . their construction has been encouraged by liberal grants of power, and aided by private and public contributions"); *Taylor v. Philadelphia & Reading R. Co.*, 7 F. 386 (Cir. Ct. E.D. Penn. 1881) ("quasi public corporations, such as railroads . . . are invested with important public and governmental functions").

Defendants' practices show that when they solicit and host third-party content they are acting like common carriers. Defendants, like railroads or airlines, are fully entitled to define the parameters by which they will carry content, and their Terms of Service set out these guidelines.

But, just like other common carriers, the Defendants engage in no individualized decisions whether and on what terms to deal. This lack of individualized decision making is the classic hallmark of a common carrier. *U.S. Telecom Ass'n v. FCC,* 825 F.3d 674, 740 (D.C. Cir. 2016). Further, the First Amendment concerns raised in the *Tornillo* and *Hurley* no more apply to Defendants when they host the Mr. Trump's tweets than the First Amendment concerns of Delta Air Lines are affected when Mr. Trump rides their planes. Defendants cannot plausibly argue that a platform that hosts five hundred million tweets *per day* is engaged in individualized decisions whether and on what terms to deal with its three hundred and forty million users.

Moreover, whether a party is conveying speech or physical goods is immaterial to common carrier analysis. *U.S. Telecom Ass'n,* 825 F.3d at 742. Further, common carrier principles are no less pertinent in the 21st century than when they arose in the 17th century. As recently as 2017, the Ninth Circuit referenced how the contemporary understanding of common carriers dates from the England of the 1670s. *FTC v. AT&T Mobility, LLC*, 883 F.3d 848, 860 (9th Cir. 2017). Additionally, in 2015 a federal court allowed a federal common law claim for unfair discrimination (based on decisions dating from the 1880s) to be asserted against an airline. *Conservation Force v. Delta Air Lines, Inc.* 190 F. Supp. 3d 606 (N.D. Tex. 2016).

When Defendants solicit and host third-party content, they do so armed with a Congressionally approved immunity that traditional media could only dream of, and knowing that the forums in which they host this content furthers the policy of the United States. FAC ¶ 85. Defendants could not be further from a newspaper; at best, they are merely a printer.

## VI.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

Dated: January 10, 2022

RICHARD P. LAWSON
GARDNER BREWER HUDSON

By:  /s/ Richard P. Lawson
     Richard P. Lawson *(pro hac vice)*

JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON *(pro hac vice)*
GARDNER BREWER HUDSON
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gardnerbrewer.com

*Attorneys for Plaintiffs*