PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile: (650) 858-6100

*Attorneys for Defendants Twitter, Inc.
  and Jack Dorsey*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DONALD J. TRUMP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC., et al., <br><br> Defendants. | Case No. 21-cv-08378-JD <br><br> **DEFENDANTS' REPLY TO PLAINTIFF TRUMP'S EXTRA BRIEF REGARDING THE CONSTITUTIONALITY OF SECTION 230** |

Plaintiff Donald Trump's latest brief again confirms both that he and his co-plaintiffs lack standing to challenge the constitutionality of Section 230 and that their constitutional challenge is meritless. Mr. Trump also argues, for the first time, that the Court can avoid the purported constitutional issue by construing Section 230 not to apply to the editorial decisions at issue in this case. Because Plaintiffs' constitutional challenge is not properly before the Court, this argument is an improper request for an advisory opinion. And there is no need to apply the canon of constitutional avoidance because Plaintiffs do not come close to raising doubt about the constitutionality of Section 230. Regardless, Mr. Trump's proposed constructions of Section 230 are wrong and the Court should, if it considers them, reject them.

### I. Plaintiffs Lack Standing To Challenge The Constitutionality Of Section 230

Plaintiffs do not have standing to raise a constitutional challenge to Section 230 in this case because Defendants have not raised it as a defense and because Section 230 has not caused them any injury. *See* Mot. to Dismiss ("MTD") 12-13; Opp. to Prelim. Inj. Mot. ("PI Opp.") 26; MTD Reply 6-7. Mr. Trump now appears to concede that the Court "need not" decide the constitutionality of Section 230 in "the case at bar" but argues the Court should reach that question "if the statute is later asserted by Defendants." Resp. 4. His concession that this case can be decided without considering the constitutionality of Section 230, on its own, requires dismissing Plaintiffs' claim seeking a declaration that Section 230 is unconstitutional. Moreover, Plaintiffs would lack standing to seek a declaratory judgment regarding the constitutionality of Section 230 even if Twitter had asserted, or were to assert, Section 230 as a defense. That statute has not caused them any injury. Twitter, not Section 230, removed Plaintiffs' content from its platform, and a judicial declaration that Section 230 is invalid would not remedy that alleged injury. *See Lewis v. Google LLC*, 851 F. App'x 723, 723-24 (9th Cir. 2021).

### II. Section 230 Does Not Violate The First Amendment

Even if Plaintiffs' declaratory-judgment claim regarding Section 230 were properly before the Court, it still should be dismissed because Section 230 does not violate the First Amendment. Mr. Trump argues (Resp. 5), as he has before, that Section 230 violates the First Amendment because it "permits" Twitter to exercise editorial control over its platform. *See* Prelim. Inj. Mot. ("PI Mot.") 18-19; Opp. to Mot. to Dismiss ("MTD Opp.") 18-19; PI Reply 5-6. But Section 230's neutral grant of immunity—protecting platforms whether they host or block content—does not violate the First Amendment. *See*

1  MTD 13; PI Opp. 19-21, 26; MTD Reply 7.  Mr. Trump's latest brief just restates his prior argument on
2  this point, except for offering one new—and likewise meritless—contention: that in *Denver Area Educ.*
3  *Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996), the Supreme Court "held statutes that permit but
4  do not require a private party to regulate speech could lead to a First Amendment violation."  Resp. 5.

5        *Denver Area* does not support Mr. Trump's position.  Section 230 is vastly different from the
6  provision found to violate the First Amendment in that case.  That provision regulated the broadcasting
7  of "patently offensive" sex-related material on public access cable channels by authorizing operators of
8  those channels to ban programming that the operator reasonably believed described or depicted offensive
9  sex-related material.  *Denver Area*, 518 U.S. at 732, 735.  That provision, unlike Section 230, singled out a
10 particular, content-based category of speech for "censorship" by private actors.  And, unlike Section 230,
11 it applied only to private actors who were "unusually involved" with the government.  *Denver Area*, 518
12 U.S. at 739.  Those are dispositive differences, as the (splintered) opinions in *Denver Area* makes clear.
13 Two of the five Justices who voted to overturn the provision opined that it violated the First Amendment
14 because it "single[d] out one sort of speech for vulnerability to private censorship in a context"—believed
15 by those Justices to be a "public forum"—"where content-based discrimination is not otherwise
16 permitted."  *Id.* at 782-783, 791-794 (Kennedy, J., concurring in part, concurring in the judgment in part,
17 and dissenting in part).  The other three Justices in the majority explained that there were special features
18 of public access cable channels that made government-empowered, content-based censorship of them by
19 private cable operators constitutionally infirm, including that: (1) the operators had not "historically
20 exercised editorial control" over public access channels and (2) those channels were subject "to complex
21 supervisory systems of various sorts, often with both public and private elements."  *Id.* at 760-761 (Breyer,
22 J.).  Thus, a majority of the Court agreed that a statute that permits (but does not require) a private party
23 to "censor[]" another person's speech does not transform that private party's "censor[ing]" decisions into
24 state action—and thereby supply the state action needed for any constitutional challenge to the statute—
25 unless the statute *both* (1) "singles out one sort of speech for vulnerability to private censorship" *and* (2)
26 does so "in a context where content-based discrimination is not otherwise permitted."  *Id.* at 782
27 (Kennedy, J.); *see also United States v. Davis*, 825 F.3d 1014, 1021-1022 (9th Cir. 2016) ("A fractured Supreme
28 Court decision should only bind the federal courts … when a majority of the Justices agree upon a single

