Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

DONALD J. TRUMP, the      )
Forty-Fifth President of the  )
United States, et al.,      )
                            )
            Plaintiffs,     )
                            )
  VS.                       )   NO. C 21-08378-JD
                            )
TWITTER INC., et al.,       )
                            )
            Defendants.     )
_____)

San Francisco, California
Thursday, February 24, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    LAW OFFICE OF ANDREI D. POPOVICI, P.C.
                    2121 North California Boulevard
                    Number 290
                    Walnut Creek, California 94596
              BY:   **ANDREI D. POPOVICI, ATTORNEY AT LAW**

                    LAW OFFICE OF MARIE L. FIALA
                    1450 West Highway 290
                    Suite 1200
                    Dripping Springs, Texas 78620
              BY:   **MARIE L. FIALA, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiffs:

                        GARDNER BREWER HUDSON, P.A.
3                       400 N. Ashley Drive
                        Suite 1100
4                       Tampa, Florida 33602
                BY:   **RICHARD POLK LAWSON, ATTORNEY AT LAW**
5
                        IVEY, BARNUM & O'MARA
6                       170 Mason Street
                        Greenwich, Connecticut 06830
7               BY:   **JOHN Q. KELLY, ATTORNEY AT LAW**

8   For Defendants:

                        WILMER, CUTLER, PICKERING, HALE
9                         & DORR LLP
                        1875 Pennsylvania Ave., NW
10                      Washington, D.C. 20006
                BY:   **PATRICK J. CAROME, ATTORNEY AT LAW**
11                    **ARI HOLTZBLATT, ATTORNEY AT LAW**

12                      WILMER, CUTLER, PICKERING, HALE
                          & DORR LLP
13                      2600 El Camino Real - Number 400
                        Palo Alto, California 94306
14              BY:   **THOMAS G. SPRANKLING, ATTORNEY AT LAW**

15  For Intervenor United
    States of America:
16                      US DEPARTMENT OF JUSTICE
                          CIVIL DIVISION
17                      Federal Programs Branch
                        1100 L Street - Room 12010
18                      Washington, D.C. 20530
                BY:     **INDRANEEL SUR, ASSISTANT U.S. ATTORNEY**
19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Thursday - February 24, 2022**</u>                    <u>**11:07 a.m.**</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  All rise.  This Court is now in session. |
| 5 | The Honorable James Donato presiding. |
| 6 | **THE COURT:**  Good morning. |
| 7 | **MS. FIALA:**  Good morning, Your Honor. |
| 8 | **THE CLERK:**  Please be seated. |
| 9 | Calling Civil 21-8378, Trump, et al. v. Twitter, Inc., |
| 10 | et al. |
| 11 | Counsel, please state your appearances for the record. |
| 12 | **MS. FIALA:**  Good morning, Your Honor. |
| 13 | **THE CLERK:**  Use the microphones. |
| 14 | **MS. FIALA:**  Good morning, Your Honor.  Marie Fiala |
| 15 | appearing for plaintiffs. |
| 16 | **MR. LAWSON:**  Richard Lawson for the plaintiffs. |
| 17 | **MR. POPOVICI:**  Andre Popovici for the plaintiffs. |
| 18 | **MR. KELLY:**  John Kelly for the plaintiffs, Your Honor. |
| 19 | **THE COURT:**  Oh.  Okay.  All right. |
| 20 | **MR. CAROME:**  Good morning, Your Honor.  Patrick Carome |
| 21 | for the defendants. |
| 22 | **MR. HOLTZBLATT:**  Ari Holtzblatt, also for the |
| 23 | defendants. |
| 24 | **MR. SPRANKLING:**  And Thomas Sprankling, also for the |
| 25 | defendants. |

**PROCEEDINGS**

1        **THE COURT:**  Oh, okay.  Where is Mr. Sur?  Ah.

2        **MR. SUR:**  Your Honor, I'm Indraneel Sur, of the

3    Justice Department, for the intervenor.

4        **THE COURT:**  You can sit where you like.  You can

5    certainly sit in the well.

6        Okay.  That sounds fine.  And it's entirely up to you, but

7    if you would like to take your masks off while you're speaking,

8    that's perfectly fine, as long as you're fully vaccinated and

9    you're comfortable doing it.  If you don't want to, that's also

10   fine, too.

11       You can just use the mics at the table as well.

12       Okay.  Well, I have read with great attention all of the

13   papers that you both have filed, and today we're going to focus

14   on the motion to dismiss.  I'm not going to hear any argument

15   on the preliminary injunction.  I want to get to the

16   plausibility of the claims first because that may or may not be

17   dispositive of what the next step will be.

18       So who is going to take the lead on the plaintiffs' side?

19       **MS. FIALA:**  Your Honor, Marie Fiala.  I'll be arguing

20   for plaintiffs on the motion to dismiss.

21       **THE COURT:**  Okay.  So I do have some questions.  I'm

22   happy to hear whatever it is you would like to raise, but I do

23   have a couple of targeted questions.  And let me start with the

24   first one.

25       You're in Silicon Valley.  You're in the district court

**PROCEEDINGS**

1  that handles all of the Silicon Valley matters.  If there is

2  one thing that we see a lot of, it's change:  Change in the

3  law, change in technology.  They both intersect.  Things move

4  along and evolve, part and parcel as developments occur.

5       The one thing, though, Ms. Fiala, that's been more or less

6  a constant, I'd say going back two decades, 20 years, is that

7  private companies, private entities like Twitter, are not

8  subject to the First Amendment.

9       And, you know, just to hit some flag points, the Supreme

10 Court made a very definitive statement to that effect in the

11 *Halleck* case at 139 S. Ct. 1921.  They did that in 2019.  The

12 Ninth Circuit did the same in the case called *Prager*, 951

13 F.3d 991, in 2020.  And this Court also came to the same

14 conclusion in a case called *Williby* -- W-I-L-L-I-B-Y -- in

15 2019, and you can find that at 2019 Westlaw 11662186.  That's

16 actually the unpublished Ninth Circuit affirmance of my finding

17 that Facebook was not a state actor for First Amendment

18 purposes.

