EXHIBIT 1

JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
FERGUSON COHEN LLP
25 Field Point Road
Greenwich, CT 06830
Tel: (203) 661-1197
Email: jqkelly@fercolaw.com

MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: mjones@ibolaw.com
Email: rtougias@ibolaw.com

ANDREI D. POPOVICI (SBN 234820)
MARIE L. FIALA (SBN 79676)
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd. Suite 290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Email: andrei@apatent.com
Email: marie@apatent.com

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM, LLC
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

RICHARD POLK LAWSON *(pro hac vice)*
GARDNER BREWER HUDSON
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Email: rlawson@gardnerbrewer.com

*Attorneys for Plaintiffs Donald J. Trump,*
*American Conservative Union, Rafael Barbosa,*
*Linda Cuadros, Dominick Latella,*
*and Wayne Allyn Root*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al., | Case No: 21-cv-08378-JD |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(2) (NEWLY DISCOVERED EVIDENCE)** |
| TWITTER, INC. et al., | |
| Defendants. | |

## **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  LEGAL STANDARD ......................................................................................... 2

III.  ARGUMENT ..................................................................................................... 4

    A.  The Newly Discovered Evidence Shows That Defendants' Content
    Moderation Was Conducted Jointly with, and at Times Compelled by, the
    Federal Government. .................................................................................... 4

        1.  The Nature of the Newly Discovered Evidence.................................... 4

            (a)  The Twitter Files. ...................................................................... 4

            (b)  The Deposition of FBI Agent Elvis Chan. ............................... 6

        2.  The Newly Discovered Evidence Existed at the Time of the Judgment.......... 6

        3.  The Newly Discovered Evidence Is Relevant and Material. .................. 6

        4.  The Newly Discovered Evidence Likely Would Have Changed the
        Judgment if Known Prior to Its Dispensation. ..................................... 7

    B.  First Amendment Limitations Apply to Private Actors Who Jointly Act with
    the Government or Act in Fear of the Government's Coercive Authority. .................. 8

        1.  Joint Action Test. ................................................................................. 9

        2.  State Compulsion Test. ......................................................................... 9

    C.  The Newly Disclosed Evidence Shows That Both the Joint Action and State
    Compulsion Tests Are Satisfied................................................................... 9

        1.  Twitter's Suppression of Plaintiffs' Speech Satisfies the Joint Action Test........... 9

        2.  Twitter's Partnership with Governmental Entities................................. 10

            (a)  Twitter Executives Received Security Clearance from FBI Officials. ........... 11

            (b)  Twitter Handled an Incredible Volume of USIC Requests for
            Censorship................................................................................. 12

        3.  Twitter's Suppression of Plaintiffs' Speech Satisfies the Compelled Action
        Test....................................................................................................... 13

            (a)  Twitter Was Financially Incentivized to Maintain its Relationship with
            the FBI...................................................................................... 14

            (b)  Congressional Pressure. ........................................................... 14

            (c)  The Government Monitored Content Topics That Encompassed
            Plaintiffs' Tweets. .................................................................... 15

        4.  The Newly Discovered Evidence Shows That Plaintiff Trump Was Not
        Removed Pursuant to a Terms of Service Violation as Alleged by
        Defendants. ........................................................................................... 16

    D.  The Court Should Grant Plaintiffs' Rule 60(b) Motion for Relief from
    Judgment. ................................................................................................... 17

        1.  The Newly Discovered Evidence Is More Than Sufficient to Justify
        Granting Plaintiffs' Rule 60(b) Motion for Relief from Judgment..................... 17

            (a)  The Judgment Is Properly Subject to Motion to a Relief from
            Judgment Under Rule 60........................................................... 17

            (b)  The Evidence Constitutes "Newly Discovered Evidence" Under Rule
            60(b). ........................................................................................ 18

    (c) No Degree of Plaintiffs' Due Diligence Would Have Uncovered the Newly Discovered Evidence Prior to Entry of the Judgment. ........................ 18

    (d) The Newly Discovered Evidence Likely Would Have Changed the Dispensation of the Judgment if It Had Been Presented Prior to the Judgment. ..................................................................................................... 18

   2. The Newly Discovered Material Could Not Have Been Discovered in Time to Move for a New Trial Under Rule 59(b). ................................................ 19

IV. CONCLUSION ............................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*A.H. v. West Contra Costa Unified Sch. Dist.*,
No. 22-cv-03233, 2022 U.S. Dist. LEXIS 233744 (N.D. Cal. Dec. 30, 2022) ........................ 3

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ............................................................................................................. 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 3, 19

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................................................................. 15

*Bell Atl. Corp v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 3, 19

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ............................................................................................................. 9

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) .......................................................................................................... 8, 9

*Brunette v. Humane Society*,
294 F.3d 1205 (9th Cir. 2002) ............................................................................................. 9

*Burton v. Wilmington Parking Authority*,
365 U.S. 715 (1961) ............................................................................................................. 8

*Coastal Transfer Co. v. Toyota Motor Sales*,
833 F.2d 208 (9th Cir.1987) ................................................................................................ 3

*Defenders of Wildlife v. Bernal*,
204 F.3d 920 (9th Cir. 2000) ............................................................................................... 3

*Dennis v. Sparks*,
449 U.S. 24 (1980) ............................................................................................................... 9

*Far Out Prods. v. Oskar*,
247 F.3d 986 (9th Cir. 2001) ............................................................................................... 3

*Feature Realty, Inc. v. City of Spokane*,
331 F.3d 1082 (9th Cir.2003) .............................................................................................. 3

