ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile: (650) 858-6100

*Attorneys for Defendants Twitter, Inc.
  and Jack Dorsey*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DONALD J. TRUMP, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> TWITTER, INC., et al., <br><br> *Defendants*. | Case No. 21-cv-08378-JD <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INDICATIVE RULING UNDER FED. R. CIV. P. 60** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................................................1

ARGUMENT...................................................................................................................................2

I. Plaintiffs' First Amendment Claims Are Moot As To Trump, Cuadros, and Root.........................2

II. The New Materials Do Not Demonstrate State Action................................................................4

    A. The New Materials Do Not Support *Lugar*'s First Prong .......................................................5

    B. The New Materials Do Not Support *Lugar*'s Second Prong...................................................6

        1. The New Materials Are Irrelevant To Any Live Claim ............................................6

        2. The New Materials Lack The Requisite Specificity With Respect To Trump, Cuadros, And Root....................................................................7

        3. The New Materials Do Not Support An Inference Of State Action With Respect To Any Plaintiff...........................................................................9

            i. The New Materials Do Not Demonstrate Joint Action..............................9

            ii. The New Materials Do Not Evince Coercion ......................................... 11

CONCLUSION............................................................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Correctional Servs. Corp. v. Malesko*,
 534 U.S. 61 (2001) ................................................................................................................. 4

*Doe v. Google LLC*,
 No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ......................................... 4, 14

*Egbert v. Boule*,
 142 S. Ct. 1793 (2022) ........................................................................................................... 4

*Federal Agency of News LLC v. Facebook, Inc.*,
 432 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................................................................. 8

*Gallagher v. Neil Young Freedom Concern*,
 49 F.3d 1442 (10th Cir. 1995) ............................................................................................... 9

*Hamamoto v. Ige*,
 881 F.3d 719 (9th Cir. 2018) ................................................................................................. 3

*Heineke v. Santa Clara Univ.*,
 965 F.3d 1009 (9th Cir. 2020) ............................................................................... 6, 7, 8, 13

*Jones v. Aero/Chem Corp.*,
 921 F.2d 875 (9th Cir. 1990) ................................................................................................. 4

*Kennedy v. Warren*,
 66 F.4th 1199 (9th Cir. 2023) .......................................................................................... 8, 13

*Lugar v. Edmondson Oil*,
 457 U.S. 922 (1982) ........................................................................................................... 1, 4

*Mathis v. Pacific Gas & Elec. Co.*,
 75 F.3d 498 (9th Cir. 1996) ....................................................................................... 2, 9, 11

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*,
 9 F.4th 1201 (9th Cir. 2021) ................................................................................................. 3

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ................................................ 1, 2, 6, 9, 11, 12

*Ochoa v. Public Consulting Grp., Inc.*,
 48 F.4th 1102 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 782 (2023) ................................... 14

*Public Utils. Comm'n v. FERC*,
 100 F.3d 1451 (9th Cir. 1996) ............................................................................................... 3

*Rawson v. Recovery Innovations, Inc.*,
   975 F.3d 742 (9th Cir. 2020) ............................................................................................9, 14

*Spencer v. Kemna*,
   523 U.S. 1 (1998) ............................................................................................................... 2

*Sutton v. Providence St. Joseph Med. Ctr.*,
   192 F.3d 826 (9th Cir. 1999) ..............................................................................5, 11, 13

*Trendsettah USA, Inc. v. Swisher Int'l, Inc.*,
   31 F.4th 1124 (9th Cir. 2022) ............................................................................................1

*United States v. Dreyer*,
   804 F.3d 1266 (9th Cir. 2015) ...........................................................................................6

*Vincent v. Trend W. Tech. Corp.*,
   828 F.2d 563 (9th Cir. 1987) ...........................................................................................11

**STATUTES, RULES, AND REGULATIONS**

18 U.S.C. § 2703 ................................................................................................................10, 12

18 U.S.C. § 2706 ................................................................................................................10, 12

Fed. R. Civ. P. 60(b) ..............................................................................................................4, 5

**INTRODUCTION**

Plaintiffs Donald Trump, American Conservative Union ("ACU"), Rafael Barboza, Linda Cuadros, Dominick Latella, and Wayne Allyn Root (collectively "Plaintiffs") seek relief from this Court's final judgment dismissing their First Amendment claims against Defendants Twitter and Jack Dorsey ("Twitter"). Relief from judgment based on newly discovered evidence, however, is available only where the new evidence is "of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Trendsettah USA, Inc. v. Swisher Int'l, Inc.*, 31 F.4th 1124, 1136 (9th Cir. 2022). Here, much of Plaintiffs' challenge is moot. The only three specific Twitter accounts mentioned in Plaintiffs' motion—Trump's, Cuadros's, and Root's—have all been reinstated and Plaintiffs do not identify anything suggesting that decision is likely to change.