underlying rationale and one opinion can reasonably be described as a logical subset of the other."); *Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 841 (9th Cir. 2017) (applying this rule to *Denver Area*).[1]

Those critical features are absent here. *See Divino Grp. LLC v. Google LLC*, 2021 WL 51715, at *7 (N.D. Cal. Jan. 6, 2021) (distinguishing *Denver Area* on those grounds and rejecting a First Amendment challenge to YouTube's editorial decisions). First, unlike the provision in *Denver Area*, which sought to regulate a very specific category of "patently offensive" sex-related material, Section 230 concerns who can be treated as a publisher of online speech, not what is being said. Second, the context in which Section 230 protects Twitter's content-moderation decisions is the polar opposite of one "where content-based discrimination is not otherwise permitted." Unlike cable operators who historically had no editorial control over public access channels and were subject to complex supervisory systems, Congress determined online platforms should be "unfettered by Federal or State regulation." 47 U.S.C. §§ 230(a)(4), (b)(2). *See also infra* 4-5. Nor do online platforms like Twitter become public forums, or otherwise suffer any constraints on their editorial discretion, by hosting and making widely available massive quantities of content from millions of third parties. *See Prager Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020). Indeed, every Twitter user (including every Plaintiff) agreed to Terms of Service that explicitly gave Twitter discretion over what content may and may not appear on its platform. And, on top of all that, whereas *Denver Area* deemed the First Amendment interests of operators of public access channels to be "nonexistent, or at least much diminished," 518 U.S. at 761 (Breyer, J.) (citing *id.* at 791-794 (Kennedy, J.)), Twitter's decisions to exercise "editorial control and judgment" over what content is and is not published through its communications platform is core expressive conduct protected by the First Amendment. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257-258 (1974); *see also O'Handley v. Padilla*,

---

[1] A much more recent Supreme Court decision casts doubt on a key premise—namely, that privately operated public access cable channels are public forums—necessary to form the operative majority in *Denver Area*. In *Manhattan Cmty. Access Corp. v. Halleck*, the Court held that private operators of public access cable channels do *not* qualify as state actors and that those channels are *not* public forums. 139 S. Ct. 1921, 1928 (2019). The Court's opinion in *Halleck* favorably cited Justice Thomas's dissenting opinion in *Denver Area*, in which he offered two reasons for upholding the provision at issue: first, because privately operated public access channels are not public forums, and second, because private actors who own and operate cable systems enjoy the same First Amendment rights to control the content distributed through those systems as newspaper editors have over what content appears in their newspapers. *See, e.g., Halleck*, 139 S. Ct. at 1933 (citing *Denver Area*, 518 U.S. at 829 (Thomas, J., concurring in judgment in part and dissenting in part); *see also Denver Area*, 518 U.S. at 831 (Thomas, J.) ("Public access channels are not public forums, and, therefore, petitioners' attempt to redistribute cable speech rights in their favor must fail.").

2022 WL 93625, at *14 (N.D. Cal. Jan. 10, 2022) (Twitter's "decisions about what content to include, exclude, moderate, filter, label, restrict, or promote … are protected by the First Amendment.").

In sum, *Denver Area* in no way aids Plaintiffs' arguments concerning the constitutionality of Section 230. The state action doctrine "require[s] private actors to be state actors as a prerequisite to challenging permissive statutes." *Roberts*, 877 F.3d at 841-842. Because Section 230 does not transform the editorial decisions of online platforms into state action, *see* MTD 9-10; PI Opp. 19-21; MTD Reply 4-5, it does not violate Plaintiffs' First Amendment rights.

### III. Mr. Trump's Constitutional Avoidance Arguments Are Baseless

Because Plaintiffs' constitutional challenge to Section 230 is procedurally barred, Mr. Trump's constitutional avoidance arguments in effect improperly invite the Court to issue an advisory opinion about the statute's scope. *See Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (the standing requirement "prevent[s] courts from issuing advisory opinions"). The Court should decline that invitation. And that issue aside, the canon of constitutional avoidance would not apply because, as Twitter has explained, Mr. Trump has not raised "a serious doubt" about the constitutionality of Section 230. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018); *see supra* 1-3; MTD 13; PI Opp. 19-21, 26; MTD Reply 7.