19      So you've got a mountain of law saying "no" to your First

20 Amendment claim, and it's just not clear to me how you're

21 traversing that.

22           **MS. FIALA:**  Thank you, Your Honor, for the opportunity

23 to respond.

24      It is true that there have been decisions holding that in

25 specific contexts the social media giants from Silicon Valley

**PROCEEDINGS**

1    are not subject to limitations under the First Amendment.

2         But the answer to that question depends on the operation

3    of a doctrine that's much older than the cases Your Honor has

4    referenced state action, dating back to the civil rights cases

5    of the 1960s.  And the answer to Your Honor's question is very

6    heavily fact-dependent and, as such, unsuitable for disposition

7    on this motion.

8         The cases Your Honor mentioned, *Halleck* and *Prager*, sought

9    to hold social media platforms responsible as state actors

10   under a theory that they were public forums.  We have no

11   disagreement at this point with the holdings in those cases

12   because we do not allege state action under a public forum

13   theory.

14        The Supreme Court allows at least four different factual

15   contexts to give rise to state action, and we rely on two of

16   those:  The compulsion theory, which includes either coercion

17   by the Government or encouragement by the Government, and the

18   joint action theory, by which the Government and a private

19   actor work hand-in-hand to censor or limit a speaker's First

20   Amendment rights.

21        So my starting answer to Your Honor's question is that

22   *Prager* and *Halleck* are not relevant to the issues before

23   the Court today.

24        I'll touch briefly on the civil right cases, especially

25   *Lombard*, because it does illustrate the basis on which we are

**PROCEEDINGS**

1   claiming state action.  In fact, our facts are significantly,

2   significantly stronger than what was before the Supreme Court

3   in *Lombard*.

4        As Your Honor will recall, that was a case in which the

5   mayor and the police chief of the City of New Orleans stood on

6   the courthouse or the City Hall steps and gave press

7   conferences in which they said, "We will not tolerate sitting

8   demonstrations in our city."

9        A week later, a group of African-American citizens

10  attempted to order a meal at a restaurant.  They were asked to

11  leave.  They refused to leave.  The restaurant owner called the

12  police.  They were arrested and convicted.

13       And the Court -- a supreme court -- after the conviction

14  was affirmed by the state supreme court, the Supreme Court

15  reversed, saying the reason these folks were arrested was

16  because of the coercive or compulsive force of the mayor's and

17  the police chief's public statements.  In fact, the Court said

18  those rose to the same level as if there had been an ordinance

19  compelling the restaurant to segregate.

20       The Court --

21            **THE COURT:**  Let me just jump in.  I'm with you on all

22  that.  That is what the case says.  But that doesn't really

23  shed much light on your complaint.  So let me just see if I can

24  put a finer point on it.

25       And, by the way, it's perfectly fine to resolve state

PROCEEDINGS

 1  action issues at the motion to dismiss stage.  Our circuit

 2  certainly held so in a case call *Heinicke*, at 965 F.3d 1009 in

 3  2020.

 4      So there is nothing wrong with that.  Of course, you get

 5  every benefit of the doubt, because that's what we do at the

 6  pleadings motion stage.  But I just read and reread and read

 7  again, your complaint, and I just -- I'm not seeing any

 8  coercive statements by state actors, and that is the hook that

 9  you are hanging your hat on.

10      So what were the coercive statements by state actors?

11      Clearly, politicians spoke, but that's what politicians

12  do; they speak.  That doesn't necessarily -- that isn't always

13  and necessarily a statement or expression of state power.

14      So what's the coercive element?

15      **MS. FIALA:**  Your Honor, between middle of 2020 and

16  middle of 2021, the House and the Senate held multiple hearings

17  at which the CEOs of Twitter, Facebook, and YouTube were asked

18  to appear, and the specific purpose and intent of those

19  hearings was to examine how these social media platforms were

20  managing content -- what they call "content moderation" -- on

21  their platforms.

22      The CEOs appearing were subjected to aggressive

23  questioning by the Democratic members of the committees holding

24  the hearings, at which repeatedly the congressmen or senators

25  asked and demanded that speech -- specifically, speech by

**PROCEEDINGS**

1   then-President Trump, or in the 2021 hearing, recently former

2   President Trump, be moderated, suppressed, labeled as false, or

3   otherwise censored.

4        There are a few statements quoted in the brief, but due to

5   page limitations, we were only able to quote a small portion of

6   the Government's coercive statements.  We have --

7             **THE COURT:**  Sorry.  I have to just jump in on that.

8        You know, it's perfectly fine for a politician to express

9   dissatisfaction with conduct.  I mean, to quote another

10  relatively recent case, *American Family Association v. City and*

11  *County of San Francisco*, that's 277 F.3d 1114, a 2002 case, and

12  on page 1125, the circuit panel concluded, quote (as read):

13            "We agree with the host of other circuits that

14       recognize that public officials may criticize

15       practices that they would have no constitutional

16       ability to regulate so long as there is no actual or

17       threatened imposition of government power or

18       sanction."

19       So what I'm really looking for is not so much what a

20  Democrat or Republican might have said in front of a camera at

21  a committee hearing, but the actual threat that Government

22  power would be brought to bear, and I just didn't see it in the

23  complaint.

24            **MS. FIALA:**  Your Honor, it is not possible to

25  understand the answer to that question without understanding

 1  the critical role that the immunity under Section 230 of the

 2  Communications Decency Act -- the benefit that that

 3  congressionally-enacted immunity from liability confers on the

 4  social media platforms and the effect on those platforms that

 5  at the -- of the fact that at these same hearings, senators and

 6  congressional representatives repeatedly linked their overt

 7  demands that speech that differed from the official narrative

 8  be limited or censored; repeatedly linked those demands with

 9  the threat to repeal Section 230 immunity for these platforms

10  if they did not fall in line.