*George v. Pac.-CSC Work Furlough*,
91 F.3d 1227 (9th Cir. 1996) ............................................................................................... 9

*Gorenc v. Salt River Project Agric. Improvement & Power Dist.*,
869 F.2d 503 (9th Cir. 1989) ............................................................................................... 9

*Herring Networks, Inc., v. Maddow*,
8 F.4th 1148 (9th Cir. 2021) ............................................................................................... 7

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ............................................................................................... 6

*Jones v. Aero/Chem Corp.*,

921 F.2d 875 (9th Cir.1990)........................................................................ 3

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) ................................................................................. 8

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972) ................................................................................. 8

*Morongo Band of Mission Indians v. Rose*,
893 F.2d 1074 (9th Cir. 1990)................................................................. 7

*Nevitt v. U.S.*,
886 F.2d 1187 (9th Cir. 1989)................................................................. 3

*O'Handley v. Weber*,
No. 22-15071, 2023 U.S. App. LEXIS 5729 (9th Cir. Mar. 10, 2023)........................ 7, 13, 15

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001)................................................................. 7

*Ping Shun Corp. v. Imperial Pac. Int'l Cnmi, LLC*,
No. 21-15836, 2022 U.S. App. LEXIS 20051 (9th Cir. July 20, 2022)................... 6

*Rawson v. Recovery Innovations, Inc.*,
975 F.3d 742 (9th Cir. 2020)................................................................. 9

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) ................................................................................. 9

*Simmons v. California*,
No. 95-16954, 1997 U.S. App. LEXIS (9th Cir. Aug. 25, 1997) ........................... 3

*United States v. Harrington*,
410 F.3d 598 (9th Cir. 2005)................................................................. 3

*United States v. Kulczyk*,
931 F.2d 542 (9th Cir. 1991)................................................................. 3

*Wallis v. J.R. Simplot Co.*,
26 F.3d 885 (9th Cir. 1994)................................................................. 3

**Other Authorities**

Wilson R. Huhn, *The State Action Doctrine and the Principle of Democratic Choice*,
34 Hofstra L. Rev. 1379 (2005) ............................................................. 10

**Rules**

Fed. R. Civ. P. 12 ................................................................................. 15

Fed. R. Civ. P. 15 ................................................................................. 8, 20

Fed. R. Civ. P. 54 ................................................................................. 19

Fed. R. Civ. P. 59 ................................................................................. 2, 3, 21

Fed. R. Civ. P. 60 ................................................................................. passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

After the entry of this Court's Judgment, on June 6, 2022 (the "Judgment"), J., 1. ECF 168, two extraordinary events unearthed troves of new evidence supporting Plaintiffs' claim for relief.  Because much of this evidence comes from Defendants' own files and was not otherwise available, its disclosure merits granting Plaintiffs relief from the Judgment pursuant to Rule 60(b)(2) of the Federal Rules of Civil Procedure ("Rule 60").

First, Defendant Twitter was privately acquired by Elon Musk, who became its CEO. Musk granted unlimited access to Twitter's internal files and authorized a series of exposés showing that, since 2016, Twitter maintained a cooperative (and at times compelled) relationship with the FBI, CIA, DHS, and the Office of the Director of National Intelligence ("ODNI") (collectively, the United States Intelligence Community or "USIC").  These exposés, known as the Twitter Files, were published on Twitter in a series of installments beginning in December 2022.  The Twitter Files reveal that the USIC, along with members of Congress and congressional staffers, collaborated with, and sometimes bullied, Twitter into censoring content, regardless of whether it violated Twitter's terms of service and, indeed, even when Twitter believed it was *not* violating its terms of service.  This was pure censorship of viewpoints the government did not approve of—the most objectionable kind of censorship under long-established First Amendment law.

Second, in November of 2022, long after this Court entered its Judgment, the Attorneys General of Louisiana and Missouri deposed the FBI's social media-industry liaison – Assistant Special Agent in Charge Elvis Chan.  The deposition took place in an action brought by the Attorneys General in a lawsuit against 67 government defendants for coercing or colluding with social media platforms to suppress disfavored speakers and viewpoints. In this deposition, Chan further corroborates the heavy-handed influence of the USIC on Twitter's content moderation decisions.

1
2       Both sets of disclosures confirm the state action allegations in Plaintiffs' Amended

3   Complaint.  The newly discovered evidence was unknown and unknowable to the Plaintiffs until

4   after the Judgment was entered.  Moreover, this evidence could and would have been discovered

5   had this Court denied Defendants' Motion to Dismiss.  Rule 60 authorizes this Court to grant

6   relief from a final judgment based on "newly discovered evidence that, with reasonable diligence,

7   could not have been discovered in time to move for a new trial under Rule 59(b)."  This new

8   evidence was disclosed well after the 28-day window available for a Rule 59 new-trial motion.

9   Fed. R. Civ. P. 59(b).

10      The Rule 60 motion speaks to key points addressed by the Court in its order granting the

11  Motion to Dismiss ("Order").  For example, the Court held that the Plaintiffs had failed to plead

12  sufficient facts supporting their allegations that the actions of the Defendants can be deemed

13  actions of the government.  Order, 3, Dkt. 165.  The newly discovered evidence shows that

14
15  members of the executive and legislative branches, working in cooperation with each other,

16  pressured and urged the Defendants to censor disfavored speakers such as the Plaintiffs, and that

17  as a result Plaintiffs' First Amendment rights were violated.  If uncovered prior to the Judgment,

18  the newly discovered evidence would have undoubtedly satisfied the Court's concerns about the

19  sufficiency of the Plaintiffs' allegations.  The newly discovered evidence, taken together with the

20  allegations in Plaintiff's First Amended Complaint, and accepted as true for the purposes of a

21  motion to dismiss, justifies relief from the Judgment.  If the Court were to grant this Rule 60

22
23  motion the Plaintiffs would seek leave to file a Second Amended Complaint incorporating these

24  new facts.