Moreover, the new evidence suffers from the same defects as the already-dismissed allegations in the Amended Complaint. Specifically, Plaintiffs once again put forth a "grab-bag" of communications between various government actors and Twitter employees, Dkt. 165 at 6, which once again do not mention any of Twitter's content-moderation actions with regard to *their* Twitter accounts. Plaintiffs' theory of relief appears to be that *any* communication between governmental actors and Twitter employees transforms Twitter into a state actor. That theory has been resoundingly rejected both by this Court and recent precedential Ninth Circuit decisions.

Indeed, in light of the Ninth Circuit's subsequent decision in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), Plaintiffs' First Amendment claims have only grown weaker since this Court dismissed them. In *O'Handley*, the plaintiff alleged that Twitter and the California Secretary of State violated his First Amendment rights by allegedly "acting in concert to censor his speech on Twitter's platform." *Id.* at 1153. O'Handley alleged both the existence of a heavily used "[p]ortal" through which state officials reported alleged misinformation to Twitter—which Twitter allegedly removed 98% of the time—and that "state official flagged one of [the plaintiff's] tweets as false or misleading," after which "Twitter limited other users' ability to access his tweets and then suspended his account," *Id.* at 1153-54. The Ninth Circuit applied the two-part state-action test established in *Lugar v. Edmondson Oil*, 457 U.S. 922 (1982), and held that those facts did not plausibly allege state action with respect to O'Handley's account because (1) Twitter's decision was not made pursuant to a state-created right or state-imposed rule and (2) Twitter

1  could not be considered a state actor under any theory because the decision whether to take action—and
2  what action to take—was made by Twitter pursuant to its own rules and policies. *See O'Handley* at 1156-
3  61.
4        *O'Handley* is dispositive here. It confirms all of the grounds on which this Court dismissed
5  Plaintiffs' constitutional claim, and nothing in Plaintiffs' newly submitted materials provides any basis to
6  depart from it. Indeed, unlike the allegations in *O'Handley*, the new materials do not contain a single
7  communication between Twitter and any governmental actor regarding any of Plaintiffs' or Plaintiffs'
8  Twitter accounts. Instead, the new materials suggest at most the very same "'consultation and information
9  sharing'" that the Ninth Circuit held in *O'Handley* does not support state action. 62 F.4th at 1160 (quoting
10 *Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 504 (9th Cir. 1996)). Because the new materials would not
11 change this Court's dismissal of Plaintiffs' First Amendment Claims, Plaintiffs' motion should be denied.[1]

## ARGUMENT

**I.   PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE MOOT AS TO TRUMP, CUADROS, AND ROOT**

14       A matter is moot if during the course of litigation, the plaintiff ceases to be threatened with or
15 suffer "an actual injury [that is] traceable to the defendant" and "likely to be redressed by a favorable
16 judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quotation marks omitted). This Court already
17 recognized that Plaintiff Wolf "has been restored as an active Twitter account holder without any of the
18 challenged limitations on her tweets" and held "consequently" that her "First Amendment claim is moot."
19 Dkt. 190 at 2. The same is true for Plaintiffs Donald J. Trump, Linda Cuadros, and Wayne Alan Root—
20 the only specific accounts mentioned in Plaintiffs' motion.

21       Trump, Cuadros, and Root—like Wolf—all sought "[a]n injunction … ordering Twitter to
22 immediately reinstate the[ir] Twitter accounts." Dkt. 21 at 56. They also sought "[a]n injunction …
23 ordering Twitter to remove its warning labels and misclassification of all [their] content … and to desist
24 from any further warnings or classifications." *Id.* But Twitter has since reinstated their accounts. *See*
25 Sebhatu Decl. ¶¶3, 5, 7. And, since being reinstated, Twitter has affixed no labels to these Plaintiffs'

---

[1] As indicated in the recently filed supplemental corporate disclosure statement, Twitter, Inc. has been merged into X Corp. and no longer exists. For the convenience of the Court and Plaintiffs, however, Defendants will continue to refer to the corporate entity as "Twitter."

1  Tweets and has not taken any new content-moderation enforcement actions against their accounts. *See*
2  *id*. Because these Plaintiffs have already received all the relief they sought, their First Amendment claims
3  are moot.