In any event, Section 230 is not susceptible to the interpretations proposed by Mr. Trump. *First*, it is frivolous for Mr. Trump to suggest (Resp. 2) that phrases he plucks from Section 230's preamble—such as that the Internet and online platforms have "benefit[ted] all Americans," 47 U.S.C. § 230(a)(4)—mean that Section 230 should be construed (contrary to the statute's plain language and decades of precedent) as offering such platforms no protection for barring account holders, like Mr. Trump, who repeatedly violate their rules. To promote the interests of all Americans, Congress did *not* mandate that Internet platforms host the content of all Americans. It did exactly the opposite, concluding that the "flourish[ing]" of "[t]he Internet and other interactive computer services" "to the benefit of all Americans" is best served by leaving the Internet "*unfettered*" by Federal or State regulation." 47 U.S.C. §§ 230(a)(4), (b)(2) (emphasis added). To that end, Congress provided Internet platforms with immunity from liability for their decisions "to publish *or to withdraw* from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (emphasis added).

*Second*, Mr. Trump errs in suggesting that Plaintiffs have a "common law" right to have Twitter

host their content because Twitter "resembles a common carrier." Resp. 1, 2. To be a common carrier, an entity must "serve the public indiscriminately and not 'make individualized decisions, in particular cases, whether and on what terms to deal." *Am. Orient Express Ry. Co. v. STB*, 484 F.3d 554, 557 (D.C. Cir. 2007). Plaintiffs' own allegations demonstrate that Twitter does not "merely carr[y]" speech that the "general public posts" without "engag[ing] in individualized decisions whether and on what terms to deal." Resp. 2. Rather, as the Complaint alleges, Twitter has adopted public rules and policies that govern how it moderates content on its platform and it enforces those rules and policies through individualized decisions about what content to host or remove. *See* Am. Compl. ¶¶ 37-40, 113-167. In its Terms, Twitter also reserves the right to take enforcement action against individual accounts or content for any reason or no reason at all. *See* Sprankling Decl. Ex. F. This practice of "mak[ing] individualized decisions, in particular cases, whether and on what terms to deal" is the opposite of a common carrier's indiscriminate service to all comers. *California v. FCC*, 905 F.2d 1217, 1240 n.32 (9th Cir. 1990).

*Third*, contrary to Mr. Trump's argument (Resp. 3-4), Section 230 also applies to "political speech." As another judge in this District put it, "[i]mmunity under the Section 230 does not contain a political speech exception." *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1120 (N.D. Cal. 2020). The statute provides that no "provider or user of an interactive computer service shall be treated as the publisher or speaker of *any* information provided by another information content provider. 47 U.S.C. § 230(c)(1) (emphasis added). It does not distinguish between political speech and non-political speech. The statement of findings at the beginning of Section 230 on which Mr. Trump relies (Resp. 4) does not support his contrary interpretation. According to Mr. Trump, Congress's conclusion that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse," 47 U.S.C. § 230(a)(3), demonstrates that Section 230 was "expressly designed to encourage *more*, not less, political speech." Resp. 4. But, as discussed above, Congress chose to protect the Internet as a "forum for a true diversity of political discourse" by allowing platforms to choose what speech to host, not by forcing every platform to host whatever content any member of the public would like to post.

## CONCLUSION

For the reasons provided herein and in Defendants' prior briefing, Plaintiffs' claim seeking a declaration that Section 230 is unconstitutional should be dismissed with prejudice.

| | |
|---|---|
| Dated: February 21, 2022 | Respectfully submitted, |
| | /s/ *Patrick J. Carome* |
| | PATRICK J. CAROME (*pro hac vice*)<br>patrick.carome@wilmerhale.com<br>ARI HOLTZBLATT (*pro hac vice*)<br>ari.holtzblatt@wilmerhale.com<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>1875 Pennsylvania Avenue, NW<br>Washington, D.C. 20006<br>Telephone: (202) 663-6000<br>Facsimile: (202) 663-6363 |
| | FELICIA H. ELLSWORTH (*pro hac vice*)<br>felicia.ellsworth@wilmerhale.com<br>WILMER CUTLER PICKERING<br>HALE AND DORR LLP<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>Facsimile: (617) 526-6000 |
| | THOMAS G. SPRANKLING<br>CA Bar No. 294831<br>thomas.sprankling@wilmerhale.com<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>2600 El Camino Real, Suite 400<br>Palo Alto, CA 94306<br>Telephone: (650) 858-6062<br>Facsimile: (650) 858-6100 |
| | *Attorneys for Defendants Twitter, Inc.<br>  and Jack Dorsey* |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2022, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of these filings to all registered counsel.

Dated: February 21, 2022         By:    */s/ Patrick J. Carome*
                                        PATRICK J. CAROME