11      Those two are inextricably linked.  They occurred at the

12  same hearings, the same speakers uttering both of those

13  comments within minutes of each other.

14      And the threats were not, in the least, subtle or

15  difficult to understand.

16      We have submitted --

17      **THE COURT:**  Just to jump in:  The threats that --

18  you know, look, it's just a baseline concept that private

19  companies, private entities are not subject to the First

20  Amendment.  That's the baseline, and it's a strong baseline.

21      So when we talk about government threats in the cases

22  enough to really overcome that strong presumption against the

23  application of the First Amendment to private entities, we're

24  talking about express threats of Government prosecution, of,

25  you know, some kind of criminal sanction, takings.

1     I mean, just saying, you know, I have an idea that we

2     might amend the Communications Decency Act, I just -- I

3     really -- the threat factor there seems pretty low.

4         One other -- I mean, we are going to get to the

5     Section 230 point in a moment -- your ability to challenge the

6     constitutionality of that.  But, if I might, let me just

7     hear -- we'll take a little break and hear from the defendants.

8     Okay.

9         **MR. CAROME:**  Thank you, Your Honor.  Patrick Carome,

10    WilmerHale, on behalf of the defendants.

11        I think your questions go directly to the heart of the

12    issue here, Your Honor.  And there has to be -- I mean, there

13    is an extremely strong presumption against state action.  If

14    there weren't such a presumption, you would have a situation

15    where the actions of private companies, left and right, would

16    become subject to the federal constitution, and that's clearly

17    not what we have in this country.

18        And *Halleck* couldn't have been clearer about the

19    importance of really policing carefully where that line is

20    drawn so as not to affect the liberties of everybody who is not

21    in government, like Twitter.

22        So, if you look at the statements that they are relying

23    on -- I mean, first of all, a number of courts have held that

24    the statements of solo legislators do not have the power of

25    state action at all behind them.  Congress doesn't act by

1    individual; it acts by majority votes of multiple houses.

2         And, you know, in the *Abu-Jamal* case from the First

3    Circuit and from a series of cases here in the Northern

4    District of California from other courts, there has been just a

5    principle recognized which I think is just central, actually,

6    to our democracy, which is that haranguing, jawboning of

7    individual legislators -- which is what elected officials do --

8    is not the stuff of coercive state action that means every time

9    a private actor acts coincidentally with a wish of a

10   legislator, suddenly makes it the Government's action.

11        We wouldn't --

12        **THE COURT:**  I imagine a lot of politicians would like

13   it to be -- would like to have the ability to say that once I

14   speak, it becomes law.

15        But I agree with what you're saying.  It's sort of what

16   their job is.  They comment on what's happening in the world,

17   and in very rare circumstances, it might actually turn into a

18   legislative bill that's signed by the president into law.  But

19   short of that, it's just commentary.  That's basically what

20   you're saying.

21        **MR. CAROME:**  Yes, Your Honor.  And actually, if you

22   look at the transcript of the hearings that they're referring

23   to, where lots of different congresspeople spoke, it was very

24   much a bipartisan haranguing or jawboning from both Republican

25   members and Democratic members.  I mean, that's what you

1    expect; nothing wrong with it.  They couldn't be sued for

2    having done it.

3        I mean, if the legislator had actually engaged in coercive

4    state action, they would be the ones violating Twitter's First

5    Amendment rights, and Twitter might have a right to sue them.

6    Of course, we're nowhere near that realm of anything

7    approaching state action here.

8        And, you know, it's not just that individual legislators

9    have no to power on their own.  It's also that they --

10   you know, Your Honor mentioned the examples of prosecutors or

11   other types of executive branch officials who can arrest,

12   impose criminal sanctions.  In the *Lombard* case that Ms. Fiala

13   referred to, yeah, you had the mayor and chief of police saying

14   they were going to arrest people.  And they did, and, of

15   course, there was state action.  There were convictions of

16   individuals.

17       We've got nothing like that here.  Congresspeople don't

18   have that authority.  I mean, you've got cases like where you

19   have the potential for state action coercion.  You know, cases

20   like *Carolyn Communications v. AT&T Mobility*, a Ninth Circuit

21   case, where the prosecutor called up a phone company and said,

22   stop running Mr. Carolyn's supposedly indecent audiotapes.  Of

23   course, there could be state action there with a prosecutor

24   threatening to prosecute AT&T.

25       Or in the *Mathis* case, one of the leading Ninth Circuit

1  cases on state action.  There, you had the Nuclear Regulatory

2  Commission with licensing authority over PG&E with the threat

3  of taking away PG&E's licensing to operate a nuclear plant.  I

4  mean, the cases where state action has been found are so far

5  afield from what we have here.

6       Ms. Fiala suggests that, you know, well, there was some

7  threat to take away Section 230 protection from the social

8  media platforms if they didn't do something differently.  Well,

9  if you actually look at the materials that they've cited,

10  you know, there are only four or five statements that -- even

11  in the mountains of exhibits they submitted, where there was

12  even a mention of Mr. Trump's account and some desire to do --

13  that his account be moderated, that there be different

14  editorial decisions with respect to it.

15       There were a couple of tweets from Kamala Harris while she

16  was a candidate for president, and there were a couple of

17  statements, one by Blumenthal, one by Markey, at these

18  hearings.  But even those statements didn't connect:  Oh, take

19  down Mr. Trump's account with -- and, if you don't, you're

20  going to lose Section 230; you're going to go to jail.

21       There is nothing like that at all.  And so the allegations

22  are really -- are really extremely paltry, and --

23            THE COURT:  On that issue, though -- so let's just

24  talk out loud among friends here for a moment.

25       Assuming that I end up dismissing -- and I don't know yet,

1   but assuming that I do, we have a long policy and practice of

2   allowing amendments.