25  **II.     LEGAL STANDARD**

26      Under Rule 60(b)(2), a "court may relieve a party or its legal representative from a final

27  Judgment, order, or proceeding for . . . newly discovered evidence that, with reasonable diligence,

28  could not have been discovered in time to move for a new trial under Rule 59(b) . . . ."  Fed. R.

Civ. P. 60(b)(2).  The Ninth Circuit has extrapolated this into a three-part test:

> Relief from Judgment on the basis of newly discovered evidence is warranted if (1) the moving party can show the evidence relied on in fact constitutes "newly discovered evidence" within the meaning of Rule 60(b); (2) the moving party exercised due diligence to discover the evidence; and (3) the newly discovered evidence must be of "such magnitude that production of it earlier would have been likely to change the disposition of the case."

*Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir.2003) (quoting *Coastal Transfer Co. v. Toyota Motor Sales*, 833 F.2d 208, 211 (9th Cir.1987)).  A motion under Rule 60(b) "must be made within a reasonable time and . . . no more than a year after the entry of the judgment or order or the date of the proceeding."  Fed. R. Civ. P. 60(c)(1). *See also Nevitt v. U.S.*, 886 F.2d 1187, 1188 (9th Cir. 1989).

For evidence to be newly discovered within the meaning of Rule 60(b) it must "exist[] at the time of the trial," *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir.1990); *Simmons v. California*, No. 95-16954, 1997 U.S. App. LEXIS at *5 (9th Cir. Aug. 25, 1997); and it must be "discovered after trial" and neither "cumulative nor merely impeaching," *Far Out Prods. v. Oskar*, 247 F.3d 986, 993 (9th Cir. 2001) (citing *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 929 (9th Cir. 2000)).  The evidence cannot have been in the moving party's possession or discoverable by it with due diligence.  *Feature Realty*, 331 F.3d at 1093; *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 892 (9th Cir. 1994).  Additionally, it must be "material to the issues at trial . . . ."  *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005) (quoting *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991)).

As the Judgment was entered in response to the Defendants' Motion to Dismiss, materiality is determined under the motion-to-dismiss standard, where claims are evaluated by accepting the allegations as true.  *See Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *A.H. v. West Contra Costa Unified Sch. Dist.*, No. 22-cv-03233, 2022 U.S. Dist. LEXIS 233744, at *3-4 (N.D. Cal. Dec. 30, 2022) ("A claim is

plausible on its face if, accepting all the factual allegations as true and construing them in the light most favorable to the plaintiff, the Court can reasonably infer that the defendant is liable for the misconduct alleged.")

## III.    ARGUMENT

### A.    The Newly Discovered Evidence Shows That Defendants' Content Moderation Was Conducted Jointly with, and at Times Compelled by, the Federal Government.

#### 1.    The Nature of the Newly Discovered Evidence.

##### (a)    The Twitter Files.

On or about October 27, 2022, Elon Musk officially acquired sole possession of Twitter, celebrating the event with a statement on the platform reading: "the bird is free." (Declaration of Richard P. Lawson, dated April 28, 2023, ("Lawson Decl.") annexed hereto as Exhibit A, ¶ 4). Musk has served as Twitter's CEO since the acquisition. (*Id*. ¶ 5). In statements principally made through his personal Twitter account, Musk announced that a series of exposés he termed "The Twitter Files on free speech suppression" were "to be published on Twitter itself." (*Id*. ¶ 6).

Each installment of the Twitter Files is presented as a series of posts (known as a thread) by a specific reporter. The first installment explained that the exposés were based on thousands of internal Twitter documents. (*Id*. ¶ 7). Since then, at least sixteen additional installments have been published. Of Twitter File materials cited herein, Musk has personally promoted or endorsed each of the Twitter File threads referenced in this motion through his personal Twitter account. (*Id*. ¶¶ 8-20, 70).

For example:

- The first installment detailed how Twitter "handled" tweets flagged for content moderation review "from the Biden team." When a user commented on that portion of the Twitter Files, Musk replied: "If this isn't a violation of the Constitution's First Amendment, what is?" (*Id*. ¶ 21).

- After the conclusion of the first installment, Musk tweeted:  "Tune in for Episode 2 of the Twitter Files tomorrow!"  (*Id*. ¶ 22).

- When a Twitter user referenced a post from a later installment of the Twitter Files, stating that the "the government was in constant contact" with Twitter and other social media platforms, Musk replied ". . . *Every* social media company is engaged in heavy censorship, with significant involvement of and, at time, explicit direction of the government . . . ."  (*Id*. ¶23).

- Responding to a Twitter user's tweet asking "**[W]ere any political candidates**—either in the US or elsewhere—**subject to shadowbanning** while they were running for office or seeking re-election?," Musk tweeted "**Yes.**"  (*Id*. ¶ 24) (emphasis added).

- Responding to a Twitter user's tweet stating "Yoel Roth [Twitter's Head of Trust & Safety], meeting with FBI weekly, and his little censorship minions absolutely degraded Twitter into little more than a full-on Democratic Party activist machine, all while lying to the public about its function," Mr. Musk tweeted "**There is no question that Twitter operated as a Democratic Party activist machine.**"  (*Id*. ¶ 25) (emphasis added).