4  Plaintiffs dispute none of these facts but insist that their claims remain live under the voluntary-
5  cessation doctrine. Mot. 4-5. That is wrong. As this Court recognized, the voluntary-cessation doctrine
6  applies only to actions the defendant takes "*because of* the litigation." Dkt. 190 at 4 (quoting *Public Utils.*
7  *Comm'n v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996)). But Twitter restored the accounts of Cuadros and
8  Root pursuant to the same new "general amnesty" policy that was applied to Wolf. *See* Sebhatu Decl. ¶¶5,
9  7; Holtzblatt Decl. Ex. D. And on November 18, Musk conducted a public poll asking whether he should
10 reinstate Mr. Trump's Twitter account. *See* Holtzblatt Decl. Ex. A. The following day, Musk announced
11 that "[t]he people have spoken" and thus "Trump will be reinstated." Holtzblatt Decl. Ex. B. Mr.
12 Trump's account was thus reinstated pursuant to Twitter's business judgment that Twitter's users should
13 collectively be permitted to determine the account's status. Because Twitter's actions were "motivated by
14 economic/business considerations, [and] not this litigation," the exception does not apply. *Public Utils.*
15 *Comm'n*, 100 F.3d at 1460.[2]

16 If anything, the new materials cited by Plaintiffs simply underscore the mootness of their claims.
17 The voluntary-cessation doctrine addresses the defendant's motivations for ceasing the allegedly wrongful
18 conduct, not their motivations for engaging in it in the first place. Thus, for mootness, the relevant
19 question is not why Plaintiffs were *suspended*, but rather why they were *reinstated*. The entire goal of the
20 "Twitter Files" is to bring to light decisions made by past management with which current management

---

24 [2] Plaintiffs do not argue that the capable-of-repetition-yet-evading-review exception to mootness applies,
25 and thus any such argument is forfeited. *See Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1209 (9th Cir. 2021) (explaining that plaintiffs carry the burden of demonstrating this exception). In any
26 event, the Court has already recognized that "[t]he factors that foreclose[] the voluntary cessation exception apply here to the same end" to this exception. Dkt. 190 at 5. For the exception to apply, among
27 other things, there must be "a reasonable expectation that the same complaining party will be subject to the same action again." *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018) (per curiam) (quotation marks
28 omitted). But, for the reasons explained, there is simply no evidence that Plaintiffs' accounts will be suspended again.

1  disagrees. Thus, the evidence simply confirms that Twitter reinstated Plaintiffs' accounts because of a
2  genuine change in strategic vision and not because of anything to do with this lawsuit.[3]

3        Finally, to the extent that Plaintiffs rely on their claim for damages to avoid mootness, that
4  argument fails. As this Court recognized, the "Supreme Court has foreclosed an implied cause of action
5  for damages against a private corporation for First Amendment violations." Dkt. 190 at 5 (citing *Egbert*
6  *v. Boule*, 142 S. Ct. 1793, 1807-09 (2022); *see also Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 71-72 (2001);
7  *Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *3 (9th Cir. Nov. 18, 2022) (unpublished). Thus,
8  "there is no legal basis for damages against Twitter," Dkt. 190 at 5, and Plaintiffs' claim for damages is
9  insufficient to preserve jurisdiction.

10  **II.  THE NEW MATERIALS DO NOT DEMONSTRATE STATE ACTION**

11        The new materials provide no basis to disturb this Court's dismissal of Plaintiffs' First Amendment
12  claims. Relief from final judgment under Rule 60(b)(2) "require[s] a strong[] showing" that the newly
13  discovered evidence is "of such magnitude that production of it earlier would have been likely to change
14  the disposition of the case." *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990). Here, Plaintiffs'
15  new materials fail to support their First Amendment claims for the same reasons this Court already held
16  the Amended Complaint insufficient to state a claim. The new materials thus do not warrant relief from
17  this Court's order of dismissal.

18        As this Court previously held, state action "is determined by a 'two-part approach,' which requires
19  that 'the [alleged constitutional] deprivation must be caused by the exercise of some right or privilege
20  created by the State or by a rule of conduct imposed by the state or by a person for whom the State is
21  responsible'; and that 'the party charged with the deprivation must be a person who may fairly be said to
22  be a state actor.'" Dkt. 165 at 5 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). The new
23  materials fail to support either prong.

---

27  [3] On May 12, 2023, Musk announced that NBCUniversal executive Linda Yaccarino will become the new CEO of Twitter, with Musk serving as Executive Chair and Chief Technology Officer. This will
28  not result in a different content-moderation strategy for Twitter, a company that will still be owned by Musk and led by a person chosen by Musk.