3       What's your position on whether that should be afforded to

4   the plaintiffs?

5       **MR. CAROME:**  It should not be, Your Honor.  They've

6   already amended once, and they appeared to have a lot of time

7   to collect mountains of paper where they've just combed through

8   every news article, every congressional hearing, everything

9   they could find.  And the paltry things they have come up with

10  are really nowhere close.  If there was something more here to

11  show that Twitter was, in fact, coerced, that this decision was

12  not Twitter's decision, they would have found it.

13      You know, even after, you know, they put in a mountain of

14  paper with their motion for preliminary injunction, they put in

15  another mountain with their opposition.  Now, a lot of folks

16  might say that's improper, but we don't quarrel with that.  I

17  mean, they -- we're happy to have the Court look at the full

18  record that they put in.  And it's a big record.

19      There is just -- there is no "there" there.  There is

20  nothing to suggest coercion.

21      **THE COURT:**  Okay.  If I -- Ms. Fiala, what are your

22  thoughts about, if you had a chance to amend, do you feel like

23  you have some facts you could add on the state actor point?

24      **MS. FIALA:**  Yes, Your Honor.  We feel we have more

25  than enough facts presently, especially if the Court admits the

**PROCEEDINGS**

1  material that we've submitted with our request for judicial

2  notice, especially the many statements -- coercive statements

3  included at Exhibit A to the request for judicial notice.  But

4  we would certainly be able to adduce additional facts upon

5  amendment.

6      There has been one previous amendment, but it was not in

7  response to a motion to dismiss.  It was a voluntary amendment.

8  This is the first time the complaint has been tested on a

9  motion to dismiss.

10     Your Honor, if I may --

11         THE COURT:  You do feel like you have facts you could

12  allege?

13         MS. FIALA:  Yes, Your Honor.  We --

14         THE COURT:  Not presently in the current complaint?

15         MS. FIALA:  We certainly have facts we could allege

16  that are not in the current complaint.

17         THE COURT:  Okay.  All right.  I would like to move to

18  Section 230.  Is there anything else you want to add on --

19         MS. FIALA:  Your Honor, if I may --

20         THE COURT:  Yes.

21         MS. FIALA:  I would like to respond briefly to

22  Mr. Carome's comments and then move on.

23         THE COURT:  Sure.

24         MS. FIALA:  I mentioned at the outset that there are

25  different tests or theories for application of state action.

**PROCEEDINGS**

1      *Heinicke* and the other cases that Your Honor asked about

2    were based on -- *Sutton* in the Ninth Circuit as well -- were

3    based on a plaintiff coming in and saying, This defendant has

4    acted pursuant to a law of general applicability.

5          In *Sutton*, the plaintiff said, This employer has asked me

6    to give them my Social Security number.  That's under

7    compulsion by federal law because the Federal Government

8    requires employers to ask Social Security numbers from

9    employees.

10          In *Heinicke*, the professor who was terminated said, I was

11    terminated because the University of Santa Clara complied with

12    the law of general applicability, that is, federal

13    antidiscrimination laws.

14          That is nothing like the facts that we have alleged here,

15    where threats made --

16          **THE COURT:**  I understand your point, but the case I

17    was trying to highlight -- may have come out differently than I

18    intended -- was *American Family*.  And that is where the Board

19    of Supervisors of the City and County of San Francisco, in

20    which you currently stand, took a very strong position on

21    statements about LGBT orientation that Christian groups had

22    been putting out, and said that they were anathema to the Board

23    of Supervisors' views to human rights and a number of other

24    things; encouraged media outlets not to run them; encouraged

25    people not to support the Christian group.

**PROCEEDINGS**

1    To be honest, at least at, you know, some level of

2  generality, pretty similar to the allegations in your

3  complaint.

4    And the circuit had no problem concluding that the

5  comments by the Board of Supervisors, the legislative body

6  locally, was not anywhere close to being the type of coercive

7  conduct that might -- might amount to state action.

8    So --

9          **MS. FIALA:**  Your Honor --

10         **THE COURT:**  Anyway -- yes.  Go ahead.

11         **MS. FIALA:**  The existence of Section 230, the fact

12 that Congress passed 230, and Congress can take it away, makes

13 a critical dispositive difference between supervisors and the

14 Mayor of San Francisco standing on the steps of City Hall

15 saying, "This is distasteful.  This is awful.  We don't support

16 this."

17    This social media platform industry exists only because of

18 Section 230.  Twitter and the other social media platforms

19 disclosed in their Forms 10-K that repeal or modification of

20 Section 230 would have a material adverse effect.  It's a

21 material adverse business risk.  And that's in our request for

22 judicial notice, Your Honor.  They themselves recognize and

23 highlight to their investors the importance of Section 230.

24    A congressional hearing, where the very legislators who

25 have the power to take away that immunity, say:  We are going

1   to compel you, compel you to toe the line at risk.

2       And that is a quote:  Compel you, at risk of losing your

3   immunity to moderate -- i.e. remove -- content that we find,

4   quote/unquote, misleading.

5       Misleading because it disagrees with the official

6   narrative.  That is a world of difference from what occurred in

7   San Francisco.

8       **THE COURT:**  I'm struggling with how so, because -- and

9   this is a little bit outside the corners of the complaint.

10  But, under *Twombly* and *Iqbal*, we don't consider complaints in a

11  vacuum.  But, you know, at various points, we all certainly

12  know -- I certainly have seen both parties threatening to take

13  away all sorts of things from groups that they have an issue

14  with.

15      And I cannot say -- and I don't think you can -- as a

16  matter of historical fact that it's Democrats alone who have

17  threatened to take away Section 230 immunity for online conduct

18  that one or another legislator didn't like.  Certainly

19  Republicans have said the same thing.

20      So, when it's a bipartisan issue like that, and at the end

21  of the day, it's just individual politicians speaking with no

22  actual consequence in terms of something coercive happening, I

23  think they are free to say what they want, and it doesn't make

24  Twitter a state actor.

25      It's just -- it's a big jump.  I'm not sure you're jumping

1    at --

2        **MS. FIALA:**  Your Honor, I believe that we already

3    have, and certainly could, upon amendment, allege more facts

4    showing coercion than any other state action case of which I am

5    aware.