- Responding to a Twitter user's tweet stating "@Twitter Files show Twitter activist employees, without basis, suppressed and censored the President of the United States … in the days before the 2020 election.  **This is damning evidence of election interference**," Mr. Musk tweeted, "**Unequivocally true.  The evidence is clear and voluminous.**"  (*Id*. ¶ 26) (emphasis added).

As Mr. Musk is Twitter's owner and CEO, these statements are therefore binding on Twitter.  "[A] statement made by a party's agent or servant may be introduced against that party if

1
2
3

it concerns a matter within the scope of the agency or employment and was made during the existence of the relationship." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 458 (9th Cir. 1990).

4

### (b)     The Deposition of FBI Agent Elvis Chan.

5
6
7
8
9
10
11
12
13

On November 29, 2022, the Attorneys General of Louisiana and Missouri deposed FBI Agent Elvis Chan.  *See State of Missouri, et al., v. Joseph R. Biden, et al.*, No. 22-cv-1213-TAD-KDM (W.D. La.) 27, ECF 90 (Oct. 21, 2022).  At all times relevant to Plaintiffs' claim, Agent Chan was assigned to the FBI's San Francisco field office and served as the FBI's liaison to the social media industry, including Twitter.  (*Id.* ¶ 27a).  His sworn testimony reinforces the relationship between Twitter and the USIC described within the Twitter Files.  He also explained that, in addition to the pressure placed on social media platforms during congressional hearings, congressional staff made numerous field visits to the companies.

14
15
16
17
18
19

### 2.     The Newly Discovered Evidence Existed at the Time of the Judgment.

While the publication of the Twitter Files and deposition of Elvis Chan occurred after the entry of the Judgment, they detail events and documents that predate the Judgment; all evidence referred herein describes events that took place on or before the entry of the Judgment on June 6, 2022.

20

### 3.     The Newly Discovered Evidence Is Relevant and Material.

21
22
23
24
25
26
27
28

Insofar as Rule 60 requires the evidence presented to be admissible, *see Ping Shun Corp. v. Imperial Pac. Int'l Cnmi, LLC*, No. 21-15836, 2022 U.S. App. LEXIS 20051, at *3 (9th Cir. July 20, 2022), the newly discovered evidence qualifies.  The deposition of Agent Chan is sworn under penalty of perjury, while the Twitter Files have been endorsed, adopted, and promoted by Defendant Twitter's CEO, Elon Musk, on his personal Twitter account.  And the relevance of this evidence to the Plaintiffs' allegations is manifest.  It outlines the deeply rooted nature of collaboration and coercion exerted by the USIC and Congress on Twitter's content moderation

decisions.  This includes entrenched involvement in censorship decisions, deplatforming,

blacklisting, shadow banning, content flagging and other censorship of Plaintiffs' speech.

### 4.   The Newly Discovered Evidence Likely Would Have Changed the Judgment if Known Prior to Its Dispensation.

The newly discovered evidence is of such an extraordinary character that it easily meets

the threshold for leave to amend under Rule 15.  Fed. R. Civ. P. 15(a)(2); *see also Herring*

*Networks, Inc., v. Maddow*, 8 F.4th 1148, 1160-61 (9th Cir. 2021) ("Federal Rule of Civil

Procedure 15(a)(2) provides that the district court should 'freely give leave when justice so

requires.'  We have previously 'stated that "this policy is to be applied with extreme

liberality."'" *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir.

2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.

1990))).   The newly discovered evidence presents a fundamental change in circumstances:

Defendant Twitter has publicly admitted through its owner-CEO that the USIC was deeply

involved in the company's content moderation scheme and has provided documentation of this

conduct.  The USIC promoted censorship of content like that posted by Plaintiffs.  Importantly, as

to Plaintiff Trump, the Twitter Files show his suspension was not made pursuant to Twitter's

Terms of Service, as Twitter falsely claimed.  Unlike the situation in *O'Handley v. Weber*, No.

22-15071, 2023 U.S. App. LEXIS 5729 (9th Cir. Mar. 10, 2023), where Twitter passively

received information from California and acted on it at its discretion, the newly disclosed

evidence shows that Twitter met with federal agents on a regular basis, Twitter reported back to

its federal handlers as to what actions it had taken in response to the government's censorship

requests, the FBI paid Twitter millions of dollars for doing this work, the FBI offered Twitter

executives security clearances, and the Biden White House was "very angry" that Twitter was not

doing more to comply with the Administration's censorship requests. *See infra* at 16.  This

significantly undermines Twitter's defense that its actions against Plaintiffs were taken solely

1    pursuant to its content moderation policies.

2         If the newly discovered evidence had been disclosed by Twitter prior to the Judgment,

3    Plaintiffs would have moved for leave to amend the complaint.  Combined with the allegations in

4    the current First Amended Complaint, the newly discovered evidence would have presented

5    sufficient allegations to survive Defendant's Motion to Dismiss.

6         **B.    First Amendment Limitations Apply to Private Actors Who Jointly Act with
7              the Government or Act in Fear of the Government's Coercive Authority.**

8         First Amendment limitations do not apply to private actors but, like other constitutional

9    provisions, they can be asserted against private entities where "there is a sufficiently close nexus

10   between the State and the challenged action of the regulated entity so that the action of the latter

11   may be fairly treated as that of the State itself."  *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176

12   (1972).  The "sufficiently close nexus" is known as the "state actor" requirement.  While several

13   tests exist for meeting the state actor requirement, the Supreme Court has emphasized that "only

14   by sifting facts and weighing circumstances can the nonobvious involvement of the State in

15   private conduct be attributed its true significance."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922,

16   939 (1982) (quoting *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961)).