### A.     The New Materials Do Not Support *Lugar*'s First Prong

The new materials do not plausibly suggest that Twitter suspended any of Plaintiffs' accounts pursuant to any state-created right or rule of conduct. As this Court held, *Lugar*'s first prong requires a "clear," government-imposed rule. Dkt. 165 at 6. But, as with Plaintiffs' Amended Complaint, the new materials contain only a "grab-bag" of communications about varied topics, none establishing a state-imposed rule responsible for Plaintiffs' challenged content-moderation decisions. The new materials cover topics ranging, for example, from Hunter Biden's laptop, Pls.' Exs. A.14 & A.27-A.28, to foreign interference in the 2020 election, Pls.' Exs. A.13 at, *e.g.*, 35:15-41:4, A.22, A.37, A.38, to techniques used in malware and ransomware attacks, Pls.' Ex. A.38. As with the allegations in the Amended Complaint, "[i]t is … not plausible to conclude that Twitter or any other listener could discern a clear state rule" from such varied communications. Dkt. 165 at 6. The new materials would not change this Court's dismissal of Plaintiffs' First Amendment claims for this reason alone.

Moreover, a rule of conduct is *imposed* by the state only if backed by the force of law, as with a statute or regulation. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (regulatory requirements can satisfy *Lugar*'s first prong). Here, nothing in the new materials suggests any statute or regulation dictating or authorizing Twitter's content-moderation decisions with respect to Plaintiffs' accounts. To the contrary, the new materials show that Twitter takes content-moderation actions pursuant to its own rules and policies. As attested to by FBI Agent Elvis Chan, when the FBI reported content to social media companies, they would "alert the social media companies to see if [the content] violated *their terms of service*," and the social media companies would then "follow *their own policies*" regarding what actions to take, if any. Pls.' Ex. A.13 at 165:9-22 (emphases added); *accord id.* at 267:19-23, 295:24-296:4. And general calls from the Biden administration for Twitter and other social media companies to "do more" to address alleged misinformation, *see* Pls.' Ex. A.47, fail to suggest a state-imposed rule of conduct for the same reasons this Court already held the Amended Complaint's allegations insufficient: "[T]he comments of a handful of elected officials are a far cry from a 'rule of decision for which the State is responsible'" and do not impose any "clear rule," let alone one with the force of law. Dkt. 165 at 6. The new materials thus would not change this Court's determination that Plaintiffs have not alleged any deprivation caused by a rule of conduct imposed by the State.

### B.      The New Materials Do Not Support *Lugar*'s Second Prong

The new materials also would not change this Court's conclusion that Twitter could not "fairly be deemed to be a state actor." Dkt. 165 at 7. Though Plaintiffs contend (Pls.' Ex. 1 at 9-16) that the new materials demonstrate both joint action and compulsion, their arguments are foreclosed both by the reasoning of this Court's prior order on Twitter's motion to dismiss and by Ninth Circuit precedent, including precedent decided since this Court issued its prior order. The new materials thus do not support Plaintiffs' Rule 60(b) motion.

#### 1.      The New Materials Are Irrelevant To Any Live Claim

Plaintiffs' motion is silent with regard to the accounts of the three remaining Plaintiffs with live claims (the ACU, Latella, and Barboza). That silence is fatal, for two reasons. *First*, Plaintiffs have "waive[d] any argument" that the new materials pertain specifically to the claims of ACU, Latella, and Barboza by "fail[ing] to raise" any such argument in their motion. *United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015). For that reason alone, the new materials do not warrant the relief sought because Plaintiffs do not even argue they are relevant to any live claim.

*Second*, waiver aside, Plaintiffs' own silence reflects a fatal absence in the new materials. Alleging state action requires a plausible allegation that the "government commanded a particular result in, or otherwise participated in, [the plaintiff's] *specific* case." *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020) (emphasis added). The Ninth Circuit's recent decision in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), illustrates how high that bar is. As discussed *supra* at 1-2, the Ninth Circuit recently held that even if a state official specifically "flag[s]" a plaintiff's Tweet, that does not suggest state action in Twitter's subsequent content-moderation decisions so long as the "flag" was made "with no strings attached" and left to Twitter the decision whether and how to respond. 62 F.4th at 1158-60.