6        And I'd ask the Court:  If this is not state action, does

7    that doctrine still exist?  Under what circumstances could one

8    find state action under the compulsion theory if not based on

9    the facts as alleged here?

10        **THE COURT:**  Oh, I think the cases are replete with

11    examples where state action could be found in the presence of

12    actual coercive, prosecutorial, criminal regulatory

13    consequences that have not been alleged here.

14        But if we may, Ms. Fiala, I would like to go to

15    Section 230 --

16        **MS. FIALA:**  Yes, Your Honor.

17        **THE COURT:**  -- and the constitutional challenge to

18    Section 230.

19        You know, this is a relatively recent decision that came

20    out.  Let me just get it here.  Ah.  Came out about 10 months

21    ago, April of 2021.  It is, of course, unpublished, and so it's

22    not necessarily the law of the land for the Ninth Circuit.

23        But in *Lewis v. Google*, which is at 851 Federal

24    Appendix 723, 2021, the plaintiff there brought exactly the

25    same challenge that you are alleging here to the

1   constitutionality of CDA Section 230.  The plaintiff in that

2   case, Lewis, alleged that Google had removed videos, canceled

3   advertising, sharing, and engaged in shadow banning in

4   connection with, I guess, YouTube in a way that the plaintiff

5   thought was viewpoint discriminatory.

6        So he tried to bring a constitutional challenge to

7   Section 230, and the Circuit said, plain as day, that, quote,

8   (as read):

9             "Section 230 does not apply to plaintiff's

10       conduct or provide a mechanism for sanctions that

11       could affect the plaintiff.  Instead, it provides

12       immunity to providers of interactive computer

13       services against liability arising from content

14       created by third parties.  As a result of that, the

15       plaintiff had no standing under Article III to seek a

16       declaration that Section 230 was unconstitutional."

17       As I said, it's unpublished.  The reasoning is sound, in

18   my view.  Why should I not -- why is that not the end of the

19   question for you?

20       **MS. FIALA:**  Your Honor, we agree that Section 230

21   provides no immunity for the defendants against the federal

22   claims, the First Amendment claim, that we have alleged.  But

23   we also have state law claims.  And although the defendants

24   have not yet pled an affirmative defense under Section 230, it

25   is reasonable and predictable that they will do so.

1    The state law claims, especially -- particularly the claim

2    under the Florida Stop Social Media Censorship Act, alleged

3    that by applying content moderation standards inconsistently,

4    the defendants have censored plaintiffs' speech, at the same

5    time allowing other content which is a violation of their terms

6    of service to remain on the platform.

7         THE COURT:  I may have -- I appreciate that.  And

8    you'll have a chance to talk about that.  But this is going to

9    whether you have standing -- you have challenged the

10   constitutionality of Section 230, I think; is that --

11        MS. FIALA:  Yes, Your Honor.

12        THE COURT:  So what I want to kind of focus on now is,

13   how is it, in light of *Lewis* and similar cases, you have

14   standing to bring that -- Article III standing to bring that

15   claim?

16   That's what I'm focusing on now.

17        MS. FIALA:  Yes, Your Honor.

18   The Supreme Court, in a case called *Gonzales v. Carhart*,

19   said that a preenforcement as applied challenge to a statute

20   can be maintained and that standing exists because a

21   particular -- in a discrete and well-defined instance, a

22   particular condition either has occurred or is likely to

23   concur [sic].

24   In *Blum v. Yaretsky*, one of the leading state action

25   cases, the Supreme Court said, "One does not have to wait the

1  consummation of a threatened injury" to avoid -- "to obtain

2  preventative relief."

3      The question becomes whether the perceived threat is

4  sufficiently real and immediate to show an existing

5  controversy.

6      Defendants have not waived the Section 230 immunity

7  defense, and unless they are willing to do so, it is entirely

8  predictable that if the Court dismisses the claim based on

9  standing, the very next thing the defendants are going to do is

10  to assert that claim as a defense.

11      At a minimum, Your Honor, we would ask the Court to hold

12  decision on standing in abeyance until defendants are put to

13  the test.  They either waive 230 -- I doubt very much they'll

14  do that -- or they assert it, at which point if standing -- if

15  we need that additional step to be taken for standing to exist,

16  we would clearly have standing.

17      But we are, literally, in a catch-22 at this point.  We

18  know they are going to assert 230.  I'd respectfully submit

19  that if Your Honor were to ask defendants today whether they

20  waive 230 immunity to the state law claims, they would decline

21  to do so; but they haven't done it yet.

22      We predict, as the Supreme Court said in *Gonzales v.*

23  *Carhart*, that this particular condition is likely to occur, and

24  we believe that that is sufficient at this time because the

25  affirmative defense is obvious and can be seen on the face of

1    the pleadings.

2         **THE COURT:**  Well, the point I was maybe not artfully

3    making is *Lewis* said, when in the face of an actual challenge

4    to the constitutionality by Section 230, the plaintiff, who is

5    pretty much in the same position as your client, had no

6    standing to sue.  So I don't think we have to wait on anything.

7    *Lewis* says, when it happens, it ain't going to happen.

8         So, anyway, Defendants, do you have any -- yeah.

9         **MR. CAROME:**  Yes, Your Honor.  This is a

10   straightforward question of Article III standing.

11        The only way that -- there is a path, if this case has a

12   life beyond where it is now -- which I hope it doesn't -- where

13   Section 230 might come up.

14        But three things would have to happen before that could

15   happen:  The plaintiffs would have to have stated a claim that

16   survives a motion to dismiss; the defendants would have to

17   actually elect to assert to defend the claim on that basis; and

18   then the plaintiffs, if they then argue that application of the

19   defense to that claim somehow would deprive them of a

20   constitutional right, then, as in any affirmative defense

21   situation, the Court could reach that question.