17         Notably, the state actor tests are disjunctive; where the elements of any test are satisfied,

18   the private entities actions may be fairly attributed to the state and subject to constitutional

19   limitations.  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 302 (2001)

20   (explaining that a finding of state action under the "entwinement" test was "in no sense unsettled

21   merely because other criteria of state action may not be satisfied by the same facts").  *See also*

22   Wilson R. Huhn, *The State Action Doctrine and the Principle of Democratic Choice*, 34 Hofstra

23   L. Rev. 1379, 1391-92 (2005).  Here, the newly disclosed evidence satisfies both the Joint Action

24   and State Compulsion tests.

### 1.    Joint Action Test.

The Joint Action Test asks whether the State has so far inserted itself into the conduct of a private actor that there is interdependence between the two so that the state itself is a participant in the activity. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Dennis v. Sparks*, 449 U.S. 24, 27 (1980); *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989). The test is satisfied when the State "significantly involves itself in the private parties' actions and decisionmaking" in a "complex and deeply intertwined process." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020). It also occurs where there is a "symbiotic relationship" between government and the private party, *Brunette v. Humane Society*, 294 F.3d 1205, 1210 (9th Cir. 2002); the private entity is "entwined with governmental policies," *Brentwood*, 531 U.S. at 296; government has "authorized or approved the private parties' actions," *Rawson*, 975 F.3d at 754-55; or the private action "received clear state imprimatur." *Id*.

### 2.    State Compulsion Test.

A private entity's actions are subject to First Amendment limitations whenever those actions are sufficiently compelled by a governmental body such that the actions may be properly deemed to be actions of the state. This test is satisfied whenever a state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982). *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *George v. Pac.-CSC Work Furlough*, 91 F.3d 1227, 1232 (9th Cir. 1996); *Gorenc*, 869 F.2d at 508.

### C.    The Newly Disclosed Evidence Shows That Both the Joint Action and State Compulsion Tests Are Satisfied.

#### 1.    Twitter's Suppression of Plaintiffs' Speech Satisfies the Joint Action Test.

The joint-action test examines the degree of governmental participation in private action

and asks whether the state has so intertwined itself with the private entity that the state must be recognized as a joint participant in the private action.  Here, the newly discovered evidence shows that (1) Twitter executives regularly met with, consulted with, and took direction from governmental entities in what Twitter executives described as a "partnership;" (2) Twitter executives were offered security clearances by FBI officials; (3) Twitter handled an incredible volume of USIC requests for censorship; (4) Twitter was paid millions of dollars for its efforts; and (5) when the Biden White house was not satisfied with Twitter's compliance, it summoned Twitter's Head of U.S. Public Policy to a meeting she described as "very angry in nature" to urge Twitter to do more censorship.  *See infra* at16.

## 2.    Twitter's Partnership with Governmental Entities.

The depth of Twitter's relationship with the USIC is evinced by the frequency of meetings and communications between company executives and governmental entities.  According to Chan's Deposition, a unit of DHS, the Cybersecurity and Information Security Agency ("CISA"), invited him to participate in industry working group meetings.  These meetings were attended by executives from Twitter and other social media companies, the FBI's Foreign Influence Task Force ("FITF"), DHS's Intelligence and Analysis department, and ODNI.  (*Id*. ¶ 27b).  In these meetings, government agents described what the USIC considered problematic content being distributed on social media platforms – preemptively flagging categories of state-disfavored speech.  (*Id*. ¶ 27c).

In the months preceding the 2020 election meetings between the FBI, the broader USIC, and Twitter executives occurred on a weekly basis.  (*Id*. ¶¶ 27d, 28).  Weekly meetings were not the full scope of this relationship.  According to the Twitter Files, Twitter executives were also meeting with federal enforcement and intelligence agencies about moderation of election related content, (*id*. ¶ 29), and between "January 2020 and November 2022, there were over 150 emails between the FBI and former Twitter Trust and safety Chief Yoel Roth," (*id*. ¶ 30).  Twitter

developed dedicated channels of communication between the USIG and its content moderation team.  These emails contained numerous requests by the FBI for Twitter to act on election misinformation, even involving tweets from parody accounts with relatively low numbers of followers.  (*Id*. ¶ 31).

Twitter executives were aware of the sensitive state-based nature of their dealings with the USIC.  According to the Twitter Files, "Chan [FBI] & Roth [Twitter's head of Trust and Safety] had set up an encrypted messaging network so employees from FBI & Twitter could communicate." (*Id*. ¶ 32).  Chan and Roth also worked together to "create a 'virtual war room' for 'all of the [Internet] industry plus FBI and ODNI."  (*Id*. ¶ 32).

Twitter recognized its relationship with the federal government as a "partnership."  For example, a draft news release circulated within Twitter stated that it fights misinformation by engaging in "human review and **partnerships with outside experts?*," (*Id*. ¶ 33), Commenting on the draft, Twitter Policy Director Nick Pickles asked "if they could 'just say "partnerships"[']" clarifying that he was "not sure we'd describe the FBI/DHS as experts, or some NGOs that aren't academic," (*Id*. ¶ 34).

### (a)    Twitter Executives Received Security Clearance from FBI Officials.

The USIC deepened its relationship with Twitter by offering its executives security clearances.  According to the Twitter Files, in July 2020, Chan offered security clearances to Twitter executives so that the FBI could share information about threats to the upcoming elections.  (*Id*. ¶ 35).  In the lead up to the 2020 election Twitter's legal executive Stacia Cardille held weekly meetings with the USIC, (*id*. ¶ 36), and informed Twitter's management that the "FBI was adamant no impediments to sharing [classified data with Twitter] exist," (*id*. ¶ 37).