Here, with respect to the ACU, Latella, and Barboza, the new materials suggest far less even than what was alleged in *O'Handley*, and thus cannot support relief from this Court's order of dismissal. Specifically, the ACU alleged a "reduction in engagement in its content" between 2017 and June 2020, Am. Compl. ¶¶128-29, before most of the communications contained or referenced in the new materials. Latella alleged state action in Twitter's 2018 suspension of his account, *see* Am. Compl. ¶143, which long

predated the communications on which Plaintiffs rely.[4]  Finally, Barboza alleges that his account was suspended for violating Twitter's policies against "hurtful content, abuse, and harassment" and for "retweeting President Trump and other conservatives on January 6, 2021." Am. Compl. ¶¶135-37.  The new materials say nothing of Twitter's hurtful-content policy.  And even if one assumes that Twitter's reasons for taking action against Barboza for retweeting Trump's January 6 Tweets were the same as its reasons for Trump, the new materials show that the decision to suspend Trump's account was made by Twitter's employees, not the government, *see* Pls.' Ex. A.5.5.

Moreover, given the subjects discussed in the new materials, it is utterly implausible that they had any bearing whatsoever on Twitter's decisions with respect to the ACU, Latella, and Barboza (or any of the other Plaintiffs).  The communications between the FBI and Twitter—the centerpiece of the new materials—pertain to attempts by "[f]oreign adversaries" to interfere in the 2020 election, Pls.' Ex. A.22, *accord* A.32, A.37, and information regarding known "ransomware" and "malware" "tactics, techniques, and procedures" to be aware of, Pls. Ex. A.38.  As FBI Agent Chan testified, communications between the FBI and social media companies focused on "malign foreign influence by state-sponsored actors." Pls.' Ex. A.13 at 39:4-16.  It was only in the few days *leading up to* the 2020 election that the FBI *also* identified and reported potential misinformation regarding "the time, place or manner of elections in various states." *Id.* at 162:12-24.  Because Plaintiffs do not allege that their accounts were removed for Tweeting misinformation about the time, place, or manner of voting in the days leading up to the election, the new materials are irrelevant to them.

### 2. The New Materials Lack The Requisite Specificity With Respect To Trump, Cuadros, And Root

Even if the Court needed to address the merits of the now-moot claims brought by Trump, Cuadros, and Root, the new materials do not plausibly suggest that any governmental actor participated in or compelled the challenged content-moderation actions with respect to them.  Again, state action requires that the "government commanded a particular result in, or otherwise participated in, [a plaintiff's]

---

[4] Latella also alleged state action in Twitter's subsequent "shadow bann[ing]" of a second account, but the Amended Complaint lacks any specificity regarding the alleged reason for that shadow banning, thus there can be no plausible inference that the new materials have any relevance whatsoever to Twitter's actions with respect to Latella's second account.

specific case." *Heineke*, 965 F.3d at 1014.  Here, nothing in the new materials shows any governmental actor compelling or even discussing any content-moderation action with respect to Trump, Cuadros, or Root, and the new materials thus would not change this Court's dismissal of their First Amendment claims.

Plaintiffs appear to contend (Pls.' Ex. 1 at 16-17) that the new materials support an inference of state action in Twitter's suspension of Trump's account because they show that certain Twitter employees initially determined that Trump's January 2021 Tweets (for which his account was ultimately suspended) did not violate Twitter's policy against inciting violence.  But these materials regarding Twitter's internal deliberations and disagreements show no governmental participation with respect to Plaintiffs' accounts.  *See* Pls.' Exs. A.5.5, A-49-53.[5]

Plaintiffs are also wrong (Ex. 1 at 15-16) that general calls from the Biden administration to address alleged COVID-19 misinformation support a plausible inference of state action in Twitter's suspensions of Cuadros's and Root's accounts simply because they "had their Twitter accounts suspended or revoked due to Covid-19 content."  For one thing, most of the relevant communications date from Spring 2021 or later, after Cuadros and Roots' suspensions in 2020 and early 2021, respectively, *see* Pls.' Ex. A.46-A.47; Am. Compl. ¶¶124, 150.  Such communications that "post-date the relevant conduct that allegedly injured Plaintiffs … do not establish [state] action." *Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1125-26 (N.D. Cal. 2020).  Additionally, the new materials contain only general calls on Twitter to "do more" to address COVID-19 misinformation and questions regarding why Twitter had not taken action against certain other accounts (not Plaintiffs').  Pls.' Exs. A.43-A.48.  Such requests to "do more to stop the spread of false or misleading COVID-19 information," untethered to any specific threat or requirement to take any specific action against Plaintiffs, is "permissible persuasion" and not state action. *Kennedy v. Warren*, 66 F.4th 1199, 1205, 1207-12 (9th Cir. 2023).  As this Court previously held, government actors are free to "urg[e]" private parties to take certain actions or "criticize" others without giving rise to state action.  Dkt. 165 at 12-13.  Because that is the most that the new materials suggest with respect to Cuadros and Root, the new materials would not change this Court's dismissal of their claims.