22        But, as a matter of Article III jurisdiction and just for

23   the scope of the Declaratory Judgment Act, there is no basis

24   whatsoever for the Court to just have a free run at the

25   constitutionality of a federal statute when --

**PROCEEDINGS**

```
 1          THE COURT:  I think maybe a better way of putting it
 2    is:  It's not me; it's plaintiff.  The plaintiff does not have
 3    standing to present the issue to me.  Yeah.
 4          MR. CAROME:  Correct.
 5          THE COURT:  Mr. Sur, would you want to add anything to
 6    that?
 7          MR. SUR:  Thank you, Your Honor.  If I may, just very
 8    briefly.  I'm a little bit --
 9          THE COURT:  Focusing in on -- I'm happy to hear
10    whatever you have, but I was really kind of lasering in on the
11    standing point.
12          MR. SUR:  Certainly.
13          And to that point, what I'm a little bit surprised about
14    is that I thought there were papers that there was agreement on
15    this point at this stage in the case, because, when the
16    plaintiffs responded to the United States's memo, as they did
17    relatively recently, they said there -- this is the
18    next-to-last page of that brief -- that the plaintiff agrees
19    with the U.S., that the Court need not decide the
20    constitutionality of Section 230 in the case at bar.
21          I took that sentence to have essentially solved the
22    problem as far as the very limited intervention by the United
23    States was concerned.
24          The next sentence says that, "Yet, if the statute is later
25    asserted by the defendants, the Court should invalidate it."
```

 1  That would be anticipating or questioning of constitutional

 2  law, which is contrary to the Avoidance Doctrine, among other

 3  problems, including standing.

 4      So I think that wouldn't be a course that's consistent

 5  with the precedent, Your Honor, but certainly a decision now

 6  that there is an Article III standing doesn't preclude the

 7  development of some configuration of circumstances where the

 8  plaintiff might have standing.

 9      But, as I say, I'm a little bit surprised by the

10  disagreement right now because I thought, from the papers, that

11  there was agreement that this constitutional question was --

12      **THE COURT:**  Well, it's more than entirely clear to me.

13  And I think Ms. Fiala is suggesting that it's still at issue,

14  but --

15      **MS. FIALA:**  If I may respond to that specific --

16      **THE COURT:**  Sure.

17      **MS. FIALA:**  Our intention -- and let me say in the

18  papers -- was to say that the Court did not need to decide the

19  merits of the unconstitutionality issue.

20      We were not making any concession about standing or lack

21  of standing.  But we are going to be in, literally, a catch-22.

22  I would stake my -- a significant portion of my savings on the

23  fact that if the case goes further, we're going to get a

24  Section 230 defense, and at that point, we would have had

25  standing, unless this claim has been dismissed.

1      So, again, at a minimum, I would ask Your Honor to hold in

2   abeyance the determination of standing until defendants are put

3   to the test of either pleading it or not.

4          THE COURT:   Okay.  All right.  Moving from sort of the

5   more federal points into the state issues, I don't really have

6   too much.  The papers, I thought, were quite thorough.  I don't

7   have too much to ask.

8      I just -- with respect to the Florida unfair practices

9   claim -- and the plaintiffs' claim sort of hangs on the

10  deception aspect of that statute.  The FDUPTA -- I can't figure

11  out a good way of saying that.

12         MS. FIALA:   "FDUPTA," Your Honor.

13         THE COURT:   It doesn't -- it's not musical to the ear.

14     You know, Twitter, like every social media site

15  everywhere, is pretty clear that -- in the terms of service

16  that you have to accept before you can do anything on the

17  website that the company has the right to suspend or terminate

18  accounts at any time for any or no reason, I think the terms of

19  service say.

20     With that much sunshine, how can anybody say they were in

21  the dark about Twitter's practices?

22         MS. FIALA:   Twitter does have extensive conditions for

23  content moderation which they've attached in -- to counsel's

24  declaration on the motion to dismiss, setting forth numerous

25  conditions and circumstances under which they purport to

1   moderate content.

2      What they haven't disclosed -- and this is a

3   nondisclosure-based claim.  What they haven't disclosed is that

4   they, in fact, selectively moderate or remove content based on

5   the political perspective or other perspectives, unpopular

6   perspectives, that are involved, while allowing other content,

7   for example, the Ayatollah of Iran and the Taliban, to maintain

8   Twitter accounts that, on their faces, equally violate -- or

9   not equally -- more -- much more egregiously violate the terms

10   of service.

11      So the nondisclosure at issue is the fact that the

12   content -- extensive content moderation policies are, in fact,

13   applied selectively and at the whim and discretion of Twitter.

14      Your Honor, if I may, on the Florida claims, there is one

15   point that I think is critical to the choice of law questions,

16   and I don't think it came out clearly in the briefing.

17      The Florida unfair competition Law, "FDUPTA," is

18   fundamentally different than California's Unfair Competition

19   Law.  It is a private attorney general statute.  It allows any

20   user of the service to bring a legal challenge, whether or not

21   they are personally impacted, simply for -- if they are

22   aggrieved, simply to vindicate/validate the rights of other

23   users.

24      And the courts in this Florida have held that "aggrieved"

25   literally means a person angry or sad on grounds of perceived

1  unfair treatment.

2       **THE COURT:**  Well, I think I'm good on choice of law.

3  But my point is, I'm just having a hard time seeing how any of

4  this matters if Twitter expressly says:  Before you can do

5  anything on the website, please be advised we can suspend your

6  account and do anything else we want for, quote, "any or no

7  reason at all at any time."

8       I just -- I don't see any room for anybody to say that

9  they felt deceived by having something taken down when you have

10 that broad of a scope of action.