The FBI also took advantage of its numerous alumni working at Twitter.  Prior to joining Twitter as Deputy General Counsel in July 2020, Jim Baker served as the FBI's General Counsel

from 2014 to 2017.  (*Id*. ¶ 38).  In September 2020, the FBI requested the opportunity to provide

"a classified briefing for Jim [Baker]" without the presence of other Twitter staff.  (*Id*. ¶ 39).  A

month later, on the very day that the *New York Post* released its stories regarding the Hunter

Biden Laptop, Baker, spoke with the FBI's General Counsel's Office.  (*Id*. ¶ 40).  Internally at

Twitter, Baker urged suppression of the story.  (*Id*. ¶ 41).  Twitter staff, however, quickly began

to question any basis for the suppression under Twitter's policies.  Twitter communications

official Trenton Kennedy messaged Roth and General Counsel Gadde stating, "I'm

struggling to understand the policy basis for marking this as unsafe."  (*Id*. ¶ 42).

Nevertheless, the story was banned from Twitter.

**(b)**     **Twitter Handled an Incredible Volume of USIC Requests for Censorship.**

Twitter's relationship with the FBI deepened as more and more members of the USIC

attempted to influence the company's practices.  The intertwined nature grew so extensive that, in

a rather unfortunate turn of phrase, the FBI offered to be the "belly button" for all of Twitter's

government interactions.  (*Id*. ¶ 43).  As the election approached in 2020, the FITF/FBI inundated

Twitter with requests for content moderation containing lists of hundreds of flagged accounts.

(*Id*. ¶ 44).  For example, on November 3, 2020, Twitter's legal executive Stacia Cardille sent an

internal email disseminating a "report of 207 Tweets" flagged by the FBI for potential content

moderation.  (*Id*. ¶ 44).  Twitter officials understood that the FBI had dedicated teams "in the

Baltimore field office and at [FBI] HQ that are just doing keyword searches for violations [of the

Twitter TOS]." (*Id*. ¶ 45).

The quantity of USIC requests became so voluminous that Twitter staffers were obliged to

develop internal processes to handle them.  (*Id*. ¶ 47).  In one email from an FBI representative to

a Twitter employee, the FBI representative even expressed regret for the volume, saying: "I

apologize in advance for adding to your workload."  (*Id*. ¶ 47).  The FBI eventually resorted to

paying Twitter millions of dollars for the staff Time Twitter expended in handling the government's censorship requests.  (*Id*. ¶ 48).

The requests came from many sectors of the USIC, and from other agencies such as the State Department, the Pentagon, and CIA.  (*Id.* ¶ 49).  Another particularly egregious offender was the Global Engagement Center, an arm of the State Department. (*Id*. ¶ 50).  As Musk stated, this one "US govt agency demanded suspension of 250k accounts, including Journalists & Canadian officials."  (*Id.* ¶ 19)

Twitter also took requests for content moderation from the Senate Intel Committee ("SSCI"), (*id*. ¶ 51), and began escalating content moderation requests from the Treasury Department, the National Security Agency, the Department of Health and Human Services, the Department of Homeland Security, and other federal agencies,  (*id.* ¶ 52).  And, unlike the situation in *O'Handley*, where Twitter maintained "an arm's-length relationship" with California, 2023 U.S. App. LEXIS 5729, at *20, the continuous stream of meetings, cascade of emails, impatient requests for immediate action, payment of large sums of money, "very angry" White House meetings and according security clearances to Twitter executives all document an undeniable collaborative relationship between the federal government and Twitter.

### 3.    Twitter's Suppression of Plaintiffs' Speech Satisfies the Compelled Action Test.

This Court granted Defendants' 12(b)(6) motion in large part based on the facts that the evidence that Plaintiffs were unable to identify "a concrete and specific government action, or threatened action . . . ."  Order, 11, Dkt. 165.  Similarly, in *O'Handley*, the Ninth Circuit noted that the California agency that had flagged plaintiff's tweets for censorship had "no enforcement power over Twitter2023 U.S. App. LEXIS 5729, at *20.  The new evidence disclosed since the Court's ruling paints a far different picture.  Importantly, the agency spearheading the government's censorship effort was the FBI, working in close cooperation with other law

enforcement agencies.  The FBI's mission is to investigate violations of federal law, which includes "[p]rotect[ing] the U.S. from terrorist attack," "[c]ombat[ing] significant cyber-criminal activity" and "[c]ombat[ing] transnational criminal enterprises."  (*Id*. ¶ 53).  A private party confronted with repeated, insistent and very specific requests from the federal government's premier law enforcement agency would feel compelled to collaborate lest it be suspected and perhaps prosecuted for abetting the unlawful conduct the law enforcement agency was tasked with combatting.  A suggestion from a state agency with no enforcement powers might reasonably be viewed as an arms-length request; an avalanche of requests from an agency with the power to make arrests would reasonably be viewed as commands.  And. if that weren't clear enough, being called on the White House carpet for "very angry" meetings for failing to be sufficiently compliant would have left no doubt that the government was making demands, not merely providing information.

### (a)  Twitter Was Financially Incentivized to Maintain its Relationship with the FBI.

As mentioned above, Twitter handled incredible volumes of USIC censorship requests.  In an internal communication immediately following the 2020 election, Twitter staff congratulated themselves on processing the workload, saying, "thank you all so much for your help.  A monumental undertaking."  (*Id*. ¶ 54).  The volume is also demonstrated by the FBI's compensation of Twitter for responding to its requests.  Between October 2019, and February 2021, the FBI paid Twitter $3,415,323.00 for its efforts.  (*Id*. ¶ 45).