---

[5] Contrary to Plaintiffs' accusations (Ex. 1 at 16-17), the new materials are consistent with Twitter's prior representations to this Court.  Plaintiffs have identified nothing showing that those who made the ultimate decision in January 2021 to suspend Trump's account did not believe that his actions—taken in the context of the events of January 6—violated Twitter's policies.

**3.    The New Materials Do Not Support An Inference Of State Action With Respect To Any Plaintiff**

Even if the new materials discussed or pertained directly to any of the Plaintiffs, as was the case in *O'Handley*, they still would not support a plausible inference of state action because they suggest neither the degree of deep public-private entwinement necessary for joint action nor the kind of threatened sanction necessary for coercion.

*i.    The New Materials Do Not Demonstrate Joint Action*

Even if the new materials pertained to Plaintiffs, they still would not support Plaintiffs' joint-action theory of state action. The joint-action test "is intentionally demanding," requiring significant governmental participation in the specific conduct being challenged. *O'Handley*, 62 F.4th at 1159-60. Beyond the fact that Plaintiffs have not identified government participation in the specific accounts at issue, *see supra* pp. 6-8, Plaintiffs' claims fail for the independent reason that they do not show the requisite "'complex and deeply intertwined'" involvement in "'private parties' actions and decisionmaking.'" *O'Handley*, 62 F.4th at 1159 (quoting *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020)). Specifically, to establish joint action, Plaintiffs must show a governmental actor "'significantly involve[d] itself in [Twitter's] actions and decisionmaking.'" *Id.* (quoting *Rawson*, 975 F.3d at 753). This requires direct governmental participation in the challenged conduct, not merely "close cooperation" in other matters or even in conduct that "facilitated the [challenged] decision." *Mathis*, 75 F.3d at 504. Here, Plaintiffs' newly submitted materials show only information sharing and general references to a "partnership" to address misinformation. *See* Pls.' Ex. 1 at 10-12. This suggests, at most, a "common goal" of addressing misinformation rather than "concerted action" with respect to any particular content-moderation decision (let alone a decision with respect to Plaintiffs). *Gallagher v. Neil Young Freedom Concern*, 49 F.3d 1442, 1455 (10th Cir. 1995).

First, the simple act of receiving information from the government, or of deciding to act upon that information, does not transform a private actor into a state actor. *See O'Handley*, 62 F.4th at 1160 (reports from government actors "flagg[ing] for Twitter's review posts that potentially violated the company's content-moderation policy" were not state action). While Plaintiffs have attempted to distinguish O'Handley on the basis of the repeated communications reflected in the new materials, (Ex. 1

at 13), *O'Handley* held that such "flag[s]" do not suggest state action even where done "on a repeated basis" through a dedicated, "priority" portal. *Id.* The very documents on which Plaintiffs rely establish that when governmental actors reported to social media companies content that potentially violated their terms of service, the companies, including Twitter, would "see if [the content] violated their terms of service," and, "[i]f [it] did, they would follow their own policies" regarding what content-moderation action was appropriate. Pls.' Ex. A.13 at 165:3-17; *accord id.* at 296:1-4 ("[W]e [the FBI] would send information about malign foreign influence to specific companies as we became aware of it, and then they would review it and determine if they needed to take action."). In other words, Twitter made an independent assessment and acted accordingly.

Moreover, the "frequen[t] [] meetings" on which Plaintiffs rely heavily in attempting to show joint action fall even farther short of what was alleged in *O'Handley* because, as discussed *supra* at 7, they were wholly unrelated to the kinds of content-moderation decisions at issue here.

Second, contrary to Plaintiffs' contention (Ex. 1 at 11-12), the fact that the government gave certain Twitter employees security clearance does not transform information sharing into state action. The necessity for security clearance reflects only the sensitive nature of the information being shared— i.e., efforts by "[f]oreign adversaries" to "undermine the legitimacy of the [2020] election," Pls.' Ex. A.22. It says nothing about whether Twitter would work hand-in-hand with the federal government. Again, when the FBI shared sensitive information regarding possible election interference, Twitter determined whether and how to respond. Pls.' Ex. A.13 at 165:3-17, 296:1-4.