11      **MS. FIALA:**  Twitter also says that its terms of

12 service are part of its contract with its users, and the

13 content moderation statements in its terms of service are

14 material and extensive.  And if Twitter takes that position,

15 they are, on their face, omitting to add the key fact that

16 these content moderation policies apparently are meaningless.

17 They are not what Twitter is going to apply at all.  Twitter is

18 going to be subjective.

19      Twitter is going to apply -- as Twitter recently -- a

20 couple of years ago said in a San Francisco Superior Court

21 proceeding in front of Judge Harold Kahn, to its counsel, that

22 Twitter can take someone off of its platform if it doesn't like

23 the fact that the person is a woman or gay.

24      Well, that is nowhere in their content moderation

25 policies.  If they -- not to say we can take someone off the

1    platform because the user is a woman or gay or Republican, and

2    they ought to disclose that that's a factor that they're --

3         THE COURT:  Well, I don't know anything about that

4    case.  It's interesting to hear about.  But, when Twitter says,

5    "for any or no reason," that's pretty limitless.

6         Anyway, may I hear from the defendants on this?

7         MR. HOLTZBLATT:  Thank you, Your Honor.  Ari

8    Holtzblatt.  I'll be addressing the state law claims.

9         And, if I may, let me address both the merits that

10   Your Honor raised and the choice of law briefly -- issue --

11   unless Your Honor would prefer I not.

12        THE COURT:  I think I'm good on choice of law, but I

13   would like to hear about the substantive -- I guess FDUPTA.

14        MR. HOLTZBLATT:  Of course, Your Honor.

15        As Your Honor indicated, to establish a claim under FDUPTA

16   as to establish a claim under the California UCL, which we do

17   believe should apply here, the plaintiff must establish an

18   actor or actress is, quote, "likely to deceive a consumer

19   acting reasonably in the same circumstances."

20        And a deception claim such as this one, that's sounding in

21   fraud, must satisfy Rule 9(b), which sets a heightened pleading

22   standard.

23        And both of those barriers set an impossible barrier for

24   the plaintiffs' claim for the very reason that Your Honor

25   highlighted, which is that, in the terms of service, Twitter

1  makes clear that it is not going to -- and really can't, given

2  the fire hose of information that is on the Internet and on the

3  Twitter platform -- and that makes any content moderation

4  exercise an extraordinarily difficult one; that it is not going

5  to be able to apply its content moderation policies with

6  perfect consistency.  It doesn't purport that it will.

7       And, really, the plaintiffs' claim here is predicated on

8  the notion that there is some perceived inconsistency in how

9  Twitter has carried out its policies.

10      It makes clear in the rules themselves, for example, in

11 the Glorification of Violence Policy, which is attached as

12 Exhibit B to the Sprankling declaration, or the Civic Integrity

13 Policy or the COVID Misleading Information Policy, all of which

14 are attached to the Sprankling declaration.  Twitter makes

15 clear that how it enforces its rules will, quote, "depend on

16 the severity of the violation and the account's previous

17 history of violations."  Twitter uses the terms, "we may take

18 this action."  "We may under this circumstance."

19      Twitter is making clear that it is going to have to apply

20 some discretion.  It has a large number of individuals who

21 carry out those policies.  There is going to be -- there is not

22 going to be perfect consistency, and I think that's one of the

23 reasons why, in the terms of service themselves, which were

24 also attached to the Sprankling declaration, there is the

25 language that Your Honor quoted, "We may remove content for any

1   or no reason at all."

2       And there is other language, including the statement that

3   Twitter may not -- not we are going to every time, but we may

4   take action when we determine that there has been a violation

5   that we reasonably believe violates our rules, but we also may

6   not monitor or control certain content.

7       Twitter warns users that we sometimes are going to do

8   this, and we are sometimes not go to do this.  And frankly,

9   that's just the nature of the exercise of having to moderate

10  content when you have hundreds of millions of users and, by

11  necessity, have to moderate content across a broad array.

12  Under those circumstances, no reasonable consumer would be

13  deceived by the fact that there happens to be a perceived

14  inconsistency.

15      The last point I'll make on this, Your Honor, is that, to

16  the extent that what plaintiffs are claiming is that what was

17  omitted was something having to do with Twitter carrying out

18  its moderation at the direction of or under the coercive force

19  of the Government, that really -- that the failure of that

20  claim collapses with the failure of the state action claim.

21      There is -- as my colleague, Mr. Carome, has already

22  explained, there is no plausible allegation of state action.  I

23  think, therefore, there can be no plausible allegation of

24  having omitted that Twitter was acting at the direction of the

25  state.

1    So unless Your Honor has questions about --

2         THE COURT:  You know, my other question is on that

3    Florida -- that social media statute.  I guess it's the SSMCA,

4    so I know the district court in the Northern District of

5    Florida struck it down.

6         What's the status of the appeal right now?  Do you know?

7              MR. HOLTZBLATT:  The status of what?

8         THE COURT:  To the Eleventh Circuit.

9              MR. HOLTZBLATT:  That oral argument has been

10   scheduled, and that appeal just was scheduled for April 28th.

11             THE COURT:  April 28th?

12             MR. HOLTZBLATT:  Yes.

13        THE COURT:  Okay.  All right.  Then it could be not

14   until the end of year that that comes out.  I have read the

15   decision and looked at the statute.  I'm not making any

16   findings on it right now because it's not on the books.  It's

17   been struck down.

18        But I certainly had some constitutional concerns after

19   looking at, for example, how censor -- quote/unquote, "censor"

20   is defined by the statute was awfully broad.

21        I do have just one sort of technical question.  I'm kind

22   of reluctant even to mention it because the statute has been

23   taken off the books for the moment at least.

24        A user under the SSMCA is defined as a Florida resident

25   who had an account on or after July 2021; is that right?

**PROCEEDINGS**

1          **MR. HOLTZBLATT:**  That's correct, Your Honor.