### (b)  Congressional Pressure.

The newly discovered evidence provides crucial context for the congressional hearings alleged in the Amended Complaint.  Twitter also faced field visits from the staff of congressional committees overseeing the social media industry.  FBI Agent Chan testified that these meetings were very intense for social media staff: "[T]hey [social media personnel] would not reveal the

types of discussions that they had with these House and Senate staffers, they would indicate that they had to prepare very thoroughly for these types of meetings and that it was - - they indicated that it felt like a lot of pressure." (*Id*. ¶ 27e).  This is in stark contrast to the passive transmission of information in *O'Handley* and reminiscent of what this Court characterized as "a state commission sending local police officers for drop-in visits" to booksellers in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).  Order, 11, Dkt. 165.

This new evidence contradicts assertions by the Defendants before this Court.  For example, in Defendants' Reply in Support of Motion to Dismiss, they reasserted a quote by Defendant Dorsey stating, "Twitter *does not coordinate* with other entities when making content moderation decisions."  Dkt. 147, pg. 10, ln. 7-9 (emphasis in the original).  Yet, as disclosed above, Twitter regularly coordinated with multiple elements of the USIC in its content moderation process.  From creating dedicated channels of communication with the FBI to handling personalized requests for censorship from members of Congress, to angry White House meetings, a significant portion of Twitter's contention moderation was indeed coordinating with, and sometimes knuckling under to pressure from, elements of the U.S. government.

### (c) The Government Monitored Content Topics That Encompassed Plaintiffs' Tweets.

Plaintiffs Cuadros and Root had their Twitter accounts suspended or revoked due to Covid-19 content.  J. at 6:22-27.  As the Twitter Files show, the federal government maintained regular meetings with Twitter regarding Covid-19 during both the Trump and Biden administrations.  (*Id*. ¶¶ 56, 57).  After the transition of power, the Biden White House focused its attention on vaccine information and high-profile anti-vaccine accounts on Twitter.  (*Id*. ¶ 57).  The Biden administration meetings even went so far as to highlight particular users on Twitter's platform that the government disfavored.  (*Id*. ¶¶ 57, 58).  Notably, one of these highlighted users had his account suspended from Twitter hours after President Biden blamed social media

companies for "killing people" by allowing certain vaccine related posts on their platform.  (*Id*. ¶ 59).  In December 2022, Twitter's Head of U.S. Public Policy drafted a summary of the company's meetings with the Biden White House describing how "the Biden Team was not satisfied with Twitter's enforcement approach, as they wanted Twitter to do more and to deplatform several accounts," further describing the team as "very angry in nature."  (*Id*. ¶ 60, 61).  The Twitter Files also show that Twitter moderated content that conflicted with the official positions of the White House.  (*Id*. ¶ 62).

> **4.  The Newly Discovered Evidence Shows That Plaintiff Trump Was Not Removed Pursuant to a Terms of Service Violation as Alleged by Defendants.**

In their previous filings, Defendants repeatedly asserted that the removal of Plaintiff Trump was based solely on the violation of the company's Terms of Service (the "Rules").  The very first line in Defendants' Motion to Dismiss argument articulates the core of their argument, stating that, "Plaintiffs—like all Twitter account holders—agreed to abide by Twitter's Rules, and yet proceed to repeatedly violate those rules."  Dkt. 138, pg. 6, ln. 11-12.  Following on Twitter's argument that its actions were guided by Twitter's rules rather than government direction, the Court stated in its Order that Twitter's "explanations indicate that Twitter acted in response to specific factors for each account, and not pursuant to a state rule of decision."  Dkt. 165, pg. 7, ln. 1-2.  Regarding Plaintiff Trump's permanent suspension on January 8, 2021, following his two Tweets from that morning, the Motion to Dismiss continued:  "After assessing the language in these Tweets against our Glorification of Violence policy, we have determined that these Tweets are in violation of the Glorification of Violence Policy and the user @realDonaldTrump should be immediately permanently suspended from the service."  Dkt. 138-12, pg. 2, Sprankling Decl. Ex. K.  Defendants reasserted this argument in other filings as well.  In their Opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants argued that "Twitter decided to remove Mr. Trump's account because it concluded that he had violated its own Rules . . . ."  Dkt. 139, pg. 30,

ln. 1-2.

The Twitter Files reveal that Plaintiff Trump's tweets, in fact, complied with Twitter's Rules.  After the tweets were posted, they were reviewed by several members of Twitter's content moderation team who stated:  (1) "As an FYI, safety has assessed the DJT Tweet above and determined that there is no violation of our policies at this time," (*id*. ¶¶ 63, 64); (2) "It's a clear no vio[lation].  It's just to say he's not attending the inauguration," (*id*. ¶ 65); (3) "I think we'd have a hard time saying this is incitement," (*id*. ¶ 66); (4) "Don't see an incitement angle here," (*id*. ¶ 67); (5) "I also am not seeing clear or coded incitement in the DJT tweet," (*id*. ¶ 64); (6) "It's pretty clear he's saying the 'American Patriots' are the ones who voted for him and not the terrorists (we can call them that, right?) from Wednesday," (*id*. ¶ 68).  In short, the content moderation team at Twitter acknowledged that Plaintiff Trump's tweets that morning do not violate Twitter's Rules.  Twitter was aware of these statements, as they come directly from its files, but it did not disclose them to Plaintiffs or to this Court.  Instead, it presented a false declaration stating precisely the opposite.  Because Plaintiffs were denied discovery, they had no access to Twitter's files, so had no way to contradict Twitter's sworn statement.  Defendants should not be allowed to profit from their lack of candor.