Third, Plaintiffs are also wrong (Ex. 1 at 12-13) that Twitter became a state actor because the FBI "pay[ed] Twitter millions of dollars for the staff [t]ime Twitter expended in handling the government's censorship requests." For one thing, the communication on which Plaintiffs rely in fact explains that Twitter was reimbursed $3 million pursuant to a "*statutory right* of reimbursement for time spent processing" "legal process" requests. Pls.' Ex. A.34 (emphasis added). The "statutory right" at issue is that created under the Stored Communications Act for costs "incurred in searching for, assembling, reproducing, or otherwise providing" electronic communications requested by the government pursuant to a warrant. 18 U.S.C. § 2706(a), *see also id.* § 2703(a). The reimbursements were *not* for responding to requests to remove any accounts or content and thus are wholly irrelevant to Plaintiffs' joint-action theory.

And, in any event, a financial relationship supports joint action only where there is complete "financial integration" and "indispensability." *Vincent v. Trend W. Tech. Corp.*, 828 F.2d 563, 569 (9th Cir. 1987) (quotation marks omitted). During the period in which Twitter recovered $3 million (late 2019 through early 2021), the company was valued at approximately $30 billion. Even Plaintiffs do not argue that a $3 million payment would be indispensable to Twitter.

In sum, Plaintiffs seek the extraordinary remedy of relief from a nearly year-old judgment based on precisely the kind of general "'consultation and information sharing'" that the Ninth Circuit has repeatedly, and recently, held insufficient to support a joint-action theory. *O'Handley*, 62 F.4th at 1160 (quoting *Mathis*, 75 F.3d at 504). The new materials thus would not alter this Court's prior dismissal and do not support the relief requested.

### ii. *The New Materials Do Not Evince Coercion*

The new materials also would not alter this Court's determination that Plaintiffs failed to allege that Twitter's content-moderation decisions with respect to Plaintiffs were the result of government coercion, for two reasons: (1) they contain no threat of retaliatory sanctions by government actors if Twitter did not suspend Plaintiffs' accounts and, regardless, (2) they do not suggest the "something more" than a threat that is required to hold a private actor liable under a coercion theory, *Sutton*, 192 F.3d at 838.

a. **No Threatened Sanction**. The new materials do not evince coercion because they contain no threat of government sanction premised on Twitter's failure to suspend Plaintiffs' accounts. As this Court already held, coercion requires "a concrete and specific government action, or threatened action" for failure to comply with a governmental dictate. Dkt. 165 at 11. Even calls from legislators to "do something" about Plaintiffs' Tweets (specifically, Mr. Trump's) do not suggest coercion absent "any threatening remark directed to Twitter." *Id.* at 7. The Ninth Circuit has since affirmed the same basic conclusion, holding in *O'Handley* that "government officials do not violate the First Amendment when they request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." 62 F.4th at 1158. Like the Amended Complaint, the new materials show, at most, attempts by the government to persuade and not any threat of punitive action, and thus would not alter the Court's dismissal of Plaintiffs' First Amendment claims.

*FBI Officials.* None of the FBI's communications with Twitter cited by Plaintiffs evince coercion because they do not contain a specific government demand to remove content—let alone one backed by the threat of government sanction. Instead, the new materials show that the agency issued general updates about their efforts to combat foreign interference in the 2020 election. For example, one FBI email notified Twitter that the agency issued a "joint advisory" on recent ransomware tactics, and another explained that the Treasury department seized domains used by foreign actors to orchestrate a "disinformation campaign." Pls.' Ex. A.38. These informational updates cannot be coercive because they merely convey information; there is no specific government demand to do *anything*—let alone one backed by government sanction.

So too with respect to the cited FBI emails flagging specific Tweets. The emails were phrased in advisory terms, flagging accounts they believed *may* violate Twitter's policies—and Twitter employees received them as such, independently reviewing the flagged Tweets. *See, e.g.*, Pls.' Exs. A.30 ("The FBI San Francisco Emergency Operations Center sent us the attached report of 207 Tweets they believe may be in violation of our policies."), A.31, A.40. None even requested—let alone commanded—Twitter to take down any content. And none threatened retaliatory action if Twitter did not remove the flagged Tweets. As in *O'Handley,* therefore, the FBI's "flags" cannot amount to coercion because there was "no intimation that Twitter would suffer adverse consequences if it refused." 62 F.4th at 1158. What is more, unlike *O'Handley*, not one of the cited communications contains a request to take any action whatsoever with respect to any of Plaintiffs' accounts.[6]