2          **THE COURT:**  Okay.  So no matter what happens, that

3    claim would be solely limited to Florida residents.

4          **MS. FIALA:**  We agree, Your Honor.  We are only -- we

5    have four -- five -- four Florida plaintiffs, including the

6    former president.  The claims are -- under that statute are

7    brought solely on their behalf at this time.

8          Your Honor, the question Your Honor has asked is a

9    fundamental question of contract interpretation.

10         **THE COURT:**  Yeah.  Which one?  Are we talking about --

11         **MS. FIALA:**  The question about Twitter can moderate

12   content for any reason, whether you're a woman; whether you're

13   gay; whether you're Republican?

14         **THE COURT:**  This is for the Deceptive Practices Act;

15   is that fair?

16         **MS. FIALA:**  Yes, Your Honor.  The SSMCA, by the way,

17   is a part of FDUPTA.

18         **THE COURT:**  Yes.

19         **MS. FIALA:**  Yes.

20         But the question you've asked, Your Honor, is a

21   fundamental question of contract interpretation.  If that

22   interpretation is correct, then all of the many pages of

23   content moderation policies that were attached to the

24   declaration submitted with the motion to dismiss are mere

25   surplusage.  They're part of the contract.  They're mere

1  surplusage.  They mean nothing, violating canons of contract

2  interpretation.

3       And I'd submit, Your Honor, that that's not a question --

4  that contract interpretation question is not one for resolution

5  without a factual record on a motion to dismiss.

6       **THE COURT:**  Well, it's an interesting point.  As a

7  matter -- it is typically the case a contract interpretation is

8  a matter of law just for the Court.  So it usually almost

9  always is done legally and often at the 12(b)(6) stage.

10      **MS. FIALA:**  Yes, Your Honor.  There may be evidence

11  going to the meaning and proper interpretation of the contract

12  provisions.  However, that's not submitted at this time and

13  might be more appropriate on summary judgment.

14      Your Honor, before we close, I do have a technical request

15  of my own, which is -- we have submitted a request for judicial

16  notice.  The materials attached to the RJN are all judicially

17  noticeable, as explained in Mr. Popovici's declaration, and

18  we'd ask the Court to grant the request so that those materials

19  are part of the record.

20      **THE COURT:**  I will take that under submission, along

21  with the motion to dismiss.  I'm not going to take any argument

22  or decide the preliminary injunction motion at this time until

23  we know that the claims are plausible on the merits.

24      You both have approved -- or both have proposed, jointly,

25  to stay discovery.  That seems fine with me.  Should we just do

 1   that?  Let's just -- in fact, can we just put everything on ice

 2   until I get my order out?  I don't see any reason why --

 3           **MS. FIALA:**  Yes, Your Honor.

 4           **THE COURT:**  You okay with that, Plaintiffs?  Yes?

 5           **MS. FIALA:**  Good.

 6           **THE COURT:**  Good?

 7       Defendants, you're okay with that?

 8           **MR. HOLTZBLATT:**  Yes, Your Honor.

 9           **THE COURT:**  Also, we can defer any alternative dispute

10   resolution as well.  I'll be happy -- you're certainly free to

11   do it, but -- you know, we have a very good program here in

12   this district.  I'm just not going to trigger it for right now.

13       Okay.  So it will take me a little bit of time to get this

14   thing done.  We have this important case -- all the cases are

15   important.  You know that.  Everybody has a stake in their

16   cases.

17       And our district filings are up 25 percent last year,

18   which is -- for this district, which is one of the busiest in

19   the country, that equates to thousands of new cases that we had

20   not had before.  Just last month, I got -- just last -- just in

21   January alone, I got 70 new cases.

22       And so I'll get it out when I can, but it won't be

23   tomorrow.  Okay?

24           **MS. FIALA:**  Thank you, Your Honor.

25           **MR. CAROME:**  Thank you, Your Honor.

1        **THE COURT:**  Just a long pitch to give the judge a

2   break.  It won't be tomorrow.  Okay.

3      Anything else from the defendants?

4        **MR. CAROME:**  I would just say one thing, Your Honor.

5   Patrick Carome.

6      On the question of amendment, I think there has been a lot

7   of time here, and Ms. Fiala has said a couple of times, "Oh,

8   there is more we could add."  I would suggest that if she isn't

9   able to identify something now as to what more there is out

10   there that's so different in kind from what we've -- has

11   already been alleged, I think it's important that we not be put

12   to the task of continuing the life of this case if there is not

13   really something more and quite different.

14        **THE COURT:**  Okay.  Ms. Fiala?

15        **MS. FIALA:**  There are extensive additional facts.

16   There are congressional hearings on this content moderation

17   policy that we did not reference in our first amended

18   complaint.  There are exhaustive factual materials submitted in

19   connection with the preliminary injunction motion, many of

20   which were not referenced in the first amended complaint.

21      I can't detail them for the Court, but --

22        **THE COURT:**  That's okay.

23        **MS. FIALA:**  -- I'd make the representation that --

24        **THE COURT:**  We don't require people to do that.  It's

25   just -- what I need to hear -- or what I'm interested in

**PROCEEDINGS**

1   hearing, I should say, is whether you have a good-faith belief

2   that there are additional facts.  And I'm hearing that you

3   believe that you do, and I will take that into account --

4            **MS. FIALA:**  Thank you, Your Honor.

5            **THE COURT:**  -- and we'll see.

6        All right.  Thanks very much, everyone.  This has been

7   very useful.  And I'll have this out when I can.

8            **MS. FIALA:**  Thank you, Your Honor.

9            **MR. CAROME:**  Thank you, Your Honor.

10           **THE CLERK:**  All rise.  Court is in recess.

11           (Proceedings adjourned at 12:00 p.m.)

12                   ---o0o---

13           **CERTIFICATE OF REPORTER**

14       I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   DATE:   Monday, July 11, 2022

18

19

20

21

22   _____
         Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
               Official Reporter, U.S. District Court

23

24

25