**D.    The Court Should Grant Plaintiffs' Rule 60(b) Motion for Relief from Judgment.**

**1.    The Newly Discovered Evidence Is More Than Sufficient to Justify Granting Plaintiffs' Rule 60(b) Motion for Relief from Judgment.**

**(a)    The Judgment Is Properly Subject to Motion to a Relief from Judgment Under Rule 60.**

By its language, Rule 60 provides a mechanism for relief from a final judgment.  Fed. R. Civ. P. 60(b) ("Grounds for relief from a Final Judgment, Order, or Proceeding").  Rule 54 provides that a "'[j]udgment' as used in these rules includes a decree and any order from which an appeal lies." Fed. R. Civ. P. 54(a).

(b)     **The Evidence Constitutes "Newly Discovered Evidence" Under Rule 60(b).**

The newly disclosed evidence presented herein is not merely impeaching or cumulative but is substantially material to Plaintiffs' claims.  Neither the Plaintiffs' Complaint nor the First Amended Complaint reference the FBI; this agency's (and other executive agencies') role was simply unknown to Plaintiffs.  *See* Compl., ECF 1; First Amend. Compl., ECF 21.  The newly disclosed evidence reveals a deeply rooted relationship between the FBI and Twitter's content moderation team, and reveals an entirely new facet of Plaintiffs' First Amendment claims.

(c)     **No Degree of Plaintiffs' Due Diligence Would Have Uncovered the Newly Discovered Evidence Prior to Entry of the Judgment.**

At no time did Plaintiff have any means or mechanism by which to uncover or discover any of the evidence revealed through the Twitter Files and Agent Chan's deposition.  By their own language, the Twitter Files are "based upon thousands of internal documents obtained by sources at Twitter."  (*Id.* ¶ 7).  At the motion to dismiss stage, Plaintiff could not rely on compulsory discovery to uncover these internal documents.  The documents came to light as a result of Mr. Musk's unprecedented decision to open up Twitter's internal files to the world.  Likewise, Plaintiff had no means to compel FBI Agent Chan to testify or release any of the information provided in his deposition.  Plaintiff exercised due diligence in drafting its complaint, alleging those facts available to it in articulating its state action theory.  Only now is it obvious that a plethora of substantiating evidence existed in the exclusive control of Defendants and their partners within the USIC.

(d)     **The Newly Discovered Evidence Likely Would Have Changed the Dispensation of the Judgment if It Had Been Presented Prior to the Judgment.**

The newly discovered evidence exhibits a foundational change in the nature of this case.  Had these facts been known before the Judgment, Plaintiffs would have immediately moved for leave to amend their Amended Complaint under Rule 15(2).  Defendant Dorsey has confirmed the

significance of this newly discovered evidence.  After publication of the Twitter Files, Dorsey

stated that social media companies must on principle, "be resilient to . . . government control,"

and that, "Twitter when I led it . . . [did] not meet . . . [that] principle."  (*Id*. ¶ 69).  If included

within an amended complaint, the newly discovered evidence, including Mr. Dorsey's own

admission, undoubtedly would have caused this Court to deny Defendant's Motion to Dismiss.

> ### 2.    The Newly Discovered Material Could Not Have Been Discovered in Time to Move for a New Trial Under Rule 59(b).

As explained above, Elon Musk acquired Twitter in late October 2022, and the first

installment of Twitter Files was published on December 6, 2022.  The Attorneys General of

Louisiana and Missouri deposed Agent Chan on November 29, 2022.  Rule 59 permits a motion

for a new trial within 28 days after the entry of the Judgment, which in this case would have been

July 5, 2022 (accounting for the federal holiday).  As the newly discovered evidence presented

herein was neither known nor knowable until well after July 5, 2022, Plaintiffs are not barred

from presenting it here through a Rule 60 motion.

## IV.    CONCLUSION

The newly discovered evidence constitutes an extraordinary circumstance warranting

relief under Rule 60.  Rare indeed is the factual scenario where a corporate defendant (1)

successfully moves to dismiss a complaint, (2) is privately acquired, and (3) admits nearly every

allegation of the dismissed complaint.  Taken together with the factual assertions within

Plaintiff's Amended Complaint, and viewed under the *Twombly* and *Iqbal* standard, the newly

discovered evidence justifies relief from the Judgment with direction to proceed to discovery.  A

Rule 60(b)(2) motion is an appropriate vehicle for this Court to address the extraordinary impact

this newly discovered evidence has had on this case.  Accordingly, for the reasons set out above,

this Court should grant Plaintiff's Motion for Relief from Judgment.

Dated: May 3, 2023                    Respectfully submitted,

RICHARD POLK LAWSON *(pro hac vice)*
GARDNER BREWER HUDSON

By:       */s/Richard Polk Lawson*
          Richard Polk Lawson

ANDREI D. POPOVICI (SBN 234820)
MARIE L. FIALA (SBN 79676)
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd. Suite 290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Email: andrei@apatent.com
Email: marie@apatent.com
.
JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
FERGUSON COHEN LLP
25 Field Point Road
Greenwich, CT 06830
Tel: (203) 661-1197
Email: jqkelly@fercolaw.com

MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: mjones@ibolaw.com
Email: rtougias@ibolaw.com

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM, LLC
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT—20          Case No: 21-cv-08378-JD

1

2

*Attorneys for Plaintiffs Donald J. Trump,*
*American Conservative Union, Rafael Barbosa,*
*Linda Cuadros, Dominick Latella,*
*and Wayne Allyn Root*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28