Plaintiffs' claim (Ex. 1 at 14) that the FBI's "compensation of Twitter for responding to its requests" had coercive force is meritless. As a threshold matter, as discussed *supra* at 10, the new materials demonstrate only that Twitter exercised its statutory right—provided to all private actors—to seek reimbursement for time it spent processing a government official's legal requests for information under the Stored Communications Act, 18 U.S.C. § 2706; *see also id.* § 2703. The payments therefore do not concern content moderation at all—let alone specific requests to take down content. And in any event,

---

[6] Any inference from the new materials that the FBI's alleged requests may have encompassed Plaintiffs is particularly implausible because the bulk of the FBI communications at issue took place *prior* to the 2020 elections—i.e., while Trump was still in office.

the Ninth Circuit has made clear that, under a coercion theory, "receipt of government funds is insufficient to convert a private [actor] into a state actor, even where virtually all of the [the party's] income [i]s derived from government funding." *Heineke*, 965 F.3d at 1013 (quotation marks omitted) (third alteration in original). Therefore, Plaintiffs' reliance on those payments does not evince coercion.

*Congress*. The new materials do not contain any actionable threat by Congress tied to Twitter's suspension of Plaintiffs' accounts. First, Plaintiffs place much stock (Ex. 1 at 14-15) in a single FBI agent's opinion that Twitter employees may have felt "pressure" by Members of Congress to adopt a more proactive approach to content moderation, Pls.' Ex. A13 at 117:15-118:6. But a third-party's opinion as to what Twitter's employees *might* have felt is hardly dispositive. And in any event, "[g]enerating public pressure to motivate others to change their behavior is a core part of public discourse," and is not coercion absent a specific threatened sanction for failure to comply. *Kennedy*, 66 F.4th at 1208. Here, because the agent's comment intimates no such threat, it does not support Plaintiffs' coercion theory.[7]

*White House Officials*. The new materials do not evince any actionable threat by White House officials either. Plaintiffs rely (Ex. 1 at 16) on a single statement by a Twitter employee that "[t]he Biden team was not satisfied with Twitter's enforcement approach as they wanted Twitter to do more and to deplatform several accounts," Pls.' Ex. A.47. But those exchanges took place in December 2022, *id.*— well after Plaintiffs' suspensions, and so could not have compelled Twitter to suspend their accounts. Furthermore, the new materials fail to identify any threat of government sanction arising from the officials' "dissatisfaction"; indeed, Twitter was only asked to join "other calls" to continue the dialogue. *Id.*

**b.** ***No "Something More."*** The new materials are irrelevant for yet another reason: "something more than state compulsion" is required "to hold a private defendant liable" on a coercion theory. *Sutton*, 192 F.3d at 838 (quotation marks omitted). Thus, a private actor can be held liable under a coercion theory only where, for example, the private actor leased property from the state and acted

---

[7] Plaintiffs' claim (Ex. 1 at 15) that the new materials contradict a public statement made by Mr. Dorsey is baseless. Mr. Dorsey's quote, when considered in full, is wholly consistent with the new materials. He stated, "Twitter does not coordinate with other entities when making content moderation decisions. However, we have partnerships with government agencies, nonprofits, and industry peers to facilitate information sharing to inform our policy and enforcement decisions." That is all the new materials show—various government officials sharing information that Twitter used to inform its enforcement decisions.

pursuant to statute, *see Rawson*, 975 F.3d at 753-756, or acted pursuant to a total delegation of state functions, *see Ochoa v. Public Consulting Grp., Inc.*, 48 F.4th 1102, 1109-10 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 782 (2023). Nothing in the new materials suggests any such statutory authority or delegation here, and Plaintiffs fail to even argue otherwise. Therefore, even if the new materials evinced coercion, that would only allow Plaintiffs to "hold the *government* liable," not Twitter. *Google*, 2022 WL 17077497, at *2.

## CONCLUSION

For the reasons stated, the Court should deny Plaintiffs' Motion for an Indicative Ruling.

Dated: June 1, 2023                                    Respectfully submitted,

/s/ *Ari Holtzblatt*

ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-6000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile: (650) 858-6100

*Attorneys for Defendants Twitter, Inc.
 and Jack Dorsey*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2023, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of these filings to all registered counsel.

Dated:   June 1, 2023         By:    /s/ *Ari Holtzblatt*

ARI HOLTZBLATT

DEFENDANTS' OPP'N TO PLAINTIFFS' MOT. FOR INDICATIVE RULING          Case No. 21-cv-08378-JD